UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**THE DRAGONWOOD CONSERVANCY, INC.,**
**PLEGUAR CORPORATION, &**
**TERRY CULLEN**

Plaintiffs. *CASE# 16-534*

Vs

**PAUL FELICIAN***
**PHIL SIMMERT II***
**JANE AND JOHN DOE(S) &**
**CITY OF MILWAUKEE, *et. al.*,**

Defendants

---

**AFFIDAVIT OF TERRY CULLEN**

---

*STATE OF FLORIDA )*
*)ss*
*LAKE COUNTY )*

TERRY CULLEN, being first duly sworn, states on oath:

1. I am one of the named Plaintiffs herein, and the principal of Plaintiff corporations. I am considered one of the top authorities in my field internationally as world-class herpetological researcher, who works and coordinates with zoos, governments, federal wildlife agencies, humane organizations, and international conservation groups to rehabilitate, breed, and conserve herpetological species (including crocodilians, snakes, lizards, and turtles). I am a senior member of the "IUCN Crocodile Specialist Group", and the Species Survival Commission – which are prestigious international conservation organizations. My conservancy is an "authorized holding station" for animals confiscated by the government and various state agencies (typically, US Fish & Wildlife and/or Florida Fish and Game). As one function of our many specialties, Plaintiffs undertake rescue and/or conservation operations for reptiles and amphibians whereby we accept abused, critically ill, diseased, or injured reptiles and amphibians, and nurse them back to good health. We had such an operation in progress

(temporarily located) at Plaintiffs' South 13th and South 17th Street addresses - which would explain any purported problematic appearance of various specimens.

2. I understand that Det. Simmert authored certain "incident reports" indicating that we spoke twice – prior to the execution of the search warrants herein

2a. The first time I did not know who I was speaking with – I thought it was a set up for a scam or burglary (as I was out or town, and being asked about our valuable Reptile Inventory); thus I was recitant about giving information.

2b. The second time, I called a phone number given to me by Jane Flint, for a person purporting to be a detective (who I am now assuming was Det. Simmert); to confirm that I operated (in relevant part) under the licenses granted to the Wisconsin Humane Society. I did not tell him that I possessed a "federal captive wildlife breeding program" [sic], because there is no such thing. To the extent Det. Simmert is talking about a federal "breeders permit" -- that does not exist. (The only "permit" possibly available in that regard, would be the federal "CBW" permit -- which is required for commercial, interstate transportation, only). There is no permit "required" nor available, to possess a Chinese Alligator.

3. The "skeletal remains of an unknowns species crocodilian contained in a large metal container" at 13th Street, was in fact, the carcass from an intentional "skeletonization" via *dermestid* beetles, which Plaintiffs were undertaking, to give to a high school biology teacher. [Cullen Affidavit at par. 3; PAPFOF 23c]. As a result of the execution of the search warrants, the Plaintiffs' *dermestid* beetle colony was destroyed.

4. I did not sexually assault "Jennifer R", and I was not convicted of any sexual assault (nor other criminal offenses) as the result of the *twenty count* (2nd Amended, felony) Criminal Complaint filed against me in the Milwaukee County Circuit Court. However in order to resolve those proceedings I entered "no contest" pleas to three "county ordinance" violations. All criminal charges were then dismissed and I have no criminal record.

5. The Chinese Alligators I possessed were "on loan" or/or "donated" to me from

the Bronx Zoo; I understand that the police verified this with the Bronx zoo after-the-fact. Thus the federal CBW permit did not apply to these Chinese Alligators.

6. After Plaintiffs' entire Reptile Inventory was seized by Defendants (much of which I owned for over two decades)[1], my attorneys brokered "a deal" with the adverse parties (including the District Attorney's Office, the MPD, MADACC, and my attorneys including Josh Levy and Stephen Glynn); whereby I was assured that I would receive a proper due-process hearing before any speciments were re-homed. In the meantime, we offered to have the specimens re-homed by experienced, licensed, and neutral, third-parties (as I knew I was not-guilty, and that the specimens would be returned to me, I was trying to ensure that the specimens would not be dead when it came time for return).

7. I prepared the "damage lists" attached to the Complaint, as Amended (and now attached hereto as Exhibit 1, entitled "SOUTH 13th Street"); I personally observed these damages; prior to the execution of the search warrants the Plaintiffs' properties were somewhat cluttered and crowded, they were clean and functional, and lacked the significant destruction that existed when possession was returned to Plaintiffs. They were certainly not "filthy" – at least not until the police had their way while in exclusive control of the premises. The unreasonable damage to Plaintiffs' properties included:

7a. 17th Street – the hole in foundation was approximately 3'x5' or greater; the snakes and their stock tanks were originally brought in through the 'side door' and straight down into the basement; they could have (and should have) been taken out the same way; the only requirement would be trained handlers. I could have provided any number of qualified individuals, had I been allowed to.

7b. 13th Street – garage door: MPD personnel cut-out the "garage door" at 13th Street with a power-metal-saw, *despite having unlocked access* via the unlocked, interior (courtyard) door.

7c. 13th Street – MPD personnel literally tore-out the front 8x10 ornate plate glass window to create a giant hole apparently (Defendants submitted photos; see Exhibit M to

---

1 Including "feeder mice" and our two dogs that were lucky enough to escape without being shot.

Smokowicz Affidavit]; whereas they could have removed the specimens and their enclosures through the same door they came in by, with a trained handler;

7d. 13th Street – basement: the stairs going up to the courtyard were destoryed; and the basement floor-drain was obstructed with pieces of metal and other materials, which reflecting an intentional clogging; therefore I ran a pump-hose out the 'back cellar door' to the garage, to the garage drain.

7e. "KK" had water damage from pipes being broken (intentionally, apparently) behind bathtub, and from tubs which held water, that were dumped or cracked.

7f. In fact the City attempted to condemn the 13th Street Property because of the damage inflicted as the result of the execution of the search warrants [which attempt was thwarted by Plaintiffs' attorneys at the time]. The police left Plaintiffs properties in a state of devastation; the damages inflicted were unreasonable and not necessary to effectuate the search warrants.

8. Several additional specimens of significant value were seized from Plaintiffs' residences but not inventoried (and obviously, not returned), to wit:

8a. New Guinea Crocodile (female, very rare): I owned her for over twenty years; MADACC and Defendants denied having her; after pressing the issue with MADACC Mr. McDowell sent me a 'look what I found' photograph of her – but she was dead; he implied that she had recently died but it was clear by the photo that she had been dead for many days and likely, a couple of weeks. Worse, I had just found a mate for her after many years of searching. A fair market value for her was in the $20,000.00 to $25,000.00 range.

8b. Smooth Fronted Caiman (female, rare in collections at the time): I owned her for over twenty five years; there were only two pair in the United States at one time. A fair market value for her would be a minimum of $10,000.00.

8c. Phillipine Crocodile: owned by the Phillipine government, on loan to Plaintiffs. Fair market value approximately $15,000.00.

8d. Black Caiman: fair market value $15,000.00 to $18,000.00.

8e. Central Brazilian Boa: (very rare) – estimated fair market value $3,000.00.

9. After the wholesale seizure of Plaintiffs' Reptile Inventory, "MADACC" prepared its 'inventory' of the animals [attached to the Murphy Affidavit as Exhibit 5; and pleaded with the Complaint, as Amended, herein; this 'inventory' is not accurate but is fairly representative]. MADACC re-homed the reptiles into **un-heated garages** (where the outside temperatures were

in the 40's) – whereas the crocodilians and other reptiles required ambient temperature in the 80's; and therefore the care by MADACC immediately and substantially threatened their well-being. Plaintiffs were so distressed by MADACC's treatment of the Repitile Inventory, that we put together a offer to have 3rd parties house and care for the Inventory *at Plaintiffs' cost* (but the authorities rebuffed the offer, ultimately). The captors of the Reptile Inventory caused significant injury during (or as the result of) the move, and my investigation revealed that at least 100 specimens (of approximately 240) died due to incompetent care; many –or most- of which Plaintiffs had successfully kept for decades.[2]

10. The only specimens in Plaintiffs' possession – at the time of the raids- that were considered "endangered" as defined by Wisconsin Law, were two turtles (one Ornate Box and one baby Blandings turtles). Plaintiffs were given each of the turtles by the Wisconsin Humane Society for rehabilitation and the plan to release them back into the wild. Plaintiffs were in lawful possession of all specimens within Plaintiffs' Reptile Inventory.

11. The Defendants apparently attempted to "green board" the exterior damages they caused to Plaintiffs' properties; however the effort was unreasonable in two respects. First, visible "gaps" remained after the board-up was completed. Second, one window [on the north side of 17th Street] and one door [the inner-courtyard door at 13th Street leading down to

---

2 Further examples of incompetent care include the euthanasia of the "pouch rats" *(seized from the* 13th Street residence) because of their allegedly visible, "poor condition" (*i.e.*, balding, frail, no food); those "pouch rats" had effectively *doubled the world record* for longevity (which was previously set at about '7 years old'); each was over fourteen years old. (Copies of original receipts available). The pouch rats did not have food in their cages on purpose per protocol: food left standing would develop mold which would kill these delicate specimens if consumed. A final example: the deformed (hook-snouted) crocodile was received in that condition by Plaintiffs' for 'rescue and rehabilitation'.

the basement] were left *completely open*. The properties became infested with vermin and the like.[3]

12. The MPD seized cash and checks during the execution of the search warrants; the MPD did inventory some, and those have been returned to Plaintiffs. However two items of cash remain "missing": $4500.00 out of Jane Flint's dresser drawer; and $9831.00 cash from a recent fundraiser for Plaintiff Conservancy. These cash amounts were not inventoried and never returned with the other monies.

13. Plaintiffs were excluded from their properties for weeks and in some cases, months following the execution of the search warrants - during which time the Defendants and/or their agents exercised *exclusive control* over the Plaintiffs properties. I also recall that the properties were released to Plaintiffs in a staggered fashion over a lengthy period of time; without any explanation or justification given. My attorneys -at my direction- filed a motion in the Milwaukee County Circuit Court, seeking the "Return of Seized Real Property" –amongst other requested relief – "filed"- stamped July 13, 2010. [Reproduced as Exhibit H to Smokowicz Affidavit (Document 31-8 at p.2 of 16).] For that hearing we brought to court (after having flown-in) several 'experts' - and prepared with them all, the day before hearing (including experts from across the country and region); we were prepared to litigate rightful ownership and proper care of the specimens comprising the Reptile Inventory, but we were not heard by Judge Conen.

---

3 To the extent it needs to be stated: the properties were not infested with vermin and others, prior to the execution of the search warrants.

14. Shortly after being restored to possession of their real property Plaintiffs 'coincidentally' suffered two separate burglaries (one house, one car – both of which were locked and had no signs of forced entry, but were unlocked upon my re-entry, which reflects a 'professional job' – in terms of defeating the locks. Several items of apparent value to any thief ( i.e., power tools, CD player, etc.), *were left untouched* whereas the only items stolen, were Plaintiffs' "evidence bags" which (primarily) contained photographs, documents, and other electronic media which documented the vandalism caused by the Defendants.

15. During the execution of the warrants, various firearms were seized without warrant, from Plaintiffs' properties.

15a. After the raids we were told by the MPD that guns were taken; however, after the criminal court proceedings were finished we were admonished to not even "bother" trying to obtain return as the guns were "destroyed per order of Detective Simmert". That was the status for several years apparently.

15b. In January of 2016 Ms. Flint and I received two "notices" in the mail that advised us that Plaintiffs guns were indeed being held after all this time; I thus petitioned the Milwaukee County Circuit Court for their return, under my attorney's cover letter dated May 24, 2016. [See, Exhibit 8 to the Murphy Affidavit: the May 24, 2016 cover letter and three pages of Petition].

15c. After filing said Petition -and prior to the hearing thereupon- my attorney requested (and received) 'open records' as to the guns seized and inventoried -- because said "notices" did not identify the guns in the inventory, and we did not know what guns

were inventoried, we were trying to figure out what guns were being held. [Id., Murphy Affidavit, Exhibit 8]. The open records return however, only listed four guns.

15d. Thereafter, the Circuit Court granted my Petition and ordered Plaintiffs' guns returned by its Order filed August 31, 2016. [Id.]. Thereafter, I went to retrieve the guns from the 'gun desk', and was advised that another 'inventory number' existed; such that I therefore requested and obtained an *Amended* Order from the Circuit Court regarding that additional inventory (filed October 11, 2016).

15e. Several guns that were seized during the execution of the warrants, have not been returned to me; I have obtained the (attached) estimate for them, from a regional firearms dealer, which lists the gun and value ($10,050.00 total). [Id., Exhibit 8, last page].

15f. Many other items of Plaintiffs' personal property were seized without warrant during the execution of the search warrants – and which were not inventories and have not been returned; including various business "papers", computers, tools, cash, and jewelry.

16. Jane Flint sued for the dogs'-shootings in her prior Federal Court action; we owned 'Pogo' 'Kong' for 10 & 8 years, respectively. Losing them has been heartbreaking – even more so given the horrendous and avoidable manner of death. It was like losing a beloved member of the family, and is a horror which (I expect) will haunt me all my days and nights.

17. I was permitted to view (most of) my animals on or around June 22, 2010; Knowing I was innocent, I understood that (while the charges of mistreatment of animals were pending") I could not take custody of the animals. I only wished the Court to return the animals to a responsible party so that they would be safe, well-cared for and alive when the charges were dropped.

I have read the foregoing and it is true and accurate to the best of my present knowledge.

Terry Cullen

*Subscribed to and sworn before me*
*This 29 day of January, 2018*

*Notary Public, State of* Florida
County of Lake

JENNIFER S. ELSZASZ
MY COMMISSION # FF 999832
EXPIRES: August 16, 2020
Bonded Thru Notary Public Underwriters