# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**THE DRAGONWOOD CONSERVANCY, INC.,**
  *formerly known as The Cullen Vivarium Wildlife Conservancy,*
**PLEGUAR CORPORATION,** and
**TERRY CULLEN,**

     Plaintiffs,

     **v.**                       **Case No. 16-CV-534**

**PAUL FELICIAN,**
**PHIL SIMMERT II,**
**JANE AND JOHN DOE(S),**
**CITY OF MILWAUKEE,** and
**ABC INSURANCE COMPANY,**

     Defendants.

---

## DECISION AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

In May 2010, officers from the Milwaukee Police Department seized over 200 animals and other personal property that belonged to Terry Cullen, his conservancy, and his employee-tenant, after having searched four properties owned or maintained by Mr. Cullen for evidence relating to the unlawful transportation or possession of endangered and threatened species. About six years later, Mr. Cullen, his conservancy, and the owner of one of the properties sued two of the executing officers, unnamed officers or agents, the City of Milwaukee, and the City's insurance provider under 42 U.S.C. § 1983, alleging violations of their Fourth

Amendment right to be free from unreasonable searches and seizures and their Fifth and Fourteenth Amendment rights to due process

The defendants have moved for summary judgment on all of the plaintiffs' claims. Because no reasonable jury could return a verdict in favor of the plaintiffs on their probable-cause claim, due-process claims, and municipal-liability claim, the defendants are entitled to summary judgment on those claims. However, a reasonable jury could find that the defendants unreasonably seized and damaged the plaintiffs' property, and the officers' actions are not shielded by qualified immunity. The defendants therefore are not entitled to summary judgment on the plaintiffs' remaining Fourth Amendment claims.

## I.    Factual Background

Terry Cullen is a world-class herpetological researcher who works and coordinates with zoos, governments, federal wildlife agencies, humane organizations, and international conservation groups to rehabilitate, breed, and conserve herpetological species, including crocodilians, snakes, lizards, and turtles. Plaintiffs' Additional Proposed Findings of Fact ¶ 1a, ECF No. 48. As one function of his many specialties, Mr. Cullen undertakes rescue or conservation operations for reptiles and amphibians whereby he accepts critically ill, abused, diseased, or injured animals and nurses them back to good health. Pls.' Facts ¶ 1c.

In 2010, Mr. Cullen resided and owned property within Milwaukee's south side: 3443 South 17th Street, 3401 South 16th Street, and 3448 South Kinnickinnic Avenue. Defendants' Proposed Findings of Fact ¶ 1, ECF No. 30. He ran a

conservation operation out of the 17th Street property and had another one at a property (2319-2323 South 13th Street) owned by Pleguar Corporation. Pls.' Facts ¶ 1c; Defs.' Facts ¶ 2. Mr. Cullen's friend and employee, Jane Flint, resided at the 13th Street property. *See* Pls.' Facts ¶ 30a. Mr. Cullen also was the principal director of The Dragonwood Conservancy, Inc., a Florida not-for-profit corporation formerly known as The Cullen Vivarium Wildlife Conservancy. Amended Complaint ¶ 304, ECF No. 13; Defs.' Facts ¶ 3.

## A. Investigation and execution of search warrants

In May 2010, Lieutenant Paul Felician of the Milwaukee Police Department received information that led him to believe that Mr. Cullen was unlawfully harboring animals in the City of Milwaukee. Exhibit 1 to Affidavit of Attorney Mark Murphy, ECF No. 46-1; *see also* Defs.' Facts ¶¶ 9–18. The source of the information, Jennifer R., told MPD Detective Phillip Simmert II that on February 27, 2010, Mr. Cullen took her to his residence (i.e., the 17th Street property) for a trail internship assignment, where she observed five, twenty-foot-long anacondas in a trough in the basement, as well as what she believed to be Chinese alligators in small enclosures and boxes containing spiders and turtles. Defs.' Facts ¶ 12. According to the intern, Mr. Cullen also took her to the 13th Street property, where she saw an alligator freely roaming the residence. Defs.' Facts ¶ 13. The intern claimed that Mr. Cullen repeatedly told her that he could not legally possess the creature. *Id.* The intern showed Detective Simmert pictures she had taken of several reptiles, which—based on Detective Simmert's computer search—had characteristics similar to Chinese

alligators. Defs.' Facts ¶ 12. Given this information, Detective Simmert believed that the anacondas and alligators were being kept in violation of city ordinances regulating non-domesticated and dangerous animals. Defs.' Facts ¶¶ 15–18.[1]

Detective Simmert contacted a conservation warden with the Wisconsin Department of Natural Resources about the animals. The conservation warden indicated that Chinese alligators were critically endangered and that Mr. Cullen did not have a permit to breed or house such creatures. Defs.' Facts ¶ 20. According to the conservation warden, Mr. Cullen did have a "breeders permit" in Florida, but it did not apply to Chinese alligators. Pls.' Facts ¶ 20b.

On May 6, 2010, Detective Simmert spoke on the phone with Mr. Cullen, who acknowledged owning The Dragonwood Conservancy. Pls.' Facts ¶ 19a. They spoke again a few days later, and Mr. Cullen claimed to not keep snakes, alligators, or crocodiles within the city. Defs.' Facts ¶ 19. Mr. Cullen further claimed that he had a federal wildlife breeding program in Florida where he maintained his conservancy. Pls.' Facts ¶ 19b. Mr. Cullen told Detective Simmert that he was not required to be licensed to care for the creatures because he was covered by the license belonging to the Wisconsin Humane Society. *Id.*

---

[1] In May 2010, Milwaukee City Ordinances provided that "[n]o animal that is not a domesticated animal may be kept or brought into the city except as provided in ss. 78-20 and 78-23 or as otherwise authorized by the commissioner," § 78-5-1, and that "[n]o person may harbor or keep a dangerous animal within the city unless all provisions of this section are complied with," § 78-23-1; the Ordinances defined a "dangerous animal" in part as "[a]ny animal which, when unprovoked, bites or otherwise inflicts bodily harm on a person, domestic pet or animal on public or private property," § 78-1-13.-a-1. *See* Exhibit 1 to Plaintiffs' Response to Defs.' Facts, ECF No. 48-1.

Detective Simmert subsequently applied for and obtained a warrant to search the 13th Street and the 17th Street properties for evidence related to the violation of Wis. Stat. § 29.604, which, among other things, criminalizes certain conduct related to endangered and threatened species.[2] *See* Pls.' Facts ¶ 23a (citing Exhibit 4 to Murphy Aff., ECF No. 46-4).[3] The warrant described the objects of the search as:

- Reptiles including but not exclusive of Chinese Alligators or Chinese Crocodiles.
- Python or Anaconda snakes.
- Spiders and turtles.
- Items commonly associated with the breeding, transport, and care of the above listed animals. This would include items like heat lamps, cages, and warming rocks.
- Other endangered or threatened species not included on this list.

*See* Murphy Aff., Ex. 4 at 2–3.

The warrant was executed on May 12, 2010. *See* Murphy Aff., Ex. 1 at 4–5. Lieutenant Felician, Detective Simmert, the DNR conservation warden, a member of the Milwaukee Area Domestic Animal Control Commission (MADACC), and officers from MPD's Tactical Enforcement Unit were present at the time of

---

[2] The statute provides, in pertinent part, that "[n]o person may take, transport, possess, process or sell within this state any wild animal specified by the department's endangered and threatened species list." Wis. Stat. § 29.604(4)(a). The department's list consisted of three parts: "wild animals and wild plants on the U.S. list of endangered and threatened foreign species; wild animals and wild plants on the U.S. list of endangered and threatened native species; and a list of endangered and threatened Wisconsin species." Wis. Stat. § 29.604(3)(a).

[3] Law enforcement also obtained warrants to search the 16th Street and the Kinnickinnic Avenue properties. However, nothing was seized from those residences.

execution. *Id.* Mr. Cullen and Ms. Flint were denied access to their properties during the execution of the warrant. Pls.' Facts ¶ 23f.

Law enforcement entered the 13th Street property first but, due to the condition of the property, they secured the residence to return the following morning with the proper equipment and personnel. *See id.*; *see also* Pls.' Facts ¶ 23e.[4] Before leaving, the conservation warden did positively identify an ornate box turtle in the kitchen that was an endangered species and illegal to possess without special permits. Defs.' Facts ¶ 24. Also, law enforcement shot and killed two of Ms. Flint's pet dogs. Pls.' Facts ¶ 23c.[5]

Law enforcement then proceeded to the 17th Street property. Inside that residence, officers located and seized a lizard, alligators, scorpions, turtles, spiders, snakes, and a chicken. *See* Murphy Aff., Ex. 1 at 5–6; *see also* Attachment L to Affidavit of Jan A. Smokowicz, ECF No. 31-12. The fire department assisted in the search and cut a hole in the basement wall to allow the passage of the troughs containing the anacondas. Murphy Aff., Ex. 1 at 5; *see also* Defs.' Facts ¶ 27; Pls.' Facts ¶¶ 27a–27b.

Back at the 13th Street property, law enforcement recovered a number of other animals. *See* Pls.' Facts ¶ 29a. They tore out a large glass window and cut a

---

[4] A portion of the 13th Street search was captured on video by law enforcement. However, the camera was turned off repeatedly. *See* Exhibit 14 to Murphy Affidavit in Sur-Rebuttal, ECF No. 60-3 (available in hard copy only).

[5] Ms. Flint sought damages in a separate case (14-CV-333) for the alleged unlawful killing of her dogs. That action resolved prior to trial.

hole in the garage door to extract some of the animals and their cages. *See* Pls.'
Facts ¶¶ 30b–30c; *see also* Defs.' Facts ¶ 27.

In total, more than 200 animals were seized. *See* Smokowicz Aff., Attach. L;
*see also* Pls.' Facts ¶¶ 29a–29c. Law enforcement also took cash, guns, jewelry, tools,
computers, permits, documents, and other business paperwork. Pls.' Facts ¶¶ 23s,
29a. According to Mr. Cullen, law enforcement seized other animals that were not
inventoried of returned. Pls.' Facts ¶ 29b. Following execution of the warrants, law
enforcement took photographs of the interior and exterior of the 13th Street, 17th
Street, and Kinnickinnic Avenue properties. Defs.' Facts ¶ 32 (citing Attachment M
to Smokowicz Aff., ECF No. 31-13). The photographs show that properties were
cluttered with many items. *See* Smokowicz Aff., Attach. M; *see also* Defs.' Facts
¶ 30.

## B. Post-execution aftermath

Law enforcement continued to maintain control of the properties for weeks
after the warrants were executed. Pls.' Facts ¶ 23g. Mr. Cullen claims that law
enforcement inadequately secured his properties during this time—allowing gaps in
the green particle board used to board up the properties and leaving a window and
door completely open—and, as a result, they became infested with vermin. Pls.'
Facts ¶¶ 27c–27f. The properties also suffered extensive damage. *See* Pls.' Facts
¶¶ 23h–23k; *see also* Exhibit 3 to Murphy Aff., ECF No. 46-3 at 3; Exhibit 7 to
Murphy Aff., ECF No. 46-7. Indeed, the City attempted to condemn the 13th Street
property. Pls.' Facts ¶ 23l.

Robert Henderson, the Curator of Reptiles at the Milwaukee Public Museum, was present during the execution of the search warrants. In his opinion, the snakes recovered from the residences were being kept in neglectful conditions. Nevertheless, nearly all of them were in good health. *See* Exhibit 2 to Murphy Aff., ECF No. 46-2 at 2–3. The same was true for the alligators. *See id.* According to Mr. Cullen, however, the care of the animals deteriorated while in MADACC's custody. *See* Pls.' Facts ¶¶ 29e, 29g. Mr. Cullen offered to have third parties care for the animals in the meantime, but he was rejected. *See* Pls.' Facts ¶¶ 29f, 29h.

Mr. Cullen was subsequently charged in Milwaukee County Circuit Court with several crimes relating to the animals seized from his properties. On July 13, 2010, Mr. Cullen moved to have the Circuit Court order the return of the animals seized from the 13th Street property. Defs.' Facts ¶ 36 (citing Attachment H to Smokowicz Aff., ECF No. 31-8). Following a hearing, the Circuit Court denied the motion, finding that it was not properly before the court because it should have been filed in civil court, not in Mr. Cullen's criminal proceedings. The court further determined that Mr. Cullen had "waived his right to request return of said animals by failing to petition the circuit court for return of the seized animals *within seven days of confiscation* as required by statute. *See* Wis. Stats. § 173.19,[6] 173.22."[7] *Id.*

---

[6] "[A] political subdivision or person contracting under s. 173.15 (1) may treat any animal taken into custody under s. 173.13 (1) (a) 3., 4., or 9. as an unclaimed animal subject to s. 173.23 (1m) if, within 7 days after custody is taken of the animal, it is not claimed by and returned to its owner under s. 173.23 (1), except that an animal taken into custody under s. 173.13 (1) (a) 3. or 4. may not be treated as unclaimed if its owner files a petition under s. 173.22 (1) within 7 days after custody is taken." Wis. Stat. § 173.19(2) (2010).

Finally, the court held that, because no petition had been timely filed, "said animals are deemed, by operation of statute, to be '*unclaimed*,' and therefore . . . MADACC . . . has lawful authority over said animals and may dispose of and/or distribute said animals as it see[s] fit, consistent with law." *Id.*

A few weeks later, Mr. Cullen moved for reconsideration, arguing that the Circuit Court had misapplied the law in denying his motion to return the animals. *See* Attachment J to Smokowicz Aff., ECF No. 31-10. The Circuit Court vacated its previous decision but still denied Mr. Cullen's motion. *See* Attachment K to Smokowicz Aff., ECF No. 31-11. The court determined that "[t]he animals were seized under Wis. Stat. §173.13(1),"[8] that "[t]he animals were and are held by . . . MADACC . . . under Wis. Stat. §173.21(1)(a)," and that "there are reasonable grounds to believe the owner has mistreated the animals in violation of Wis. Stat. ch. §951." *Id.*

In January 2016, Mr. Cullen and Ms. Flint received notice that MPD was holding their firearms and that they would have to petition to have the firearms returned. Pls.' Facts ¶ 23o (citing Exhibit 8 to Murphy Aff., ECF No. 46-8). Three months later, their attorney filed petitions for return of property in Milwaukee

---

[7] "A person claiming that an animal that he or she owns was improperly taken into custody under s. 173.13 (1) (a) 3., 4., 5., 6., or 8 . . . may seek return of the animal by petitioning for an order from the circuit court for the county in which the animal was taken into custody or in which it is held." Wis. Stat. § 173.22(1) (2010).

[8] "[A] humane officer, on behalf of a political subdivision in which the humane officer has jurisdiction under s. 173.03 (3), or a law enforcement officer, on behalf of a political subdivision, may take custody of an animal if the humane officer or law enforcement officer has reasonable grounds to believe that the animal is one of the following: . . . An animal mistreated in violation of ch. 951." Wis. Stat. § 173.13(1)(a)8. (2010).

County Circuit Court. *Id.* The Circuit Court granted the petitions, and several firearms were given back to Mr. Cullen and Ms. Flint. Pls.' Facts ¶ 23q. Mr. Cullen, however, claims that additional firearms were seized but have not been returned. Pls.' Facts ¶ 23r. Mr. Cullen further claims that many items of his personal property have not been returned either. Pls.' Facts ¶ 23s.

## II.    Procedural Background

On May 3, 2016, the plaintiffs filed this action under 42 U.S.C. § 1983 against Lieutenant Felician, Detective Simmert, Jane and John Does, the City of Milwaukee, and ABC Insurance Company. *See* Complaint, ECF No. 1. An Amended Complaint, ECF No. 13, was filed on December 5, 2016. The plaintiffs claim that the defendants violated their rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution when they searched the plaintiffs' properties and seized all of the plaintiffs' animals, as well as other items. The matter was reassigned to this Court in March 2017 after all parties consented to magistrate judge jurisdiction. *See* Order, ECF No. 17; *see also* Consent to Proceed Before a Magistrate Judge, ECF Nos. 15, 16 (citing 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b)).

On September 11, 2017, the defendants filed a motion for summary judgment on all of the plaintiffs' claims. *See* Defendants' Motion for Summary Judgment, ECF No. 27; *see also* Defendants' Brief in Support, ECF No. 28. That Motion is now fully briefed and ready for disposition. *See* Plaintiffs' Brief Opposing Summary

Judgment, ECF No. 42; Defendants' Reply Brief, ECF No. 53; Plaintiffs' Brief in Sur-Rebuttal Opposing Defendant's Motion for Summary Judgment, ECF No. 59.

## III. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255). "However,

[the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." *Fitzgerald*, 707 F.3d at 730 (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)).

## IV. Discussion

A plaintiff is entitled to relief under § 1983 only if he demonstrates that "(1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)). In this case, the plaintiffs allege that Lieutenant Felician, Detective Simmert, and unnamed officers or agents violated their Fourth and Fifth Amendment rights (as incorporated by the Fourteenth Amendment) while acting under color of state law. They further allege that these deprivations stemmed from the unconstitutional policy, practice, or custom of the City of Milwaukee.

The defendants seek summary judgment on all of the plaintiffs' claims, arguing that they fail on their merits and that the individual officers are otherwise entitled to qualified immunity. "Qualified immunity shields a government official from liability for civil damages unless his or her conduct violates a clearly

established principle or constitutional right of which a reasonable person would have known at the time." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2011)). The plaintiff has the burden of defeating the qualified-immunity defense once it is raised. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017) (citing *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013)).

> To do so, the plaintiff must show (1) that the defendant violated a constitutional right, when construing the facts in the light most favorable to the plaintiff, and (2) that the right was clearly established at the time of the alleged violation, such that it would have been clear to a reasonable actor that her conduct was unlawful.

*Archer*, 870 F.3d at 613 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "A failure to show either is fatal for the plaintiff's case." *Archer*, 870 F.3d at 613 (citing *Pearson*, 555 U.S. at 236).

## A. Fourth Amendment claims

"The Fourth Amendment protects persons against unreasonable searches and seizures of their 'persons, houses, papers, and effects.'" *Siebert v. Severino*, 256 F.3d 648, 653 (7th Cir. 2001) (quoting U.S. Const. amend. IV). "Searches undertaken pursuant to valid search warrants are presumptively valid." *Archer*, 870 F.3d at 613–14 (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). To be valid a search warrant must: "(1) be issued by a neutral and disinterested magistrate; (2) establish probable cause that the evidence sought in the warrant will aid in obtaining a conviction of a particular offense; and (3) describe with

particularity the things to be seized and the place to be searched." *Archer*, 870 F.3d at 614 (citing *Dalia v. United States*, 441 U.S. 238, 255 (1979)).

"Even if one of those elements is missing, an officer is still entitled to qualified immunity if she is acting pursuant to a warrant that was authorized by a judge, and her action is reasonable." *Archer*, 870 F.3d at 614 (citing *United States v. Leon*, 468 U.S. 897, 920–21 (1984); *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986)). "Only when an officer seeks or obtains a warrant 'so lacking in indicia of probable cause as to render . . . belief in its existence unreasonable,' may the officer face liability for damages." *Archer*, 870 F.3d at 614 (citing *Malley*, 475 U.S. at 344–45).

The plaintiffs claim that the defendants violated their Fourth Amendment rights in three ways: the warrants failed to state probable cause; the warrants failed to comply with the particularity requirement; and the warrants were unreasonably executed.

### 1. Probable cause

"When an affidavit is the only evidence presented to a judge in support of a search warrant, the validity of the warrant rests solely on the strength of the affidavit." *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003) (citing *United States v. Roth*, 391 F.2d 507, 509 (7th Cir. 1967)). "[A]n affidavit submitted in support of a search-warrant application will be sufficient to support a probable-cause finding if, 'based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search

will uncover evidence of a crime.'" *Junkert v. Massey*, 610 F.3d 364, 367–68 (7th Cir. 2010) (quoting *United States v. Dismuke*, 593 F.3d 582, 586 (7th Cir. 2010)).

In determining whether probable cause existed, the Court must "look only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003) (citing *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994)). "The law affords 'great deference' to the probable cause finding made by the judge who evaluated the warrant application in the first instance." *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1057 (7th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). Accordingly, a finding of probable cause will be upheld "as long as the issuing judge had a 'substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *Junkert*, 610 F.3d at 367 (quoting *Dismuke*, 593 F.3d at 586).

The defendants maintain that they are entitled to summary judgment on the plaintiffs' probable-cause claim because the search-warrant affidavits sufficiently established that a search of the plaintiffs' properties would likely uncover evidence relating to a violation of Wis. Stat. § 29.604. *See* Defs.' Br. 13–15. The Court agrees.

According to Wis. Stat. § 29.604(4)(a), it is unlawful for a person to possess within the State of Wisconsin "any wild animal specified by the department's endangered and threatened species list." The affidavits established that, two months prior, a prospective intern had observed what she believed to be Chinese alligators in small enclosures at the 17th Street property and an alligator freely roaming the 13th Street property. The intern claimed that Mr. Cullen repeatedly

indicated that he could not lawfully possess the 13th Street alligator, and she showed Detective Simmert pictures she had taken of several reptiles. Based on a computer search, Detective Simmert believed that the creatures depicted were Chinese alligators. Detective Simmert also confirmed with a state conservation warden that Chinese alligators were critically endangered—a fact undisputed by the plaintiffs—and that Mr. Cullen did not have the necessary permit for them. *See* Murphy Aff., Ex. 4. Thus, based on the totality of the circumstances, the issuing judicial officer had a substantial basis for concluding that Mr. Cullen possessed Chinese alligators in violation of § 29.604(4)(a) and that a search of his properties would uncover evidence of that wrongdoing.

The plaintiffs' argument that Mr. Cullen's possession of the Chinese alligators was not unlawful under § 29.604 is undermined by the plain language of the statute. The plaintiffs first suggest that the statute does not apply to animals that are on the U.S. list of endangered species but not native to Wisconsin. *See* Am. Compl. ¶ 510. This argument fails because Wisconsin's endangered and threatened species list incorporates "wild animals and wild plants on the U.S. list of endangered and threatened foreign species." Wis. Stat. § 29.604(3)(a).

The plaintiffs also argue that Chinese alligators may be lawfully possessed in Wisconsin for educational purposes according to Wis. Stat. § 29.604(6)(c), which states that "possession, sale or transportation within this state of any endangered species on the U.S. list of endangered and threatened foreign species shall not

require a state permit under par. a."[9] *See* Pls.' Br. 32–34; Pls.' Sur-Rebuttal 13. That provision, however, does not exclude such species from regulation altogether. It simply means that no state permit is needed to possess an animal on the foreign endangered species list for educational purposes because a federal permit will suffice. At the time law enforcement applied for the search warrants, they reasonably believed—based on information provided by a state conservation warden—that Mr. Cullen did not have a federal permit to possess Chinese alligators.

The plaintiffs nevertheless argue that a federal permit was not required because Mr. Cullen did not possess the Chinese alligators for use in interstate commerce. Pls.' Br. 33. It's true that after execution, law enforcement learned that the Bronx Zoo had loaned the alligators to Mr. Cullen. *See* Murphy Aff., Ex. 2 at 4. And it may be true that a bona fide loanee does not need a federal permit. But it does not follow that the individual defendants are personally liable under § 1983.

Assuming the search warrants lacked probable cause, the individual defendants would still be entitled to qualified immunity. "[A]n officer who relies on a subsequently invalidated warrant may be liable for § 1983 damages only if the warrant application was 'so lacking in indicia of probable cause as to render official

---

[9] "The department shall issue a permit, under such terms and conditions as it may prescribe by rule, authorizing the taking, exportation, transportation or possession of any wild animal or wild plant on the list of endangered and threatened species for zoological, educational or scientific purposes, for propagation of such wild animals and wild plants in captivity for preservation purposes, unless such exportation, possession, transportation or taking is prohibited by any federal law or regulation, or any other law of this state." Wis. Stat. § 29.604(6)(a).

belief in its existence unreasonable.'" *Junkert*, 610 F.3d at 369 (quoting *Malley*, 475 U.S. at 344–45). The plaintiffs have not pointed to a Supreme Court or Seventh Circuit case involving an affidavit materially similar to the ones at issue here that failed to establish probable cause. *See Junkert*, 610 F.3d at 369 (citing *United States v. Koerth*, 312 F.3d 862, 869 (7th Cir. 2002)). And the affidavits in this case were not so deficient on their faces "that any reasonably well-trained officer would have known that probable cause was lacking." *See Junkert*, 610 F.3d at 370. Based on what they knew at the time of execution, the officers reasonably believed that Mr. Cullen's possession of the Chinese alligators was unlawful. Subsequently learned information that potentially negated that belief does not render the officers' reliance on the warrants objectively unreasonable.

### 2. Particularity

"The Fourth Amendment requires a warrant to 'particularly describ[e] the place to be searched, and the . . . things to be seized.'" *United States v. Wenzel*, 854 F.3d 957, 961 (7th Cir. 2017) (quoting U.S. Const. amend. IV). As such, "the scope of a lawful search is 'defined by the object of the search and the places in which there is probable cause to believe that it may be found.'" *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (quoting *United States v. Ross*, 456 U.S. 798, 824 (1982)). "To satisfy this requirement, 'a warrant must explicate the items to be seized only as precisely as the circumstances and the nature of the alleged crime permit.'" *Wenzel*, 854 F.3d at 961 (quoting *United States v. Vitek Supply Corp.*, 144 F.3d 476, 481 (7th Cir. 1998)). "[E]xceeding the scope of a warrant violates the Fourth Amendment; it is

tantamount to a "general exploratory rummaging through one's belongings.'"

*Archer*, 870 F.3d at 616 (quoting *United States v. Mann*, 592 F.3d 779, 782 (7th Cir. 2010)).

The plaintiffs claim that the defendants violated their Fourth Amendment rights when they seized animals and personal property (including firearms) outside the scope of the warrants.

*Animal inventory*

The plaintiffs allege that the defendants unreasonably seized their entire "reptile inventory," regardless of whether the animals were endangered or threatened, and took other animals not listed in the search warrants and not inventoried. *See* Am. Compl. ¶¶ 424–26; Pls.' Br. 7, 23–24, 25–26; Pls.' Sur-Rebuttal 12. The defendants argue that any creatures taken outside the scope of the warrants were lawfully seized pursuant to the plain-view doctrine. The defendants further argue that the individual officers are entitled to qualified immunity because a reasonable officer could conclude that the creatures constituted evidence of violations of local ordinances and state law. Defs.' Reply 7–10.

The warrants to search the plaintiffs' properties particularly described the items to be seized, but that list encompassed items beyond the scope of the crime under investigation. The warrants indicated that there was probable cause to believe that the properties contained evidence relating to the unlawful possession of endangered or threatened species, in violation of Wis. Stat. § 29.604. *See* Murphy Aff., Ex. 4 at 2–3. The Chinese alligators—which indisputably were critically

endangered at the time—were properly listed as an object of that crime, as were other endangered or threatened species and items commonly associated with the breeding, transport, and care of such animals. But the warrants also listed spiders and other reptiles (including but not limited to pythons, anacondas, and turtles) without any basis to believe those creatures were endangered or threatened under Wisconsin law or otherwise associated with illegal activities. The warrants were therefore unconstitutionally overbroad, providing officers with too much discretion over which animals to seize and resulting in dozens of animals being seized without a valid warrant. "[W]arrantless searches are presumptively unreasonable." *Leon*, 468 U.S. at 960 (Stevens, J., concurring).

Furthermore, the undisputed facts do not demonstrate that the plaintiffs' animals were lawfully seized pursuant to the plain-view exception to the warrant requirement. According to that doctrine, the government may seize material without a warrant if, among other requirements, "the incriminating nature of the item is immediately apparent (i.e., the government can show probable cause to believe the item is linked to criminal activity)." *See United States v. Raney*, 342 F.3d 551, 558–59 (7th Cir. 2003) (citing *United States v. Bruce*, 109 F.3d 323, 328–29 (7th Cir. 1997)). The defendants contend that, based on what was observed inside the properties while executing the warrants—the smell of rotting animals, urine, and animal excrement; hundreds of animals, including some in containers that allowed limited movement; dead animal carcasses; and freely roaming crocodiles—officers had probable cause to believe that the other animals were linked to violations of city

ordinances concerning dangerous creatures or objects of criminal mistreatment under state law. That explanation does seem to justify seizing certain animals (e.g., the alligators/crocodiles and the snakes). But it doesn't apply indiscriminately to all of them (e.g., spiders, turtles, and the two dogs that weren't killed by the officers).

Moreover, the plaintiffs dispute the general state of their properties and the condition of their animals. The plaintiffs acknowledge that their properties were "cluttered and cramped" but claim that they remained "clean, habitable, and functional." *See* Pls.' Facts ¶ 30a. And while certain factors suggested that the animals were neglected, nearly all of them were in good health. *See* Murphy Aff., Ex. 2 at 3. It would be inappropriate for this Court to resolve those factual issues at the summary-judgment stage; that task is left to the ultimate trier of fact. The facts, viewed in the light most favorable to the plaintiffs, establish that the defendants' seizure of all animals violated the plaintiffs' Fourth Amendment rights.

The individual defendants are not entitled to qualified immunity for that constitutional deprivation because no reasonable officer could have believed that he could seize each and every one of the plaintiffs' animals. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (establishing that a plaintiff can defeat qualified immunity by showing that "no reasonable person could have believed that [his conduct] would not violate clearly established rights") (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)). First, officers seized animals plainly outside the scope of the warrants. Second, Detective Simmert prepared the first search-warrant affidavit, so he cannot rely on the issuing judge's assurance that

there was probable cause to believe that the animals listed—aside from the Chinese alligators—were unlawfully possessed under Wisconsin law. *See Groh v. Ramirez*, 540 U.S. 551, 564 (2004) (denying qualified immunity in part "because the petitioner himself prepared the invalid warrant"). Finally, unlike in *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 490 (6th Cir. 2014)—a case relied upon by the defendants—factual disputes exist as to the conditions under which the animals were housed. At the very least, it's fair to say that no reasonable officer could believe that every animal was being kept in violation of city ordinances or mistreated in violation of state law.

Consequently, the plaintiffs have presented sufficient evidence from which a reasonable jury could conclude that the defendants violated their clearly established constitutional rights when they seized the plaintiffs' entire animal inventory.

*Firearms*

The executing officers seized a number of firearms and ammunition from the plaintiffs' properties, *see* Murphy Aff., Ex. 8 at 8–10, even though the warrants did not explicitly authorize the seizure of those items, *see* Murphy Aff., Ex. 4 at 2. The defendants nevertheless argue that the firearms were properly seized as "[i]tems commonly associated with the breeding, transport, and care of [the animals listed in the warrant]." Defs.' Reply 3 (quoting Murphy Aff., Ex. 4 at 2–3, 9, 19). According to the defendants, "[a] reasonable officer in Felician or Simmert's shoes would be aware that traffickers in endangered and threatened

[species] are commonly armed with firearms" to poach animals, to ward off the animals' protective parents, or to fire at wildlife officers. Defs.' Reply 3–4.

The defendants' argument, while creative, overplays the hand dealt by the warrants. First, in the Court's view, the connection between the illegal wildlife trade and firearms is not as straightforward as the defendants suggest. Second, even if it was, the search-warrant affidavits do not contain any information to suggest that Mr. Cullen was such a trafficker of endangered animals or that he could not lawfully possess firearms. The defendants point to a single sentence indicating that Mr. Cullen had boxes of spiders and turtles that were used to transport those animals for sale. *See* Murphy Aff., Ex. 4 at 5. However, the warrants do not indicate that those creatures were possessed or transported illegally. And those are not the types of animals that would be acquired or traded under circumstances requiring firearm protection. Finally, the defendants' reading violates the "Sesame Street" rule. The warrants provided three examples of the types of items being sought: heat lamps, cages, and warming rocks. Firearms are not like the others, firearms just don't belong.

The defendants are not entitled to qualified immunity for the seizure of the plaintiffs' firearms because it was obvious that the warrants did not authorize the seizure of those items. The warrants did not list firearms as objects of the search, and firearms are substantially unrelated to the items that were listed. Even assuming that the connection between illegal firearms and trafficking endangered

animals is as clear as the defendants suggest, officers did not have credible information to believe that Mr. Cullen was such a trafficker.

Accordingly, the defendants' reliance on *Messerschmidt v. Millender* is misplaced. In that case, a warrant authorized the seizure of all a suspect's firearms when officers had information only about a specific one (a sawed-off shotgun). *Messerschmidt*, 565 U.S. 535, 541–42 (2012). The Supreme Court determined that the officers were entitled to qualified immunity regarding the global seizure of the firearms because it was reasonable to conclude that the suspect—a known gang member who had allegedly used the shotgun in an attempted murder—owned other illegal firearms. *Id.* at 548–49. The warrants at issue here, however, did not authorize the seizure of *any* firearms. And there was nothing within the search-warrant affidavits to suggest that Mr. Cullen had firearms, let alone that he couldn't lawfully possess them.[10]

Consequently, the plaintiffs have presented sufficient evidence from which a reasonable jury could conclude that the defendants violated their clearly established constitutional rights when they seized the plaintiffs' firearms without a warrant and without any other lawful basis.

*Other property*

Mr. Cullen and Ms. Flint have each submitted an affidavit swearing that personal property—including various business papers, computers, tools, cash,

---

[10] *Messerschmidt* may possibly support the defendants' entitlement to qualified immunity with respect to the animal inventory. However, the defendants do not make that argument; the Court will not construct it for them.

jewelry, and a generator—was taken during the execution of the search warrants and not inventoried or returned. *See* Affidavit of Terry Cullen ¶ 15f, ECF No. 43; Affidavit of Jane Flint ¶ 5, ECF No. 44. The warrants clearly did not authorize the executing officers to seize those items. *See* Murphy Aff., Ex. 4 at 2. The defendants nevertheless seek summary judgment on this claim, arguing that the plaintiffs failed to produce evidence to suggest that either Lieutenant Felician or Detective Simmert was personally involved in this constitutional deprivation. *See* Defs.' Reply 6–7 (citing *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017)). The Court respectfully disagrees.

The plaintiffs have provided sufficient evidence to support liability against the individual defendants based on a failure-to-intervene theory. *See Colbert*, 851 F.3d at 664–65 (citing *Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000)) (Hamilton, J., concurring in part and dissenting in part). "An official satisfies the personal responsibility requirement of § 1983 if she acts *or fails to act* with a deliberate or reckless disregard of the plaintiff's constitutional rights." *Miller*, 220 F.3d at 495 (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)). "Under this rule, police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights . . . but fail to do so have been held liable." *Miller*, 220 F.3d at 495 (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

Mr. Cullen and Ms. Flint were not present at the time the search warrants were executed, and the defendants denied them access to their properties for several weeks after execution. According to Mr. Cullen and Ms. Flint, certain

personal property (aside from the animals and firearms) was missing when they were finally allowed to return home. If these allegations are taken as true (which the Court must do), then it can reasonably be inferred that someone from the search team—Lieutenant Felician, Detective Simmert, or another officer or agent of the City—unlawfully took the plaintiffs' personal property. Detective Felician asserts that it was not him and that he did not observe any other officer take property without inventorying it. *See* Defs.' Facts ¶ 29. In response, the plaintiffs allege that Lieutenant Felician and Detective Simmert, who indisputably were present during the warrants' execution, "turned a blind eye" to the other officers' or agents' unconstitutional seizure. *See* Am. Compl. ¶¶ 513–15. This factual issue must be resolved at trial by the jury.

### 3. Unreasonable execution of search warrants

"The reasonableness requirement [of the Fourth Amendment] extends to the manner in which the search is conducted." *Johnson v. Manitowoc County*, 635 F.3d 331, 335 (7th Cir. 2011) (citing *Green v. Butler*, 420 F.3d 689, 694–95 (7th Cir. 2005)). As such, "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search not subject to suppression." *United States v. Ramirez*, 523 U.S. 65, 71 (1998). The Fourth and Fourteenth Amendments therefore "provide a remedy when a citizen's property is unreasonably damaged during a search." *Colbert*, 851 F.3d at 657 (quoting *Heft*, 351 F.3d at 282).

"It is 'generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant.'" *Johnson*, 635 F.3d at 335 (quoting *Dalia*, 441 U.S. at 257). "The test is whether 'the officers executing the warrant employ[ed] a methodology that is, in light of the values protected by the Fourth Amendment and the exigencies of the situation, a reasonable one.'" *Johnson*, 635 F.3d at 335 (quoting *United States v. Jones*, 54 F.3d 1285, 1292 (7th Cir. 1995)).

The defendants seek summary judgment on the plaintiffs' property-damage claim, arguing that any damage to the plaintiffs' properties was incidental to searching for evidentiary items or removing the animals. The defendants further argue that the individual officers are entitled to qualified immunity on this claim because no case put them on notice that their conduct was unreasonable. *See* Defs.' Br. 11–13. The Court is not convinced.

A reasonable jury could find that the defendants' execution of the search warrants, viewed in the light most favorable to the plaintiffs, was unreasonable. The plaintiffs have provided a lengthy, detailed list of the damage inflicted upon their properties by the search team. *See* Am. Compl. pp. 40–48; *see also* Murphy Aff., Ex. 3 at 3. The most egregious examples include knocking out doors and windows, cutting a hole in the basement wall at the 17th Street property, draining large tanks by simply pulling the plugs and allowing gallons of water to rush out, and not properly boarding up the properties. The defendants assert that those actions were necessary to extract the animals inside their large containers,

claiming, for example, that the horse troughs could not be safely removed through an existing doorway. This argument fails to acknowledge that Mr. Cullen somehow got the troughs and snakes inside the residence and down the basement stairs. It's very unlikely that Mr. Cullen built the troughs inside his basement like a ship in a bottle.[11]

It is clear from Detective Simmert's police report, and the video depicting the 13th Street search, that the executing officers were ill-prepared for what they encountered upon entering the properties. Instead of taking time to map out a plan and to enlist the help of individuals trained to handle the animals in question—the record does not show exigent circumstances requiring the immediate removal of the animals—the officers forged ahead seemingly with little care about the plaintiffs' properties. That crack-a-nut-with-a-sledgehammer approach was objectively unreasonable under the circumstances.

The defendants are not entitled to qualified immunity with respect to the plaintiffs' property-damage claim, as the officers' conduct here was "so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Gonzalez*, 578 F.3d at 540 (quoting *Smith*, 242 F.3d at 742). It would be unreasonable to require the plaintiffs to point to "a clearly analogous case" given the unique factual circumstances at play. The Supreme Court's general rule, expressed in 1998, that "[e]xcessive or unnecessary destruction of property in the

---

[11] He didn't; the snakes and their tanks were originally brought into the residence through a side door. *See* Cullen Aff. ¶ 7a.

course of a search may violate the Fourth Amendment," *Ramirez*, 523 U.S. at 71, provided the officers sufficient notice that their conduct here was unreasonable.

## B. Due-Process claims

"Due process requires that a person not be deprived of property without notice and an opportunity for a hearing." *Siebert*, 256 F.3d at 659 (quoting *United States v. Michelle's Lounge*, 39 F.3d 684, 697 (7th Cir. 1994)). "A 'procedural due process [claim] requires a two-step analysis'": (1) "whether the plaintiff[s] [were] deprived of a constitutionally protected interest in life, liberty or property," and if so, (2) "what process [they were] due with respect to that deprivation." *Siebert*, 256 F.3d at 659 (quoting *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996)).

The Seventh Circuit in *Siebert* re-confirmed that "a pre-deprivation procedure is generally required before the government may deprive a person of their property." *Siebert*, 256 F.3d at 659 (citing *Zinermon v. Burch*, 494 U.S. 113, 132 (1990); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982)). This general rule falls away, however, if the government "must of necessity act quickly," if "the degree of the deprivation is not serious and the procedures underlying the decision to effect the deprivation are adequate to address the risk of an erroneous deprivation," or if "a postdeprivation hearing or the availability of a common law tort remedy may satisfy due process." *Porter*, 93 F.3d at 305–06 (citations omitted).

The plaintiffs claim that the defendants violated their rights to procedural due process by removing the reptile inventory without providing the plaintiffs with a pre-deprivation hearing and by providing inadequate post-deprivation process.

Am. Compl. ¶ 519; Pls.' Br. 26–32. The plaintiffs' ownership interest in the reptile inventory clearly is a protected interest under the Fourteenth Amendment. *See Porter*, 93 F.3d at 305. Thus, the Court must consider the constitutionally required process corresponding to the removal of those animals.

### 1. Pre-deprivation procedural due process

No reasonable jury could conclude that the plaintiffs were denied due process with respect to the initial removal of the reptile inventory from their properties. The plaintiffs argue that, if they had been provided a pre-deprivation hearing, they could have demonstrated legal possession of the reptiles. Pls.' Br. 27. But Detective Simmert did talk to Mr. Cullen prior to searching the properties, and Cullen denied keeping any snakes, alligators, or crocodiles within the city. *See* Murphy Aff., Ex. 1 at 5. Mr. Cullen did, however, confirm that he owned The Dragonwood Conservancy and that he lived at the 17th Street property. *Id.* Detective Simmert also spoke with Ms. Flint, who verified that she lived at the 13th Street property, that she was Mr. Cullen's employee, and that she took care of Mr. Cullen's animals when he was out of town. *See id.* This case is therefore materially distinguishable from *Siebert*, as the defendants here did provide the plaintiffs with an opportunity to tell their side of the story before their animals were seized. *Cf. Siebert*, 256 F.3d at 660 (reversing summary judgment in favor of state defendant because plaintiff had presented sufficient facts to support a due-process claim based on the removal of her horses without a pre-deprivation hearing).

Moreover, "[a] seizure arising from a criminal investigation does not threaten due process where . . . the state requires a fair and reliable determination of probable cause as a condition to the seizure." *Mahnke v. Garrigan*, 428 F. App'x 630, 636 (7th Cir. 2011) (citing *Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 19 (1978); *Reams v. Irvin*, 561 F.3d 1258, 1264 (11th Cir. 2009)). Detective Simmert obtained a warrant to seize the reptiles based on the information provided by the prospective intern and verification by a state conservation warden that Chinese alligators were critically endangered and that Mr. Cullen did not have a permit to breed or house such creatures. *See* Murphy Aff., Ex. 4 at 2–8. Law enforcement therefore seized the reptile inventory only after a detached judicial officer determined that there was probable cause to believe that the animals were used in the commission or constituted evidence of a crime. *See Westmore v. Hyde*, 14-cv-861-wmc, 2016 U.S. Dist. LEXIS 60274, at *38–39 (W.D. Wis. May 6, 2016) (finding that plaintiffs were not entitled to a pre-deprivation hearing prior to the removal of their animals because "Wisconsin requires probable cause before law enforcement officials are permitted to take custody of an animal[,] and . . . [the seizing officer] acted upon the recommendations of two veterinarians").

### 2. Post-deprivation procedural due process

The plaintiffs also argue that the post-deprivation remedies provided by Wis. Stat. ch. 173 were inadequate. Mr. Cullen petitioned in his state criminal proceedings to have the reptile inventory returned to him. The Circuit Court initially denied the motion because it was improperly filed in criminal court; the

petition apparently should have been filed in the civil division. The Circuit Court

subsequently vacated that decision but nevertheless denied Mr. Cullen's motion,

finding reasonable grounds to believe that the animals had been mistreated in

violation of state law. *See* § 173.13(1)(a)8. According to the plaintiffs, they "were

never given a due-process hearing . . . on the issue of mistreatment." Pls.' Br. 31.

Admittedly, the plaintiffs may have a legitimate gripe that the state-court

proceedings did not adequately protect their due-process rights. But the plaintiffs

have not submitted any evidence to suggest that any of the individual defendants—

Lieutenant Felician, Detective Simmert, or Jane and John Does—were involved in

that process. *See Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("[I]ndividual

liability under § 1983 requires 'personal involvement in the alleged constitutional

deprivation.'") (quoting *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir.

2003)). Thus, the plaintiffs' individual-capacity claims concerning the lack of post-

deprivation due process must fail. And the plaintiffs' official-capacity claims fall

victim to the same fate. It was the Circuit Court—an arm of the State of

Wisconsin—that allegedly denied the plaintiffs adequate post-deprivation process,

not the City.

For similar reasons, the plaintiffs' reliance on *Porter v. DiBlasio* is misplaced.

In *Porter*, the Seventh Circuit held that "Wisconsin must provide an owner notice

and an opportunity for a hearing prior to *permanently* terminating an individual's

interest in seized animals." *Porter*, 93 F.3d at 307 (emphasis added). But the

plaintiffs have not provided any evidence to suggest that the defendants

permanently terminated the plaintiffs' interest in the reptile inventory.

### C. Municipal liability claim

Although a city is considered a "person" within the meaning of § 1983,

liability does not attach vicariously; in other words, municipalities cannot be held

liable under § 1983 on a respondent superior theory. *Monell v. Dep't of Soc. Servs. of*

*City of New York*, 436 U.S. 658, 690–92 (1978). Rather, a city may be liable for the

unconstitutional actions of its employees under § 1983 only when the constitutional

deprivation was caused by an official municipal custom, practice, or policy. *Id.* at

690–91; *see also Palka v. City of Chicago*, 662 F.3d 428, 434 (7th Cir. 2011).

> To establish an official policy or custom, a plaintiff must show that his
> constitutional injury was caused "by (1) the enforcement of an express
> policy of the [city], (2) a widespread practice that is so permanent and
> well settled as to constitute a custom or usage with the force of law, or
> (3) a person with final policymaking authority."

*Wragg v. Village of Thornton*, 604 F.3d 464, 467–68 (7th Cir. 2010) (quoting

*Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001)).

"Absent proof that the injury in question was caused by an employee with

final policymaking authority or by an express policy or established custom of the

municipality, there can be no liability on the part of the municipality itself." *Palka*,

662 F.3d at 434. Accordingly, to demonstrate that a city is liable for a harmful

custom or practice, "the plaintiff must show that [city] policymakers were

'deliberately indifferent as to [the] known or obvious consequences.'" *Thomas v.*

*Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (quoting *Gable v. City of*

*Chic*ago, 296 F.3d 531, 537 (7th Cir. 2002)). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303 (citing *Gable*, 296 F.3d at 537).

The defendants are entitled to summary judgment on the plaintiffs' municipal-liability claim against the City. The plaintiffs allege that the City has an unconstitutional practice, custom, or policy of causing unreasonable damage during the execution of search warrants and that the City failed to train, supervise, and discipline officers regarding proper search-warrant protocols. *See* Am. Compl. ¶¶ 520–25; Pls.' Br. 19–20. The only "evidence" the plaintiffs have to support this claim is the testimony of Steven Glynn, a retired criminal defense attorney in Milwaukee, who indicated that MPD routinely caused unnecessary damage during its searches. *See* Murphy Aff., Ex. 7.

Mr. Glynn's anecdotal account lacks the specificity needed to support a *Monell* claim. The plaintiffs have not provided any other evidence to support their claim that MPD had a policy of inadequately "greenboarding" kicked-in properties or a practice/custom of causing damage to the interior of homes subject to search warrants. The alleged similarity in damage to three properties is insufficient to establish an official policy. In other words, no reasonable jury could find in the plaintiffs' favor on their municipal-liability claim.

## V.    Conclusion

For all the foregoing reasons, the Court finds that the defendants are entitled to summary judgment on the plaintiffs' Fourth Amendment probable-cause claim, the plaintiffs' due-process claims, and the plaintiffs' municipal-liability claim. However, the defendants are not entitled to summary judgment on the plaintiffs' Fourth Amendment claims concerning the seizure of their animal inventory, the seizure of their firearms, the seizure of other personal property, and the unreasonable damage to their properties. The defendants' motion will therefore be granted in part and denied in part.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 27, is **GRANTED IN PART** and **DENIED IN PART**, as stated herein.

Dated at Milwaukee, Wisconsin, this <u>24th</u> day of January, 2019.

BY THE COURT:

*s/ David E. Jones*
DAVID E. JONES
United States Magistrate Judge