UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

THE DRAGONWOOD CONSERVANCY, INC.,
PLEGUAR CORPORATION,
TERRY CULLEN
        Plaintiffs,

vs.                                    Case No: 16:cv:0534

PAUL FELICIAN
PHIL SIMMERT II
        Defendants

---

PLAINTIFFS' BRIEF
IN SUPPORT OF
"R702 Motion To Exclude Sean Perry As Expert Witness".

---

NOW COME PLAINTIFFS by their undersigned counsel, and respectfully submit their BRIEF IN SUPPORT OF PLAINTIFFS' "R702 Motion To Exclude Sean Perry As Expert Witness".

**I.    INTRODUCTION.**

The Defendants have identified Mr. Sean Perry as their expert, and offer four separate written reports, identified as follows

    1.    International And Domestic Market Assessment

    2.    Collection Evaluation Assessment

    3.    Response to Kalmanson Report

    4.    Veterinary Animal Welfare Assessment

Plaintiffs now file this Brief In Support of their "R702 Motion To Exclude Sean Perry As Expert Witness".

II.     FRCP702 & *Kumho Tire.*

In this case -and contrary to the Defendants' position apparently[1]- the parties' expert witnesses (as to the animals and values) do not present as scientific witnesses under the auspices of *Daubert*; and instead present as "experience" experts measured by *Kumho Tire, 526 U.W. at 141. 119 S. Ct. 1167*

The initial task falls on the party opposing expert testimony to sufficiently call into question the reliability of some aspect of the anticipated testimony; the proponent of the expert testimony then has the burden of showing that the testimony is reliable. *Bourjaily v. United States*, 483 U.S. 171, 175-176, 107 S. Ct. 2775 (1987). Then, the court determines whether the evidence and opinions related thereto are more probative than prejudicial under FRE403.

Experience alone may qualify a witness as an expert - "In certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony." Advisory Committee Notes to Rule 702. Indeed the Seventh Circuit has stated repeatedly that " genuine expertise may be based on experience or training." *United States v. Conn, 297 F.3d 548, 556 (7th Cir. 2002)* (quoting *Tyus v. Urban Search Mgmt., 102 F.3d 256, 263 (7th Cir. 1996)*).

> "[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trustees of Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Sav. Plan Trust Funds v. Royal Intern. Drywall and Decorating Inc. 493 F.3d 782, 787-788 (7th Circuit 2010)* (emphasis in original) (quoting Fed. R. Evid. 702).

As such, courts "consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an

---

[1] The City asks the Court to measure Plaintiffs' expert -Mitchel Kalmanson- as a scientific expert under *Daubert* standards [EDoc 96 pp5-6]; whereas undersigned counsel proffers that both experts – Perry and Kalmanson- are measured under the "experience" expert under *Kumho Tire, supra.*

opinion in a given area." *Trustees of Chicago, 493 F.3d at 788* (quoting *Smith v. Ford Motor Co. 215 F.3d 713, 718 (7th Cir. 2000)*).

In its gatekeeper role, the district court must "assess the reliability of the *methodology* the expert has employed in arriving at his opinion" *Fuesting v Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir., 2005, emphasis original). The Supreme Court, however, has clearly stated that "the test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire, 526 U.S. at 141. 119 S. Ct. 1167* (internal quotation omitted). This is especially true when the expert's opinions are non-scientific in nature and do not follow traditional scientific testing. "[T]he test for reliability for nonscientific experts is 'flexible' and…*Daubert's* list of specific factors neither necessarily nor exclusively apples to all experts or in every case." "[T]he law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire, 526 U.S. 142* (emphasis in original).

Expert testimony must be based upon "sufficient facts or data." FRE 702(2). In analyzing the factual foundation, an expert must utilize "reliable principles and methods." *Kumho Tire Co. v Carmichael* 526 UW 137, 152 (1999). Where value is "not readily ascertainable" (i.e., "there is no better method of arriving at a reasonably accurate figure") the use of expert opinion testimony to establish valuation may be particularly appropriate: it "is simply a matter of what is the best evidence in a particular case". *Kohler Co. v. United States, 247 F. Supp 2d 1083, 7th Circuit 2003)(Citations omitted)*

## III.     PRIOR EDUCATION, TRAINING & EXPERIENCE

Mr. Perry graduated college with a bachelor's degree some eleven years ago (2009); he went to Western University and obtained his Doctorate of Veterinary Medicine in 2013; he then pursued a Doctorate in Veterinary Clinical Sciences, at Louisiana State University at Baton Rouge; he recently a PhD this past May (2020), in "reptile reproduction" [See, Perry's *Curriculum Vitae*, Murphy Dec. Exhibit E; also see Transcript of Perry's Deposition Testimony, excerpted pages attached to Murphy Declaration as Exhibit I thereto; (hereinafter "Perry") at p18].

At deposition, Perry acknowledged he is <u>not</u> a veterinarian with a "reptile specialty" [Id., p142], as he is "sitting for boards in the next year" [Id. p141].   However he "has taken several herpetology classes" and "advised by multiple herpetologists" [Id. p18]

Perry admits to "zero" education, training and experience with Chinese alligators ( Id. pp23-24);  and as for having "physically been in the presence of a Chinese alligator" it would have been when he "was in the same room as Terry Cullen at a reptile show."  (Id. p24).

Likewise, Perry has never been in the physical presence of Dwarf Caimans, Schneider's Dwarf Caiman, Black Caimans, Spectacled Caiman, Caiman Yacare, Dwarf Crocodile, African slender snouted crocodile, phillipine crocodile, nile (dhomi) crocodile, siamese crocodile, new guinea crocodile, nor west african dwarf crocodile [Id. pp26-29].  Nor Gambian pouch rats [Id. p130].  Nor mussurana and red mussurana (snakes) [Id. p36].

Therefore, it comes as no surprise, that Perry is not a member of the AZA Crocodile Management School nor the IUCN Crocodile Specialist Group (Id. p16).

Although Perry is affiliated with the Aubdobon Zoo, he has not been "directly involved in the management and the husbandry" of the crocodilians [Id. p50].   Perry has not personally

bred crocodilians or anacondas [Id. p51]. He admits he does not know whether the Chinese Alligator could breed every other year [Id. p179]. He also cannot say "how often" a black caiman can be bred [Id. p181], nor anacondas [Id. p183].

Most notably, Mr. Perry has never given deposition testimony before (p17). In fact he has never given live testimony in a legal proceeding. [Id., p41]. He has never previously valued a collection of animals [Id. p157]. He is not a licensed Vet in the State of Wisconsin [Murphy Dec., Exhibit E; Perry at p39].

When asked how he [as a veterinarian from Lousiana who has never testified in any court proceedings] became to be Defendants' expert in this case, he indicated that "PETA" referred him to the City's attorneys. [Id., p48].

## IV.     PERRYS' (FOUR) REPORTS

Mr. Perry is the only expert identified by Defendants; and he has authored four written reports, which are now the subject of Plaintiffs' Motion, *to wit*:

- **"International And Domestic Market Assessment"** [Murphy Declaration, at par. 2, referencing Exhibit A thereto]

- **"Response to Kalmanson Report"** [Murphy Declaration at par. 3 referencing Exhibit B thereto]

- **"Collection Evaluation Assessment"** [Murphy Declaration at par. 4, referencing Exhibit C thereto]

- **"Veterinary Animal Welfare Assessment"** [Murphy Declaration at par. 5, referencing Exhibit D thereto]

The four reports proffer opinions on three primary subject matters: valuations (in two of the reports); market assessments (one report); and 'welfare' assessments (one report).

Accordingly, for the sake of efficiency, Plaintiffs' discussion below is primarily devoted to the three subject matters of the proffered opinions.

## IV. PERRYS' REPORTS & SUBJECT MATTERS

    A.    <u>Perry's Valuations.</u>

Perry offers many opinions as to value, throughout his reports. He believes he is qualified to give expert opinions as to the "values" of Plaintiffs' animals, because as a hobbyist [Id. p44] he has "sold animals in the reptile world" and routinely observes "the market and understand the economic forces behind it and the flow of money behind it". [Id. p151]. He also "observed internet websites and attended reptile shows since he was young" [Id. p153]. He admits however, that he has never sold <u>any</u> crocodilians [Id. p151], <u>nor</u> boas or anacondas [Id. p152].

To properly value any animal, Perry requires evidence of "research that was ongoing with any of these specific animals"; and in order to qualify as "research", Perry would require "an Institutional Animal Care and Use Protocol from a Zoological Institution/University or any reputable source" [Exhibit B p2; Perry at p148-9]. Next, Perry would require "evidence that there was a relationship with a veterinarian and that these animals health was evaluated". [Id. p7]

Further, Perry believes there is no "fair market value" for a creature that has not been born. [Id. p150-151]. Perry assigns values based upon "food", "leather and fashion", "breeding operations", and the "pet industry and zoos" [See, International and Domestic Market Assessment", Exhibit A to Murphy Declaration, at p2]. However, Perry's deposition testimony reflects that he requires a cash monetization:

> "When we talk about predicting future value of in an animal, one of the very important things that you need to understand is how you're getting money from the animal" [Id. p168]

Finally, and perhaps most importantly, Perry is unable quantify an animal's "conservation value" - except that it would "exceed food and skin trade value" [p62].

Perry valued 162 of Plaintiffs' animals. [Exhibit C to Murphy Declaration, at p2]. As for the common reptiles "often traded in the open market", Perry's valuations were based upon two "online marketplaces" - *www.faunaclassifieds.com* and *www.kingsnake.com* [Id. p4].

But for the rarest of species (like the Chinese Alligator and other "species where trade in the legal open market does not regularly occur" and values are not published) Perry made one phone call to the owner of "Crocodile Encounters" in Houston TX , a Mr. Chris Dieter. [Exhibit C p4, Perry at pp164-165]. The call was made the "day before" his report was due and lasted about "twenty minutes". [Id. pp164-165]. Perry used Dieter's numbers to value *seven* of Plaintiffs' Chinese [Id. p158-160] [2], along with the other, rarest of species "highlighted" in yellow on the last page of his "Collection Evaluation Assessment" [Perry pp164-165; Exhibit 4 to Murphy Declaration at last page].

### B. Perry's Thoughts On Kalmanson.

It worth noting, that Perry has rejected all of Mitchel Kalmanson opinions, based upon an apparent misstatement, *to wit*: Kalmanson "stated in his deposition that turtles are amphibians" [pp180-181]. Kalmanson however, corrected the misstatement by *errata*, he meant to say that turtles are "amphib<u>ous</u>" and not "amphib<u>ans</u>". [Murphy Declaration at par 7, referencing Exhibit F thereto]. Therefore, Perry now "questions everything" Kalmanson has to say about reptiles and his assessments [Perry at p183].

---

[2] Where Plaintiffs had 13 (live) Chinese Alligators in the animal collection. [Murphy Dec., at par.11]

7

C. "International And Domestic Market Assessment"

Perry authored a purported "International and Domestic Market Assessment ("IDMA") for this lawsuit, even though he was not asked to do so. [Id. p43]

Perry claims expertise in the international and domestic marketplaces, for reptilian and other exotics, based upon: "Intrinsic knowledge of the reptile industry and the mechanisms behind it, how it's been structured and changed", and "being a part of the reptile industry since 2006, first as a hobbyist, which has turned into breeding". [Id. p44]

Perry acknowledges however, that his IDMA is based upon the 2011 "Collis Study"[3] [Id. p15]. However, *he is unfamiliar with the data* underlying the study and admits the study is limited – as tracking only "certain importers" and not "all international transactions" [Id. pp54-55].

D. "Veterinary Animal Welfare Assessment"

As for his "Veterinary Animal Welfare Assessment" ("VAWA"), Perry assess the "conditions, health, and welfare of the animals" based upon review of photos provided by the City of Milwaukee [Exhibit D p.2][4]. Beyond those photos however, Perry was not provided with any other information regarding Plaintiffs' animals – and was not made privy to opinions of others that viewed the animals at MADACC facilities [Perry at p92]. (Meaning he was not made privy to animal reports after the seizures concerning the good condition of the animals – including that of William Ziegler[5]]. Perry never reviewed the photographs in the Kalmanson

---

[3] "Collis, A.H., Fenilli, R.N. The Modern U.S Reptile Industry, Georgetown Economic Services LLC, Economic Analysis Group". [IDMA / Exhibit A at p9]

[4] Acknowledges that "welfare" is not same as "condition" necessarily: "welfare can contribute to their condition" [Id. p81]

[5] Ziegler reports that, shortly after the animals were seized, he went to MADACC and went through as many animal boxes "as he could" and observed that virtually all animals were in good shape, no obvious disease, health issues, none were emaciated; he concludes that -even if some animals had been found in *less-than-ideal-husbandry*-

report. [Id. p7] Perry was not aware of Plaintiffs' rescue and rehabilitation operations; including the status as "holding station" for US Fish & Wildlife Service, amongst others [Id. pp109-110]

Finally, when it comes to reptiles, Perry acknowledged they can "survive for extended periods of time without the presence of water", because:

> "there's actually different changes in their renal system that actually adapt that are evolutionary driven for that…reptiles are better at adapting to environments with less water, period, and that's a fact". [Id. pp115-116]

Even though reptiles have extraordinary ability to adapt, Perry gave no consideration to this "innate plasticity" in his welfare assessment . [Id., p112-113].

## VI.     PERRY GENERAL OPINIONS -  HEALTH & HUSBANDRY

A.     <u>According to Perry, The Only Way An Animal May Be Declared "Healthy" Is By A Veterinarian, After A Full Physical Examination And Confirming Diagnostics.</u>

In Perry's opinion, the assessment of an animal's health requires a physical exam by a veterinarian, plus additional diagnostics to confirm any physical exam findings [Perry at p82 & 92 ]. [6]

Moreover -regarding reptiles- Perry opines that the health assessment must be done by a veterinarian with a "reptile specialty" [Id. pP140-141; 190-191]. Ironically Perry admits he is not credentialed with a "reptile specialty" [Id. p142]. But as a veterinarian, Perry boasts:

---

*conditions at seizure* - the conditions must have been short term, as they did not affected present (good) health. [Exhibit H to Murphy Declaration]

[6] Specifically, Perry testified: "To fully assess an individual reptile's health, irrespective of taxon, a minimum database should be evaluated. This includes a through history which includes a critical husbandry assessment, hands on physical examination, full body radiographs, and blood work consisting of both a complete blood count and biochemical parameters. This minimum database allows for a full assessment of most body systems". [VAWA / Exhibit D p.2]

"I'm pretty good at mortality because I can euthanize a lot of things because, unfortunately, that's what I do in my job" [Id. p158]

### B. Other Noteworthy Opinions On "Husbandry"

When discussing the topic of "animal welfare", Perry acknowledges "it's a personal opinion a lot of times" [Id. p108]; and that "not all zoos are perfect, not all zoos keep animals in perfect husbandry positions at all times" [Id. p106].

A healthy animal that is otherwise in a present, poor welfare state, tells him "that the animal has not been there for an extended duration of time" [Id. p83].

## VII. Perry's Opinions On The "Welfare" Are Based Upon "Ideal States" Of Keeping *Livestock* in the UK.

Perry's "Veterinary And Animal Welfare Assessment" relies upon a novel formula *he created*, which combines his (subjective) scoring on (objective) metrics known as the "Five Freedoms" and "Opportunities to Thrive" [Perry at p75].

First, as to the "Five Freedoms", Perry acknowledges the these "Five Freedoms" by their terms, merely "define ideal states" for managing livestock and are not "standards for acceptable welfare". [Murphy Dec. Exhibit D, p2]. The Five Freedoms purport to "form a logical and comprehensive framework" to "safeguard and improve welfare within the proper constraints of an effective livestock industry" [Exhibit D p 2; Perry at p74].

"Farm animals should have freedom to stand up, lie down, turn around, groom themselves, and stretch their limbs" [Id. p144][7]

---

[7] Perry argues that "Any animal that you could possess could be considered livestock" [Perry at p73]

Although Perry applies these "five freedoms" to the Dragonwood collection as a "veterinarian and protector of animal health", <u>he was unable to point to any legal authority</u> for applying the ideal states, to Plaintiffs' animal collection. [Id. pp75-76].

Second, as to the "Opportunities To Thrive", those are also a "set of desired outposts" [Id. p105] developed by the San Diego Global Zoo for its aviary program [Murphy Dec Exhibit D p2-3]; and in Perry's opinion, were "Developed to replace the seminal Five Freedoms established by the UK's Farm Animal Welfare Council" [Exhibit D p2].

Perry's testimony however, was <u>equivocal</u> as to whether the veterinary industry has actually adopted these metrics, or whether it should:

> "I would say the *veterinary industry should consider applying these metrics*, both the Five Freedoms and the Opportunities to assess animal welfare across species" [Perry at p81, italic supplied];

> "*I think that's been something that's been adopted by the veterinary community* with regards to animal welfare" [Id. p75, italic supplied]

Perry explains that the difference between the Five Freedoms and the Opportunity to Thrive is perceptual: "some people's opinions are that the Five Freedoms are too negative and have more negative connotations, like you're in distress, pain, injuries, diseases, where the Opportunity to Thrive have a more positive connotation and positive language to them" [Id. p84]

Perry acknowledges that "there is no standard necessarily for some of this"; therefore he created his own formula to assess animal 'welfare' in this case – <u>which is the first time ever used</u> [Id. p94].

Specifically, Perry's first scores animals according to each scale: "you do the first scale, then you do the second scale, and then you total" [Id. 98]; and then average [Id. p94] and divide to determine a median [Id. p88]. Perry does this to 'decrease bias in the assessment' [Id. pp93-4]

because of the admitted "abnormally distributed…skewdness of the data" [Id. p87]; the final result is "based off the cumulative score" and a "basic assessment of normal distribution for statistics" [Id. 84]. [Also, see Exhibit D at p3]

Perry's conclusion is that the median rank score for the Plaintiffs' animals, is the equivalent of "poor animal welfare" [mostly due to enclosure size and water issues. [Exhibit D p3; Perry at p.17]. [8]

VIII. ARGUMENT

THIS COURT SHOULD GRANT PLAINTIFFS' r702 MOTION AND EXCLUDE PERRY'S PROFERRED TESTIMONY.

### A.  Perry Has Not Certified Any Opinion (To A Reasonable Degree Of Certainty In His Field of Expertise)

Notably, Perry has not certified in any report, nor at deposition, that his opinions rise to a reasonable degree of certainty (within his field of expertise). This Court should grant Plaintiffs Motion on this ground alone, and exclude Perry from testifying at trial herein.

### B.  Perry Lacks The Education, Training, And Experience To Qualify As An Expert In This Case

Perry's bachelor's degree was dry for about one year, at the time the Search Warrants were executed herein. Fast-forward a decade later: he is now a Veterinarian, but not credentialed as a 'reptile specialist'. Perry's *Curriculum Vitae* reflects nominal reference to reptiles (practical or academic) - and the experience he does have focuses on reproductive systems.

---

[8] Note: if Perry is allowed to testify Plaintiffs will argue they are being penalized for the conduct of the executing officers, who disturbed the evidence prior to taking photos (i.e., photos do not accurately reflect how the animals were originally found). [Murphy @ par 12]

Moreover, there is no reference to formal experience valuing animals - or assessing marketplaces (whether domestic or international).

Likewise Perry is not directly involved in the daily and extended management and husbandry of reptiles. He has never valued an animal collection before. He is not a member of the American Zoological Association's prestigious Crocodile Management School (nor the IUCN's Crocodile Specialist Group). He admits to zero practical experience or training with Chinese alligators and the many other species in Plaintiffs' animal collection. He does not breed crocodilians (or anacondas), and lacks knowledge regarding the breeding Chinese Alligators, and black caimans. In fact he has not even been in the same room with rare and exotic species like those owned by Plaintiffs. Ironically, the only time he has been in the presence of a live Chinese Alligator was through Terrry Cullen's outreach programming.

*Kumho Tire's* "reliability concerns" focus upon (1) Perry's personal knowledge, experience, and expertise; (2) the nature of the issue and subject of testimony; (3) whether Perry's opinions are based upon sufficient facts or data; and (4) whether he has applied reliable principles and methods, reliably to the facts of the case. The focus is on principles and methodology, not upon the correctness of the conclusions. Perry's opinions are not based upon scant and unreliable facts and data, and heretofore unknown principles and methodologies. He presents no "superior knowledge", "skills", "experience", "training" or "education" underlying any of his opinions - particularly as it relates to the type of rare, exotic reptiles in issue herein.

In reality, Perry has never testified in any court – let alone as an expert witness. He presents as a *PETA-planted*, newly minted Veterinarian, seeking to become a reptile expert - whose primary job responsibility is euthanizing animals, as opposed to caring for them.

His opinions on animal welfare, likewise present extreme, *ipse dixit*, academia-generated standards and opinions, based upon "ideal states" for livestock.

### C. Perry's Opinions On Marketplaces And Valuations Are Unreliable And Would Only Confuse The Jury

Perry is unfamiliar with the data underlying his *Collis-based* "International and Domestic Market Assessment" report. [Perry p.54-55]. As to his valuations Perry believes there is no "fair market value" for an animal not yet born. [Perry pp150-151]. However for those animals he did value, Perry's focus is on the consumer values for *skin* and *meat*. His opinions are based upon "how you're getting money from the animal" [Perry, p168]. Plaintiffs however, were not propagating Chinese Alligators and other endangered species, for handbags and tacos. Plaintiffs animals are conservation animals, not readily monetized. Perry admits he does not "know" conservation values. As to his valuation of the rarest-species, Perry's opinions are traceable to one short phone call – reflecting that Mr. Dieter should have been proffered as Defendants' expert. Likewise, -as for crocodilians traded regularly in the market- Perry offers data from (two) online sites for species trade.

A hobbyist turned vet, who goes to reptile shows and searches the internet, does not an expert make. Especially in areas where Perry has no special knowledge.

**D.     As To Animal Welfare, He Is Offering A Personal Opinion Based Upon A "Formulae" He Invented And Never Before Used, Which Is Based Upon "Ideal States" For Livestock in The United Kingdom (And Not Designed As "Standards" For Animal Welfare)**

Perry is not a Vet with a 'reptile specialty' and he did not personally examine the animals run diagnostics.  Under Perry's own definitions and standards, he is incompetent to render expert opinions as to the health and welfare of the animals herein.

Worse, Perry admits that the issue of "animal welfare" is usually a "personal opinion" [Perry p108].   His opinions are based upon questionable police photos, a formula he invented (never before used), and "ideal states" rather than standards for acceptable welfare" - for livestock in Europe.  There is no legal authority for applying these "ideal states" *for livestock*, to Plaintiffs' animal collection.  Perry does it *ipse dixit*.   He is equivocal as to whether the veterinary industry has actually adopted these ideal states, as "standards" for animal welfare (versus whether *he thinks they should* be adopted).

**E.     The Likelihood That Perry's Opinions Will Confuse Issues and Mislead The Jury Substantially Outweigh Its Probative Value, If Any**

Perry's opinions on "welfare" at the time of the seizure bring nothing new to the table. The would be cumulative, confusing, misleading, and unduly prejudicial.

Specifically, by Plaintiffs' count, roughly 175 animals were seized for the sole purpose of "safekeeping" [9] [Murphy Declaration at par. 11].

Perry identifies some 110 as being in poor welfare states, whereas the Defendants seized upwards of 50 animals allegedly (as probable cause) for mistreatment.   Perry's testimony is therefore cumulative, and creates a dichotomy of numbers and opinions which creates an

---

[9]  Excluding feeder mice and rats.  [Murphy Declaration par.11].

unreasonable danger of jury confusion - including the bootstrapping of Perry's numbers and opinions from 2020, onto the police numbers and opinions from 2010 – which then necessarily impacts the number of animals actually seized in 2010 for no reason other than 'safekeeping'.

The material issue is that the Plaintiffs did not get the animals back.   Any poor welfare, (measured by viewing police photos) is not relevant to the jury's decisionmaking.

### IX.   Conclusion.

Although well educated and scholarly, Mr. Perry does not qualify as an expert in this litigation, in any of the substantive areas he proffers.

Perry is a reptile hobbyist, turned recent veterinarian, and working towards his 'reptile specialty', with <u>zero</u> experience in valuing animals or assessing marketplaces (whether international or domestic).   In regards to values, his opinions are based upon scant data obtained from two sources, used in a formula he invented for this case.

Overall, and in the many instances noted above, there is far too great an analytical gap between the scant data and the many opinions offered - connected only by the *ipse dixit* of the expert and "his own say so".   His opinions will not assist the trier of fact and threaten to improperly extend this trial with cumulative, immaterial, and unduly prejudicial information.

Dated: October 26, 2020
/s/ *electronically signed by*
*Attorney Mark P. Murphy*
Attorneys for Plaintiffs
SBN 1017745
657 S. 72nd Street
Milwaukee, WI 53214
414-453-5555