UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

---

| | | |
|---|---|---|
| THE DRAGONWOOD CONSERVANCY INC., et al, | ) | |
| | ) | Case No. 16-CV-534 |
| Plaintiffs, | ) | Milwaukee, Wisconsin |
| | ) | |
| vs. | ) | February 16, 2021 |
| | ) | 9:05 a.m. |
| PAUL FELICIAN, et al, | ) | |
| | ) | |
| Defendants. | ) | |

---

**TRANSCRIPT OF ORAL DECISION/SCHEDULING CONFERENCE**

BEFORE THE HONORABLE NANCY JOSEPH

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff THE DRAGONWOOD CONSERVANCY INC., et al:

Attorney Mark P Murphy
By: Mark P Murphy
7430 Harwood Ave - Ste 100
Wauwatosa, WI 53213
Ph: 414-453-5555
Fax: 414-453-5520
attorneymarkmurphy@sbcglobal.net

Groth Law Firm
By: Thomas W Kyle
11063 W Bluemound Rd
Wauwatosa, WI 53226
Ph: 414-375-2030
tom@grothlawfirm.com

For the Defendant PAUL FELICIAN, et al:

Milwaukee City Attorney's Office
By: Jenny Yuan & Heather Hough
200 E Wells St - Rm 800
Milwaukee, WI 53202-3551
Ph: (414)286-2601
Fax: (414)286-8550
Jyuan@milwaukee.gov

U.S. Official Transcriber: SUSAN M. ARMBRUSTER, RMR
Transcript Orders: Susan_armbruster@wied.uscourt.com

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.

TRANSCRIPT OF PROCEEDINGS

Transcribed From Audio Recording

* * *

THE CLERK: Judge Joseph is on the bench calling Case No. 16-CV-534, The Dragonwood Conservancy Inc., et al v. Paul Felician, et al. Appearances please starting with the plaintiff.

MR. MURPHY: Good morning, Your Honor. Attorneys Mark Murphy and Thomas Kyle on behalf of plaintiffs by Zoom.

THE COURT: Good morning to you both.

MS. YUAN: Good morning, Your Honor. Attorney Jenny Yuan here on behalf of the defendants.

MS. HOUGH: Good morning, Judge. Attorney Heather Hough also here on behalf of defendants.

THE COURT: Good morning to you both as well. I hope none of you had any trouble with the snow this morning. It is certainly one for the books so far. If you're working from home good for you.

We have a lot of terrain to cover this morning, so I want to be efficient. We'll start with old business; that is, I had taken part of the summary judgment under advisement. I'll start with addressing that, and then I'll move onto the motions in limine, and then we'll close out with the other trial business talking about jury instruction, voir dire and, of

course, we will set our jury trial date today.

So with that the old business. If you recall, I took under advisement part of defendants' motion for summary judgment, specifically as to the issue of the overbreadth. I wanted to review affidavits from the search warrant as well as the declaration post Judge Jones' hearing a little bit closer after your arguments to take a look at that.

Part of the defendants' summary judgment on the overbreadth argument had asked me, one, to apply the (indiscernible) on good faith. If you had recalled, I had ruled that Judge Jones had already addressed that, and Judge Jones had at that time all the information that in good faith; that is, the fact that the detectives had sought and gotten a judge to approve the warrant. So that has already been addressed.

The second part of the argument the defendants had made was that there was new information that Judge Jones did not have before him at the time of his decision, mainly the declaration of Detective Simmert.

So I took a closer look at that; that is, comparing what Judge Jones had before him, which was the affidavit and search warrant and the police report and the declaration. And looking at the declaration of Detective Simmert, the paragraph that really addresses -- that addresses the overbreadth argument is really paragraph 14.

And paragraph 14, that's the paragraph where Detective

Simmert explains that you included the python, anaconda, snakes and spiders and turtles based on witness testimony and also based on reaching out to Warden Blankenheim.

Well, that was already in the affidavit, so that's information that Judge Jones had before him, so that part is not new. The only thing that paragraph does is add a little bit more detail in that it added that Warden Blankenheim stated that people who keep illegal animals do not typically keep just one illegal animal but usually is someone who keeps an animal -- is keeping an illegal animal, there are multiple illegal animals that have been kept.

Given this one sentence and compared to what Judge Jones had before him, I am not persuaded that this one sentence addresses Judge Jones' concern that the warrant listed animals without, quote, this is from Judge Jones' decision, "without any basis to believe those creatures were endangered or threatened under Wisconsin law or otherwise associated with illegal activities."

So I will decline to disturb that portion of Judge Jones' argument on the basis that there's no new information that warrants doing so.

The barrels of Detective Simmert's declaration does not speak to the overbreadth issue. As you know, the rest of the declaration goes into more detail regarding the execution of the search warrant, what was observed, more conversation that he

had, so that was not of any assistance to me, so that concludes our old business that I had to address.

As to new business, I think a good place to start is with our *Daubert* motions. And both sides had filed *Daubert* motions to keep each other's proposed experts out, so I'll hear you if you want to add anything to what you have already stated in your brief, and I'll give you an oral decision.

As I read the summary judgment, what I will do is do a minute order that details so that you have my citation, and I believe that will be sufficient for purpose of making sure you have a record if a higher court needs to review this.

All right. So as to the *Daubert* motions, let me begin first. I'll begin first with the defense as to the Motion to Exclude Mr. Kalmanson. If you want to add anything further besides what you had already submitted.

MS. YUAN: Judge, I don't believe that we have anything further to add other than what we've already briefed. Attorney Hough; is that correct?

MS. HOUGH: That is correct, Your Honor. So I think our brief states our argument, and we have nothing to add to that at this time.

MS. YUAN: Thank you.

THE COURT: Thank you. And for plaintiff as to your proposed expert witness, Mr. Kalmanson, do you wish to add anything to what you have to say?

MR. MURPHY: I just repeat I think one sentence that was in my brief that if Mr. Kalmanson is not the expert here, one doesn't exist. Thank you.

THE COURT: Thank you. Because I am going to be talking both about Mr. Kalmanson and Dr. Perry at the same time, does plaintiff wish to be heard on the Motion to Exclude Mr. Perry -- Dr. Perry?

MR. MURPHY: The only -- I have a really brief comment and; that is, that *Daubert* I think looks to the opinion's reliability based upon methodology, sufficient facts, data, reliable principles and methods, considering the witnesses full range of practical experience and training.

And in a case like this, I don't think this new invented vet is a proper expert for any of the four opinions that he's given in total, which he was not even commissioned to give. He kind of just did it on his own, which is interesting on some other levels. Thank you.

THE COURT: Thank you. And for defendant, any -- Either counsel? Ms. Hough, I see you are muted. Do you wish to add anything regarding your proposal to have Dr. Perry testify as an expert?

MS. YUAN: Judge, I think we'll rely on our briefing as well. Thank you.

THE COURT: Thank you. I think for me it makes sense to address both of them at the same time because I was thinking

about them in the same way. And of course as you all know, the same legal standard applies to both regardless of their particular background.

So for the record, I will begin with what you are all very familiar to which is the *Daubert* standard, which is summarized in Rules of Evidence 702, which governs the admissibility of expert testimony.

You know and probably have in front of you 702 says, "that a witness who is qualified as an expert -- a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise give the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; the expert has reliably applied the principles and methods to the facts of the case."

In summary, the testimony must be helpful to the jury. The expert must be qualified by knowledge, skill, experience training or education, and the testimony must be reliable to fit the facts of a particular case.

While the Court serve as a gatekeeper for expert testimony, this should be liberally admitted, vigorous cross examination, presentation of contrary evidence and careful instruction on the burden of proof or the traditional and

appropriate means of attacking shaky but admissible evidence.

In this case, I will allow both Dr. Perry and Mr. Kalmanson to testify as experts in this case. And here's my reason. Although expert witness when you qualify based on either knowledge, skill, experience and training, this is a situation neither of them fit each of the categories, and they don't have to.

Where Dr. Perry is mostly based on his education, Dr. Kalmanson -- Mr. Kalmanson is mostly based on his experience in the world. And also as to Mr. Kalmanson specifically, I think the totality of the experience, and I'm putting more weight on his experience as an underwriter, claims adjustor coverage -- new coverage, which requires him to perform valuation.

This case is odd in the sense that this is not a field where there's a whole universe of competing people who are qualified to do this, as evidenced by the fact that both individuals who are offering testimony, are coming to the issue with different backgrounds. And doesn't mean that neither is wrong, it just means different experiences.

So I find that the information that they are relying on is reliable and would be helpful to the jury. The specific objections that each of you have as to both Mr. Kalmanson and Dr. Perry are the kinds of stuff that will be probed during your cross examination regarding their qualifications, regarding

their methodology and regarding their conclusion, so I'll allow both of them to testify.

As to Mr. Kalmanson, the defense also moved to exclude many reports that were untimely, the three law review reports, and I do agree on the basis that they were untimely that they should be excluded.

While we are on the subject of experts, there's also the issue of Mr. Larsen, who plaintiff is offering as an expert in this case. Mr. Murphy, do you wish to add anything regarding proposing to have Mr. Larsen testify?

MR. MURPHY: The only comment I have is that I did go back and review the cases cited by the defendants, and the primary case that they rely upon was where an expert -- offered expert was going to comment and give an opinion as to whether there was probable cause in a case, which is definitely a no no.

So at first blush, there's cases out there that say you can't do this, and there's others that say you can. I think we have to lift up the lid and see what kind of case we're talking about.

And in this case, Mr. Larsen was one of the first third-party fact witnesses that were there, and he's got an incredible, extensive experience, and he is imposing the very basic -- most basic, minimalistic standards. And basically his opinion what he saw there, it was just not necessary for the execution of a warrant, and I think that's perfectly fair

grounds along with some of his other opinions.

I do agree that he can't take the stand and say the defendants violated the plaintiff's Fourth Amendment rights. These's easy, but I think he can get in there and say, you know, his expert opinions short of that. Thank you.

THE COURT: Thank you. And for defendants.

MS. YUAN: Judge, actually -- Sorry, Heather, I'll let go on Mr. Larsen. Judge, I just wanted to clarify on your ruling, excluding those three reports as untimely by Mr. Kalmanson. Just so it's clear for me besides excluding those reports from being untimely, does that mean then your ruling extends to him not being able to testify as to any opinions that he expressed in those reports?

THE COURT: Yes, he can't. They were given after the deposition, so the door is closed as to those three reports.

MS. YUAN: And the opinions expressed. Thank you.

MR. MURPHY: Judge, then I assume that those are fair game for any rebuttal though?

THE COURT: If -- If the door is open as to them, of course.

MR. MURPHY: Thank you.

MS. YUAN: Attorney Hough, I know you're going to address Mr. Larsen, sorry.

MS. HOUGH: So just a couple of things about John Lewis Larsen as an expert witness, Your Honor. Attorney Murphy

just asserted he was a fact witness. A fact witness is different than an expert witness. And here, his report -- the only thing he offers in his expert witness report is a legal opinion. So while we have filed a number of motions about expert witnesses, this one is most alarming.

He's there certainly not as a fact witness because he did not observe anything that took place. He came in afterwards, and the only thing he will opine to is that our defendants have violated the law, which is what this case is about.

And so the City fully briefed this in its motion and response and just want to highlight to the Court that Mr. Murphy characterized this witness as a fact witness just now; however, has offered him as an expert witness in this case. Thank you.

THE COURT: Thank you. Mr. Murphy, you're looking like you wish to add something?

MR. MURPHY: Thanks, Judge. I am going to defer to my counsel here.

MR. KYLE: Your Honor, he didn't say just as a fact witness. He said that he is one of the few people third parties to be at and witness the destruction that happened. He didn't say that was a reason. He listed him as an expert witness. He has always been an expert witness.

It's no different than in a trucking case where you have a trucking expert or a medical malpractice case where we

have a medical malpractice case. You're trying to say he's negligent, but he can't. A medical practice expert can't say, yeah, he was negligent, but he can say he violated the standard of care. Same thing with a trucking expert. If you exclude these experts, what you have then is you have an expert, and let's call them Felician and Simmert because this is their job and then no one would testify against him that has the chops to do it. So you're kind of leaving the I guess the plaintiffs out there to prove someone who has the expertise to tell the jury that, no, just because they are cops and they are testifying they did it the right way, that that was the right way. That's why you need testimony like someone like Larsen or a trucking expert or a doctor testifying in a medical malpractice case. It's no different.

The analogy is exactly the same. But this witness was also a fact witness as well because he was one of the first people on the scene from a third party to be able to witness the destruction, so he also has that, which is another level.

MS. HOUGH: Your Honor, if I may just add. This witness is different than those that Attorney Kyle offered because there's an assumption being made that our two defendants did what they're alleging that they did. So his testimony comes in, one, he offers no facts or testimony to say Felician and Simmert did this or observed this in any way. The testimony he offers is based on an assumption that our defendants did this.

And so when he offers testimony that they may -- they went beyond what a reasonable person who have done in a search, they're providing to the jury an assumption that our defendants did this. He offers no testimony to say that they are the ones that caused this. The only thing he offers is a legal opinion after the fact.

MS. YUAN: And Judge, I'd like to also add, I took Mr. Larsen's deposition. He made it very clear at his deposition that he did not witness any -- I guess it's obvious right because that's in the record when he first went to the properties is going to be in the record, and it was after the execution of the warrants. What he testified is he did not witness who he caused what damage he was viewing while he was at the properties in response to Attorney Kyle's statement that he was one of the first witnesses to witness the extensive damage there.

I mean, I think that's something that we're working very hard to ensure that the jury isn't tainted with information like that with that kind of where they might be thinking this witness has that knowledge when, in fact, they don't.

And frankly to try to separate Mr. Larsen between "fact" versus how they're going to be presenting him, we're not disputing that he has a lot of experience. His credentials -- His C.V., we reviewed that. That's going to be all before the jury. He's going to be held up as this expert, and then we're

going to have him opine on areas that simply is for the jury to decide on its own. But so there's a real danger if you were to allow this expert to come in given how he's going to be presented by the plaintiffs as someone with all this extensive knowledge, so they're going to be holding his opinion up in a higher level than I think any other witness that's presented as a fact witness.

THE COURT: Okay. Thank you. Mr. Kyle, you're nodding your head. Is that nod like is that equivalent to waiving your hand here?

MR. KYLE: Yeah, it's kind of raising my hand. I guess it is no different than a trucking expert or medical malpractice expert. The fact that they are not there in the operating room when the malpractice went down or when the trucking accident happened.

They are never in that situation, so that's just absolutely ridiculous to even say that. Hopefully, we can put that argument to bed for the rest of this hearing. No one was there, and the cops did come there. Judge Jones specifically addressed that in both of his orders.

So to leave plaintiffs hang with no one in regards to having a police officer's type of training to testify would really just be hanging the plaintiffs out to try because you have a bunch of cops who are going to testify and they will say we did this by the books and this is exactly how it went down.

Larsen will say hold on, that is not necessarily the case. He's not making a legal conclusion even though the federal rules allow him to do so. He can testify on what reasonably should have been done and what procedures should have been followed.

THE COURT: Thank you all. Well, let me start with in your -- in plaintiffs' summary of witnesses, your witness list, you summarize Mr. Larsen as testifying that amongst other things, that the defendants search and seizure was unreasonable, and that is precisely the question that the jury will be asked to answer in this case, and that is not allowed by the rules for expert witness to come in and answer the ultimate question that the jury will have to testify.

I need not repeat Rule 702. That is the same standard that I'm applying here. In applying Rule 702, there's no question that Mr. Larsen has excellent credentials and is qualified. That's not the issue as I see it. The issue as I see it is whether or not the information that he is providing, one, would assist the jury. Or, two, whether the information he is providing is doing the job that the jury has to do in this case; that is, determine reasonableness of the officers' conduct.

Now, there are cases. You make the medical malpractice analogy where you have a doctor who is not in the operating room to come and testify. That doctor is testifying as to special knowledge, procedures that a lay person would not

be familiar with here.

In the facts of this case although the parties are making this case more complex than the way I see it, this is not a complex case. There is no particular police tactic at issue, special police move or takedown that you might see in an excessive force case. There is no special equipment being used here that a jury would not be familiar with.

Under the facts of this case, Mr. Larsen's testimony would not provide any assistance to the jury, so I will not allow him to testify in this case on that basis. Go ahead. Is that Mr. Murphy jumping in?

MR. MURPHY: What about -- I understand your ruling on that, that he can't say the search is unreasonable. But what about testimony short of that, that the destruction he witnessed was not necessary to effectuate the warrant at issue?

THE COURT: Well, my view of that, Mr. Murphy, is this. In his report, he talks about whether they were in compliance with law enforcement guidance or ethics. That's not an issue here. It's not whether they followed the book, whether they were reasonable as the jury will be instructed, and that's something -- Reasonableness, those are -- I'm not saying it's an easy standard, but that's the kind of standard that a jury use and fact finders have to wrestle with and have to follow the instructions. So I -- I'm not persuaded that Mr. Larsen will add anything helpful to their analysis.

I'm also resting my decision on 43 in that there is a risk the jury putting undue weight on what Mr. Larsen has to say if he is allowed to testify as an expert witness instead of properly assessing the reasonableness based on common sense and the totality of the facts, which they will be instructed to do.

MR. MURPHY: From your ruling, Judge, can we take it that the defendants are not be going to be allowed to testify that their search was reasonable on the flip side?

THE COURT: On the flip side, no. That's for the jury to decide. What the defendants will be allowed to testify, this is what I did. I went in the house, and this is why I did it. The question then whether what you did and why you did it was reasonable, that will be for the jury to decide.

MR. MURPHY: Thank you. And I presume, though, if necessary, Mr. Larsen can testify as to his personal observations as strictly as a fact witness?

THE COURT: Yes. If he observed something relevant to the case, yes, he could testify as a fact witness.

MR. MURPHY: Thank you.

MS. YUAN: Judge, again, I think then Mr. Larsen's testimony, as far as I'm aware, will be part of some of the motions in limine that we have in front of you, which is any discussion regarding the damage. Mr. Larsen made it very clear at his deposition that he didn't witness who caused the damage. He doesn't know how the damage was caused. He was there after

the fact and saw what he saw. But to make that leap as to the causation, I think, is a dangerous -- to allow that in when he really -- He's hired by the plaintiff to come in and then he saw what he saw.

THE COURT: I agree. As with any -- all witnesses, right, they have to have personal knowledge, and he can't say Felician broke down this door. He did not observe it with his two eyes, right? So that's to me, that's obvious, or Simmert left these soda cans in the house if he did not see it for himself.

MS. YUAN: Correct, Judge. My concern with Attorney Murphy asking you if Mr. Larsen may be permitted to testify as to some fact issues is -- I reviewed his report. I took his deposition. He's very clear. His report is saying what the police did. That's the whole basis of his report. What he made it very clear, he does not know who did what, who left what, who was in the place or in the properties. And, in fact, the record will show there were many other people, in addition to Simmert and Felician, that were there.

So we really, you know, defendants are asking the Court for a ruling to completely exclude Mr. Larsen's testimony.

THE COURT: Mr. Murphy, what is your proffer as to what Mr. Larsen would testify to as a fact witness?

MR. MURPHY: I don't believe that Mr. Larsen was ever going to say either one of these defendants did something

personally. He came in after the fact. He's a damage witness. He's corroborative. He's going to testify that he saw what we're calling water in the basement, which is a big deal because it wasn't just a wet floor. It was actually inches of water whereby basements were flooded, and we believe intentionally or at least recklessly.

And basically, he's going to corroborate other things that he saw. He's not going to say the defendants did anything. He's just going to say exactly what Your Honor said what he saw in terms of property damage.

MR. KYLE: And Your Honor, it's a good opportunity for advocacy. That is what cross examination is all about. If they want to get into what he saw or didn't see then go ahead, you can have him on the stand, you can cross him and make him look as ridiculous as you want to make him look. Still he was there. He saw. He has personal knowledge. If you want to say he doesn't, then cross examine him.

MS. HOUGH: Your Honor, I just want to assert that his testimony then would be cumulative. They certainly have a number of witnesses that came in months after the warrants were executed who will assert those very same things. So the danger here is then his background and expertise may persuade the jury to believe him in a different way than all of their other witnesses who will testify to the very same thing. So as a fact witness, he offers nothing more to this Court and the jury than

many other witnesses that the plaintiffs will be calling in this case.

MS. YUAN: Judge, if I may. In hearing what plaintiffs' counsel has argued regarding Mr. Larsen as a fact witness, they've made it very clear that -- To say that Mr. Larsen -- They are admitting Mr. Larsen does not have evidence against the only two defendants that are in this case. He's not going to speak to what Simmert or Felician personally may have done in those properties is the very reason why this Court really should exclude him.

There's a risk of confusing the jury or having the jury put more weight with his testimony given his background, and it's not a question of cross examination as to whether or not Mr. Larsen had personally witnessed or has any personal knowledge of what occurred.

Mr. Larsen already testified that he does not know how a coke bottle or something that was left behind was left there. He doesn't know who did it. He doesn't know how the damage was caused. He's admitted that under oath. To allow that to come in and then rely on defendants to then have to make that point still allows his coming in and speaking to the jury with his background, and there's just too much of a risk that the jury is going to be unduly swayed by -- by his background.

THE COURT: Mr. Kyle, you're raising your hand. If you could also answer how would Mr. Larsen be presented to the

jury as a fact witness? We hired him to come and check this house, the property out? Can you explain that? Set him up as a witness for me.

MR. KYLE: Absolutely. It all depends on your limitation rulings, Judge. But real quickly, all we have to do is go back to your order, your December 4th order. That's why I hope we just stop arguing about they weren't there to witness the damages because you addressed that in your record. You talked about the failure to intervene. We've already been there. We've already done that.

THE COURT: Okay. So what does Mr. Larsen have to say about failure to intervene?

MR. KYLE: By his failure to intervene?

THE COURT: What does Mr. Larsen have to say about Simmert or Felician's failure to intervene?

MR. KYLE: You first said that there's a possibility that he can testify as a fact witness for what he saw. And if you allow him to testify with regards to the failure to intervene, I'm sure he will say this. This destruction didn't need to be done and no matter who did it. It was up to the people who were controlling the scene to make sure that it didn't happen.

THE COURT: Okay. So you're offering an opinion regarding that. Okay. The more that the parties talk about this, I'm just going to categorically exclude Mr. Larsen.

Here's my concern. That by allowing him as a fact witness, that that's a backdoor way of contravening the order that you're not allowed to testify as an expert witness.

Now, if during the trial other witnesses are not able, you may take it up with me again or offer what the house looked like or the condition of the house. You may ask me to revisit it. But from what you both are saying right now, Mr. Larsen will not add anything to this trial. All right. That has addressed our three expert witness.

Now, I'm going to move to the motion in limine starting with the plaintiffs' motion in limine, and I'll go through them in the order that they were numbered. Some of them the parties are not objecting to, so I will -- We can dispose of those very quickly.

Motion in Limine No. 1. There's no objection to from the defense, so I will grant that motion.

Motion in Limine No. 2 from the plaintiff to exclude evidence referencing underlying criminal proceeding Milwaukee County case. I agree there's no reason in this trial for the jury to hear about the underlying sexual assault case in Milwaukee County, so I will grant that portion of Motion in Limine No. 2.

It's also to exclude, like, a sensitive crimes being stated. I guess to the extent I think the defense responded that Felician and Simmert, I guess, part of their background

would say we're detectives with sensitive crime. Am I understanding that correctly the defense?

MS. HOUGH: Yes. That's where they were assigned at the time this all occurred. So that is the department in which they worked and, you know, for a number of years that is their assignment. So to exclude that means excluding what the nature and role of their work is.

THE COURT: Yeah but because we watch enough television to know sensitive crime has to do with sexual offenses, I think for purpose of laying out their background, I think it is sufficient to say they have been detectives with the Milwaukee Police Department for X number of years.

If the point is that they were not in any special animal unit, they can be asked that directly. But we can just leave out sensitive crime without taking anything away from the defense narrative and also without risking or inviting the jury to speculate why sensitive crime is doing animal warrants.

Is there anything else I need to address as to this motion in limine, Mr. Kyle or Mr. Murphy?

MR. MURPHY: The only thing I would say, Judge, is the warrant itself and/or the affidavits -- if the affidavit even goes into evidence, I'm not sure it does. But they may need some redaction along the way, which I'll keep an eye out for of course.

THE COURT: Yes, that's also -- That's also

appropriate. The affidavit does -- at least in one paragraph does mention a sexual assault allegation, so that can be redacted from the exhibits.

MR. MURPHY: Thank you. And then part of my motion was except for Mr. Cullen's petition for the return of his firearms, and he was not convicted of any crimes.

THE COURT: I'm sorry, please say that again, Mr. Murphy, as to Motion No. 2?

MR. MURPHY: Yeah, I asked the Court to exclude everything from the circuit court except for two items I thought were particularly relevant. Number one, that Mr. Cullen petitioned for the return of firearms, and that's how he got firearms back in this case.

And second, Mr. Cullen was not convicted of any crime as a result of these search warrants.

THE COURT: Any objection to that?

MS. YUAN: That at trial, and I just want to be sure I'm clear, Attorney Murphy, that you're asking at trial what can come in is that Mr. Cullen did petition for return of his firearms, and that he was not actually convicted of any crimes. You want that to come in?

MR. MURPHY: That's correct.

MS. HOUGH: But nothing else from the criminal proceeding can come in, including the petition for the animals, which was denied and all of those things?

MS. YUAN: Judge, I think that needs to come in. I think defense should be able to ask Mr. Cullen because that's a logical question that's going to come up in the jury's mind. Mr. Cullen, what has he done before this lawsuit was filed? He did try to get these animals back. I think we should be allowed to ask Mr. Cullen if he's taken any steps and what he did, and that does go into the proceedings that occurred in the criminal case just pertaining to the return of the animals.

THE COURT: Why do we need to get into that area? And this relates to a couple of the other motions in limine, right? If you recall, the continued deprivation is no longer a claim in this lawsuit, so why do we need to get into anything having to do with the continued retention of the animals, efforts to get the animals back or anything related to that.

MS. YUAN: Thank you. I really think it speaks to the damages that plaintiffs are claiming in this case. I mean, they are claiming damages spanning and it may even increase when we took Mr. Kalmanson's deposition. But there was this calculation of Mr. Kalmanson of every year that Mr. Cullen didn't have these animals, the type of damages he suffered. And I think it speaks to could he have gotten those animals back cutting off the damages from the defendants' perspective?

THE COURT: So you are making it a mitigation argument?

MS. HOUGH: Correct.

THE COURT: Okay. Mr. Kyle or Mr. Murphy.

MR. MURPHY: Your Honor, this issue has been handled in Document 71 in Judge Jones' ruling where he said, "Mr. Cullen was therefore never provided a reasonable opportunity to demonstrate that his animals were improperly taken or wrongfully withheld." That is on the first paragraph page 15 of 18, Document 71, where Judge Jones went through this whole diatribe about what happened to him in the circuit court, and that there's nothing else he could have done; that the error by the circuit court is what stopped him from getting his animals back.

So Judge Jones has already made that -- made that finding. It can be read to the jury.

MR. KYLE: This will open a huge box of worms if we get into that because that's where we then have to prove up what the Judge already found.

I think Your Honor is right. If we're talking about the point of the initial seizure was a permanent deprivation reasonably foreseeable, these orders are clearly immaterial.

MS. HOUGH: Your Honor, if I may though. So this case, there are two tracks. One, whether or not Felician and Simmert are somehow liable for any damage that occurred at the properties or the seizure of the animals.

And then two, if they are, if the jury finds that, then what are those damages? And so understanding that Felician and Simmert did what they did and whether or not a jury finds in

their favor or not beyond that, how do you calculate damages?

This information in the criminal case related to petitioning the court for the animals and being denied. And whether wrong or right, how then should Felician and Simmert have to pay for that is certainly something that the jury needs to hear and decide when they're determining damages. And you know --

THE COURT: I hear what you're saying, but I still have this question for all of you, right. If the claim is the initial seizure, when does the damage clock stop running? Because the initial seizure is the constitutional claim? Does it stop there, or are the parties in agreement that the damage clock keep running?

MS. YUAN: Well, Judge, I think it has been very clear in our interactions and defendants' interaction with plaintiffs' counsel, that the damage clock is continuing to run up until we get to trial. And I think they in making their argument to you, Judge, in saying this must be excluded, they are saying that Mr. Cullen didn't have an ability to get those animal back; that it was based on this Judge's order. Well, and they are taking about foreseeability for our defendants, the two named defendants.

I think that's completely relevant to be able to present to the jury that it was not foreseeable for Simmert or Felician that this Judge would rule in this way, and that's a

subject matter that can be questioned, you know, if they've ever experienced this before, what's happened in the past. To allow for the millions of dollars of damages to be resting on the shoulders of Simmert and Felician because plaintiffs want to argue that it was foreseeable for them when they seized those animals in May of 2010, that Mr. Cullen would never get those animals back, it's hinging on this court order. I think that's very relevant and highly prejudicial if it was excluded for defendants to be able to show how could they possibly have known what this judge was going to rule on or what motion Mr. Cullen would be making and what law he'd be relying on. To make that kind of leap is unreasonable would be defendants' argument.

And I will say that a court -- It's very clear plaintiffs want to argue that Felician and Simmert should have seen that; that it was foreseeable for them that the animals were never going to be returned to Mr. Cullen. And to exclude this very relevant piece of evidence, I think, would be highly prejudicial. It really is completely relevant to why Mr. Cullen -- one of the reasons why he didn't get the animals back.

THE COURT: Okay. In the interest of time, let me take this -- this portion of the motion under advisement; that is, looking at this Milwaukee County court order as to whether or not it can come in on the question of mitigation and foreseeability. Whenever there is damages, you all know,

mitigation is always an issue. Let me take that under advisement, take a second look at that.

MR. MURPHY: If I can just very briefly. The damage clock does not continue to run. I'm really concerned about counsel kind of molding of what's going on here. The record is perfectly clear. The plaintiffs are seeking the value of the animals that never came back, and either one or two rounds of breeding. That's it. In theory, he could have kept say breeding all the way as these years go by, but it is a boxed damage claim at this point.

And Judge Jones basically said that the damage clock runs to what's reasonably foreseeable, which is what the law is. That's our claim is that the permanent deprivation here and loss of animals was a reasonable foreseeability at the time of seizure, particularly where both defendants agree that MADACC had no capability to handle this influx of animals and mostly exotic animals.

MS. YUAN: And Judge, I want to make sure it's clear. I know Mr. Kalmanson's report and his deposition is part of the record, but it's a very big record. And I apologize if my recollection is incorrect. But I was at Mr. Kalmanson's deposition and his report takes out the damages through the time when he actually wrote the report. That was nine years that he was opining about before he finally issued the report.

So it's not -- I mean, we want to talk about rounds

of breeding, but really they're relying on the damage claim up until they actually hired the expert. So I was under the impression that they are taking the position that these damages continue to run based on the initial deprivation. But I just wanted to make sure, Judge, that you're aware of our position on that.

THE COURT: Thank you. All right. I will take a second look at that. Motion in Limine No. 3 seeking to exclude all evidence preceding the date and time of Simmert's presentation of the application for search warrant to the court commissioner. What are we talking about here? What are we talking about here, Mr. Murphy, all information preceding the date? Are we back to the sexual assault information?

MR. MURPHY: I think it's everything because this Court has found probable cause so we don't need to mitigate whether or not there was enough facts for probable cause. I think we start at probable cause if the warrant was issued and we go from there. Otherwise, we're going to -- This case will be expanded by days if we're going to relitigate the probable cause finding.

THE COURT: No, we're not going to relitigate it because I'm not going to allow it. But since the question is reasonableness, right, of the seizure of the animals is always relevant what did they knew at the time of the execution of the search warrant? That includes the information from the search

warrant, so I don't -- I guess I'm denying this motion in limine and agreeing with you that we're not -- This is not a door to reopen and relitigating the motion in limine.

The only reason I'm denying it is because if it's a question of reasonableness, it's going to be what did the officers knew, what facts are they acting upon? And I can't see to close a door as to a particular time. You know, what did they know? You know, did they know the investigation that preceded getting the warrant and so on.

Okay. Number 4, exclude use of highly prejudicial use of language by law enforcement reflected in the report such as house of horror, near or actual vomiting, and shoveling. Does the defense wish to answer to this one?

MS. YUAN: Judge, I'll just mention that these terms were memorialized in police reports. And I think insofar as any officers or any individuals that were part of the execution of the warrant that were present were going to describe what they saw, they should be allowed to do so. And plaintiffs can argue how they want to present evidence to the contrary as during discovery in this case. That is defendants understanding that that's what's going to occur. They are going to present a different set of facts as to what was present at the properties, and that's their right to do so. But our argument would be that our witnesses should be able to describe what they observed in their own words.

THE COURT: Mr. Murphy, Mr. Kyle.

MR. MURPHY: I don't have much to add except, you know, I think the police were very careful about putting into their police reports. I think there were two references of one guy gagging and one guy vomiting whereas there's probably 35 people there. I mean, then do I have to prove that these two have a poor gag reflex as compared, you know, to the masses?

THE COURT: Okay.

MR. MURPHY: How is that relevant to any fact that's material?

MS. HOUGH: If I may to the extent that --

THE COURT: Hold on one second. I think Mr. Murphy was mid-sentence. Mr. Murphy, you can continue.

MR. MURPHY: Thank you. I was done.

THE COURT: Go ahead, Ms. Hough.

MS. HOUGH: To the extent that our officers may be able to testify that this is what occurred to them at the scene at the time, they ought to be allowed to testify to that. It isn't about proving whether or not they gagged when they got there. That is their testimony, what they observed, you know, their description. To disallow them to use certain terms is akin to disallowing the plaintiff to use certain terms about how outrageous this damage might be or any other descriptor they might use.

I feel -- I feel like this request is saying we need

to sensor our witness testimony in a way that doesn't make a whole lot of sense to me.

THE COURT: Well, there are times I do order you to sensor your witnesses, right, so I will like, for example, order that none of the witnesses mention sexual assault.

MS. HOUGH: Correct.

THE COURT: But for this, this is different. This is witnesses testifying what they saw, smelled, heard. They could use their own language to -- to describe that, so I will deny that and, of course, it can be cross examination, whether they are exaggerating or play acting or however the plaintiff wants to challenge them.

The next one, Motion No. 5. Testimony and evidence about the amount of ammunition seized. There's no objection to that, so that will be the granted.

Number 6, to exclude testimony and evidence about officers seeking gynecological books. I will also grant that. That's not relevant to anything that's at issue in this case.

Number 7, motion to exclude the testimony of evidence of prior bad acts of plaintiff witness Erik Katz relating to a previous citation an for animal-related offense. The defense object to this. So while I have Mr. Murphy or Mr. Kyle speak to this a little bit more. You spoke to it in your -- I think in your reply is where for the first time you expanded on what this issue is about, so you want to tell me what this issue is about?

I understand there was a house that was foreclosed. Subsequently, Mr. Katz received a citation.

MR. MURPHY: Right, I can be brief, Your Honor. Mr. Katz was associated with the plaintiffs, and he observed property damage. He observed -- You know, he has knowledge of what the buildings looked before the raids and how they looked after the raids, so he's a property damage witness, and he also helped the plaintiffs in their protocols in feeding, cleaning, preparing for transportation, et cetera. That's what he is going to testify about.

However, apparently he got a ticket for an animal-related offense that the defendants want to cross-examine Mr. Katz about whereas Mr. Katz is not giving any of his own opinions about husbandry or care. He's just saying I was with the plaintiffs, and I did what the plaintiffs told me to do. Thank you.

THE COURT: Thank you.

MS. YUAN: Just briefly. I took Mr. Katz's deposition. You know, he testifies quite a bit about his relationship -- his longstanding relationship with Mr. Cullen and how it began as an internship and how he learned about care of animals and reptiles and his interest in them. It goes to his foundation. I assume plaintiff will be bringing out that information to show his credibility and how he learned care of animals through Mr. Cullen.

And in our investigation of witnesses as you know as we're preparing for discovery, we did discover that Mr. Katz was issued and arrested for a matter pertaining to how he kept certain exotic animals. It was actually very similar in some of the police reports to the police reports in this case in terms of what was found and the animals being seized, and I think it's relevant to show if we're going to be able to attack his credibility in terms -- He also testified as to the feeding schedule and the care of Mr. Cullen's animals and what he knew about that as Mr. Murphy stated.

So I think it's fair game to be able to attack his credibility as to what he's learned and how he takes care of animals and how that's played out in terms of his relationship with Mr. Cullen and what he learned in that relationship.

THE COURT: So this is to say, well, you were not a good intern or you didn't learn anything because he got a ticket or animal citation. You know, if it's something related to his truthfulness, that's always fair game because a witness' credibility is always at issue. I don't understand the point of how this citation rebuts, attacks, challenges his credibility.

MS. HOUGH: Well, Your Honor, so if he is used as a witness to speak to property damage alone, then this would not be an issue. But here is our concern. So he is going to testify he learned from Mr. Cullen. Mr. Cullen was a mentor on how to care about these animals. Mr. Cullen knows so much about

exotic animals. That speaks also to damages because Mr. Cullen is going to assert that his animals are worth this amount of money and breeding them is worth this amount of money, and he's such an expert. These animals were in pristine condition, and therefore that's why they are worth this much.

Now, if you have somebody come in to say they've learned all this stuff, they were monitored by the plaintiff and took care of these animals in a certain way, well, what speaks to the credibility of taking care of the animals a certain way that gives them a certain value is you have a prior conviction that you didn't take care of animals in a certain way.

And so I think that this, then if Mr. Katz is limited to testifying to strictly the damage he observed months after the warrants were executed however that may prove Felician and Simmert are responsible, that's one thing. However, he's being offered to almost bolster the credibility of the plaintiff and then -- and then speak to his great care of these animals and how he's observed that great care of the animals, and that goes to damages.

THE COURT: And Mr. Murphy, is Mr. Katz also saying I too am a good animal caretaker?

MR. MURPHY: He's just going to say I worked for the plaintiff. I did what the plaintiff told me to do. I did this stuff, I did that stuff, and I saw the damage. Thank you very much.

THE COURT: Okay. So this is one I'm going to wait and see how he testify. Again, the main point of his testimony, this is the damage that I observed, I don't think we need to get into the citation. We'll see how his testimony plays out in real life.

MR. MURPHY: Thank you.

THE COURT: Number 8 is not objected to; that is, to exclude testimony or evidence on the issue of required federal and state permits.

Number 9. Exclude testimony and evidence of the legality of plaintiffs' ownership, including whether it was previously litigated under circuit court proceedings. What are we talking about here?

MR. MURPHY: Your Honor, if I may. The investigation of the defendants started with the -- they thought a permit was required under Wisconsin law, and that the plaintiffs were not legally in possession of these animals because of that.

I believe counsel have agreed that we're not going to litigate permitting or the legality in that respect. But what I'm concerned about in addition is that if the -- I'm sorry, if the defendants get to testify about what they knew in the run up to the warrants if they're starting make allegations about permitting and legality and possession without a permit, then we're litigating permits, so that's kind of my concern.

And that is really a rabbit hole when you talk about

permitting exotic species because technically Wisconsin doesn't grant permits for exotic species. It's a federal matter, and they don't grant permits except on very limited circumstances for interstate commerce. And if you're educational and nonprofit, you don't need permits for even that, so it's a really complicated web that I'm trying to stay out of.

THE COURT: Okay. Defense, are we going to get into permits here? What are we talking about here? And if so, why?

MS. HOUGH: So I think, you know, what our officers knew at the time of executing the warrants to the extent that it's valid that they may have believed a permit ought to have been had for particular animals and it was not, that mistake of law could be okay to find what they did as reasonable.

So, you know, we're not going to attack the permits. Now, one thing that not necessarily the permits but whether Mr. Cullen could legally possess certain animals may speak to damages. If he has Chinese Alligators worth $2 million dollars, but you're not allowed to possess Chinese Alligators, that's akin to a drug dealer coming to court seeking damages for his cocaine.

So I don't think that we would get into permitting at all, you know, and get that nuance. Again, this case is simpler than we're all making it I think.

THE COURT: I disagree, but go ahead.

MS. HOUGH: You know, I do think that whether or not

Mr. Cullen could legally possess animals if he's claiming $22 million dollars in damage, it may be relevant to ask that question on the legality of his ability to possess.

MR. MURPHY: I mean, we have a stipulation on that counsel because this really comes as a surprise to me because you saying I really think we're not going to litigate permitting. It that's the case, I will have to check my pretrial report, but we had specific witnesses listed originally to come and testify that these animal permits were not required and not even available. So if we're going to litigate that, I need to know.

MS. HOUGH: I just said I don't believe that that's going to be an issue at all.

MR. MURPHY: You don't believe.

THE COURT: Okay. So is what I'm hearing from the two sides is that this legality issue has been addressed by stipulation?

MS. YUAN: Well, Judge, I want to make sure we're clear. There's a difference between permits which I think was what we're saying that wasn't going to be an issue at trial. But I think it may be broader on what Attorney Hough was touching upon in terms of what our officers considered in terms of was it legal for these type of animals to be in the location that it was? I think that goes to the, you know, mind frame of the defendants and in terms of when they were seizing the

animals as well so that may be relevant.

But Attorney Murphy to your point if you're asking are we going to get into or present to the jury Mr. Cullen didn't have this permit, it was illegal for him to have this animal, no, we're not going to go there. We don't want to touch that issue. We don't need those other witnesses that you're mentioning about to bolster or address the issue of permits. But I think this motion in limine that we're looking at, number nine, is worded broader than that. We just want to make sure that we're allowed to get in all factual evidence that our defendants took into account when they seized the animals. And some of it may have been the dangerousness of these animals, should they have been -- You know, are they allowed to be here in this neighborhood in this home next to these, you know, these other businesses and other homes nearby. I think that that's all part of the reasonableness when the animals were seized.

MR. MURPHY: Your Honor, I can read our stipulation. Heather Hough email -- Actually from Jenny Yuan, October 22nd at 10:48 p.m. to myself and Mr. Kyle and others at number three. "Plaintiffs agree, that's us, permitting of animals is not an issue in this case. Plaintiffs stipulate to not calling any witnesses to testify as to permitting, and plaintiffs will not elicit any testimony as to the issue of permitting as long as defense counsel does not elicit any testimony or put in any evidence regarding permitting. Defendants agree not to solicit

testimony or put in any evidence regarding pertaining to the permitting of animals, and plaintiffs specifically agree not to call my permitting witnesses."

MS. YUAN: Yes, I think that's consistent with what I just said to the Judge. We're not going to touch permitting. It's just an issue. The way Motion in Limine No. 9 is worded is broader than that.

MR. MURPHY: I'd like to finish. The officers apparently will testify we thought a permit was required, and that's why we did some of the things we did. If they say that, I mean, I guess maybe not in my case in chief, but it will make a rebuttal case for me, and I will bring in witnesses in.

Second, counsel says he's not allowed to possess a Chinese Alligator. What is the authority for that? That simply is not true in this case. And if we have to litigate, we're prepared to do it, but I thought we carved that out.

MS. HOUGH: So I want to clarify that for you, Attorney Murphy. First of all, our defendants, Felician and Simmert, should be able to testify to what they knew or what they knew at the time of executing these warrants. One of the things they knew and whether or not they were mistaken or not could have been I knew -- I learned that there needed to be permits for some animals, and I believed this to be true. That's something that is not getting at the permitting where we need to then say you were wrong. This is -- He had all the

right permits, and here are a million witnesses to testify as such.

It's just, you know, he is able to get in his frame of mind when he got the warrant and then subsequently executed what he knew at the time. It could be a mistake of law. We get that. But a permit whether or not Mr. Cullen had one is just a factor in that testimony.

So we're saying, we don't need to get into whether or not Mr. Cullen had permits, he needed permits. All that stuff in the weeds of the specific email you read, we agreed to that. But we cannot agree to not mention permitting at all when it is relevant testimony to what our officers knew at the time that they executed the warrants. It is very relevant or could be relevant.

MR. MURPHY: That's why we don't need to go into all of the run up to probable cause. That's the problem with it. Because regardless of what they knew or didn't know, the court authorized them to do certain things. And the issue is what they did and how they did it.

So if we're going to mistake of law, that's a whole nother can of worms. I don't think it helps the defendants. I think the defendants maybe could say, well, we were concerned about whether or not he was legally in possession. We were concerned about this. But for them to say, yeah, you know, we thought he needed this. I think that crosses the line because

then we're going to have to prove that he didn't. We can't disprove whether they were concerned about something. If they were, they were.

THE COURT: Okay. The issue at trial is why did the officers seize these animals, right, and also the manner of the execution of the warrant? So I think everything that we're talking about, we always have to bring it back to what is it that we're going to be asking the jury to determine, and it's these two very broad questions. Do I have the questions correctly as to what the jury will be asked to do? Why did they seize these animals? The animals were seized because they had a warrant for it. Well, that's not an issue. That has already been addressed. We're talking about here animals that were not authorized by the warrant or that the judge was overbreadth, and they're going to explain why they took them.

So this permit issue -- Both sides may be making a bigger deal out of it. Is this one of the main reasons, the driving reason as to why this particular category or subcategory of the animals that were taken were taken?

MS. YUAN: You're waiting for a response?

THE COURT: I'm hearing silence. You already have a stipulation on this issue, so I'm directing you to talk again about this. How would this come up other than the stipulation? And then work this out, a way that both sides can execute the stipulation without getting a side issue. Not everything is

going to end up into another side trial. It's not going to happen. We're not going to do that. The issues really are focused. A lot of pretrial work has been done to focus what the issues at trial are.

So that's the driving principle here. So I'm going to just order you to take a look at your stipulation on this issue and see if it addresses both of your concerns, and we can address it again closer to trial.

Number 10. Exclude testimony and evidence on defendants' claim that plaintiffs should have but did not avail themselves of Chapter 173 of the state process for the return of property. This sounds very familiar -- similar to the earlier motion in limine which I took under advisement which had to do with mitigation, foreseeability and damages; is that correct?

MR. MURPHY: I think that's fair to look at it that way.

THE COURT: And also again to me when I saw this motion in limine, the first thing that came into my mind was why do we need to get into this given that the continued deprivation is not at issue here, right, under *Lee*, which I cited to you when we were last together.

Only the initial seizure is a claim. There's no claim for continued deprivation, so why do we need to get into other state processes for the return of the property? But you're telling me that it has to do with damages. I'll take another

look at that. And it also sound to me that the sides need to talk and clarify the clock on damages that you'll be asking because that might also be relevant to this question as well.

So I will take another look at this and ask you as well to take a look at this and talk to each other about this, what is the universe of damages we're talking about? Is this relevant?

Number 11, exclude testimony and evidence relating to plaintiffs' tax returns produced to defendant. Defense says the tax returns are relevant basically to damages, to the loss income claim of damages. Plaintiff says that the tax returns are just gross income. It does not address loss of shows that plaintiff did not attend. So where are we on this? Mr. Murphy first.

MR. MURPHY: There's no data that's offered in support of the defendants' position. It's clear to me that the defendants misunderstand what these tax returns are. Maybe they are 1040 Easy filers, but what's been filed here is not producing what they say is there, and they haven't shown otherwise.

I think -- I think I know why they're doing it. Why they don't to introduce this stuff, I won't go there. As we stand here, there's no reason, no valid evidentiary reason for these to come into the record.

MS. YUAN: So Judge, we obtained the tax returns of

the conservancy which, according to plaintiffs, own most except for maybe five of the animals that were seized along with Mr. Cullen's personal tax returns that were finally provided though not all of them that was requested. And in questioning during deposition regarding the conservancy, Mr. Murphy is taking the position that these returns don't show damages so, it's irrelevant. Defendants' position -- Plaintiffs are claiming $22 million in damages. They are claiming lost wages they are claiming due to the loss of animals. They were claiming a number of damages that you would expect to show up in the tax returns that one being claimed. And the fact that it's not demonstrated, that nothing -- If you look at the numbers for the relevant years had changed much in terms of gross, net, expenditures for animal care, things of that nature.

I think that's all relevant, and that was asked at deposition. And the fact that there isn't a loss shown, I think, is highly relevant to the damage claim. Thank you.

THE COURT: All right. I'm going to deny this motion in limine. It's relevant to damages. And, of course, both sides will have the opportunity to probe, you know, what weight you think the jury should give it if any or if plaintiff believed it doesn't show what defendant is saying it shows, that can be addressed in examination.

Motion No. 12 is regarding Mr. Perry. I had already addressed this in a *Daubert* motion.

MR. MURPHY: If I may. That was intended to go beyond Mr. Perry, and it was aimed more at some of the other academians that were brought in from UW Parkside, the Zoo, the museum, et cetera, that are not on the witness list, so I'm concerned the defendant will say, yeah, all these experts told me this, and they're going to have some serious hearsay issues.

MS. HOUGH: Your Honor, our defendants would testify of what they knew at the time of seizure. One of the things they knew is there are people on scene telling us X, Y and Z, so it's not going -- They are saying they relied on this information is not going to the truth of the matter asserted. It's just going to what the officers knew at the time of the execution of the warrant.

So we're not soliciting testimony from any of these agencies, but we will have our officers testify that there were individuals there on hand from these agencies during the execution of the warrant. So part of our defense is there were many individuals on scene that day. And our officers can testify to that truthfully based upon their own personal observations that these people may have been there.

Our officers can also testify to what they relied upon in making their decisions to do what they did. And so any of these individuals are not going to again the truth of the matter asserted, they're just going to what our officers relied upon in making decisions and acting upon them. And two, testimony on

who was all on scene.

THE COURT: So this is beyond Warden Blankenheim, if I'm pronouncing his name correctly? This is other people from Milwaukee animal place who was giving the officers information?

MR. MURPHY: Correct. I can think of four maybe five without Blankenheim, the DNR guy. But I'm concerned about the hearsay reports here. And to say it's not for the truth of the matter asserted, that's I think just doublespeak. Obviously, it is. The police can say what they saw and what they thought they were seeing. But to say we had half a dozen experts in here that said these animals were whatever, I don't think that's proper.

THE COURT: This one -- This one is trickier. So a person can testify as to what prompted them to take certain actions. I spoke to these experts that were on the scene. But once they start getting into what opinion these experts gave them, it is hearsay.

I understand the arguments that are offered by the truth, but we also, as we talked about for our *Daubert* concepts, I'm concerned about the jury hearing it and the title expert putting -- accepting it as being for the truth.

MS. YUAN: Judge, if I may. Sorry Attorney Hough. Justify really briefly. You saw in our briefing and the declarations that we submitted by our officers, Felician and Simmert, I mean, they're going to be the first to say that they

are not experienced or experts in exotic animals or certainly not the animals that are at issue in this case. They don't know. But they can see what they observed.

Certainly, there are a number of factors that we listed for the Court as to why they seized the animals. But one of them, one important reason, is they did then call in a number of people that do specialize in the care of these type of animals and relied upon them.

I think that it's very important that our defendants should be able to say -- That's a large part of what they -- why they took the action they did. They relied upon the opinion. They took the effort to stop the search to make sure everything -- they can get the individuals there, and then they relied upon them in terms of their opinion as to the condition of the animals.

Of course, our officers will also say it didn't look good to them, but they're not -- they don't keep these type of animals, and they'll say that. And so I think we can distinguish for the jury. In fact, plaintiffs' counsel has mentioned in briefing and has attached reports to the Court that after the seizure of the these animals, execution of the warrants, that there was additional reports that indicated from some of these very same experts that actually the animals were in okay condition, were in fine condition, were in good condition.

Plaintiffs highlighted that for the Court. And so that can also come in if that's the concern. But what's relevant is the state of mind and why our officers seized them in the first place, and I think that that needs to come in. They need to be able to testify to that.

THE COURT: I understand that, Ms. Yuan, and I'm seeing this play out, you know. We observed these animals. They looked this way, and then we also called people and consulted. Why did you take the animals? Because we also consulted with the experts in the field, and then that's the advice that we were given. Do you anticipate soliciting more than that, this is what they said?

MS. YUAN: Well, I think we're going to have our officers say that -- that's all in the materials that we submitted -- that the animals didn't look like they were in good shape and needed to be removed. Our officers relied upon that opinion in addition to everything else that we had already, you know, in our summary judgment had laid out as to all of their reasons for seizure.

MS. HOUGH: I think it's also relevant when we ask our officers, who was all there on scene? Remember, we have two individuals that have been sued here. So --

THE COURT: No, I get that. My question for Ms. Yuan is, are they going to -- is Mr. Felician -- Detective Felician and Simmert, are they going to repeat for the jury, this is what

our consultant told us to do? Is that -- We consulted with them and based on our consultation with our experts, we thought it was important that we remove the animals or we were directed to remove the animals?

MS. YUAN: I think that's much more accurate, Judge, and we can certainly limit it. We don't want to have excluded that the experts were there and the officers relied upon their opinion. If it's a big concern understandably, we don't need to get into the details as memorialized in the police report.

What we did put forth in their declaration and my memory is that they said that the expert said the animals didn't look like they were in good condition and should be removed and so that. But in terms of any other specifics, we don't intend to do that, but we want to be able to say our officers did rely on the opinion of the experts that they solicited and had brought to them on scene.

MR. MURPHY: They are doing exactly what we did in Larsen. They are backdooring in an expert's report and expert testimony for people who hadn't even been listed as experts in this case. What's good for the goose is good for the gander. The facts are the same in Larsen.

MR. KYLE: I think Your Honor was 99 down there that the defendants can say we called in these people, we consulted with them, and these are the actions we took. What they can't say based on the advice given because that's hearsay or they

directed us to do that, I think that's hearsay too. So I think they can say they consulted. But the substance if they wanted to come in, they should have put him on the witness list, and we could have vetted it.

THE COURT: All right. So for this motion, again, I think they can testify what steps that they took when they got there, including consulting with experts, including getting expert advice before taking action. What I don't want to get into is the additional layer and then the experts said X, Y and Z.

MS. HOUGH: Okay. Thank you.

THE COURT: All right. Motion in Limine No. 13, I believe we addressed in the *Daubert* context.

MR. MURPHY: Thirteen. Let's see. Well, my intention is that this went beyond *Daubert* more to a relevance 904.03. I guess they can't blended together. But when we talk about cumulative testimony, Mr. Perry just observed some pictures and has given opinions, and he's going to say apparently what everyone else is saying. I don't think it's relevant.

THE COURT: Does defense want to say anything here?

MR. MURPHY: The Court already ruled I think that the defendants may have had probable cause to seize certain animals they perceived as evidence of mistreatment. But we haven't necessarily identified those animals. Instead, the defendants took all of the animals regardless of evidence of mistreatment.

MS. HOUGH: Your Honor, if I may. This is another one of those that we would assert could go to damages certainly. So if you recall, plaintiffs' expert is asserting a large amount of damages based on the ability of animals to breed. Our expert is offering testimony that says husbandry is really important in breeding, and these numbers don't reflect things that factor into husbandry, and that includes the treatment of animals. Based upon my observations and photographs of the conditions of the animals, their value is less than what their expert is asserting.

So this isn't going to whether or not what the officers did was reasonable. This is more to those damages and disputing that figure.

MR. MURPHY: Mr. Perry said about that. They are trying to welfare into valuation. I don't think he got that far the just for the record.

THE COURT: Okay, so I'm going to deny this. I don't need to repeat the *Daubert* decision, but I think Dr. Perry is qualified to give his testimony. And also, I agree that this testimony does go to damages if the damages is being asked -- if part of the valuation analysis is the conditions of the animals it would be relevant.

Number 14, any police video not produced by defendants. Of course, no video or no evidence not produced will be allowed. That's why we have discovery, so this is

granted.

Number 15. Use of reference of notice of injury dated 9-8-10 by Attorney Halbrooks. Is this regarding the 17th Street property?

MS. YUAN: No, Your Honor. This pertains to all of the properties at issue. And I mean, defendants believe that it's fair game for trial.

THE COURT: I'm sorry, defendants believe what?

MS. YUAN: That it's fair game for trial. It's a recording of what was presented by the attorneys for plaintiff at that time as to what the damages were that they're claiming, and so I think we should be allowed to ask Mr. Cullen about that.

THE COURT: Okay. Mr. Murphy.

MR. MURPHY: Well, I believe the notice of injury had some relevance before the 17th Street real property damage claim was struck because there was some inconsistencies apparently between who was claiming ownership in that document versus who was claiming ownership in this case, and that's why we conceded and allowed that damaged claim to be struck.

Beyond that, I don't know how they can use this except for impeachment, which of course is always on the table. So I just don't want to get -- so I don't know how they use it except for impeachment, which I don't have any problem with of course.

THE COURT: Mr. Murphy, does this notice of injury addresses other properties beyond the 17th Street? I don't know if I have that or I did not take a look at it.

MR. MURPHY: I suspect it does, but I'm not recalling it specifically.

MS. YUAN: Judge, it mentions all four properties, and we talked about it at deposition multiple times with all the witnesses, including Mr. Cullen. I think in addition to impeachment during our examination of Mr. Cullen, defendants should be allowed to ask him questions as to what was presented at that time back in 2010 as opposed to what he's claiming now. It's fully relevant to the damages that he's claiming as to the properties that are still at issue.

THE COURT: I agree. If it has the other properties, of course, we're going to not focus on the 17th Street property because that's no longer an issue. But as to the other property, that's fair game, so I will deny this motion.

Number 16, permit the jury to answer all damages questions respective of the answers to questions of liability. There's no basis for this. I will deny it. We don't get to damages unless the way their verdict form would be written, they don't answer damage questions unless they answer liability questions in favor of the plaintiff.

Number 17, sequestration. Yes, I will grant that. That's standard. We can tell your witnesses now they will be

sequestered at trial, but I will also enter an order at trial.

Number 18, prohibit defendants or anyone on their behalf from using law enforcement database to do background checks. No objection to this. This is granted.

Number 19, take judicial notice of any material findings of the circuit court. No objection to this, so I'll grant this, but we need to talk further about circuit court materials as well, which we will do when we take up those two objections that -- two motions in limine I'm taking under advisement.

Take judicial notice of Judge Jones finding based on undisputed evidence. I wrote in my notes which, it depends. So I don't know what you had in mind here, Mr. Murphy.

MR. MURPHY: I think in my various briefings I raised a variety of findings of Judge Jones that -- The defendants are saying that was a summary judgment finding that they took the facts in favor of plaintiffs.

Now, it's true to some findings, obviously. But there are many findings that Judge Jones made that were based upon the undisputed evidence that I think is proper for judicial notice, one of which is the overbreadth. Did we resolve that? And, you know, the findings about what the warrant was, that's undisputed, and Judge Jones made findings that they seized guns that weren't on the warrant. They seized animals that weren't on the warrant. There was no exigent circumstances. There was

no plain view like contraband. All of those findings were based upon undisputed evidence, and I think, well, we don't need to relitigate that stuff.

THE COURT: We don't need to relitigate what already has been relitigated. Not only that, the jury is being asked very specific questions, so they're not even getting into things that Judge Jones have given summary judgments, so I'm not sure what specific facts. So the parties can discuss what -- You can prepare a list if you wish. I don't know what specific facts are relevant to our trial, so I'm going to leave this one on the table, and you can let me know which specific facts that you're seeking that I take notice of for the purpose of this trial.

It's not just academically for the purpose for the history of this case. But for the purpose of the work that the jury is going to be asked to do, if there are facts that you think I need to take judicial notice, you need to be specific about them, and we can take them up then.

Number 21, authorize the use of videotape deposition of Attorney Steve Glenn. I have a question about what, and it relates to some of the motions in limine by the defense as to what Mr. Glenn will be testifying about, so let's take it up now.

Mr. Murphy, what is Mr. Glenn going to testify about? From the pleadings, I understand it's regarding efforts and plans, alternative for removing the animals; is that correct?

MR. MURPHY: That is one angle, that he was involved in the attempt to remove the animals when they were being held and they were finding. But he was also in the premises, and he also observed what I'm calling the water in the basement, which I think is a big factor. I believe he said it was over his ankles, and he was a witness to the slop and destruction that was left over.

Coincidentally, he also will testify that he has seen literally hundreds of search scenes, and he has never even anything this destructive, so there's a few different things, a few different categories I guess we'll call for him.

THE COURT: Okay. In each of them, I guess they're different. As to the plan to remove the animals, what is the -- What work or what purpose would the plaintiff intend to enter that into evidence?

MR. MURPHY: The plaintiff, with the help of counsel, produced a plan to the authorities, the district attorney who was spearheading the effort with the DNS, MADACC, police, city attorney basically to have the animals temporarily relocated to be held by persons that could care for them.

It's our testimony that it took a little doing, but it wasn't particularly difficult, and it's relevant to show how unreasonable the search and seizure was here because there was no plan to take care of these animals when they left the house except to give them to MADACC who the defendants knew would not

be able to handle it.

So the anticipated or proposed rehoming. Also, the mitigation of damages, if you want to take a play out of the defendants' playbook. So I think the jury needs to hear that it wasn't a real terribly difficult thing to do. The defendants note they didn't do it.

THE COURT: The way the whole rehoming issue, Mr. Murphy, and the dialogue with me on this because I'm sure you will disagree is that what's at issue in this case is the defendants' actions and whether they were reasonable. So I agree with you that whether the defendants had a plan for the animals can bare the analysis on the reasonableness of their actions or inactions. But that the plaintiff had a plan for rehoming is not relevant, right, because Mr. Cullen's actions, as far as rehoming or not rehoming, is not being put into question.

The focus is the defendants' actions. So even if Mr. Cullen had a plan, it's not relevant. What's relevant is whether the defendants had a plan or did not have a plan. So why do we need to get into that the defendant had a rehoming plan?

MR. MURPHY: For mitigation. Had they rehomed the animals, people that could have cared for them, they would have got the animals back because there was no criminal charges. Then it goes to mitigation, that they tried to save these

animals. The defendants used the value a couple times for adverse evidence. Now, it's time. It fits the bill.

MS. YUAN: Judge, there's no evidence that I'm aware of that the two named defendants in this case had any say in terms of this removal, this rehoming plan. What was listed on the witness list was very clear that this was an agreement between the individuals that were part of our motion in limine that I listed, including Mr. Glenn, and their interactions with the DA's Office.

I think that it's unduly prejudicial to let in this type of evidence against our two particular defendants. I think it's fair game if plaintiffs want to ask them about what involvement the defendants had in terms of when these animals were seized, what was their plan? That was stuff that was asked at their depositions anyway.

But to get into this whole other issue of having witnesses come in and testify as to conversations or agreements or plans that they presented to people where there's no evidence that the two named defendants had any say or authority as to if this could be executed or if they knew about it. I think that that's unduly prejudicial and confusing to the jury.

MR. MURPHY: It's not about the defendants at this point. It's about mitigation. I mean, the defendants apparently plan to say, you know, these 173 procedures happened and these orders were issued and all that. I mean, the judge

has ruled that plaintiffs did not get a reasonable opportunity to contest the seizure, and I don't know how this does not go to mitigation. Thank you, Judge.

THE COURT: All right. I'm going to -- I'm likely -- Mr. Murphy, I lost you.

MR. MURPHY: Sorry.

THE COURT: That's okay. I turned my head around for a second and I'm like did he duck under the table? I wasn't sure. I know we've been going at it for a while, so I don't blame you for getting a cup of water. Mr. Murphy and Mr. Kyle, I'm not likely to allow this line of question -- this line of evidence as to what plan the plaintiff had, but I think I will -- Not I think, I will allow it in questioning the defendants on whether they had a plan because they -- because it could go to the reasonableness of their actions or inactions.

As far as any mitigation theory on this line of questioning, I'm going to leave that open to take a look at when I take a look at the other stuff that's being proffered for mitigation, but those are my thoughts where I'm heading with this one.

Number 22, exclude -- Allow plaintiffs to collectively be referenced to -- excuse me -- allow plaintiffs to be collectively referred to and referenced as plaintiff. I'm not getting this one, Mr. Murphy.

MR. MURPHY: Well, defendants did object to it, and I

think that may actually carry the day on it. We were trying to make it a little bit easier on everybody, including the jury and the verdict. Because if we have to have three sets of verdicts for the plaintiffs, I mean that's a lot to do I guess. But Cullen is the sole, I guess, shareholder or member of Pleguar and the conservancy. It's a 501c3, but he is really the only guy there too. If the defendants object, I'm not sure I can make them do this. I was just trying to make it easier on everybody.

THE COURT: All right. I'm going to deny this one, and we'll -- although it may be a little bit of work for us on doing the verdict form, we'll -- We'll get through it.

And lastly number 23, declare counsel to advise their witnesses of any restrictive or limiting ruling of the Court on plaintiffs' motions in limine and also on defendants' motion in limine. That's granted.

I'm counting on counsel to advise their witnesses, clients of any restrictions, any motion in limine and so forth, so that is granted. All right. Turning now to defendants.

MS. HOUGH: Your Honor, I do apologize for the interruption, and I'm sorry to do this with all of the parties, but would it be possible to take a very brief break?

THE COURT: That's a very good idea. We've been really going at it. Before I continue, are we all ready to continue this morning?

MS. HOUGH: Yes.

THE COURT: Let's take ten. Go get some water, Mr. Murphy. Let's take ten and reconvene. Yeah, come back in ten minutes. Let's back at 11 o'clock. It's 10:48 now. Stretch your legs.

(Brief recess taken.)

(Back on the record.)

THE COURT: I believe we are all back. So let's get back on the record and into defendants' motion in limine. Before I do that, Mr. Murphy, I did address all your motions in limine with the exception of the two or three I'm taking under advisement. Is there anything else on the motion in limine? Did I miss anything?

MR. MURPHY: No. Thank you, Judge.

THE COURT: All right then. Let's dive into defendants' motion in limine. The first one regarding Mr. Kalmanson was resolved with the *Daubert* decision.

The second one likewise was resolved with the *Daubert* decision, so we'll start with Motion in Limine No. 3, to exclude a list of witnesses regarding reference to plaintiffs' conservancy operations. Defense, you want to address this?

MS. HOUGH: I don't think we have anything to add at this time beyond what was included in our brief, Your Honor.

THE COURT: All right. Mr. Murphy, Mr. Kyle, why do we need these witnesses and this side trial?

MR. MURPHY: Thank you, Judge. And I don't think we can lump them all into the same category. I can break it down too. The premise is that plaintiffs in order to proceed with a credible damage claim, plaintiffs need to establish that they are not some hack animal hoarder, that they are indeed one of the premier breeders if not in the United States perhaps the entire world for some species. I don't intend to take up a lot of time for it. I think I'm just brining in the big hitters.

Lewdyn Densmore is a professor at Texas Tech. He was on the other end of what they are calling the Chinese Alligator Operation where plaintiffs were sending him blood that had specific DNA for specific types of creatures, and Mr. Densmore is going to validate that this conservancy was really a scientific operation as opposed to like a Tiger King, which is a very big concern to us.

So I will start with him and invite the analysis with him because I think he stands alone in that regard.

THE COURT: Okay. So let's pause on Mr. Densmore on the legitimacy and tie Tiger King testimony that he would offer. If the defense elicit or offer testimony that Mr. Cullen's operation is not legitimate, is Tiger King like for a shorthand, I think that's fair rebuttal, but I don't see why Mr. Densmore is needed otherwise.

Mr. Cullen can certainly testify that he is a legitimate businessman, this is what he's been doing and how

long he's been doing it and so on. I don't believe that we need this legitimacy and tie Tiger King rebuttal witness unless the defense tells me now that you intend on taking such a line of questioning in your case -- in your case. Ms. Hough, Ms. Yuan.

MS. YUAN: No, Your Honor, we don't intend to do that. I mean, we are going to talk about the fact as to why the animals were seized and the condition. We're not going into attacking Mr. Cullen's or the Dragonwood Conservancy as a legitimate operation. There is no intention on that.

THE COURT: Right. So I am going to exclude Mr. Densmore. And again, he will stay on the rebuttal list in case such line of questioning is pursued. The next group of witnesses, Mr. Murphy.

MR. MURPHY: I'd like to -- I guess I can try to go down the line. Curt Harbsmeier. He also will validate the plaintiff and the plaintiffs' operations. I must respectfully take issue. Terry Cullen, yes, he can take the stand and say things, but he's the guy that's looking for $21 million dollars. His testimony needs to be corroborated. Curt Harbsmeier has been the attorney for the conservancy. He knows the operations there, both here and in Florida, which is an important part of the case. And coincidentally, he owns a Chinese Alligator where he would have his opinions as to the value of his alligator, so there's -- Again, he's another multifaceted, potential witness.

THE COURT: I think then the same ruling applies as to

the other witness that you -- we just discussed, Mr. Densmore. Is Mr. -- Unless Mr. Cullen's legitimacy is at issue, I don't know that his legitimacy needs to be corroborated here. Again, the question for the jury is the reasonableness of the defendants' actions.

As far as damages are concerned, I mean that's something else. If -- We already discussed witnesses, we're going to discuss the value of the animal taken, the loss income and so on, so I don't see how this witness can add to this. The remaining witnesses.

MR. MURPHY: Bill Ziegler was actually involved first hand. He was called in by MADACC and the authorities not once but twice, and he's issued reports. I've produced them. I will identity him as an expert witness. He is a fact witness about was going on in this case. He also coincidentally had a relationship, but he knew of plaintiffs and plaintiffs' operations, and again would have information about them being premiere breeders, which I think plaintiffs need to prove that because the defendants are going to say, you're not a breeder, and you got bad welfare so you can't breed. Bill Ziegler has first-hand information about what happened.

THE COURT: When you say first-hand information as to what happened, he was there the day the warrants were executed? I don't understand. What is he going to testify to other than the operation, the legitimacy of the operation?

MR. MURPHY: He was involved in the beginning of MADACC and at the end of MADACC where he was visually inspecting the animals. He was in the police reports. He's been in this case from the ground level. And originally, he went in there and said these animals -- I believe his quote was 95 percent of the animals were either in very good or excellent health. 30 days later, he was called back in at MADACC, and the animals had seriously declined in the care and really beyond negligent care of the animals bordering gross negligence, but that is probably neither here nor there. He saw what was happening with the animals once they were seized.

THE COURT: Okay. Well, I know we know that the conditions of the animal is a disputed fact in this case, so Mr. Ziegler observed with his two eyes the conditions of animals, he's certainly a fact witness, and he'll be allowed to testify. Next.

MR. MURPHY: James Schauer is the -- What we're calling the Humane Society liaison between the Humane Society and the plaintiffs' operations. Plaintiffs' operations included a rescue and rehabilitation efforts. In fact, the glaring example is the one crocodile with its snout that was growing straight up which evidenced abuse, but it wasn't from Mr. Cullen's operation. He got it because no one else wanted it. The zoos don't want it obviously.

And basically, the turtle that was found in the

kitchen on the first day on 13th Street, the Blanding Turtle, which is protected under Wisconsin law. Schauer actually brought that turtle to Cullen under the auspices of the Humane Society for rescue. So he's going to explain why Cullen had a Wisconsin animal of concern I guess they call it, that was on our endangered species list in Wisconsin, that he had it with the authority of Humane Society to rehabilitate it.

THE COURT: Is he speaking to how specific animals came to be with Mr. Cullen and also the conditions of these two animals is what I'm hearing?

MR. MURPHY: Yes.

THE COURT: So he'll be allowed as a fact witness on that issue as to those two animals. And you have Collete Adams.

MR. MURPHY: Collete Adams is the curator, I think is the name, of the Gladys Porter Zoo in Brownsville, Texas. That institution actually was "the owner" of the Philippine crocodiles that were on breeding loan to Mr. Cullen. And after the intervention of the authorities in this case, the animals were sent back to her. And she has knowledge of all of that and when the animals when they came back, they were in good shape.

THE COURT: Your words got lost, Mr. Murphy. When the animals came back they were what?

MR. MURPHY: When the Philippine Crocodiles came back, they were in just fine shape. There was knowledge wrong with them.

MS. HOUGH: Your Honor, I just want to assert that some of this information is news to us about these people having first-hand knowledge of specific animals, you know, and how they dealt with those specific animals under Mr. Cullen's care.

So what we had to go off of is the witness list provided by plaintiffs and letters in support that these witnesses put -- that were included in the record as they were offered as witnesses. The letters don't speak to some of these things. They only speak to what a great guy Mr. Cullen is and what an awesome conservancy that he runs.

And so given this additional information about the testimony, I -- I do certainly hope that this is the testimony that's going to be offered, and that it is noted somehow that they can't just opine on what a great guy Mr. Cullen is because those are the letters that are in the record. Those are the letters that were provided when plaintiffs filed their witness list with this Court.

MS. YUAN: Judge, may I also add one more point as to some of these witnesses, Ziegler, Schauer I think we're on to Adams now. When Attorney Murphy is talking about first-hand knowledge, I think he made clear he's talking about, at least for Ziegler, it was once the animals were brought to MADACC in terms of the conditions the animals were in at that time and then when maybe 30 days later their condition at that time.

And defendants' position is that that's not relevant

to the issues that are going to be presented to the jury. There is a danger of confusion to the jury if this information were allowed in. What's relevant is what the officers, the two defendant officers in this case, what was in their mind when they seized these animals?

In terms of damages, we have the experts to opine about that. But really, it's a matter of these animals never being returned to Mr. Cullen. That's undisputed. It's about what the damages are related to that.

In terms of these animals' condition, once an expert that was able to evaluate, examine them while they were at MADACC and then how their condition faired under the condition at MADACC, that has nothing to do with our two defendant officers and nothing to do with the questions that we're going to be asking the jury.

So we still renew our objection to them, and we hope that the Court will agree that this will lead us into an area that it's not going to be helpful to the jury but will just, in fact, confuse them.

MR. MURPHY: One edification if I may. Ziegler was also, I believe, in the alley identifying the species for MPD. If not in the alley and/or at MADACC. So he was in the very front end identifying the species coming out. That's why he can testify that the 95 percent these animals were "excellent to very good condition." So --

THE COURT: Okay.

MR. KYLE: Your Honor, and I understand your rulings thus far. And in regards to Densmore, Ziegler and the majority of these people is you say they don't need any explanation or he doesn't need any legitimacy. But you got to remember, this is somebody housing crocodiles, anacondas in Wisconsin. The jury is going to want to know why. Why does he have these animals? Unless there's someone able to explain besides himself, the jurors are going to say, number one, he shouldn't have them, and there is something wrong with him for having these. That's where this Densmore, Harbsmeier, Ziegler, Schauer and even Collete Adams come in here. They answer important jury question.

If we were in Florida or Arizona something, it may not be a big deal. But these are held in houses in Wisconsin. Why the jury is going to be answering, and that is what Harbsmeier and Densmore, Ziegler and Schauer can answer. And Terry himself is an important part of that. That's where the people shed the light on it. I only think about how a jury would view this case and having Terry being -- He's the one wanting the money. They'll say, well, he is going to say anything to get the money. These people can back him up and give credence as to why he has these really exotic reptiles in Wisconsin. They are going to answer a very important juror question.

THE COURT: Thank you, Mr. Kyle. I agree with you

that the jury will want to know why Mr. Cullen came to have these animals here in Wisconsin. And even, you know, to have -- whether, you know, he was authorized to have them as opposed to, you know, trafficking them somehow. But what I understood these witnesses to go even beyond the why and the how, right.

I understood at least Mr. Densmore to begin with, for example, to be able to testify that to Mr. Cullen's reputation, his prowess in the community, that, you know, he's a good guy. He's good at this. That's not at issue. That's not an issue in this case.

Again, if the defense have a line of attack that he has a reputation in this filed as being a scoundrel, he's somehow an outlier, a rogue, yes, then these witnesses would rebut that information. But I think Mr. Cullen, you know, can give the why. These fact witnesses if they have information about the conditions of the animals, which is a factual dispute in this case, not, you know, way after but at the time or near the time that -- that they can testify to that.

MR. MURPHY: Some of these people, you know, especially Densmore talks about why he has a Chinese Alligator, and he was involved with Terry getting the Chinese Alligator and meeting with the Chinese Government in getting this handled. Those are the kind of things that are of concern. Collete Adams, same thing with the Philippine crocks. Why does Terry have a Philippine crock in Wisconsin in his basement?

THE COURT: You are saying these witnesses will testify to the transaction that -- Again, I'm making a distinction with how he came to have these animals versus his general reputation in the field, in the marketplace, his prowess, which is what I understood from the written submissions.

MR. MURPHY: Well, from Collete Adams, I don't want to get too deep into this because it just gets weirder. But Philippine crocks can't be ever together or they'll kill each other. So very few people understand that and will take them. Collete is saying, we gave them to Terry because Terry understands how to raise and breed Philippine crocks. You got to keep them separate and so forth.

Going back to Chinese Alligator, you have to prove your chops to be able to get China to even agree to give you a Chinese Alligator. Mr. Densmore is a Ph.D.. He is a professor at Texas Tech. He's going to say he worked with Terry, and he's even co-authored a book with Terry on the Chinese Alligator in getting these alligators to him. That's why he has it in Wisconsin. That's my thought.

Ziegler was there. I mean, I don't think we have a problem with Ziegler. But some of these other witnesses I understand that they are not going to pat Terry on the back and say how great Terry is, but they can actually say why he has some specific animals that other people don't have in Wisconsin

in a basement in a house. It's kind of important stuff.

THE COURT: Go ahead, Ms. Hough.

MS. HOUGH: I just refer this Court to docket 74, which is the witness list disclosing the witnesses and the purpose for their testimony. There are some exhibits that are referenced within the witness list, and all of these are just letters in support of Mr. Cullen and the Dragonwood Conservancy.

Some of this very specific information about the testimony that's being elicited from these witnesses is new information to us. And our assertion is we don't need to go into the biography of Mr. Cullen's whole conservancy. The only thing that's relevant here is what our officers knew at the time the warrants were executed, whether or not they conducted their actions and oversaw the actions of others in a reasonable fashion, and then what those damages are.

So to get into this very specific information about how Mr. Cullen came to own certain particular animals really doesn't do -- help the jury in figuring out how to make a decision in this case.

So, one, some of this testimony that is being offered to this Court right now is news to us and was not disclosed on that witness list. For instance, Curt Harbsmeier, the only thing the witness list discloses is that he will testify that his opinions are offered to a reasonable degree of certainty within his field of expertise. He's also a fact witness as he

is familiar with the conservancy operations. That's docket 74. Along with that, a CV is provided and an affidavit and report from Mr. Harbsmeier representing he is an attorney. Mr. Cullen doesn't need a permit for the Chinese Alligators. So we've already talked about the permitting.

As an attorney, he is held out to be an expert of something. And I don't see how that is going to make the jury decide on the facts presented on whether or not Felician and Simmert are personally liable for executing a search warrant.

So all of this is obviously briefed, but I just want it noted on the record that the docket indicating these are witnesses on the witness list only provides information that they were going to speak to the conservancy operations and only provides letters in support of Mr. Cullen.

MR. KYLE: We are on the record and you deposed him. What did you find out about these people? I am sure you deposed him, right?

THE COURT: I'm sorry, was that Mr. Kyle? I did not hear what you just said right now.

MR. KYLE: I'm sorry. I just asked defense counsel when they deposed these people, what did they find out? I am sure they deposed them, correct?

MS. YUAN: Mr. Kyle, you came on the case I think after discovery was closed. We relied in making decisions based on I don't know the 35 or more witnesses that were listed in the

witness list in terms of who we were going to depose based on the description of what testimony they were likely to offer.

So having not been involved during discovery, actually these witnesses that are at issue for this motion in limine were not deposed.

MR. KYLE: That's a no. So the idea is, I don't think the federal rules require every single thing a witness is going to say be put down, especially a fact witness. And it then falls on you, the defense, to take those depositions to find out what they are going to say at trial. So I don't think anything in the federal rules has every single step that an expert is going to take or what they will say. So I don't think that's an issue. I think maybe you should have taken a deposition of these people, especially a Ph.D. from Texas Tech and ferret out what they were going to say.

But now you know a little bit more. It doesn't change anything. I mean, it's up to us on how to present our case and answer the questions that we think the jury needs to be answered. And one of those is the why did someone have these type of reptiles in Wisconsin in a basement, and how did he come about getting them?

MR. MURPHY: Judge, as for hearing things for the first time, I disagree with that. I also updated Harbsmeier's anticipated information through a Rule 26 amendment. Again, I can't tell you how many times I was accused of not producing

something. Show me where, and I will spend literally hours over time going back to this huge record showing where things were produced. So I'm hoping Your Honor takes that with a grain of salt because I don't think it's accurate.

MS. YUAN: Judge, I just want to leave you with, you know, defendants' position really is that these witnesses that are the subject of this motion in limine and we're just going through them, it doesn't really go and inform the jury as to whether or not it was reasonable for Simmert or Felician to seize all the animals at issue here or the issue of damages.

In listening to plaintiffs' counsel explain each witness and why they want them at trial, it really comes down to they want them there to bolster Mr. Cullen and the conservancy, and that's their purpose is to legitimize and to make Mr. Cullen and his operations and talk about all good that they are doing. That doesn't go to the issue of was it reasonable? Why did these officers seize these animals, and was it reasonable that they did that and then what damages flow from that? That's what those experts are for that this Court has already allowed in. Thank you.

THE COURT: All right. Grounding my ruling again on what the issues will be at trial. I'm not going to change my ruling at trial is the issue -- one of the disputed issues is the condition of the animals. So witnesses that can speak to specific animals' conditions, I will allow. But a general

Mr. Cullens and the conservancy is legitimate witnesses will not be allowed.

So we were talking about Ms. Adams. She can speak to the Philippine Crocodile condition is what I was told. And the last person is Craig Pradorelli. What does Mr. Pradorelli have to offer?

MR. MURPHY: Pradorelli was on scene to see the destruction first hand within weeks of it happening.

THE COURT: So you mean, he saw it -- He's going to offer evidence as to who did the destruction?

MR. MURPHY: No. Well, I mean obviously, Judge, we've covered that a million times. I think Judge Jones even said he understands you don't have to be there to watch a destruction to say it was Felician or it was Simmert. But he can see the aftermath by saying I had seen the property before, I saw the properties after, the aftermath. I witnessed the damage. There was never issues of the courtyard being destructed. There was never stuff thrown around when I came there, and it was all thrown about. That was it. Obviously, he wasn't there to witness Felician and Simmert. We already said nobody is going to testify that they saw Felician or Simmert steal anything personally or break anything. That is why you have failure to intervene.

THE COURT: Yes, failure to intervene is the issue as to the property damage. Yes, you'll have to show property

damage. If Mr. Pradorelli can say he can describe the damages, I will allow it, but he can't go beyond that. He can't point a finger as to, you know, who did it. If it's just to say that I was in the house before and the roof was standing and I came back and the next day the roof was no longer there, that's fine. But there still is a missing link. As long as it is limited to what he observed personally, I will allow him to testify to that. Again, no general testimony.

Number 4, exclude evidence of testimony regarding Terry Cullen's character. This is similar to what we've been talking about, right. So if it's just general Mr. Cullen is a good guy, he was acting in conformity with his good character, that's definitely for evidence which is prohibited. If it's specifics, yes. But just general and also if it's to rebut the defense putting on a case that Mr. Cullen is a what you have said Tiger King like, that's fair game. But just general he's not a good guy is not allowed.

MR. MURPHY: Understood.

THE COURT: So that motion in limine is granted with that understanding.

Number 5, evidence or testimony of any agreement efforts to rehome, seize animals. We talked about this. This is the one I'm taking under advisement. Again, what is -- As I said with the other one, what is at issue is what Simmert and Felician knew or considered in taking their actions; that

Mr. Cullen had a rehome plan doesn't speak to what Mr. Felician and Simmert knew or factored into taking actions.

So I don't foresee allowing all the defendants to come in and talk about a rehome plan that the plaintiff had with MADACC. That's neither here nor there in helping me analyze and helping the jury analyze the reasonableness of the defendants' action.

MR. MURPHY: Judge, my understanding was that -- I understand that ruling. But one step further, the Court would reconsider whether or not the rehoming "evidence" is relevant to the plaintiff's mitigation of damages.

THE COURT: Correct, Mr. Murphy. So I have it down taking under advisement to look at this mitigation and damage issue in this case.

Number 6, exclude evidence or testimony regarding the dogs being shot. Do we really need to spend time on this? This matter has already been litigated. There's no damages being asked for the dogs being shot, so it's beyond the scope of this file. Why do we need to get into this?

MR. MURPHY: It's directly relevant to the fact that this was an unreasonable search and seizure. They had literally no plan upon entry knowing there were four large dogs there. And most importantly in the video, luckily there's not a whole lot of video of the dog's bed. But in the video, I want to get it right. Felician is the one stepping over the dog making a

critical admission. That's the best evidence. I mean, it's him, real-time video evidence of what exactly was going through his mind at the time.

THE COURT: Okay. The scope of the trial again is the reasonableness as to the taking of these animals that Judge Jones said were not on the warrant and were overbreadth of those animals and also the reasonableness and the manner the warrant was executed as far as damages to the properties. The dogs were not part of that universe. Why do we need to get into that?

MR. MURPHY: That's all part of the seizure, I agree. But the search -- The dogs are relevant to the search. They had no plan from beginning to end. It's not just one little thing in a continuum of time. From beginning to end, the officers did not plan properly for any of this.

And the reasonably foreseeable consequences are, dogs are going to be dead and animals are going to be taken out and not coming back.

MR. KYLE: Judge, it's just unfortunate he makes the admission that, "this is beyond our scope, man. That's all I keep thinking. This is way beyond our scope."

MS. HOUGH: If I recall --

THE COURT: One second, Ms. Hough. Mr. Kyle still had the floor. Then, I'll call on you.

MS. HOUGH: Okay.

THE COURT: There's a video that's going to be played

at trial of him stepping over the dogs. Is that what you said?

MR. KYLE: Unfortunately, as he's stepping over the dead dog he shot he says, "this is beyond our scope, man. That's all I keep thinking. This is way beyond our scope."

Now, that goes directly to the seizure and the unreasonableness of the search and seizure itself. It's a direct admission by Felician. Now, would it be great that he wasn't stepping over a dead, bloody dog that he shot? Absolutely. But he says it. It's an admission. It is powerful, powerful evidence in this case.

THE COURT: Thank you, Mr. Kyle. Ms. Hough.

MS. HOUGH: I'm sorry. If I recall correctly from our depositions of Felician and Simmert, we established that Felician was the person in the video. However, we did not establish -- Maybe my recollection is wrong, so there are three other attorneys that are familiar with this case. We couldn't establish whose voice that was. So Felician testified, Simmert testified. They both watched the video that, yes, that is what is said, but they don't know who said it; is that correct? That is my recollection.

MR. KYLE: That is both your recollections. We understand this. Neither defendant was willing to admit that was their voice. If you watch the video, the very real inference, the voice is of the guy that is stepping over the dog, and the defendants are -- You know, obviously, we can cross

examine them about whatever they want and testify about whatever they want. But the nature and timing of that statement is really unfortunately bad for their case. That's why they don't want it in because it's an admission.

MS. YUAN: Judge, if I may. Listening to that explanation is even more reason why any mention of the dogs should be excluded for all of the reasons we already briefed not being relevant, unduly prejudicial. It is not an issue in terms of damages or why all the animals were seized in this case -- that are at issue in this case.

But now, plaintiffs' counsel is arguing that they are going to be making this argument that one of these defendants made this admission when they testified and when they were questioned during their depositions that they don't know the voice, it's not theirs, so that's inappropriate. Knowing how they are going to use it now is even more so.

We rely on your briefs in this case, Your Honor. It's going to be unduly prejudicial for the jury to hear about these dogs, and it's an issue that was settled previously in a different lawsuit. We hope that the Court will keep it out.

MR. KYLE: Our jobs would be a lot easier if we just believed everything a defendant said in their deposition. But fortunately, we don't have to do that. It's a bad thing. I mean, you can look and make the admission to the Court that, "this is beyond our scope, man. That's all I keep thinking.

This is way beyond our scope." No matter who said it, it's said. It's taken on the video of the cops themselves. And then afterwards, they cut off the video I think probably when they found out what they said.

So do we have to take their deposition for admissions to say, okay, that is fine, it wasn't us even though it was the guy stepping over? The jury can hear that. The jury can listen to it and say, okay, it wasn't Felician, it wasn't Simmert, so be it? But it was someone else. It's an admission. I don't know how that doesn't comes in. And if it doesn't, I think we have a real appellate issue.

MS. HOUGH: Your Honor, if I may. If the issue for them and the reason they want the dogs to come in despite the fact that that was done by TE when they executed the warrant, that sound bite of somebody in the room saying that, that can still be considered without, you know, the evidence of what occurred with the dogs. That was already litigated in this court.

So if they feel the need to bring in the issue with the dogs because of a particular sound bite, certainly the parties can get that information in without getting the dog part in.

MS. YUAN: Though, we would object to the video --

MS. HOUGH: Correct.

MS. YUAN: -- being shown.

MR. MURPHY: My final comment is this is appropriate. If it is not direct evidence, it is other acts evidence that shows a plan, preparation, knowledge, intent or lack thereof. And I think this is the beginning of the continuum. They didn't plan to execute this warrant. And very first step shows it and the second step and the third step and the last step. They just didn't plan. They just went in as Judge Jones found helter skelter smashing it up with the sledge hammer and not caring about citizen interest or property. They turned a blind eye.

THE COURT: Mr. Murphy and Mr. Kyle, can you speak to the fact that this particular dog issue was litigated, and there is no damages being sought as to the dogs here?

MR. MURPHY: That's why it's other acts, I think. It's not a claim for damages in this case. It is more a claim of liability because they failed to have a reasonable plan. Their plan to go into this house, in case Your Honor didn't pick it up in the briefs, was to bust in the door and see how the dogs reacted. They didn't even have a dog catcher or dog snare or MADACC. What did they expect was going to happen when they kicked in the door with four dogs? There was going to be inevitably a confrontation where the dogs were not going to win. It shows they did not plan.

MR. KYLE: I think it even goes to Judge Jones' docket 62, page 26 of 35 saying, "The plaintiffs allege that Felician and Simmert who indisputably were present during the warrant's

execution turned a blind eye to the other officers or agents during the unconstitutional seizure. This factual issue must be resolved by the jury." That -- That is Jones, and he also said correct enough with the sledge hammer, this is further proof that both of those things, turning a blind eye and cracking it up with sledge hammer, shooting and killing two dogs, blocking the door for no reason.

THE COURT: I'm sorry. Mr. Kyle, this is -- What you just read to me this turning a blind eye, was this in reference to the dogs or just reference to the potential failure to intervene issue that's proceeding to trial? I don't have that.

MR. KYLE: The latter. I'm sorry if I did not give you the page number. It was 26 of 35 of document 62. Attorney Murphy did talk about cracking up with a sledge hammer. That is another one of Judge Jones' quotes that I can find for you.

THE COURT: All right. In the interest of time, I'm going to take this under advisement, take a look at it. But I'm telling you, Mr. Kyle and Mr. Murphy, my initial reaction is to grant this motion because this matter has already been litigated, the dog issue, and also it's not relevant to damages and also under 43, potential undue prejudice and inflammatory given, you know, bloody dogs.

But if what you're saying there's a potential admission issue, I'll take a closer look at it. But I'm sharing with you what my initial inclination is and why. Mr. Murphy.

MR. MURPHY: One more thing. It does go to damages because after they shot the dogs and they let the dogs lay there, the dogs bloodstained the floor. The floor needed to be replaced, and there were bullet holes in the floor.

So the jury is going to get that evidence without any backfill if it's excluded. So the shooting of the dogs go directly to the floor damage at a minimum.

MR. KYLE: I hate to see important -- what is really important evidence, that being an admission, all being overlooked merely for the fact that they shot and killed dogs and said it at the time when they were stepping over a dead dog. If anything --

MS. YUAN: That Simmert and Felician did not shoot or kill any dogs. That should be very clear in the record that the two defendants named did not cause this damage. But if that's going to be allowed in as to the damage to the property, certainly, like many other trials, there's a way to craft and allow that information in without allowing in the prejudicial information.

MR. KYLE: It's either a body of a human or a body of a dog that caused the blood damage. I don't think we want to let the jury speculate a killing happened here of a human. What's worse than killing of a dog I guess, a human.

THE COURT: All right then. Number 7, testimony of plaintiffs' expert contractors.

MS. YUAN: Judge, I have nothing else to add other than what's been briefed. Thank you.

THE COURT: Mr. Murphy and Mr. Kyle, on the contractors. The question I have is tell me what the contractors are going to testify to and also the basis of their testimony.

MR. MURPHY: Basically, they're going to testify to the cost to make certain repairs to the houses, which my client and our witnesses are going to then provide the link that the damages were caused by the search warrant process.

The problem with -- Either way, I guess we're dammed if we do here. If we don't name these witnesses, we get a motion in limine or a summary judgment motion to say you're not proving your damages. You need an expert. So we name experts, and now we can't use the experts to prove the damages. I guess it's only up to Terry Cullen to say how much it costs to fix stuff, which again, he has issues under the law because he is seeking $21 million dollars. We have to have third parties to come in and put some numbers on things. It's not may favorite part of the case, that's for sure.

MS. YUAN: Certainly, Judge, I didn't have anything initial but to respond to what Attorney Murphy stated. Certainly, Mr. Cullen can testify as to the estimates he received or the cost to repair after he's testified to the damage that he is claiming was caused by these two defendant

officers.

But you can see from the way I briefed it, I think there's a real danger in allowing these contractors to come in as experts, and they will be presented as such. And there really will be that inference that's being alluded to being drawn as during their deposition frankly, that these experts in their field saw the damage caused by the execution of the warrant, and this is the cost associated with.

And so I think it will be very difficult to avoid that inference -- that inference of causation. I think if it's just a matter of getting in the cost of repairs, then Mr. Cullen can testify to that.

MR. MURPHY: I really appreciate how you think we should handle our case, but it's up to us how we present our case and what witnesses and what testimony we elicit to present. It's like a car accident case. If you -- If you properly have an issue, you hire a company to fix the car. You don't have a person come in and say it cost 15 grand to fix it. You have somebody who is a legitimate professional come in and say, yes, I fixed the car, it was nine grand. Number one, that is for us to decide.

THE COURT: I totally get it. Of course you would need a contractor who knows how to fix a roof hang or whatever needs fixing to give you an estimate. But the contractor, of course, cannot testify as to what caused it, right. And a

contractor also needs to testify as to what the basis of his estimate is. So did he look at the property in 2010, or is he looking at the property in 2019 that he's giving the estimate for?

I will allow the contractors to testify as to the estimate they are giving. But their testimony is limited to the cost. That's all they can talk about; that is, we were told to look at this roof, and we observed this. This is what we looked at, and this is how much we would charge you to fix it. Contractors do that all the time. I think that's fair. But, of course, they cannot say we know that Felician or Simmert damaged the roof because they wouldn't know that, and it's, you know, fair cross examination to ask when they looked at the roof and intervening facts and so forth, but they can give testimony as to their estimate.

Okay. Lastly, this testimony of Mr. Cotton regarding a female photo dead crocodile. Who is going to speak on that first?

MS. YUAN: Judge, again unless it depends on what plaintiffs' counsel have to say about it. But at this point, we will rely on what was submitted as untimely. Those are some of the reasons, and for all the other reasons I named.

THE COURT: Okay. So why don't we start with the timeliness. Mr. Murphy, why was the disclosure of Mr. Cotton untimely?

MR. MURPHY: Mr. Cotton is just an authentication, foundational witness. I will reserve the right to do that. There is no surprise in terms of the picture of the email. The email is contemporaneous to the MADACC events in 2010. Counsel refused to stipulate that this was in the MADACC file, which is where I got it from, so I named now Mr. Cotton as an authentication/foundation witness because he received the email and the picture.

And the picture is important for a couple of reasons. First of all, because that dead crocodile was not on the MADACC inventory. There's discrepancies between the inventory. I think the parties will agree to that. The nature and extent maybe not agreed but that crocodile never made it on any inventory, which I think then affects the credibility of the defendants' claims as to what was there and what was not there. And also I think it continues to reflect that there was no reasonable plan to execute this warrant because there was no plan to care for these exotic animals. What is the reasonable and foreseeable consequence for that, a dead crock with his skin coming off?

THE COURT: Okay. So Mr. Cotton, Attorney Cotton, is being offered to say that he received an email and with the email was attached a photo of this dead crocodile?

MR. MURPHY: Correct, not acknowledging -- Yeah, actually we do have that.

THE COURT: Mr. Murphy, I didn't hear what you just said. You came through jumbled. I don't know if you are sitting too far from the mic.

MR. MURPHY: I am talking too fast probably. He didn't receive that email. And the email is now acknowledging why we do have that animal, but it's dead. Or up until then, it wasn't on any inventories so it goes to the poor inventory control which is relevant to damages. And again, I say goes towards more evidence that there was no reasonable plan to execute this warrant making it unreasonable under the Fourth Amendment.

THE COURT: Okay. On the timeliness, you said -- I am not sure what had you ever said about the timeliness. I think I am getting tired. It's close to noon, Mr. Murphy.

MR. MURPHY: On the timeliness, it was contemporaneous in 2010 when MADACC -- when MADACC had the animals after the seizure, so it was May, June, I think, when they started going out in July, I think transferred in July. I don't know the exact date, but it's on there.

THE COURT: The timeliness question was regarding Mr. Cotton not being disclosed as a witness in a timely manner.

MR. MURPHY: I didn't know I needed an authentication witnesses for the matter of the document. The problem with MADACC is the two players that were involved are no longer anywhere around here. One I don't know where he is. And the

female, she's in California. So to have to depose them just to get a foundation for an email sent to a witness, that I thought was not reasonable.

THE COURT: Okay. Does defense wish to say anything?

MS. HOUGH: No, Your Honor. Thanks.

THE COURT: All right. Mr. Murphy, Mr. Kyle, I'm going to grant the motion to exclude Mr. Cotton on the timeliness for lack of timely disclosure. And also, I still have questions on the substance. I'm on the line of question for a plan of rehoming again. It's fair and relevant question as to whether the officer had a relevant plan. But whether or not plaintiff had a plan does not speak to the officers' state of mind and why they took the actions that they took. And as to damages, the crocodile, you have all kinds of questions about foreseeability, so I will deny on the simple question of the timeliness.

All right. We've addressed the motions in limine except for the ones that I want to take under advisement. We're closer at this mitigation issue as to -- as it relates to the whole rehoming line and also some of the state court records. So I'm taking that under advisement, and we can take that up again.

So as to what remains before you go have lunch and recover from this hearing. As to the jury instructions, I received proposed jury instructions from both of you. Here's my

procedure. I will create a Court's jury instruction, and I will email it to you so that we are working off of a single document. And then we'll have a conference if there's anything either side object to or want to address with me as to jury instruction, we'll do that. And also, of course, at the close of evidence, we'll have a final jury instruction conference to make sure that all the instructions are still aligned and appropriate in light of the evidence received during the trial.

So expect an email from me. I can get back to you in, approximately, a week. My law clerk will send you an email with a draft instruction, and we'll take them back again at our next conference.

As to voir dire, I know I received questions from both sides. None of them seem particularly, you know, out of the ordinary what is contemplated. I know that Mr. Murphy, you requested the opportunity to do voir dire yourself. I'm sure you can do a better job than I can. But for efficiency sake, I will do the voir dire. The way I do it is I ask the questions. I'll let you know which questions I'm going to ask. I will ask the jury questions. And before I close voir dire, I check with you to see if you have any follow-up questions based on what I asked or based on what was said, so we'll do it the way we usually do it in federal court; that is, with me doing -- asking the voir dire questions.

That leaves us then with trial date. Before we get

into our calendars, I will send you -- probably when I send the jury instructions sort of like COVID procedure that we will follow. You will be required to wear masks during the trial. The jurors will be wearing masks during the trial. Witnesses will wear their mask when they come in the courtroom. Once they are behind -- Once they are sitting in the witness box and behind the Plexiglass, they can remove their mask so that the jury can see their faces, and you can see their faces as well.

During your questioning, you also wear your mask unless you are behind a podium that has the Plexiglass in front of it. Prior to trial, I will let you know which courtroom I will be using. You will be invited to come in and check it out for yourself and see the lay of the room. If you have technology that you'll be using, you will need to bring them in yourself, and you can arrange time with my courtroom deputy if you want to test technology out and so forth. You should keep in mind because of COVID the number of people that you will have on your trial team. We are still trying to limit foot traffic in the courthouse so think about how many people you need, not necessarily want at counsel table or in the courtroom with you.

Mr. Murphy, Mr. Kyle, any questions about COVID procedures?

MR. MURPHY: No.

THE COURT: Okay. Ms. Yuan, Ms. Hough?

MS. HOUGH: Just a quick question. Will we be

addressing the verdict at a later time as well potentially maybe our jury instruction conference.

THE COURT: I apologize. That is on my list here. The verdict form I will also take a crack at it as well and give you a draft, and I will be addressing that as well at our conference.

MS. YUAN: Thank you. I don't think we have any questions regarding COVID procedures. Thank you.

THE COURT: All right. So our trial date. All the parties have been talking about this will be a two-week trial. I am going to respectfully disagree with you and say we're going to get this done in a week. And based on the narrowing of the issues and also focusing on what witnesses the parties need, I think we can do this in a week.

What I plan on doing is we'll come in on a Friday and pick our jury because that can take sometime. We get that out of the way. Monday morning we come in for your opening statements. I'm looking at Friday, May 21st for our jury selection, and for our trial to begin on Friday, May 24th.

I had asked the parties to look at your calendars. I know that you had different opinions as to when this should occur. So this is what I'm proposing as a good date for this. And today is February 16th, so that is plenty of time to verify your witnesses and have them reserve the dates for their calendars.

MS. YUAN: Judge, the only thing I would ask, our exert witness, Dr. Perry, has a conference that he's presenting at that spans part of the week of May 24th. I think as long as we can ensure that he testifies -- I suppose we go second. Defense goes second anyway, but the 27th or 28th, we can make that work. But I guess I don't see any problems with that since we're looking at the week of the 24th for trial, and defendants would likely be starting on the 26th mid-day.

THE COURT: Thank you.

MS. YUAN: Okay.

THE COURT: Mr. Murphy, Mr. Kyle.

MR. MURPHY: Earliest possible date I believe is our mantra here, so that week is fine.

THE COURT: All right. Let's all block our calendars right now. Jury selection. This trial will be Friday, May 21st, and the jury trial will be the week of May 24th.

MR. MURPHY: Judge I would really like to hope this will get done in a week. I respect it might be a little optimistic. We'll certainly do our best, but I don't want to mislead anybody here. Some of the witnesses will be shaved back. That will help me, but I don't know how I have four days. I will take a look at it. I thought I would throw that out there.

MS. YUAN: Judge, in response to that just to ensure for our clients, I think it should be made clear when defendants

can start. I don't want to be in a position where we're only given a day to present our case. So if it's a week trial, that's fine. We can certainly make sure that that's the amount of time that we need to present our defense, but then we would ask that defendants would be permitted to begin their case by calling their witnesses by -- after lunch on Wednesday, May 26th.

THE COURT: All right. I'm not going to, but I will if I need to set strict time limits. I don't like to do that. I am a former trial lawyer. I like trials. I don't want to put handcuffs on anyone. I want you to present your respective cases, but I believe the parties can communicate with each other and work out a schedule when you expect witnesses and work with each other for a smooth presentation -- a smooth presentation of the evidence.

Again, I think it would help us to get the jury selection out of the way on Friday and Monday morning you do your opening.

If you wanted to, I -- we can even do our openings on Friday after we select the jury if that would help the parties.

MR. MURPHY: Thank you, Judge. We appreciate all your work on this -- on this long morning of decision making. Thank you.

MR. KYLE: If there is a possibility of us videotaping us for trial, we can do that. We will probably end up doing

that if it is with certain witnesses that can't do this. As you know, that makes it easy.

MS. YUAN: Judge, I haven't had an opportunity to talk to Attorney Hough. I don't think attorneys will have an objection to giving opening statements Friday, May 21st just to ensure that defendants get their equal amount of time to provide their defense. But certainly, we can be prepared to do that. We can start first thing in the morning during jury selection and be prepared to give opening statements.

THE COURT: Mr. Murphy, Mr. Kyle, what do you think of that?

MR. MURPHY: It's a good idea.

THE COURT: Okay. Let's do it. Let's plan that. We'll do our selection and openings on Friday, send them home to rest and start our witnesses Monday morning nice and early. All right. I want to reconvene with you one last time because I am a glutton for punishment. I want to reconvene with you one last time for us to talk about our instructions and for me to give you ruling on the two matters that are outstanding, the motions in limine that are outstanding, instructions and to start looking at our verdict forms.

I also have one idea that I had not totally resolved in my own mind, but I will share it with you for you to chew on; that is, is this a trial where we want to have the jury to bifurcate liability and damages where we want the jury to take

in evidence about liability given the verdict and if they reached liability in favor of the plaintiff, then present damages evidence and ask them to work on that?

Again, I have been thinking about that while we've been talking this morning. I don't have a strong view of it. One down side of it is that some of the witnesses have information relevant to liability may have to come twice. But it's possible those witnesses have other fact information to do only once, but we reserve our expert witnesses for the damage section of the trial.

Again, I say it is something I have been thinking about this morning as we have been talking about the various issues. Mr. Murphy, do you have a gut reaction? I know you haven't had time to think about this idea because I'm just putting it on you right now.

MR. MURPHY: I think -- We actually crossed this bridge at least informally with Judge Jones and prior city attorney. And both counsel at this time were disinclined to do that because I think it is a lot of overlap in a lot of respects as to people that are testifying about liability. The impact of their testimony could go to damages as well and it may be just as easy to get it all done. Luckily, I think we have Kalmanson and Perry in terms of the evaluations. I'm not sure you can get them done in one day, but a day-and-a-half I would think between the two.

THE COURT: Thank you.

MS. YUAN: As long as you don't hold me to this position since I do want to discuss it at length with Attorney Hough. My reaction is it's a great idea. Frankly besides the expert witnesses, there's the contractors that we discussed. I think that there are certainly a number of witnesses that may only speak to damages, and I think that that would be a good idea, but I would like to look at the issue a little bit more. And if you'd like a response, we can provide a written letter to the Court on your position later this week.

THE COURT: Well, in the best world, both sides would talk to their respective clients and think through this issue and talk to each other and come to an agreement about it. So why don't you take a shot at that. And if the parties reach an agreement regarding the structure of the trial, I would proceed that way. So please talk about it and get back to me.

MS. YUAN: Okay.

THE COURT: All right. Is there anything else we can accomplish this afternoon? I was going to say morning. Afternoon, Mr. Murphy, Mr. Kyle?

MR. MURPHY: No. Thank you.

THE COURT: Mr. Hough, Ms. Yuan.

MS. HOUGH: No. Thank you, Your Honor.

THE COURT: All right. Thank you all for your time this morning. I believe we got a lot done, and I do want to --

let's set a date to talk about the instructions and the outstanding issues, motion in limine. Give me a second here. If we could meet again March 15th at 9 o'clock, I think that will give you sufficient time as to prepare for trial to have this information regarding the motion in limine and the jury instructions.

MR. MURPHY: Judge, I have a federal administrative hearing on another ten-year old case that morning that's pretty firm.

THE COURT: Sure. Do you want to try that afternoon? Never mind about the afternoon, Mr. Murray. I am on criminal duty that day and the afternoons are usually booked, so let's look for another date.

MR. MURPHY: Thank you.

THE COURT: How about Thursday morning, March 18th?

MS. YUAN: That works for me. Attorney Hough.

MR. KYLE: Works for Kyle.

MS. HOUGH: That also works for me, Your Honor.

THE COURT: Wonderful, let's book it. Let's see each other Thursday, March is 8th at 9:00 a.m.. Thank you all for your time and patience this morning. Please take care.

(Whereupon proceeding was concluded.)

C E R T I F I C A T E

I, SUSAN ARMBRUSTER, RMR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio Zoom file provided in the aforementioned matter to the best of my skill and ability.

Signed and Certified February 22, 2021.

/s/Susan Armbruster

Susan Armbruster

Susan Armbruster, RPR, RMR
United States Official Reporter
517 E Wisconsin Ave., Rm 200A,
Milwaukee, WI 53202
Susan_Armbruster@wied.uscourts.gov