UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

THE DRAGONWOOD CONSERVANCY, INC.,
PLEGUAR CORPORATION,
TERRY CULLEN,

      Plaintiffs,

v.                                                    Case No. 16-CV-00534

PAUL FELICIAN,
and PHIL SIMMERT II,

      Defendants.

---

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE TESTIMONY OF STEPHEN GLYNN

---

Defendants, the City of Milwaukee, Paul Felician, and Phil Simmert II, by their attorney, Tearman Spencer, City Attorney, by Jenny Yuan, Assistant City Attorney, and by Heather Hecimovich Hough, Assistant City Attorney, hereby move to exclude Attorney Stephen Glynn as a witness.

Attorney Glynn was presented by Plaintiffs as a witness in this case to speak to Plaintiff Terry Cullen's efforts to rehome the seized animals from Milwaukee Area Domestic Animal Control Commission ("MADACC") (ECF No. 74-1 at p. 7.) Defendants moved this Court to exclude evidence related to the rehoming of the animals on October 26, 2020 (ECF No. 134.) The Court took that motion under advisement as potentially relevant to the damages portion of trial at the status conference held on February 16, 2021 (2/16/21 Hearing Transcript page 79 lines 21-25, page 80 lines 3-7, 8-14, ECF No. 176-1), (ECF No. 178 at p. 7.)  On May 4, 2021, Stephen Glynn's Trial Deposition was conducted.  During deposition, it became evident that

Plaintiffs intend to utilize Attorney Glynn as an expert witness to opine on the reasonableness of the searches at issue in this case. Attorney Glynn was not disclosed or presented to this court as an expert witness. Based upon the questions asked of this witness during trial deposition, Defendants move this court to exclude Attorney Glynn as a witness in this case entirely because his testimony is highly prejudicial, provides "expert" testimony, and offers nothing more than cumulative testimony other witnesses will be providing at trial.

Defendants move this court to exclude Attorney Glynn as a witness in this case for the reasons set forth below.

### I. Plaintiffs Present Attorney Glynn as a "rehoming" witness; except Glynn provides "Expert" Legal Opinions and Conclusions that are Not Admissible.

During trial deposition, Plaintiffs asked Attorney Glynn a series of questions related to his professional legal career, experience with law enforcement, and his legal opinions related to constitutional law and the execution of warrants. Plaintiffs ask this witness to opine on the reasonableness of the warrants, and how the warrants "could have" been executed. Attorney Glynn provided extensive information regarding his background in the law and asserted he was considered "the nation's expert on policing activities in the United States". (Glynn Trial Dep. Transcript, p. 5 lines 16-18, attached as Exhibit 1 to Hough Declaration.) He discussed his background in the field of civil rights. (Id. at 7 lines 13-19.) Plaintiffs asked Attorney Glynn to provide information about his recognition and awards for his work. (Id. at 7 lines 22-24.) Attorney Glynn responds with a list of awards received, including being named "Most Ethical Lawyer". (Id. at 8 lines 5-19.) Plaintiffs ask Attorney Glynn a number of questions about his experience working with the Milwaukee Police Department, and then asked him, "Why is it important for the police to execute a warrant properly?" (Id. at 10 lines 12-13.) Attorney Glynn

2

then *extensively* opines about the importance of the constitution.  (Id. at 10 lines 16-24, page 11 lines 2-5, lines 19-25, page 12 lines 1-12):

```
12         Q.    Why is it important for the police to execute
13               a warrant properly?
14               MS. HOUGH:  Objection.  Irrelevant and asking
15               for opinion.
16         A.    Because the Fourth Amendment to the United
17               States Constitution as well as a similar amendment to
18               the Wisconsin Constitution required police to follow
19               certain elements of law when they are executing a search
20               warrant.
21               Those elements have been interpreted by
22               courts many times, both state and federal courts.  And,
23               indeed, the use of a warrant itself is the subject of
24               many court determinations.
25               MS. HOUGH:  I'm going to object to that
 1               answer.  That was providing legal conclusions.
 2         A.    The other reasons for search warrants include
 3               safety of the officers who are going in to do the
 4               warrant and of any people who would be on the scene.
 5               When I --
 6               MS. HOUGH:  I'm going to continue to object
 7               to the answer to this question.  Again, it's legal
 8               conclusions.
 9               MR. KYLE:  And please don't interrupt him.
10               We'll wait for your objection.  But if you can take
11               the time -- and I know it might be hard because you
12               are Zooming in -- that he had not finished his
13               answer.  And if you don't win your objection, then
14               you've just screwed up the transcript.
15               BY MR. KYLE:
16         Q.    Attorney Glynn, were you finished?
17         A.    No.
18         Q.    Okay.  Go ahead.
19         A.    When I say "safety of the officers",
20               sometimes these searches involve dangerous people with
21               dangerous weapons including firearms.  And if they hear
22               police coming into their home without a warrant, they
23               may be more likely to react dangerously than if they
24               understand there is a warrant.  Because then they have
25               got something they can look at and see what is going on
 1               and why the search is being held.
 2               With respect to the individuals in the
 3               premises that are being searched, again, a warrant gives
 4               them some protection in the sense that a judge has
 5               decided what crime the police believe has been committed
 6               and what evidence of that crime the police believe will
 7               be found.
 8               It's clear from all case law that the only
 9               legitimate purpose of a search warrant is to gather
10               evidence relating to a crime that the police assert has
11               occurred.
```

(Id. at 10 lines 12-25, page 11 page 12 lines 1-11.)

Plaintiffs then asked the witness Attorney Glynn a number of questions about his recollection of visiting two properties at some point after the warrants were executed, and then

3

ask him to "formulate a reason as far as why [the property] was left in the condition that it was" (Id. at 24 23-25, page 25 line 1.) Attorney Glynn responded with an opinion about the execution of the warrants:

```
 4  A.    Well, I mean, there were some things that
 5  were just plainly obvious, and that is that things had
 6  been knocked over when there was no apparent reason for
 7  that to have been done.
 8  Understand that the warrant in this case
 9  authorized the seizure of certain reptiles and items
10  relating to the reptiles such as paperwork of ownership
11  and that kind of thing.
12  Based on the warrant that's what I expected
13  to find having been seized.  But instead there were all
14  sorts of other things relating to the reptiles that were
15  still there but had been knocked over.
16  And, again, I mean, the reptiles aren't going
17  to get out of the place by themselves, so there's no
18  rush involved.  The reptiles were, you know, plainly
19  housed in these plastic bins that had been in both
20  locations.  And so I don't know why it was necessary to
21  interfere with their housing.
22  But I wasn't there when they executed the
23  warrant, so I don't know what the justification or
24  claimed justification was.
```

(Id. at 25, lines 4-24.)

Attorney Glynn further opines about the manner in which the Milwaukee Police Department executes search warrants, generally:

```
15  Q.    In your 40 years of being on the scene after
16  the Milwaukee Police Department had executed search
17  warrants, how do you compare the conditions of 13th and
18  17th to the hundreds of other ones that you have seen?
19  A.    Actually, unfortunately, very similar.  In my
20  experience of being on the scene hundreds of times after
21  the Milwaukee Police Department has conducted search
22  warrants, it is my belief that the Milwaukee Police
23  Department has very little respect for private property
24  and has virtually no interest in trying to keep premises
25  in the condition they were in when they arrived, and
 1  instead are focused solely on searches.
 2  Now, I can understand that in some
 3  circumstances, and I should explain the search
 4  background issues.
 5  There was a time when our law firm
 6  represented a family that was very much involved in what
 7  was called the numbers racket in Milwaukee, which was
 8  another form of lottery, except it wasn't legal.
 9  It was done primarily in the African-American
10  community, and people would bet on numbers.  And then if
11  the numbers came up, they got paid heavily.  And if they
12  didn't, then they just lost the money that they had bet.
13  That kind of activity led to search warrants
14  without exaggeration probably by itself 50 to 100 times
```

4

```
15  a year for our law firm.
16  The second large grouping were drug cases in
17  which officers were going in to attempt to find drugs or
18  firearms relating to drugs.
19  And the third category probably would have
20  been what I call "white collar activity" in which what
21  police were after was computer information.
22  And a lot of those crimes were related to sex
23  offenses in the form of pornography or child
24  pornography.  And so police would be looking for
25  photographs or things on computers.
 1  And we represented, "we" being our firm,
 2  represented a company that owned a series of adult book
 3  stores, and they themselves would sometimes be searched.
 4  So we would frequently be going to them.  So, I mean, I
 5  saw premises of businesses and residences based on those
 6  three categories at a minimum.
 7  MS. HOUGH:  I'm going to object to that
 8  answer.  It was expert testimony, opinion, and
 9  nonresponsive.
```

(Id. at 26, lines 15-25, Page 27, Page 28 lines 1-9.)

Plaintiffs push even further and ask the witness to opine on "how the damage could have been avoided" (id. at 28 lines 11-15), and the witness provides a lengthy answer about how the warrants should have been executed (id. at 28 lines 18 – 25, Page 29 lines 1-17).  Plaintiffs ask witness "why should these raids have been avoided" (id. at 29, lines 19-20), and witness provides a responsive opinion.

```
19       Q.   Attorney Glynn, why should these raids have
20       been avoided?
21       A.   Well, that's part of what I have said already
22       but --
23       MS. HOUGH:  I just want to get my objection
24       to the question in there.  It's asking for an
25       opinion, an expert opinion, and speculation.
 1       A.   There was no danger presented to the police
 2       officers.  There was no danger presented to anyone in
 3       the home.  The reptiles that were the subject of the
 4       warrant were on the premises and had been on the
 5       premises for various periods of time but certainly not
 6       just that day.
 7       The reptiles weren't going to hide themselves
 8       nor was anybody else going to hide them.
 9       So the usual reasons for a search warrant,
10       which are gathering evidence of a supposed crime, just
11       simply weren't present.
12       Moreover, there was at least one solid
13       alternative to breaking into the place and rummaging
14       through it, and that was waiting for Ms. Flint to
15       arrive.
16       The police were told by Ms. Flint, by
17       Mr. Cullen, by myself, by I think -- I think by that
18       time that Bob Dvorak, Ms. Flint's lawyer, was also on
19       the scene.  And he was saying that she would be there
```

5

```
20      shortly.
21      So they were told by a number of people that
22      the owner of the premises -- not the owner, the resident
23      of the premises was on her way and would be there
24      shortly.
25      Mr. Cullen was the owner of the premises.  He
 1      offered to let them in.  They said, no, they were there
 2      just to execute a search warrant, and that's what they
 3      were going to do.
 4      MS. HOUGH:  I'm going to object.  That was
 5      expert opinion, speculation, no foundation, and
 6      hearsay.
```

(Id. at 29, 19-25, page 30, page 31 1-6.)

Based upon the questions asked of this witness during trial deposition, Defendants move this court to exclude Attorney Glynn as a witness in this case because his testimony is highly prejudicial, and provides "expert" testimony that is inadmissible.

At issue for trial is whether Defendants Felician and Simmert violated Plaintiff's Fourth amendment rights by exceeding the scope of a warrant and/or failing to intervene during an unconstitutional search of real and personal property.  It is up to the jury to determine whether Felician and/or Simmert individually violated Plaintiffs' Fourth Amendment rights.  Attorney Glynn as a witness should not be allowed to address these issues; his opinions are merely legal conclusions and will offer no meaningful assistance to the jury.  While not identified by Plaintiffs as an expert witness, his testimony reads as if that is his purpose.  Expert testimony in form of legal opinions or conclusions is not admissible for two reasons.  First, it usurps the role of the judge, whose job it is to instruct the jury on the relevant legal standards.  Second, such opinions are **not relevant**.  Because the jury's realm is to determine facts, legal conclusions do not assist the jury and are therefore prohibited.  *U.S. v. Sinclair*, 74 F.3d 753, 757-758, n.1 (7th Cir. 1996) ("The potential for jury confusion may be substantial when the evidence refers to legal issues at the heart of other litigation; such evidence can create a distracting trial within a trial." at 757); *Miksis v. Howard*, 106 F.3d 754, 762 (7th Cir. 1997); *Panter v. Marshall Field & Co.*, 647 F.2d 271, 293, n.6 (7th Cir. 1981).  The Seventh Circuit has held that when an expert

6

witness explains the law, he in effect instructs the jury, and this impermissibly shifts the balance of power between the parties. *Harbor Insurance Co. v. Continental Bank Corp.*, 922 F.2d 357, 366 (7th Cir. 1990) ("By allowing the insurance companies' witness to tell the jury what the witness's legal research had turned up on the meaning of a key term in the case, the judge allowed the jury to infer that it could look to that witness for legal guidance; and by doing this the judge impermissibly tilted the balance of power between the parties toward the insurance companies." at 366). Where a legal interpretation, as for instance what certain standards mean, is required, this should be resolved for the jury by the judge, not testified to by an expert witness. *Bammerlin v. Navistar International Transport Corp.*, 30 F.3d 898, 901 (7th Cir. 1994).

Attorney Glynn's assertions about how the warrants should have or could have been executed are assuming facts not in evidence. Glynn speculates that Milwaukee Police officers caused the damage that he observed when he visited the property at some point in time after the execution of the search warrants. However, Glynn provides no evidentiary support for this speculation as he did not witness the execution of the warrants; nor was he ever in the Plaintiffs' properties prior to the execution of the warrants (See Glynn Trial Dep. Transcript at 21 lines 16-19, page 44 line 25, 45 lines 1-3.) To permit the jury to hear Glynn testify that the police caused this damage is unduly prejudicial to the defendants Felician and Simmert, contrary to the Federal Rules of Evidence, Rule 403. If Glynn's testimony is allowed, his opinion broadly condemning the actions of all Milwaukee police officers who executed the warrants would be used to hold Felician and Simmert personally responsible without providing any evidence that either had personal involvement in causing the alleged damage.

7

## II. Attorney Glynn's Testimony as to his Observations at Properties After the Warrants is Cumulative

On the witness list submitted to this Court, Plaintiffs have identified a number of witnesses to offer testimony regarding the conditions of properties after the warrants were executed (Witness List, ECF No. 74-1), including individuals who were present during the execution of the warrants (MADACC personnel, and others). Attorney Glynn's observations of the two properties post-warrant execution offers nothing more than will be provided by the testimony of others who will serve as Plaintiff's witnesses for the trial.

Under the Federal Rules of Evidence, Rule 403:

> "The court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Rule 403 permits even relevant evidence to be excluded if its probative value is substantially outweighed by the risk of unfair prejudice, confusion or delay. It mandates the application of a balancing test between probative value and the risk of unfair prejudice. *See*, *United States v. McMillan*, 744 F.3d 1033, 1039 (7th Cir. 2014); *United States v. Foley*, 740 F.3d 1079, 1088 (7th Cir. 2014). "When determining the admissibility of evidence under Rule 403, this Court [7th Circuit] "employ[s] a sliding scale approach: as the probative value increases, so does our tolerance of the risk of prejudice." *Earls*, *supra*, at 471 quoting *Whitehead v. Bond*, 680 F.3d 919, 930 (7th Cir. 2012). A review of the Attorney Glynn's trial deposition reflects that any probative value to an issue for trial is outweighed by its prejudicial effect, confusion of issues, risk of misleading the jury, and would be a waste of time at trial.

**III. Even if the Court allows testimony related to the "rehoming" of the animals under advisement, Glynn's testimony would be cumulative because Plaintiffs have identified other individuals to testify to Plaintiff's rehoming plans.**

Plaintiffs have listed several witnesses on their witness list that purportedly will testify as to efforts made to transfer the seized animals from MADACC's custody and rehome the seized animals with other third parties. In particular, plaintiffs list attorneys Josh Levy, Stephen Glynn, Bob Dvorak, and David Halbrooks on plaintiffs' witness list and summarize their respective trial testimony as follows:

1. Attorney Josh Levy ("Levy") – "Cullen's Attorney during the initial attempts seeking return of the animals; he 'claimed' the animals for Plaintiffs (re: MADACC); and was part of the process resulting in agreements between counsel that the creatures would not be 're-homed' without a full due process hearing on the issues." (Pls.' Witness List, No. 18, p. 6 of 9, ECF No. 74-1.)

2. Attorney Stephen Glynn ("Glynn") – "see deposition; was also an attorney involved in said agreement between counsel regarding the animals and a due process hearing thereupon; was involved in the proposal to temporarily re-home the animals with 3rd parties pending the outcome of the various legal proceedings." (Pls.' Witness List, No. 19, p. 7 of 9, ECF No. 74-1.)

3. Attorney Bob Dvorak ("Dvorak") – "Jane's [Jane Flint's] attorney; knows about the raids; knows about trying to get clients back into buildings; he was present at meeting about making arrangements for the proposal to temporarily re-home the creatures pending the legal proceedings." (Pls.' Witness List, No. 20, p. 7 of 9, ECF No. 74-1.)

4. Attorney David Halbrooks ("Halbrooks") – "was Plaintiffs' primary attorney in the Circuit Court, seeking an appointment of a receiver to care for the animals during the pendency of the criminal case (by way of placement with 3rd parties to hold pending final judgment)" (Pls.' Witness List, No. 22, p. 7 of 9, ECF No. 74-1.)

While Defendants believe the issue of rehoming that these four witnesses are expected to testify to at trial is wholly irrelevant to the issues for trial (See ECF No. 134), this Court has taken the rehoming issue under advisement and stated the Court will wait to see how the evidence comes in at trial as to how the rehoming issue may be pertinent to plaintiffs' mitigation efforts as to damages. (See ECF No. 178 at p. 7; see Transcript of March 18, 2021 hearing, pp. 30-31, attached as Ex. 2 to Hough Decl.) Glynn admits at his deposition that he does not know who made the decision pertaining to the rehoming plan. (Glynn Trial Dep. Transcript, pp. 57-58, attached as Ex. 1 to Hough Declaration.) While Glynn claims Felician objected to the rehoming plan, Glynn admits he does not know who had the final say and that he only dealt with the Assistant District Attorney on this issue, not the police. (Id. at 58.) Glynn offers nothing probative as to the issue of mitigation. Furthermore, should this court allow rehoming testimony at trial for mitigation purposes, there are other witnesses who can testify to the rehoming plan Plaintiff Terry Cullen developed.

For these reasons, Defendants move this court to exclude Attorney Glynn as a witness in this case entirely because his testimony is unduly prejudicial, provides "expert" testimony, would confuse the jury, and offers nothing more than cumulative testimony other witnesses will be providing at trial.

Dated and signed at Milwaukee, Wisconsin, this 12th day of May, 2021.

                TEARMAN SPENCER
                City Attorney

*/s/Heather Hecimovich Hough*
HEATHER HECIMOVICH HOUGH
State Bar No. 1092637
Assistant City Attorney

JENNY YUAN
State Bar No. 1060098
Assistant City Attorney

Attorneys for Defendants
City of Milwaukee, Paul Felician and
Phil Simmert, II

P.O. ADDRESS:
800 City Hall
200 East Wells Street
Milwaukee, WI 53202
Telephone: (414) 286-2601
Facsimile: (414) 286-8550
Email: hhough@milwaukee.gov

1032-2016-1146/274576