# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0002

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
05/12/2010
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0002 | 05/12/2010 | 13:37 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 00:01 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 15:09 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | 008005 | 05/14/2010 | 20:19:40 |

## Modus Operandi

Crime Code(s)
ALL OTHERS

## Supplement

This supplemental report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On the dates of 05/13/2010 and 05/14/2010 I, assigned to Squad 3762, assisted in investigation at [redacted] South 13th Street. Over the course of these two days, I was involved the cataloguing of animals that were being removed from the residence. The animals were tentatively identified by academic, zoological, and related professional personnel who were assisting investigators at the location, though the identifications are subject to clarification or revision when the animals can be inspected in better lighting and safety conditions and without certain other constraints that were present at the location of [redacted] South 13th Street.

The animals were identified by an abbreviation of the room in which they were found and further by a number associated with the order in which they were brought outside the residence. No more significance should be assigned to the numerical designation beyond what is outlined above. The will be listed and organized below first by the date on which the animals were removed, then, under each date, by the designation described above.

Date: Thursday, 05/13/2010

Attic (Designation abbreviation "A")
A1: Common snapping turtle, Adult
A2: Common snapping turtle, Adult

Kitchen (Designation abbreviation "K")
K1: Common snapping turtle, Juvenile
K2: Midland painted turtle, Juvenile
K3: Ornate box turtle, Female
K4: Cooter turtle, Male, Adult
K5: Common snapping turtle, Juvenile
K6: Alligator snapping turtle, Sub-adult
K7: Alligator snapping turtle, Juvenile
K8: Midland painted turtle, Female, Adult
K9: Common snapping turtle, Juvenile
K10: Common snapping turtle, Juvenile
K11: Red-earred slider turtle, Female
K12: Red-earred slider turtle
K13: Red-earred slider turtle

EXHIBIT
1005
exhibitsticker.com

| Report Officer | Printed At | |
|---|---|---|
| 009372/WICK,IVAN T | 01/27/2020 18:25 | Page 1 of 6 |

CUL-MPD 000019

## Supplement

K14: Red-earred slider turtle, Sub-adult
K15: Red-earred slider turtle, Adult
K16: Common snapping turtle, Juvenile
K17: Common snapping turtle, Juvenile
K18: Common snapping turtle, Juvenile

Interior Bedroom (Designation abbreviation "IB")
IB1: Tree frog, Unknown species
IB2: Plain box turtle
IB3: Three-toed box turtle
IB4: Ball python snake, Non-venomous
IB5: Ball python snake, Non-venomous
IB6: Snake, Identification pending, Possibly carpet python
IB7: King snake, Possibly California King snake, Non-venomous
IB8: Red-earred slider turtle
IB9: Box turtle
IB10: Ball python snake, Non-venomous
IB11: Snake, Unknown species, Possibly venomous
IB12: Rat snake, Possibly grey rat snake, Non-venomous
IB13: Alligator snapping turtle, Juvenile
IB14: Black king snake, Non-venomous
IB15: Crocodile, Unknown species, Probably Nile crocodile
IB16: Crododile, Unknown species, Probably Nile crocodile
IB17: Crocodile, Unknown species, Probably Nile crocodile
IB18: Crocodile, Unknown species, Probably Nile crocodile
IB19: Crocodile, Unknown species, Possibly Nile crocodile
IB20: Crocodile, Unknown species, Possibly Nile crocodile
IB21: Caiman crocodilian, Possibly broad-nosed caiman, Hatchling
IB22: Crocodile, Unknown species, Possibly Nile crocodile
IB23: Caiman crocodilian, Possibly broad-nosed caiman, Hatchling
IB24: Crocodile, Unknown species, Possibly Nile crocodile, Juvenile
IB25: Crocodile, Unknown species, Possibly Nile crocodile, Juvenile
IB26: Blanding's turtle
IB27: Tree frog, Unknown species
IB28: Chinese alligator, Possibly female, Adult

It should be noted that the alligator designated IB28 had been loose in the room from which it had been recovered and had been recovered from near a bed and radiator in that room.

Den (Designation abbreviation "D")
D1: Kenya sand boa constrictor snake, Male
D2: California king snake, Non-venomous
D3: Sand boa constrictor snake, Non-venomous
D4: Ball python snake, Non-venomous
D5: Ball python snake, Non-venomous
D6: Dumeril's boa constrictor snake, Non-venomous, Adult
D7: Boa constrictor snake
D8: Reticulated python snake
D9: California king snake, Non-venomous
D10: Solomon Island boa constrictor snake
D11: Snake, Unknown species, Possibly venomous
D12: Corn snake
D13: Boa constrictor snake, Non-venomous
D14: Boa constrictor snake, Non-venomous
D15: Boa constrictor snake, Non-venomous

## Supplement

D16: Boa constrictor snake, Non-venomous
D17: Southeast Asian box turtle, Female
D18: Old World tortoise
D19: Old World tortoise
D20: Remains of hingeback tortoise, Deceased
D21: Remains of tortoise, Unknown species, Female, Deceased
D22: Red-tailed boa constrictor snake, Female, Adult
D23: Ball python snake, Adult
D24: Boa constrictor snake, Adult, with a deformed mouth
D25: Ball python snake
D26: Boa constrictor snake, Adult
D27: Mexican beaded lizard, Venomous
D28: Mexican beaded lizard, Venomous
D29: Boa constrictor snake, Adult
D30: California king snake, Non-venomous
D31: Southeast Asian box turtle, Male

It should be noted that, at this point in the cataloguing, I was advised that another loose alligator (in addition to IB28, above) had been found in the room containing these animals. The presence of this alligator had been previously unknown to myself and Police Aide Daniel Garcia when we had been videotaping this room earlier in the day, as well as to other personnel who had been in the room.

D32: Boa constrictor snake
D33: Boa constrictor snake
D34: Boa constrictor snake
D35: Boa constrictor snake
D36: Boa constrictor snake
D37: California king snake
D38: Dumeril's boa constrictor
D39: Spur thighed tortoise, Possibly male, Sub-adult
D40: Ball python snake
D41: Loxocemus snake
D42: Possible bull snake
D43: Rainbow boa constrictor snake
D44: Solomon Island boa constrictor snake
D45: Boa constrictor snake
D46: Ball python snake
D47: Carpet python snake
D48: Rainbow boa constrictor snake
D49: Boa constrictor snake
D50: Boa constrictor snake
D51: Boa constrictor snake
D52: Boa constrictor snake
D53: Boa constrictor snake
D54: Boa constrictor snake
D55: Boa constrictor snake
D56: Dumeril's boa constrictor snake
D57: Dumeril's boa constrictor snake
D58: Dumeril's boa constrictor snake
D59: Chinese alligator, Possibly male

It should be noted that the alligator designated D59 had been loose in the room from which it was recovered and had, as mentioned, been unknown to personnel at the scene until one of the Department of Natural Resources (DNR) officers inadvertently stepped on its tail.

## Supplement

Main Room (Designation abbreviation "MR")
MR1: Caiman crocodilian, Possibly dwarf caiman
MR2: Caiman crocodilian, Unknown species
MR3: Chinese alligator
MR4: Dwarf crocodile
MR5: Dwarf crocodile
MR6: Dwarf crocodile
MR7: Morelet's crocodile, Adult, with a deformed snout
MR8: Chinese alligator
MR9: Yacare caiman crocodilian
MR10: Giant African pouched rat
MR11: Giant African pouched rat
MR12: Crocodilian, Possibly yacare caiman
MR13: Giant African pouched rat
MR14: Giant African pouched rat
MR15: Dwarf caiman crocodilian
MR16: Skeletal remains of Iguana, Deceased
MR17: Chinese alligator
MR18: Caiman crocodilian

It should be noted that, as the Giant African pouched rats detailed in MR10 and MR11, above, were brought outside, it was pointed out to me that neither container for the animals contained food or water, and that MR11 was suffering from facial sores and loss of hair on its body.

Basement (Designation abbreviation "B")
B1: Pygmy crocodile
B2: Dwarf crocodile
B3: Crocodilian, Unknown species
B4: American alligator
B5: Remains, Unknown animal
B6: Alligator snapping turtle, Adult
B7: False gavial crocodilian
B8: Assorted feeder rats, at least 12 in number
B9: Assorted feeder rats, at least 10 in number
B10: Remains of tarantula spider, Deceased
B11: False gavial crocodilian
B12: Dwarf crocodile OR Dwarf caiman crocodilian
B13: False gavial crocodilian
B14: Alligator snapping turtle
B15: Dwarf caiman crocodilian

B16, B17, and B18 were intentionally left blank due to some momentary confusion over the numbering and designation of the animals that were being brought out, so I decided to, in the interest of not duplicating numbers and sowing further confusion, leave these numbers blank. The source of the confusion was quickly resolved but by that time I had resumed the numbering and designation with B19.

B19: Morelet's crocodile, Sub-adult
B20: Dwarf crocodile, Adult
B21: Assorted feeder rats
B22: Ultimately determined to be empty
B23: Assorted feeder mice
B24: Alligator snapping turtle, Male, Adult
B25: Morelet's crocodile
B26: Twist-neck South American turtle, Male
B27: Asian box turtle, Male

**Supplement**

B28: Side-neck turtle
B29: Alligator snapping turtle

It should be noted that the feeder rats in B8 and B9, above, and B35 and B36, below, had neither food nor water and rats in B8 were observed attempting to lick from an empty water bottle and those in B9 had sawdust in their food bowl. In addition, a white feeder rat in B9 appeared to be very ill or dying.

Date: Friday, 05/14/2010

Basement (continued)
B30: Alligator snapping turtle, Sub-adult
B31: Nile crocodile, Sub-adult
B32: Caiman crocodilian, Unknown species
B33: African slender-snouted crocodilian
B34: Seminole spectacled caiman crocodilian
B35: Assorted feeder rats, at least 12 in number
B36: Assorted feeder rats, at least 8 in number
B37: Dwarf crocodile, Adult
B38: Crocodilian, Unknown species, Possibly Dwarf crocodile
B39: Crocodilian, Unknown species
B40: Crocodilian, Unknown species
B41: Assorted feeder mice, at least 20 in number
B42: Assorted feeder mice, at least 20 in number

It should be noted that the feeder mice in B41 and B42, above, had neither food nor water and there was the dead, desiccated carcass of a rodent in B42.

B43: Chinese crocodile
B44: Black caiman crocodilian
B45: American alligator, Adult

Main Room (continued)
MR19: Crocodile, Probably either American crocodile or Morelet's crocodile
MR20: African slender snouted crocodile
MR21: Crocodile, Possibly American crocodile

It should be noted that the container in MR21 contained two dead rat carcasses and another dead rat carcass lay on top of the container.

MR23: Crocodilian, Unknown species
MR24: Spectacled caiman crocodilian
MR25: Black caiman crocodilian
MR26: Crocodile, Unknown species, with a deformed snout

It should be noted that during the cataloguing of MR26, I was advised by zoological personnel that the deformity to the snout was caused by being kept in too small and confining of a container and was a result of it's snout pressing against the side of the container. I was also told that the crocodile appeared to be well fed.

MR27: Caiman crocodilian, Unknown species
MR28: Chinese alligator
MR29: Crocodile, Unknown species, Possibly saltwater crocodile
MR30: Dwarf caiman crocodilian
MR31: Crocodilian, Unknown species, Possibly African slender-snouted crocodile
MR32: Ultimately determined to be empty

The recovered animals were photographed on 05/13/2010 during Day Shift hours by Squad 1826, Identification Technician Sarah Turek and, after she was relieved at the end of her shift, during Early Shift hours by Squad 1829, Identification Technician Jeremy Jurvelin. On 05/14/2010, they were photographed by Squad 1725,

## Supplement

Identification Technician Jimmy Young.

The animals were conveyed from the scene by various Police, Milwaukee Area Domestic Animal Control (MADAC), and Department of Neighborhood Services (DNS) personnel to MADAC and DNS facilities. Efforts to arrange for their continuing care and placement are ongoing.

Additional investigation regarding this incident is detailed in separate supplemental reports.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0003

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
05/14/2010
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0003 | 05/14/2010 | 20:33 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 00:01 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 15:09 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | 000912 | 05/31/2010 | 08:08:28 |

MISC INFO
444 PHOTOGRAPHS TAKEN BY ID TECH PERSONNEL

MISC INFO
DVD VIDEO WALKTHROUGH DONE BY SCD PERSONNEL

## Modus Operandi

Crime Code(s)
ALL OTHERS

## Supplement

This supplemental report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On 05/13/2010 at approximately 7:48 am I, assigned to Squad 3762, was instructed by Sergeant Robert Eckert to meet with Lieutenant Paul Felician and Detective Phil Simmert regarding assisting in an investigation and execution of a search warrant at 2323 South 13th Street. I met with them and, after being briefed regarding the investigation and changing clothes, responded to [redacted] South 13th Street.

After arriving, I was instructed by Lieutenant Felician to document the location. A more detailed description of the location follows. In addition to the narrative description, the scene was also documented with the assistance of the [redacted] Crimes Division Police Aide, Daniel Garcia, who used a videocamera to document a walkthrough of the location, as well as by Identification Technician Sarah Turek, who took still photographs of the basement and ground floor on 05/13/2010 using a digital camera. She was subsequently relieved by Identification Technician Jeremy Jurvelin. On 05/14/2010 Identification Technician Jimmy Young took additional still photographs, including several of the second floor, also using a digital camera.

This report will, throughout, reference animals found in various sections of the building. The animals were catalogued as was possible at the time and that catalogue is detailed in a separate supplemental report. That report identifies more specifically which animals were found and subsequently removed from specific areas of the residence.

2323 South 13th Street is located on the west side of South 13th Street, south of West Lincoln Avenue. It is bounded on the north by an east/west alley that traverses the 1300 block and separates the address from the structure to the north. It is bounded on the east by South 13th Street and on the west by a north/south alley that connects to the east/west alley referenced above. It is bounded on the south by an adjacent structure. The address is located in an area that contains both business and residential structures and associated traffic. The building is constructed largely of brown-colored bricks and some red wood. The eastern section (approximately half) of the address was two stories while the western section (approximately half) of the address was a single story.

The building at this location had, on the ground floor, a metal overhead door opening to the east, onto the sidewalk and South 13th Street, and the metal overhead door contained a small mail slot and displayed the

numbers "2323". Very slightly to the north of this overhead door was a placard that read "All Deliveries To Side Alley Door". The metal overhead door is bounded on either side by two areas of red-painted wood. The building had three sets of second-story windows which faced to the east and what appeared to be assorted clutter was visible through the windows from the street. A surveillance/security camera was visible on the northern section of the east side of the building, on the second floor level. The camera faced down and in a southsoutheasterly direction on South 13th Street.

The ground-floor entrance door to the building was located on the north side of the location, in the alley. The north side of the building contained, on its eastern end, windows on both the first and second story and the aforementioned door. Another overhead door was located on the western end of the northern face of the building, after the structure had become only a single story in height. The north side of the building contained what appeared to be two surveillance/security cameras, one facing eastnortheasterly and the other was domed and difficult to discern.

The western face of the structure, which faced into the north/south alley, contained four overhead doors that were painted white. In front of the southernmost overhead door on this part of the was a green disposal bin with a chain over the top of it. While at the scene, I looked inside the dumpster and found that it was essentially empty. This side of the structure contained what appeared to be two similarly domed surveillance/security cameras, one on the north side and one on the south side of the western face of the structure.

The entrance door from the alley led into a kitchen area. The room was cluttered with items commonly found in a kitchen, personnel effects, and several plastic containers (some with lids, some without) that contained animals, detailed elsewhere. The kitchen had four doorways, though only three provide immediate access to the areas to which they led. A doorway on the north side of the east wall led to a stocked, if cluttered, pantry. A doorway on the south wall led to a room that, for purposes of this report and my report cataloguing the animals, was identified as the "Main Room". A doorway to the west led into a dining room and additional living areas. The fourth door in the room was located on the south side of the east wall, but was blocked by an appliance, shelving, and items stacked on top of the appliance. and shelves. Documentation with information as to occupancy at the residence was located on the counter in the kitchen, along with money and checks, which were later (on 05/14/2010) collected by myself and Detective Simmert and subsequently turned over to Police Officer Colleen Sturma, who placed the items on inventory, Inventory #'s 517918 and 499564.

The doorway to the west led into the dining room and other areas of the residence. [redacted]. The dining room contained a table, chairs, a display cabinet with dishware, and assorted personal effects. There was also a monitor and surveillance recording system in the northwest corner of the room. The dining room contained an archway on the west side of the room leading into a living area and a doorway on the south side of the room that led into a bedroom.

The doorway leading from the dining room into the bedroom led into a small, cramped, cluttered bedroom that contained numerous additional animals in plastic containers that were stacked next to a day bed. This room, for purposes of this report and the related report pertaining to the cataloguing of the animals removed from this room, was designated the "Interior Bedroom". The room also contained a purple kiddie-style pool that was filled with dirt and some sort of plant material. The south side of this room had a doorway leading to a small bathroom. This bedroom also contained a loose crocodilian reptile that was under/between the bed and a radiator. The animals that were removed from this room are detailed in a separate supplemental report.

The bedroom immediately to south of the Interior Bedroom contained a sink, toilet, and bathtub, and was unremarkable. It contained another doorway opening to the east into a small hallway area.

The small hallway contained an additional doorway to the into the aforementioned "Main Room". The hallway area also contained a doorway leading south into a room that, for purposes of this report and the related report pertaining to the cataloguing of the animals, was designated the "Den". This room was also contained stacked containers containing animals, detailed in the report pertaining to the cataloguing of the animals. This room contained additional shelving, containers, and other items, and was sufficiently cluttered that another loose crocodilian, who was in the room, remained unknown to personnel at the scene until a Department of Natural

**Supplement**

Resources Conservation Warden Supervisor, Rick Reed, inadvertently stepped on its tail while removing animals for cataloguing. This room was videotaped in the condition it was found (prior to the discovery of the crocodilian) but was not photographed by Bureau of Identification personnel until after it was emptied of animals.

The living room contained appurtenance common to such a space, including a couple of chairs, a sofa, television, games, and books. It also contained a fireplace of unknown functionality. On the south side of the room was a doorway that led to an enclosed, open-air courtyard. On the south side of the west wall was a doorway that led to another small bedroom.

The small bedroom to the west of the living room was cluttered with clothing, personnel effects, and a bed and other furniture. On the south wall was a doorway to a closet, which contained clothing and personal effects, and a bucolic painting of a female surrounded by a variety of wildlife. The room was otherwise unremarkable.

The courtyard accessed through the door on the north side of the living room was an open-air courtyard. There was a shed-like structure covering a stairwell that led to the basement in the southeast corner of the courtyard and a garage area could be accessed through a door on the northwest side of the courtyard. This garage area opened, via the overhead door referenced earlier as opening into the alley off of the north face of the structure, into the east/west alley. What appeared to be feces were plainly visible in the courtyard.

The room in the southeast part of the residence, accessible both from the kitchen and the hallway area leading to the Den and the bathroom, was, for purposes of this report and the related report pertaining to the cataloguing of the animals, designated the "Main Room". This room was rectangular, longer east/west than it was north/south, and contained numerous metal containers that were subsequently identified as animal troughs, many of which were found to contain crocodilians. It also contained metal cages containing mammalian creatures. The room was cluttered and showed signs of deteriorating. The floor was damp and also showed signs of compromise, and there were concerns during the removal of the animals that sections of the floor could collapse. The metal containers containing the animals were covered with pieces of wood, which covers were not securely anchored, when they were anchored at all. There was evidence of water damage and mold in the room, and large sections of cobwebs hung from the walls and ceilings. During the removal of the animals found in the room, a flattened, deceased and decomposed crocodilian or reptile was found on the floor, under the containers, and a jar containing a reptilian foot was recovered from a shelf on the north side of the room. These items were subsequently turned over to Gregory Mayer, one of the zoological experts assisting us at the scene, for further identification. The room smelled heavily of biological waste, mold, damp, and wood rot. It is worth noting that Gregory Mayer described the condition that the animals were currently being kept in as "putrid", though he also noted that many of crocodilians appeared to be in good health and he speculated that the crocodilians had not been continuously kept in the particular conditions at the residence for more than a month or two because they were not (except in the case of certain deformities in some of the crocodilians snouts attributable to being kept in too restrictive conditions) exhibiting other outward signs (disease, sores, etc.) that he would attribute to a more extended exposure to the conditions found at the residence.

The north side of the Main Room had a door that opened onto a small landing that led to a stairway and another room that was apparently used for storage. This storage room was very cluttered but no animals were found or removed from this room. The room contained another door on its east side that led to a door that led upstairs, which will be described further later in this report.

The stairway from the landing that led downstairs opened into a small utility area. The area had a bathroom that appeared unused and was filled with webs. A door opened to the south into an open basement area which was designated for the purposes of cataloguing the animals as "Basement". Adjacent to the door leading into the Basement's main area, there were boxes containing pill/vitamin containers. This area also contained numerous animals in containers, including more metal containers as described above, along with a variety of plastic bins, some of which were covered to greater or lesser degrees and some of which were not covered. There was another loose crocodilian in the basement, near the furnace, and another crocodilian that was in a plastic tub of water with no cover. Cobwebs and spiderwebs hung from the ceiling. This basement also contained the skeletal remains of a crocodilian in one of the metal tubs. Several containers of what were apparently feeder rats and feeder mice were kept toward the middle northwestern section of the basement. In the southwestern corner was the stairway that led up to the courtyard area.

## Supplement

The second floor of the residence was a single room (with two doorways on the southwest side opening into apparently defunct bathrooms containing plant material). This room was designated the "Attic" for purposes of cataloguing the animals that were recovered from this area. This room was also very cluttered, containing a range of items. A door on the northwest corner of the opened onto the roof around the courtyard and over the garages on the west side of the building. I recovered the Para-Ordnance handgun from this room, which was subsequently turned over to and inventoried by Officer Sturma as detailed above.

I placed the DVD video walkthrough that was made by Police Aide Garcia, along with 11 CD's containing the photographs taken by Bureau of Identification personnel and Sony digital cassettes (one blank, one containing the videotaped walkthrough as it was initially being done), on inventory as evidence, Inventory #518766. I have been advised by Identification Technician John Hinkel that a total of 444 photographs were taken by the technicians who responded.

Additional detail regarding this investigation is contained in separate supplemental reports. Further investigation is pending.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0005

2333 N. 49TH ST

Milwaukee,WI 53210

(414) 935-7502

Reported Date
05/17/2010
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0005 | 05/17/2010 | 13:37 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time |
|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 |

| Officer | Assignment |
|---|---|
| 009372/WICK,IVAN T | [redacted] CRIMES DIVISION - DAYS |

| Entered by | Assignment | RMS Transfer | Property? |
|---|---|---|---|
| 009372 | [redacted] CRIMES DIVISION - DAYS | Supplement Transfer Complete | None |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 000912 | 05/31/2010 | 08:15:48 |

## INTERVIEW 1: HENDERSON,ROBERT

| Involvement | Invl No | Type | Name | MNI | Race |
|---|---|---|---|---|---|
| INTERVIEW | 1 | INDIVIDUAL | HENDERSON,ROBERT | 2998416 | WHITE |

| Sex | Extent of Injury | D.V. | Build | Res Status | RMS Transfer |
|---|---|---|---|---|---|
| MALE | NO VISIBLE INJURY | NO | MEDIUM | UNKNOWN | Successful |

| Type | Address | City |
|---|---|---|
| WORK/BUSINESS | 800 W WELLS ST | MILWAUKEE |

| State | ZIP Code |
|---|---|
| WISCONSIN | 53233 |

| Phone Type | Phone No |
|---|---|
| WORK | [redacted]-2775 |

| CONVEYED TO | CONVEYED BY |
|---|---|
| NOT APPLICABLE | NOT APPLICABLE |

| Employer/School | Position/Grade |
|---|---|
| MILWAUKEE PUBLIC MUSEUM | CURATOR |

| Location | City | State |
|---|---|---|
| 800 W WELLS ST | MILWAUKEE | WISCONSIN |

| ZIP Code | Phone Type | Phone No |
|---|---|---|
| 53233 | OTHER | (414)278-2775 |

## Modus Operandi

| Crime Code(s) |
|---|
| ALL OTHERS |

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On 05/18/2010 at approximately 12:36 pm I, assigned to Squad 3762, conducted follow-up regarding this investigation. I called the Curator of Reptiles at the Milwaukee Public Museum, Robert Henderson, at 278-2775, and he and I spoke for approximately thirty minutes.

Robert Henderson stated that he holds a Masters Degree in Zoology and has been the Curator of Reptiles at the museum for approximately 35 years. He had been at 2323 South 13th Street during the initial investigation at the scene and was involved in subsequent follow-up efforts to refine the identifications of the recovered animals. He stated that his particular area of expertise was with respect to the snakes that were recovered and he wanted me to understand that most of what he was telling me was regarding the snakes, specifically, and that other experts who were involved could better speak about the other animals. Robert Henderson said that he had been at 2323 South 13th Street for about three hours on Thursday, 05/13/2010. He said he was also involved in checking for identification tags and refining the identifications on Monday, 05/17/2010, at the Milwaukee Area Domestic Animal Control (MADAC) facility, finishing at MADAC at about 3:00 pm. He said that Craig Berg, of the Milwaukee County Zoo, was also at MADAC on 05/17/2010 and that the two talked earlier in the morning on 05/18/2010, and

## Supplement

Robert Henderson believed that the identifications had been completed as of about 5:00 pm on 05/17/2010.

Robert Henderson said he found the scene at 2323 South 13th Street to be "very bizarre", later adding that he had "never seen so much clutter in my life". He said that Craig Berg had walked him through the entire scene on 05/13/2010 and had warned him about the compromised condition of the floor, and he had been struck by how the animals were "just sort of warehoused". He said that the "lack of sanitation" at the residence had made him feel as though he really needed to clean himself after leaving the residence, which he estimated he had been at for about three hours on 05/13/2010. He said that he had not been wearing a respirator or mask while at the scene, though he observed others who were, and he noted that the smell at the residence was "musty" and "uriney".

Robert Henderson stated that, with respect to the snakes, the snakes were being kept in conditions he described as constituting "neglect", based on several factors, including the following:

a. The enclosures were, generally, too small;
b. Not all the enclosures were translucent, so some of the snakes were kept in complete darkness. He described this as more of a "quality of life issue" than a health issue;
c. The substrate (papers, mostly) - where they even existed - were wet or covered with feces. He stated that the substrate should be changed out every time it is soiled as described doing this as "a no-brainer";
d. Water - where it existed - was fouled with biological waste. He stated that, under ideal conditions, the water would be changed daily, but added that, even at the museum, the water is not always changed daily though it is - and should always be - clean;
e. Not all of the snakes had food or water;
f. The enclosures for the snakes were dirty.

Robert Henderson also stated that, while he was "not trying to put a positive spin on this", that the ambient temperature the snakes were being kept in was warm enough and that at least "95 percent" of the snakes appeared to be in "excellent" or "very, very good" health and were "obviously kept fed". He also stated that the conversation he had had with other experts at MADAC on 05/17/2010 regarding the condition and health of the crocodilians was much the same, in that, despite the conditions the crocodilians had been kept, they were, by and large, in good health. However, Robert Henderson referred me to the other experts regarding particulars regarding the crocodilians. I asked Robert Henderson about any information he could provide as to how long the snakes might have been kept in the conditions in which they were found, and he stated that "it's tough" to make that determination. He said that snakes can go a long time without feeding or losing weight. He stated that, based on what he saw, he guessed that the snakes were probably being fed dead food and, if they were accustomed to being fed dead food, they could be kept for a long time in containers as small as the ones in which some of them were found. He said that, based on the amount of feces in the containers and feces in some of the snakes' water, he believed that the snakes could have been kept in the enclosures in which they were found for a period of time ranging from days to weeks.

Robert Henderson said that he believed the snakes had been kept in the neglectful conditions in which they were found for a relatively short time, given the apparent health of most of the snakes. He said that there had been a couple of snakes that had lumps, one with a lump on the head and one on the side of its body, but he said that those lumps could have been cancerous or some other growth, and might even have been on the snakes at the time they had been acquired. He also pointed out that the lumps were not suggestive of the snakes being struck or otherwise physically abused.

Robert Henderson also told me that some of the turtles that had been recovered from the residence had mold growing on them and he stated flatly that turtles having mold growing on them was not normal and indicative of neglect. However, he referred me to Craig Berg regarding issues associated with the turtles and husbandry issues regarding them.

Robert Henderson said that he thought he might have met Terry Cullen approximately forty years ago, but he did not know him or have a continuing relationship with him, so he was unable to provide me additional information regarding him. He did not know Jane Flint and had no information regarding her.

Robert Henderson had nothing further to add, and I provided him with my contact information.

## Supplement

Further investigation is pending.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0007

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date 05/12/2010
Nature of Call CRLTYANIML
Officer WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0007 | 05/12/2010 | 13:37 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time |
|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 |

| Officer | Assignment |
|---|---|
| 009372/WICK,IVAN T | [redacted] CRIMES DIVISION - DAYS |

| Entered by | Assignment | RMS Transfer | Property? |
|---|---|---|---|
| 009372 | [redacted] CRIMES DIVISION - DAYS | Supplement Transfer Complete | None |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 000912 | 05/31/2010 | 08:17:08 |

## WITNESS (WITHOUT INFORMATION) 1: ADAMCZAK,PETER JOHN

| Involvement | Invl No | Type |
|---|---|---|
| WITNESS (WITHOUT INFORMATION) | 1 | INDIVIDUAL |

| Name | MNI | Race | Sex | DOB | Age | Ethnicity |
|---|---|---|---|---|---|---|
| ADAMCZAK,PETER JOHN | 2767959 | WHITE | MALE | [redacted]/1985 | 24 | UNKNOWN |

| Juvenile? | Hair Color | Skin | Extent of Injury | D.V. | Gen Appearance | Build | Res Status | RMS Transfer |
|---|---|---|---|---|---|---|---|---|
| No | BROWN | MEDIUM | NO VISIBLE INJURY | NO | CASUAL | MEDIUM | RESIDENT | Successful |

| Type | Address | City | State |
|---|---|---|---|
| HOME | [redacted] MALVERN PL | MILWAUKEE | WISCONSIN |

| ZIP Code |
|---|
| 53207 |

| Phone Type | Phone No |
|---|---|
| HOME | [redacted]-9954 |

| CONVEYED TO | CONVEYED BY |
|---|---|
| NOT APPLICABLE | NOT APPLICABLE |

| Employer/School | Position/Grade |
|---|---|
| HOPE HOUSE | HOUSEMNGR |

## WITNESS (WITHOUT INFORMATION) 2: HOLLOWAY,MYRA JURANTA

| Involvement | Invl No | Type |
|---|---|---|
| WITNESS (WITHOUT INFORMATION) | 2 | INDIVIDUAL |

| Name | MNI | Race | Sex |
|---|---|---|---|
| HOLLOWAY,MYRA JURANTA | 2998847 | BLACK/AFRICAN AMERICAN | FEMALE |

| DOB | Age | Ethnicity | Juvenile? | Hair Color | Skin | Extent of Injury | D.V. | Gen Appearance |
|---|---|---|---|---|---|---|---|---|
| [redacted]/1987 | 23 | UNKNOWN | No | BLACK | MEDIUM | NO VISIBLE INJURY | NO | CASUAL |

| Build | Res Status | RMS Transfer |
|---|---|---|
| MEDIUM | RESIDENT | Successful |

| Type | Address | City | State |
|---|---|---|---|
| HOME | [redacted] E MALVERN PL | MILWAUKEE | WISCONSIN |

| ZIP Code |
|---|
| 53207 |

| Phone Type | Phone No | Phone Type | Phone No |
|---|---|---|---|
| HOME | [redacted]9954 | WORK | (262)783-2080 |

| CONVEYED TO | CONVEYED BY |
|---|---|
| NOT APPLICABLE | NOT APPLICABLE |

| Employer/School | Position/Grade | Phone Type | Phone No |
|---|---|---|---|
| PICK AND SAVE | DELI CLERK | OTHER | (262)783-2080 |

## Modus Operandi

| Crime Code(s) |
|---|
| ALL OTHERS |

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

| Report Officer | Printed At | |
|---|---|---|
| 009372/WICK,IVAN T | 01/27/2020 18:25 | Page 1 of 3 |

CUT-MPD 000034

## Supplement

On Monday, 05/17/2010, I, assigned to Squad 3762, responded at approximately 9:00 am to District Six for a briefing regarding the execution of a search warrant at 3348 South Kinnickinnic Avenue. The following personnel in addition to myself were present for the briefing:

a. Lieutenant Paul Felician, [redacted] Crimes Division;
b. Detective Phil Simmert, [redacted] Crimes Division;
c. Milwaukee Area Domestic Animal Control (MADAC) Supervisor John McDowell;
d. Tactical Enforcement Unit Squad 712 - Sergeant Bradley Buddenhagen;
e. Tactical Enforcement Unit Squad 726 - Police Officers Andrew Moutry and Kenneth Daugherty;
f. Tactical Enforcement Unit Squad 727 - Police Officers Eli Cole and Roy Horn;
g. Neighborhood Task Force (NTF) Sergeant Rick Burmeister;
h. NTF Squad 941 - Police Officers Randy Piontkowski and Brian Schull;
i. NTF Squad 942 - Police Officers Robert Lacy and Matthew Schultz
j. NTF Squad 944 - Police Officer Greg Marr

The following Department of Natural Resources (DNR) Conservation Wardens assisted in the execution of the search warrant: Gervis Myles, Steven Sandas, and Nick Blankenheim, along with Conservation Warden Supervisor Rick Reed.

I assisted in providing containment at the southeastern corner of the premise when entry was initially made by TEU and NTF personnel. Later, I knocked at the door of [redacted] East Malvern (which was an address attached to the [redacted] South Kinnickinnic and was included in the warrant). The door was answered by a male who subsequently identified himself as Peter John Adamczak (White male [redacted]/1985), [redacted] East Malvern [redacted]-9954, who is employed as a House Manager at the Hope House located at South 2nd Street and West Orchard. He stated that he has been renting the address for about three years and that "Terry" is his landlord. He stated that he had not seen Terry or anyone else carrying animals in or out of the premises, though he could not speak to the basement, which he said was under Terry's control. He added that he had not seen Terry for weeks, as he (Terry) leaves the country frequently. I asked him why Terry leaves the country and Peter Adamczak said that he believed that it was to visit his mother in Puerto Rico. Peter Adamczak described Terry as a "very private person", adding that Terry had also been "pleasant enough" and "kept rent low".

While at [redacted] East Malvern, I also spoke with Myra Juranta Holloway (Black female [redacted] 1987), [redacted] East Malvern, [redacted]-9954, who is employed at the Pick and Save grocery store in Pewaukee as a Deli Clerk. She stated that she moved in with Peter Adamczak, whom she identified as her boyfriend, approximately four months ago. She also had not seen Terry or anyone else carrying animals in or out of the premises and she had nothing further to add regarding this investigation.

I inspected this address pursuant to the warrant. While the residence was dirty and cluttered, I found no evidence of animals being kept at the address of [redacted] East Malvern.

After the warrant had been executed and evidence identified by Detective Simmert, I left the scene to meet with other police personnel at the Department of Neighborhood Services (DNS) at South 6th and West Howard, where many of the animals were being kept. While there, I observed DNR personnel photographing some of the animals. While doing so, I observed them discover that one of the Boa Constrictor snakes had escaped and wrapped itself around a nearby traffic cone. It was not known during the time that I was there which container the snake escaped from.

I then went to MADAC, located at 3839 West Burnham, where I observed Jay Christie (of the Racine County Zoo), Gregory Mayer (of the University of Wisconsin - Parkside and also affiliated with a zoo), Craig Berg (of the Milwaukee County Zoo), and Robert Henderson (of the Milwaukee County Museum) continuing the refinement of the identifications of the animals being kept at MADAC. Craig Berg advised me that some additional photographs had been taken at MADAC for purposes of associating the cataloguing number of the animals to an internal MADAC tracking number. While I was there, Detective Simmert also arrived and brought the deceased, frozen crocodilian and deceased, frozen snake that he had recovered from the basement of 3348 South Kinnickinnic. The carcasses were tentatively identified by Jay Christie and Gregory Mayer as a Chinese Alligator and a Common Boa Constrictor. The crocodilian was scanned with a Trovan Pet Tag scanner and was found to contain

# Incident Report
# MILWAUKEE POLICE DEPT

101320089 Supplement No 0007

## Supplement

Tag #00-0205-04BD. I was also advised by them that the egg-laying pool setup in the bedroom and breeding the crocodilians was something that had been specifically recommended against by Chinese Alligator Species Survival Plan (SSP) manager Joseph Abeene when the crocodilian(s) had been shipped to Terry Cullen.

Further investigation is pending.

| Report Officer | Printed At | |
|---|---|---|
| 009372/WICK, IVAN T | 01/27/2020 18:25 | Page 3 of 3 |

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0008

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date 05/19/2010
Nature of Call CRLTYANIML
Officer WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0008 | 05/19/2010 | 15:30 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time |
|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 |

| Officer | Assignment |
|---|---|
| 009372/WICK,IVAN T | [redacted] CRIMES DIVISION - DAYS |

| Entered by | Assignment | RMS Transfer | Property? |
|---|---|---|---|
| 009372 | [redacted] CRIMES DIVISION - DAYS | Successful | None |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 000912 | 05/31/2010 | 08:17:35 |

## Modus Operandi

Crime Code(s)
ALL OTHERS

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On 05/19/2010, at the direction of Lieutenant Paul Felician, I met with Assistant District Attorney Sara Lewis regarding reviewing Incident #'s 10-132-0089 (a [redacted] investigation, suspect Terry Cullen) and 10-128-0008 (a cruelty to animals and keeping endangered species investigation, suspects Terry Cullen and Jane Flint). ADA Lewis advised me of additional work she wanted done regarding the presentation of these investigations and also requested, prior to the issuance of charges or a warrant, that I attempt to make arrangements with the [redacted] investigation to appear at the District Attorney's Office for a formal charging conference. She also expressed that she would be unable to further review the cases on 05/19/2010 due to another professional obligation.

After returning to the [redacted] Crimes Division, at approximately 1:01 pm, I called [redacted] at [redacted]-1728. I did not receive an answer but left a message containing my contact information and requesting that she call me back. I called again at approximately 3:00 pm and, again, did not receive a response, and left another message. My second message also requested that [redacted] be available for a phone call, if possible, on the morning of 05/20/2010 in the event that we were unable to talk on 05/19/2010.

While at the [redacted] Crimes Division, also spoke with Sergeant Constantino Heckermann of the Streamwood Police Department in Streamwood, IL, at 630-736-3700. During our conversation he indicated that he would also attempt to make contact with [redacted] to facilitate arranging the charging conference. He also, at my request, faxed me a copy of the letter referenced in his report and currently being held as evidence by his agency. A copy of the letter will accompany the review materials when they are next presented to ADA Sara Lewis.

Additional follow-up and review is pending.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0009

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
05/20/2010
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| | | | | | |
|---|---|---|---|---|---|
| Agency: MILWAUKEE POLICE DEPT | Incident No: 101320089 | Supplement No: 0009 | Reported Date: 05/20/2010 | Reported Time: 12:59 | CAD Call No: 101321086 |
| Status: REPORT TO FOLLOW | Nature of Call: CRUELTY ANIMAL | Location: 2323 S 13TH ST | | | |
| City: MILWAUKEE | ZIP Code: 53215 | RepDist: 5886 | District: 2 | Squad: 250 | From Date: 02/27/2010 | From Time: 17:00 |
| Officer: 009372/WICK,IVAN T | Assignment: [redacted] CRIMES DIVISION - DAYS | | | | |
| Entered by: 009372 | Assignment: [redacted] CRIMES DIVISION - DAYS | RMS Transfer: Supplement Transfer Complete | Property?: None | | |
| Approving Officer: 000912 | Approval Date: 05/31/2010 | Approval Time: 08:20:08 | | | |

## WITNESS (WITHOUT INFORMATION) 1: MAYER,GREGORY

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Involvement: WITNESS (WITHOUT INFORMATION) | Invl No: 1 | Type: INDIVIDUAL | | | | | |
| Name: MAYER,GREGORY | MNI: 2999247 | Race: WHITE | Sex: MALE | DOB: [redacted]/1957 | Age: 52 | Juvenile?: No | |
| Build: MEDIUM | RMS Transfer: Successful | | | | | | |
| Type: WORK/BUSINESS | Address: 900 WOOD RD | City: KENOSHA | | | | | |
| State: WISCONSIN | ZIP Code: 53144 | | | | | | |
| Phone Type: WORK | Phone No: (262)595-2074 | | | | | | |
| Employer/School: UW-PARKSIDE | Position/Grade: PROFESSOR | | | | | | |
| Location: 900 WOOD RD | City: KENOSHA | State: WISCONSIN | | | | | |
| ZIP Code: 53144 | Phone Type: WORK | Phone No: (262)595-2074 | | | | | |

## Modus Operandi

Crime Code(s)
ALL OTHERS

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On Thursday, 05/20/2010, at approximately 8:22 am I, assigned to Squad 3762, conducted follow-up regarding this investigation. I called Gregory Mayer, one of the specialists who had been assisting with the removal of the animals at 2323 South 13th Street, and was ultimately able to speak with him at 262-595-2074.

Gregory Mayer (White male [redacted]/1957), [redacted] Road, Kenosha, advised me that he holds a doctoral degree in Biological Sciences and is a professor in that field at the University of Wisconsin - Parkside, where he has been for over 17 years. He is also the Senior Vice Chair of Technical Development and the Vice Chair of Conservation Education on the board of directors at the Racine County Zoo.

Gregory Mayer stated that he had been at 2323 South 13th Street on Friday, May 14th, 2010, during this investigation and he has, since then, been involved in the identification, cataloguing, and advising regarding care of the animals after they had been removed from the address. He stated that, in examining the animals since they were removed, his "overall view" is that the condition of the animals themselves was "generally good". He stated that his particular area of involvement was with the crocodilians and what follows should be understood as pertaining specifically to the crocodilians except where otherwise noted.

## Supplement

Gregory Mayer said that the "most striking" sign of ill health in the crocodilians was growth deformities in their snouts, specifically the curving of the snouts and associated distortions of their teeth, which he stated were the result of long-term health problems. He stated that such problems can occur even in the best zoos and he was unable to say whether the observed deformities were the result the quality of care provided after they were received by Terry Cullen or if they had been preexisting conditions, though he expressed that some of that information should be available in records from the Bronx Zoo or other documentation associated with Terry Cullen's acquisition of the crocodilians. He stated that the observed deformities are typically the result of being kept in too cramped of conditions and that the phrases "bathtub crocodile" and "bathtub alligator" are used to refer to crocodilians with this condition. He also stated that he had observed one of the crocodilians with an eye infection but he added that, given the large number of animals at the location, that the fact that one of them had an eye infection was not, in itself, particularly concerning.

Gregory Mayer and I revisited his description, referenced in an earlier report, of the conditions of the crocodilians as "putrid". He reaffirmed that description and went on to describe the conditions that crocodilians were being kept in at the scene as "terrible". I asked him to elaborate, and he stated that he had observed the water in some of the containers that had not yet been drained and said the water he had observed was "putrid" and "terrible". He said that the water containing the crocodilians was dark brown and "practically filled with feces" and also contained dead and decomposing rats. He added that "the really bad smell" in the room was more a result of the decomposing rats than it was the crocodilian feces. He also stated that the troughs that he observed many of the crocodilians in did have a mechanism for draining and flushing, but that the draining and flushing had not been done recently, though he added that the generally good conditions of the animals suggested that there had been some prior ongoing draining of their containers. Gregory Mayer also said that many of the crocodilians had been "actively defecating" after being removed from the premises and taken to other locations, which suggested that they had been fed in the "relatively recent" past. He said that some of the draining and flushing tubs had been clogged with feces and, in his involvement with the animals at other sites, tongs had been used to remove feces from the drains. With respect to feeding, Gregory Mayer stated that crocodilians do not need to be fed very often and that feeding them two or three times a month is "more than adequate", adding that a well-fed crocodilian could go weeks, up to about two months, without eating without showing adverse effects, and that a note that he had seen on one of the tanks indicated that one of the crocodilians had been fed on 05/03/2010.

Gregory Mayer also expressed the concern that, even if the water in the crocodilians' containers had been clean, there was no place for the crocodilians to climb out of the water and dry off, which he said they would normally do in order to warm up. He later elaborated that, while the size some of the crocodilians were contained in were adequate, they were inadequate in other cases, and he said that the formula as to the minimum adequate size of a crocodilian's container was the square of the length of the crocodile divided by two, with the result being the minimum adequate square footage in which to contain the crocodilian. He stated that a crocodilian of up to about 6' in length could be kept in a cattle trough, as were many of the crocodilians at the location, but that would be dependant upon the size of the trough. He added that the conditions that would be considered minimally adequate would include half that area being water, half of it being dry, and provision of heat. Gregory Mayer went on to say that he noted that, at MADAC, several of the crocodilians were contained in Tupperware-style containers, which he said would be acceptable for short term, temporary transport of the animals, up to a few days or possibly even a couple of weeks, but not for longer-term confinement. He stated that, while the Tupperware-style containers would be easy to keep clean, they had lacked the proper mix of water and dry space or accommodations for heat, and he reiterated his concerns about the space containing the crocodiles. He then quoted another person as having noted that "Crocodiles don't need a lot of tender, loving care".

Gregory Mayer further noted an additional problem with the conditions under which the crocodilians were kept as involving a lack of lighting. He stated that normal care would involve having lamps over the containers to provide lighting and heat to the crocodilians. He added that he did not observed many such lamps at 2323 South 13th Street and the ones he did observe were of unknown functionality. He stated that the temperature that crocodilians should be kept at is around 25 to 30 degrees Celsius (approximately 80 to 90 degrees Farenheit), but he could not speak to the temperature that the crocodilians had been being kept in on an ongoing basis or when the warrant was initially executed, as he had not been present until Friday, 05/14/2010.

Gregory Mayer stated that reptiles generally have much slower metabolisms than other animals and so conditions

## Supplement

that would quickly cause problems in other species would not do so in a reptile. By way of example, he explained that dogs and cats need food and water daily but that reptiles can go for weeks without eating without adverse consequence.

Gregory Mayer said that none of the crocodiles or alligators that he observed had mold or fungus growing on them, but that some had white precipitate from dried water and/or rust stains.

Gregory Mayer stated that the crocodiles and alligators could have been in the conditions in which they were found for between ten days and two months, as evidenced by the condition of the water. He added that the clutter that he observed covering the tanks would have made it difficult to provide proper care of the crocodilians.

Gregory Mayer said that he observed nothing that caused him concern as to the crocodilians being able to breath. He stated that, due to their slow metabolisms, the crocodiles can breath in containers up to practically airtight. With respect to the lids on the containers that he observed, he did not see any that he believed were airtight and he believed that, short of "extraordinary circumstance", the crocodiles and alligators would have remained contained in the containers they were found with the lids as they were.

Gregory Mayer considered that allowing reptiles (except, in certain circumstances, certain iguanas, tortoises, and similar reptiles) to wander loose "a bad idea". He stated that alligators are, "by and large", not aggressive, and described them as the "sweethearts of the crocodile world". He stated that crocodiles and caiman tend to be more aggressive and the evidence that he has seen (including visual images of Terry Cullen holding his crocodilians) suggested to him that Terry Cullen's animals were "very docile". He added that he would never put a crocodilian's jaws near his head or neck, regardless of how docile the animal was. He further stated that simply allowing crocodilians (particularly alligators) to wander loose in a residence would not inherently be dangerous to people in the house, though it could be dangerous to some pets or other animals if the crocodilians regarded the animal as prey.

The discussion with Gregory Mayer then turned to the snakes and turtles recovered from the residence. Gregory Mayer said that he did not look at the snakes that much and that that was done primarily by Robert Henderson, whose statement is detailed elsewhere, and Robert Carmichael, of the Wildlife Discovery Center in Lake Forest, IL, 847-615-4388. He stated that, from his observations and what he heard from others involved in the process, that the snakes appeared to be in generally good shape and that none of them appeared to be sick. He stated that the containers for the anacondas seems small and that there should have been places for the snakes to swim, as they are semi-aquatic. He said that the snake containers that he observed were "much cleaner" than the crocodilian containers, though he had observed the containers at MADAC and he did not know who had last cleaned the containers, or when.

Gregory Mayer said that he had looked at all of the turtles and the turtles appeared to be in "generally good shape". He said that there were two dead turtles that were found but they had been unable to determine a cause of death. He stated that he believed there had been six dead animals recovered, which he said was not that many given the size of Terry Cullen's collection. He said that "a few, not many" of the turtles that had been removed appeared to be light and underweight, which he said could have been a result of either not eating enough or from being dehydrated. He stated that those turtles (specifically, a Malaysian Box Turtle and a Red Eared Slider) had been provided food and water by MADAC personnel and appear to have gained some weight while in MADAC's care. He stated that turtles also have a slow metabolism and the dehydration would have occurred over a few days. He described the dehydration as "not serious" and something from which the turtles could quickly recover from. Gregory Mayer believed that some of the turtle containers had been too small but that others had been adequate, particularly the ones that had rocks and paper in them. He said that some of the tortoises showed evidence of caked paper and feces on their bellies, which indicated that they had been being "fed well".

Gregory Mayer said that, with respect to the Alligator Snapping Turtle found in the basement, that turtle had been contained in "much too small a trough" and that the trough had been barely wider than the turtle itself, and the turtle had been "covered in rust", which he said indicated it had been in rusty water for "a long time". Gregory Mayer said that, with respect to the Mexican beaded lizards, that one had looked "very good" but that the other had looked thin and underweight.

## Supplement

I also asked Gregory Mayer about the identifications of the four items that had been turned over to him for identification. He stated as follows:

a. The dead reptile that had been recovered from the floor of the "Main Room" he has not yet been able to positively identify. He stated that, originally, he had believed it was a monitor lizard but that was before he knew that Mexican beaded lizards had been recovered from the location. He said that, tentatively, his identification of the lizard was that it was a Varanoid lizard, which was a larger group of lizards that contained both the monitor lizard and Mexican beaded lizard species;
b. The foot contained in the jar, also recovered from the "Main Room", he has been unable to identify yet. He stated that he believed it had belonged to a crocodile, but he could not yet say with certainty;
c. The frozen crocodilian recovered from the search warrant on South Kinnickinnic Avenue was identified as a Chinese Alligator;
d. The frozen snake, also recovered from the search warrant on South Kinnickinnic Avenue, was identified as a Boa Constrictor.

Gregory Mayer's overall impressions were that, given the size of the collection of animals at the location, there was nothing remarkable about some of them being in "bad shape", though he then clarified that that was referring to the snakes, turtles, and other reptiles, and explained that, with respect to the crocodilians, the care of the crocodilians had "definitely gone south" and that proper care of the crocodilians had been "clearly interrupted". He stated that his "major neglect concern" was with respect to the "putrid" water containing feces and decomposing rats in which the crocodilians were being kept, and that was the short-term concern about their well-being. He stated that longer-term neglect concerns and issues were those associated with inadequately sized containers, lack of dry and wet space, and warmth and lighting issues.

Gregory Mayer advised me that the Ornate Box Turtle is statutorily protected by the Wisconsin Department of Natural Resources and that many crocodilians are protected by federal law.

Gregory Mayer advised me that he was in the process of writing a file containing a partial list of the catalogued animals with which he had been involved. He expected it would take several hours and he would email it to me when he was finished. A copy of the document he sends me will be provided to ADA Sara Lewis and other investigative personnel, as appropriate, after I receive it.

Gregory Mayer had nothing further to add at that time, and I concluded my interview with him at approximately 9:37 am.

Further investigation is pending.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0010

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
05/21/2010
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0010 | 05/21/2010 | 11:51 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time |
|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 |

| Officer | Assignment |
|---|---|
| 009372/WICK,IVAN T | [redacted] CRIMES DIVISION - DAYS |

| Entered by | Assignment | RMS Transfer | Property? |
|---|---|---|---|
| 009372 | [redacted] CRIMES DIVISION - DAYS | Supplement Transfer Complete | None |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 000912 | 05/31/2010 | 08:25:16 |

## WITNESS (WITHOUT INFORMATION) 1: CHRISTIE,JAY

| Involvement | Invl No | Type |
|---|---|---|
| WITNESS (WITHOUT INFORMATION) | 1 | INDIVIDUAL |

| Name | MNI | Race | Sex | DOB | Age | Juvenile? |
|---|---|---|---|---|---|---|
| CHRISTIE,JAY | 2999530 | WHITE | MALE | [redacted]/1968 | 41 | No |

| Build | RMS Transfer |
|---|---|
| MEDIUM | Successful |

| Type | Address | City |
|---|---|---|
| WORK/BUSINESS | 200 GOOLD ST | RACINE |

| State | ZIP Code |
|---|---|
| WISCONSIN | 53402 |

| Phone Type | Phone No |
|---|---|
| WORK | (262)676-9291 |

| CONVEYED TO | CONVEYED BY |
|---|---|
| NOT APPLICABLE | NOT APPLICABLE |

| Employer/School | Position/Grade |
|---|---|
| RACINE COUNTY ZOO | PRESIDENT |

| Location | City | State |
|---|---|---|
| 200 GOOLD ST | RACINE | WISCONSIN |

| ZIP Code | Phone Type | Phone No |
|---|---|---|
| 53402 | WORK | (262)676-9291 |

## Modus Operandi

Crime Code(s)
ALL OTHERS

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On Thursday, 05/20/2010, at approximately 10:15 am I, assigned to Squad 3762, received a phone call from Jay Christie (White male [redacted] 1968), who is the President of the Racine County Zoo, 200 Goold Street, Racine, 262-676-9291. During the course of my conversation with him, he told me that he has been employed in that capacity for the last 12 years and, prior to that, had run a smaller zoo in Brighton, New Jersey, for three years. He stated that he holds an Masters degree in Business Administration and a Bachelor's degree in Anthropology.

Jay Christie stated that he had been at 2323 South 13th Street and observed the conditions at the residence. He described the conditions in which the crocodilians were being kept as "wholly inadequate" for both the short and long term well-being of the crocodilians. He specifically cited that many of the crocodilians had no land area in their containers, no heat/light lamps, problems with the sizes of the containers in which the animals were kept, and the "disgusting conditions" in and around the containers. Jay Christie explained that appropriate animal husbandry, for most crocodilians, would require containers which were approximately half-aquatic and half-dry/land, which would allow for the crocodilians to bask and thermo-regulate themselves. He stated that,

## Supplement

through dietary supplementation, one might be able to grow a crocodilian in conditions in which they were not given access to light but, from an animal welfare standpoint, Jay Christie would not endorse doing so.

Jay Christie stated that the water that he observed in the tanks containing the crocodilians was "totally unacceptable", except for only one that contained clean water. He stated that the setup of the tanks indicated that the water in the tanks was being dumped then filled and, given the number of crocodilians and conditions they were in, that method of changing the water would require someone attending to the containers on a daily basis. He said that one of the caiman crocodiles was observed in a tank that had no water except for some sludge that contained algae. He said that he and some of the other experts at the scene had initially been puzzled by that and only later realized that that container was the only container that had a functioning heat lamp over it. He said that some of the containers holding the crocodilians had space heaters on top of them which would have resulted in "disaster" were they to have fallen into the tanks.

Jay Christie also said that the quantity of debris, dust, and detritus on top of the containers suggested to him that the conditions, as he had observed them, had persisted for some period of time, though he indicated that a more specific time frame would be difficult to pin down with accuracy. However, he later told me that the rust in the containers and in the water were a sign to him that the conditions in which the crocodilians were being kept "had been inadequate" for more than a few weeks, and that he has never heard anyone even "try to make a compelling argument that rust is acceptable" in the care of crocodilians. He noted that a lot of the containment systems he observed for the crocodilians were "jury-rigged in the most questionable method imaginable" with "bizarre pieces of junk" used to contain the animals. He further stated that the buildup of non-animal "junk" in the area would make it more appealing to rodents and that the cobwebs, which were observed in some abundance at 2323 South 13th Street, is one of the criteria that the USDA uses when identifying clutter and neglect at facilities holding mammalian animals.

Jay Christie said that the "most outrageous sign of care not being provided" to the animals was the presence of dead animals, which he identified as two dead turtles, a dead reptile (possibly an iguana), and a dead caiman in the container in the basement. He also stated that the domestic rodents found at the location were "suffering as much as anyone else" and were kept in extremely crowded conditions.

Jay Christie stated that he did not see many animals at 2323 South 13th Street that would have required much specialized care, other than attending to safety issues associated with keeping the animals (i.e. not being bitten, proper handing of poisonous reptiles, etc.). He stated that "A large number of reptiles [of other species] would have quickly perished under those circumstances [referring to the conditions at 2323 South 13th Street]", adding that, "for better or for worse the animals that were there can take a fair amount of abuse before perishing". However, he was also quick to note that the "generally good condition" of the animals themselves at the time of their recovery could not be denied, later adding that he had observed that one of the Giant African Pouched Rats had "crusty eyes" and "splotched hair patches".

Jay Christie said that, on Friday, 05/14/2010, when he was in the Main Room at 2323 South 13th Street assisting in the removal of the crocodilians, he had been on a section of the floor that felt "spongy". He began testing that area of the floor for sturdiness using his foot and, when doing so, his leg "punched" through the floor, through and through such that the basement was visible through the floor from the Main Room. He stated that he was not injured when that occurred.

Jay Christie stated that the conditions, as he observed them in the time he was at 2323 South 13th Street, were "certainly neglectful", though he also said that he did not believe that anyone was actively or intentionally trying to set out to injure or kill the animals at the location. He also said that, throughout the southern United States, there are commercial alligator farms in which alligators are kept in darkness 24 hours a day, 7 days a week, and that he had "not long ago" been at an AZA (Association of Zoos and Aquariums) accredited zoo in which crocodiles were kept in the same kind of tanks as observed at 2323 South 13th Street, though he could not speak to how much rust had been present in those tanks. He stated that prosecutorial personnel should be prepared for other experts to say that conditions at 2323 South 13th Street were not actually as bad as they appeared, though he does not agree with those who might say that.

Jay Christie stated that he did not observe mold or fungus on the animals at the location.

## Supplement

Jay Christie said that Billie Harris, an Animal Care Specialist at his zoo who had also assisted at the scene, was currently in Grenada and would be out of the country for a couple of weeks.

Jay Christie had nothing further to add at this time, and we concluded our conversation.

Further investigation is pending.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0013

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date 05/25/2010
Nature of Call CRLTYANIML
Officer WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0013 | 05/25/2010 | 10:33 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 15:09 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | 000912 | 05/31/2010 | 08:27:53 |

## Modus Operandi

Crime Code(s)
ALL OTHERS

## Supplement

This supplemental report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On 05/21/2010 I, assigned to Squad 3762, spoke with Department of Neighborhood Services Special Enforcement Inspector Erica Lewandowski regarding an appointment with Jane Flint and her attorney to re-enter the property at 2323 South 13th Street at 11:00 am on Monday, 05/24/2010. On 05/24/2010 at approximately 8:41 am, I spoke with her again by phone and she advised me that the only two people whom she was aware were going to be reentering the property were Jane Flint and her attorney, Robert Dvorak.

At approximately 10:45 am, I responded to 2323 South 13th regarding the appointment to reenter the premises. My understanding at that time was that Jane Flint and Robert Dvorak would be allowed to reenter the property for a period of one hour and that I was to document property that was being removed from the residence. At approximately 11:00 am, I met in the alleyway with Jane Flint, Robert Dvorak, Erica Lewandowski, and the contractor whom Jane Flint had brought to open the property, subsequently identified as Thomas Berringer (White male 0[redacted]/1980), [redacted] 13th Street, [redacted]-2855. Robert Dvorak advised me that he also expected Terry Cullen's attorney, Steve Glynn, to arrive at the address (though Terry Cullen himself was not expected). Very shortly thereafter, a female who identified herself as Angela Kvidera, an investigator with Robert Dvorak's office, also arrived.

Police Officer Stacy Stein was at the scene with me and, shortly after my arrival, Police Officers Howard Joplin, Ronald Stevens, and Ben Smith also arrived.

The alley door on the north side of 2323 South 13th Street was opened by Thomas Berringer at approximately 11:07 am. After it was opened, Robert Dvorak, Investigator Kvidera, and Jane Flint walked to the northwest corner of the building (remaining outside, in the alley), where they remained for several minutes. When I approached them, Robert Dvorak expressed his belief that, for me to enter the property and document the property being removed, I would need a search warrant. I contacted Assistant District Attorney Sara Lewis regarding Robert Dvorak's assertion and advised her of the situation. She advised me to not proceed with allowing reentry into the premises and to resecure it by boarding it back up, which was done by Thomas Berringer at approximately 11:20 am.

While at the scene, I spoke briefly with Thomas Berringer about his relationship to both Terry Cullen and Jane Flint. He stated that he has been friends with Jane Flint for approximately ten to fifteen years and that he has known Terry Cullen for "a little bit", which he defined as being ten to fifteen years.

## Supplement

Shortly thereafter I spoke with both Lieutenant Paul Felician and Captain James Shepard regarding the situation at the 2323 South 13th Street. Both concurred in the decision made by ADA Lewis.

Resolution of the reentry to the property and further investigation is pending.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0014

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date 05/25/2010
Nature of Call CRLTYANIML
Officer WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0014 | 05/25/2010 | 13:00 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 15:09 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | 000912 | 05/31/2010 | 08:28:32 |

## Modus Operandi

Crime Code(s)
ALL OTHERS

## Supplement

This supplemental report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On the morning of 05/19/2010 I, assigned to Squad 3762, met with Assistant District Attorney Sara Lewis regarding review of charges for both Incident #10 128 0008 and Incident #10 132 0089. Pursuant to a request made by ADA Lewis during that meeting, I contacted the victim in Incident #1010 128 0008 and made arrangements for her to meet with ADA Lewis and other District Attorney's Officer personnel at 1:30 pm on 05/20/2010.

On 05/20/2010 at approximately 1:45 pm, I met with ADA Lewis regarding review of charges. The victim in Incident #10 128 0008 was present for the review, along with her mother. Captain James Shepard was also present for a substantial portion of the review. Charging matters associated with both investigations were discussed at some length.

On 05/21/2010 at approximately 9:16 am, I spoke with ADA Lewis by phone regarding the charges associated with Incident #10 128 0008 and 10 132 0089. I then met her in her office and we further discussed the investigations. During that meeting, she requested that I obtain a search warrant regarding additional evidence that was still inside 2323 South 13th Street. I then applied for and obtained the requested search warrant and, at approximately 4:00 pm, briefed Early Shift supervisory and investigative personnel regarding the investigations and the warrant. The warrant was subsequently executed and details regarding the execution of that warrant, along with recovered evidence, are detailed in a separate supplementary report filed by Early Shift investigative personnel. That warrant has been sealed upon its return.

On 05/24/2010 at approximately 12:58 pm I met again with ADA Lewis regarding charges associated with Incident #10 128 0008 and 10 132 0089. We discussed the investigation and charges against Terry Cullen (regarding both incidents identified above) and Jane Flint (regarding Incident #10 132 0089). At approximately 2:04 pm, attorneys for both individuals (Steven Glynn for Terry Cullen, Robert Dvorak for Jane Flint) arrived in ADA Lewis' office. She discussed the status of the investigations and nature of the charges she intended to issue against their respective clients, though Robert Dvorak left the room prior to the discussion of the investigation as it pertained to the [redacted] investigation under Incident #10 128 0008.

This list is not intended to be exhaustive of the meetings of phone calls that I have had with ADA Lewis regarding the charging status of these cases. It is intended to highlight the major meetings that I have had with her regarding them.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0014

## Supplement

ADA Lewis has expressed that she intends to issue charges associated with both investigations and against both suspects in the investigations, Terry Cullen and Jane Flint, though the particular charges being issued against them will differ somewhat. I have kept Milwaukee Police Department supervisory personnel advised of the status of the charging conferences in accordance with their requests.

I intend to file another report particularly detailing the issued charges after those charges are filed by the District Attorney's Office and released to the media.

| Report Officer | Printed At | |
|---|---|---|
| 009372/WICK,IVAN T | 01/27/2020 18:25 | Page 2 of 2 |

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0015

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date 05/12/2010
Nature of Call CRLTYANIML
Officer WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0015 | 05/12/2010 | 13:37 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 15:09 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | 000912 | 05/31/2010 | 08:28:55 |

## Modus Operandi

Crime Code(s)
ALL OTHERS

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

I have received an email from Milwaukee Area Domestic Animal Control (MADAC) Supervisor John McDowell, dated 05/21/2010 at 3:28 pm, in which he detailed the MADAC personnel who had been involved in the recovery and removal of animals from locations associated with this and the related [redacted] investigation, Incident #10 128 0008, as of the date he sent the email.

According to his list, the following personnel were involved at the specified location, date, and time.

05/12/2010

2323 South 13th Street
Donn R. Jacobson, born [redacted]4/1968 — 2:26 pm to 3:58 pm
Erin K. Riley, born [redacted]/1984 — 1:58 pm to 3:58 pm
Nick J. Reuland, born [redacted]/1974 — 2:00 pm to 3:57 pm

3443 South 17th Street
Erin Riley — 4:10 pm to 8:12 pm
Nick Reuland — 4:00 pm to 7:44 pm
Kevin Wilken — 5:30 pm to 8:00 pm
Laura Proeber, born [redacted]/1975 — 5:30 pm to 8:00 pm
John McDowell (White male [redacted]/1946) — 6:00 pm to 8:00 pm (approximately)

05/13/2010
2323 South 13th Street
Paula Schmidt, born [redacted]8/1973 — 10:57 am to 8:10 pm
Jessica Lentz, born [redacted]/1981 — 12:29 pm to 7:00 pm
Nick Reuland — 10:04 am to 8:27 pm
Kevin Wilken — 11:00 am to 8:00 pm
Laura Proeber — 11:00 am to 8:00 pm
John McDowell — [Time not specified]
Melanie Sobel — [Time not specified]

05/14/2010
2323 South 13th Street

| Report Officer | Printed At | |
|---|---|---|
| 009372/WICK,IVAN T | 01/27/2020 18:25 | Page 1 of 2 |

## Supplement

| | |
|---|---|
| Donn Jacobson | 8:25 am to 3:54 pm |
| Nick Reuland | 8:34 am to 3:29 pm |
| John McDowell | [Time not specified] |

3401 South 16th Street

| | |
|---|---|
| Donn Jacobson | 1:28 pm to 1:50 pm |

A copy of the report contained in John McDowell's email, containing the above information, will be included in the materials provided to the District Attorney's Office.

Further investigation is pending.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0016

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
05/25/2010
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0016 | 05/25/2010 | 13:52 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 15:09 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | 000912 | 05/31/2010 | 08:29:37 |

## Modus Operandi

Crime Code(s)
ALL OTHERS

## Supplement

This supplemental report is written by Police Officer Ivan Wick [redacted] Crimes Division, Day Shift.

On 05/25/2010 at approximately 10:55 am (and again later, at approximately 2:10 pm), I, assigned to Squad 3762, spoke by phone with Special Agent Gary Jagodzinski of the U.S. Fish and Wildlife Service (US/FWS), 555 Lester Avenue, Onalaska, WI, 608-783-4116.

Agent Jagodzinski advised me that he has been in contact with the Bronx Zoo Curator of Reptiles, Jenny Pramuk, 718-220-5157, regarding a number of the animals (crocodilians, in particular) that had been recovered during this investigation. He stated that he was awaiting additional documentation from the zoo but he had some additional information regarding some of the animals and dates animals had been transferred to Terry Cullen. He later advised me that he had worked out obtaining additional documentation from the Bronx Zoo and was in the process of doing so.

Agent Jagodzinski stated that Jenny Pramuk had told him that Terry Cullen's relationship with the Bronx Zoo had started in 1995 under the previous curator and that, while she had talked with him on the phone, she had not had personal interactions with him. Agent Jagodzinski told me that, based on information he had been provided, that the Bronx Zoo had provided 11 Dwarf Caiman hatchlings to Terry Cullen in 2005 and, based on the information he had, that only 9 Dwarf Caimans were recovered thus far during this investigation. In addition, the zoo had also shipped pairs of Broad-Snouted Caimans to Terry Cullen in 1996 and 2000.

Agent Jagodzinski told me that the Chinese Alligators were on loan to Terry Cullen from the Bronx Zoo and that zoo personnel had expressed surprise that the alligators were being kept in Milwaukee, as they were all supposed to be being kept in Florida and none of them were supposed to be in Milwaukee. He stated that one of the alligators, a 52 year old female alligator named "Moscow Sally" (phonetic spelling) was on loan to the Bronx Zoo from the Tallinn Zoo in Estonia, Europe. He also stated that, in December, 2009, the Bronx Zoo loaned a male alligator, "Twistie" (phonetic spelling) to Terry Cullen. Agent Jagodzinski said that Terry Cullen was supposed to be submitting reports to the Bronx Zoo every two years regarding the alligators and the last report had been submitted in 2008.

Agent Jagodzinski told me that Assistant U.S. Attorney (AUSA) Mel Johnson had been in contact with Terry Cullen's attorney, Steve Glynn, about arranging an interview as to the animal issues associated with this case. Agent Jagodzinski later advised me that AUSA Johnson has arranged for Terry Cullen to be interviewed and that Terry Cullen appeared to be willing to cooperate with the federal investigation.

## Supplement

Agent Jagodzinski also advised me that the US/FWS had no record of Terry Cullen holding permits with their agency. He indicated that additional information would be required to determine whether this lack of permits constituted a violation of federal law.

He and I had some discussion regarding exchanging information to facilitate each other's investigation.

Further investigation is pending.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0017

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
05/12/2010
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0017 | 05/12/2010 | 13:37 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 15:09 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | 000912 | 05/31/2010 | 08:30:21 |

## Modus Operandi

Crime Code(s)
ALL OTHERS

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On Wednesday 05/19/2010 at approximately 2:19 pm I, assigned to Squad 3762, received a phone call from Attorney Robert Dvorak, who indicated that he was representing Jane Flint regarding this investigation. He expressed that they wanted the [redacted] that were being held at Milwaukee Area Domestic Animal Control (MADAC) to be released from that facility and that he had been in contact with MADAC, who had referred him to Lieutenant Paul Felician and Public Information Officer Anne Schwartz. Attorney Dvorak indicated that Anne Schwartz had referred him back to Lieutenant Felician but he had been having a hard time contacting Lieutenant Felician and he wanted someone to authorize the release of the [redacted]. I then referred him back to Lieutenant Felician.

At approximately 3:12 pm, I had occasion to speak with Lieutenant Felician regarding this investigation and I advised him of the request being made by Attorney Dvorak and Jane Flint. After our discussion, he authorized the release of [redacted], subject to any independent objection from MADAC, and requested that I contact MADAC on his behalf and authorize the release of [redacted]. I then called MADAC Supervisor John McDowell at 649-8640 and advised him of the authorization to release [redacted], and made a point to make clear that the authorization for the release extended only to [redacted]. I asked him if there were any MADAC objections to that release and he indicated that there were not. He also stated that he would advise the director of MADAC, Melanie Sobel, of the authorization to release [redacted] John McDowell then asked me to contact Attorney Dvorak and advise him to call MADAC prior to someone going to the facility to claim [redacted], as there were fees association with holding the animals.

I then called Attorney Dvorak and advised him of the authorization to release and to contact MADAC prior to going to the facility to reclaim [redacted].

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0019

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
05/12/2010
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0019 | 05/12/2010 | 13:37 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 15:09 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | 005259 | 06/04/2010 | 18:16:34 |

## Modus Operandi

| Gang Act? | Gang Name | Weapon Used | Crime Code(s) |
|---|---|---|---|
| No | NONE | UNKNOWN | ALL OTHERS |

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On Thursday, June 3rd, 2010, at approximately 10:45 am I, assigned to Squad 3762, met with U.S. Fish and Wildlife Service (USFWS) Special Agent Gary Jagodzinski at the Wisconsin Department of Natural Resources (DNR) office located at 2421 Darwin Road, Madison, Wisconsin. I provided Agent Jagodzinski with a copy of the reports that had been filed thus far regarding Incident #s 10 132 0089 and 10 128 0008 (the related [redacted], animal cruelty, and endangered species investigations), along with supporting documentation that included copies of all DVD video's and CD's containing photographs that were taken during this investigation. We discussed the status of the investigation, during which time he and I also briefly reviewed several of the discs containing photographs of the animals and the conditions in which they were found.

During our conversation, he advised me of the status and results of his investigation thus far, and he will be completing his own reports regarding the ongoing federal investigation. What follows is a brief summary of the conversation I had with Agent Jagodzinski. Agent Jagodzinski advised me of the following statuses and circumstances regarding the following animals that were recovered:

a. The Philippine Crocodiles are the most endangered crocodilian species on the planet, and that the only Philippine Crocodiles in the entire United States - until the discovery of the crocodiles at 2323 South 13th Street - had been located at the Gladys Porter Zoo in Brownsville, Texas. Agent Jagodzinski had spoken with the Curator at the Gladys Porter Zoo, Collette Adams, 956-546-9431, and the Philippine Crocodiles had been lent to the zoo by government of the Philippines under a Memorandum of Understanding between the Philippine government and the Gladys Porter Zoo and were in the country legally. The Gladys Porter Zoo subsequently lent the Philippine Crocodiles that had been recovered at 2323 South 13th Street to Terry Cullen with the understanding that he would be keeping the Philippine Crocodiles at his facility in Florida. Agent Jagodzinski stated that Collette Adams had told him that these types of crocodiles are often kept in smaller enclosures so that they do not grow as much. The Philippine Crocodiles are an Endangered Species.

b. The Schneider's Dwarf Caiman crocodilians are common, pet trade animals, and not of federal investigative concern.

c. The Black Caiman are an Endangered Species and the origin of these were of particular investigative concern to Agent Jagodzinski, as no one seems to know the origins of the recovered Black Caiman or how they came into Terry Cullen's possession (though his investigation is ongoing). Agent Jagodzinski stated he has had contact with professor who specializes in crocodilians, Kent Vliet (at the University of Florida, 352-392-8130), and that Kent

## Supplement

Vliet had stated that Terry Cullen had told him that he possessed Black Caimans, although Kent Vliet had never seen them. Kent Vliet also had told Agent Jagodzinski that he had visited Terry Cullen's vivarium in Eustis, Florida, but had not seen any Black Caiman there. Kent Vliet also said that he had heard that Terry Cullen had a facility in Chicago, Illinois, that had had flooding problems and as a result the animals Terry Cullen had there had been moved to Milwaukee.

d. The Spectacled Caiman are very common and not of federal investigative concern.

e. The Yacare crocodilians are Threatened but are bred in captivity, and it would not be unusual for someone with a collection such as Terry Cullen's to also possess Yacare crocodilians.

f. Regarding the Cuvier Dwarf Caiman, eleven hatchlings had been delivered to Terry Cullen from the Bronx Zoo in 2005 and it appeared that nine had been recovered during this investigation. Agent Jagodzinski stated that these were not of federal investigative concern.

g. Regarding the Broad Snouted Caiman, his investigation thus far had revealed that the Bronx Zoo had loaned two pairs of them to Terry Cullen in 1996, and in 2000 had donated two additional pairs to Terry Cullen. Agent Jagodzinski stated that it is not uncommon practice for zoos to look for homes for animals when they run out of capacity. He stated that no federal permits would have been required to loan or donate Broad Snouted Caiman, although a permit would be required to sell them.

h. The American Alligator is a Threatened species but there are many native sources from which one could be acquired. He stated that the American Alligators were not of federal investigative concern and the biggest issue he anticipated with respect to it would be finding appropriate placement for it.

i. The Chinese Alligators are Endangered and that all but three have been sourced. He stated that his investigation had revealed that the Bronx Zoo had lent Terry Cullen several Chinese Alligators and that all of the Chinese Alligators were supposed to be being kept in Florida. Agent Jagodzinski reiterated that the former curator of the Bronx Zoo had initiated the relationship with Terry Cullen in the mid-1990's and the first loan of the Chinese Alligators to Terry Cullen had occurred in 1995. Agent Jagodzinski stated that the alligators named Twistie, Moscow Sally, and Moo Shu had all come from the Bronx Zoo (he also added that Moscow Sally kills other Chinese Alligators she is housed with, so she in particular needed to be kept separate from others), and that some of the Chinese Crocodiles were over 50 years old.

j. The Dwarf African Crocodiles are fairly common in private ownership and the pet trade, and were not of federal investigative concern.

l. The American Crocodile is Endangered and that there are no federal permits pertaining to possession of them because they are native to the United States. He stated that he currently had "no idea" where Terry Cullen had acquired the American Crocodiles and that taking them and possessing them has been prohibited by federal law since about 1973 (though this would depend on the age of the crocodile and whether its possession was grandfathered at the time of the passage of the law). He stated that these specimens were of federal investigative concern.

m. Regarding the Slender Snouted Crocodiles, Agent Jagodzinski stated that Terry Cullen has one federal permit pertaining to his Slender Snouted Crocodiles; however, he stated that the federal authorization permit pertaining to those animals only permits them to be at his facility in Florida any Slender Snouted Crocodiles covered under that permit that were recovered in Milwaukee would have been in violation of that permit. However, his investigation was still in progress to determine if the Slender Snouted Crocodiles that were recovered in Milwaukee were the same ones as were listed in the permit. He stated that, based on his conversation with Kent Vliet, that Terry Cullen may have obtained some of the Slender Snouted Crocodiles through the Miami Metro Zoo, and that Terry Cullen had told Kent Vliet that he had reproduced Slender Snouted Crocodiles at his facility in Florida.

n. The Nile Crocodile is Endangered. According to Kent Vliet, there are many Nile Crocodiles in the United States, though they are not easy to keep. Based on Agent Jagodzinski's investigation thus far, it was suspected that Terry Cullen was probably doing rehabilitative work on the Nile Crocodile and, based upon his conversation with Collette Adams, Terry Cullen is regarded as being good at nursing these animals back to health.

o. The Siamese Crocodile is Endangered but bred extensively in the United States, and it was possible that the recovered Siamese Crocodile was a hybrid cross with a Saltwater Crocodile.

Agent Jagodzinski stated that, based on his conversations with representatives from the Bronx Zoo and Gladys Porter Zoo, the agreements by which Terry Cullen acquired crocodilian did not specifically state that the animals could only be kept at the Florida facility (except as to the Slender Snouted Crocodiles, which were federally permitted only for Florida) but that the understanding was that that was where the animals would be and were being kept, and the zoos had "no idea" the animals were being kept in Milwaukee.

After viewing several photographs and based upon our discussion, Agent Jagodzinski stated that he would be recommending that Terry Cullen's federal permit be revoked, as he agreed that the animals were not being properly cared for at 2323 South 13th Street and that, particularly with respect to the crocodilians, "no one can argue" that the conditions at 2323 South 13th Street "met proper animal husbandry standards", and he described the conditions as "ridiculous". He also expressed his intent to have Terry Cullen's facility in Florida inspected, adding that the Florida facility was run by "Angela Kirby" and is located at 28035 Hosea Lane, Eustis, Florida. Agent Jagodzinski further indicated that he would attempt to work with Assistant U.S. Attorney (AUSA) Mel Johnson to expedite a forthcoming interview with Terry Cullen and his attorney and try to resolve ongoing placement and care issues surrounding the assorted animals, and that he would work through a federal network of contacts in the public and private sector regarding care and placement for the animals. Agent Jagodzinski further stated that, with respect to animals of federal concern being returned to Terry Cullen, he would have to show lawful origin and possession of them and that he has the capacity to care for them appropriately. As mentioned earlier, the federal investigation into violations of Terry Cullen's permit conditions and of the Endangered Species Act is ongoing.

Agent Jagodzinski and I also discussed our attempts to discern what, if any, professional or academic credentials Terry Cullen possessed with respect to the animals. Neither of us had yet been able to identify any such credentials (aside from membership in or involvement in various organizations). As we were talking, Agent Jagodzinski called Kent Vliet and inquired as to whether Terry Cullen possessed a DVM degree (Doctorate of Veterinary Medicine). Kent Vliet told Agent Jagodzinski that he did not know what Terry Cullen's professional credentials were but said he had, at one point, asked Terry Cullen if he was a "DVM" and that Terry Cullen had responded that he was not but, rather, was a "DV-ent" (phonetic spelling, sounded out as "deviant"). Kent Vliet said that he knew Terry Cullen to be involved in the Crocodile Advisory Group's Veterinary Forum. Kent Vliet had also told Agent Jagodzinski that Terry Cullen had also claimed to have been in medical school but ended up dropping out. Agent Jagodzinski said that, in his conversations with Kent Vliet, Kent Vliet had told him that Terry Cullen had told him he had appropriate records for all of the animals in his possession, but Kent Vliet had never personally seen those records.

Agent Jagodzinski said that, in his conversations with Collette Adams, she had told him that she has known Terry Cullen to have owned and cared for Anacondas for many, many years, and that Terry Cullen loves Anacondas and is probably breeding them.

Further investigation is pending.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0020

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
06/04/2010
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0020 | 06/04/2010 | 11:06 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time |
|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 00:17 |

| Officer | Assignment |
|---|---|
| 009372/WICK,IVAN T | [redacted] CRIMES DIVISION - DAYS |

| Entered by | Assignment | RMS Transfer | Property? |
|---|---|---|---|
| 009372 | [redacted] CRIMES DIVISION - DAYS | Successful | None |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| 010991 | 06/04/2010 | 12:51:47 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| NO | NONE | ALL OTHERS |

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On 06/04/2010 at approximately 8:45 am, I spoke by telephone with U.S. Fish and Wildlife Service Special Agent Gary Jagodzinski regarding this investigation. He advised me that he had just spoken with Assistant U.S. Attorney (AUSA) Mel Johnson and that regarding expediting the arrangement of the interview with Terry Cullen and his attorney. Agent Jagodzinski also told me that the Bronx Zoo (in New York) and the Gladys Porter Zoo (in Texas) had recalled the animals which they had loaned to Terry Cullen and, shortly thereafter, I provided him with contact information for both Melanie Sobel at Milwaukee Domestic Animal Control (MADAC) and Don Schaewe at the Department of Neighborhood Services (DNS) so that MADAC and DNS could coordinate with Agent Jagodzinski and the zoos involved to arrange for the return or pickup of the animals belonging to those zoos.

At approximately 8:54 am, I spoke with Melanie Sobel by phone and advised her of the information from Agent Jagodzinski and provided her his contact information. At approximately 9:04 am, I spoke with Don Schaewe and did the same.

Further investigation is pending.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0021

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
07/19/2010
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0021 | 07/19/2010 | 09:31 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53204 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 15:09 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date |
|---|---|---|---|
| Supplement Transfer Complete | None | 002336 | 07/20/2010 |

| Approval Time |
|---|
| 14:29:05 |

## INTERVIEW 1: BERG,CRAIG

| Involvement | Invl No | Type | Name | MNI | Race |
|---|---|---|---|---|---|
| INTERVIEW | 1 | INDIVIDUAL | BERG, CRAIG | 1784953 | WHITE |

| Sex | DOB | Age | Juvenile? | Hair Color | Eye Color | RMS Transfer |
|---|---|---|---|---|---|---|
| MALE | [redacted]/1954 | 55 | No | UNKNOWN OR COMPLETELY BALD | UNKNOWN | Successful |

| Type | Address | City |
|---|---|---|
| WORK/BUSINESS | 10001 W BLUE MOUND RD | MILWAUKEE |

| State | ZIP Code |
|---|---|
| WISCONSIN | 53226 |

| Phone Type | Phone No |
|---|---|
| WORK | (414)771-3040 |

| Employer/School | Position/Grade |
|---|---|
| MILWAUKEE COUNTY ZOO | CURATOR |

| Location | City | State |
|---|---|---|
| 10001 W BLUE MOUND RD | MILWAUKEE | WISCONSIN |

| ZIP Code | Phone Type | Phone No |
|---|---|---|
| 53226 | WORK | (414)771-3040 |

## Modus Operandi

| Crime Code(s) |
|---|
| ALL OTHERS |

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On 07/06/2010 at approximately 2:45 PM I, assigned to Squad 3762, spoke by phone with Craig Berg (White male [redacted]/1954), who is the Curator of Reptiles at the Milwaukee County Zoo, 771-3040. Craig Berg advised me that he had been at the scene at 2323 South 13th Street all three days (i.e. 05/12/2010, 05/13/2010, and 05/14/2010) that law enforcement and other agencies were involved at that location. He stated that he had not responded to any of the other addresses that were searched during the course of this investigation.

Craig Berg stated that, particularly with respect to the crocodilians, the containment system, "as set up . . . was prepared to do a pretty good job of taking care of the animals" if it had been used as intended, adding that it was not being used as intended. He explained that, while it was not the kind of system that he or other zoos would use, the system at Terry Cullen's residence was designed to do water changes for the animals "quickly" and "efficiently". He said that the major problem that he observed with the crocodilians' containers, in particular, was the cleanliness of the water, and said that in some of the containers the "water was so black" that it was unknown if an animal was submerged in the water, and they had to use a stick in some of the containers to determine if the containers were occupied. He said that they were also working in conjunction with another expert, Peter Brazaitis, regarding problems that some of the crocodilians were suffering from, and he had indicated that some of the eye

problems that had been observed in some of the crocodilians was believed to be due to the acidic conditions in the water caused by the concentrated presence of urine and feces in their water, which was not being properly changed. He later reiterated that the dirty condition of the water was his primary concern, adding "when it's that bad, it's going to have an effect on the animals". Toward the conclusion of our conversation, he told me that he estimated that, based on the condition of the water and the amount of feces in the containers, most of the crocodilians had been kept in the conditions and without a change in their water for approximately four to six weeks.

Craig Berg said that containment for crocodilians should contain a dry space that they can crawl out onto so that they can dry themselves off, which helps them to thermal regulate. Craig Berg said that he observed only one container that was designed to provide such a crawl out space, and that the system that Terry Cullen had set up would allow for the creation of such a dry space only by completely draining the container and leaving it to dry. Craig Berg said that the only drained containers he observed were leaking and one container a dead crocodilian. He later told me that reptiles need to be able to thermal regulate in order to be healthy and to maintain their health.

Craig Berg also said that reptiles should be able to receive light, particularly exposure to ultraviolet light, and he saw nothing indicating to him that the animals were, in fact, receiving such light. He said that the rooms in which the crocodilians were kept were very dark and the enclosures themselves were covered mostly with solid wood that did not allow for light to penetrate.

Craig Berg further stated that the total space in the containers that was provided to the crocodilians was inadequate. He said that, "decades ago", Terry Cullen's arrangement with respect to the crocodilians would have been "zoo standard" and considered appropriate, but no longer.

With respect to the other reptiles being kept stacked in Tupperware-style containers, Craig Berg stated that a lot of people keep reptiles in "rack systems", using things such as sweater boxes to keep and, in some cases, successfully breed reptiles. He expressed that personally he does not think such systems are appropriate and added that those systems frequently have build in heating mechanisms and other mechanisms in place to care for the reptiles, and he did not observe such mechanisms in place at 2323 South 13th Street. He added that the keeping of reptiles stacked in plastic containers would not, in and of itself, necessarily be problematic, if other mechanisms were in place to properly provide care.

Craig Berg said that he observed holes in the floor of the room described in other reports as the "Main Room", located on the ground floor and in which a large number of crocodilians were being kept. He stated that he had observed Jay Christie's leg punch through the floor and said that the compromised condition of the floor was the reason that they were laying boards on the floor when removing the animals, so as to provide additional support. He said that there was "an awful lot of weight in there", referring to the crocodilians, the containment systems, and other materials, which weight he described as being spread out over the floor but the floor was damp and rotting.

Craig Berg further stated that he had observed what he believed was a slender snouted crocodile, loose on the floor in the basement near the terrariums/aquariums which housed the feeder mice and rats, which had its tail stuck in a broken aquarium in which there were still three pieces of broken glass, and he had been worried about how they were going to capture the crocodilian with the tail stuck in that way. However, he said that the crocodilian subsequently moved forward and, when it did so, its tail came out of the aquarium and they were able to pull the broken aquarium away, resolving that problem.

Craig Berg said that, overall, most of the animals at 2323 South 13th Street looked in "fairly good condition", though some "obviously" had long term health problems.

Craig Berg had nothing further to add at that time, and we concluded our conversation.

Further investigation is pending.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0022

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
11/05/2010
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0022 | 11/05/2010 | 10:40 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 13:34 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | 005259 | 11/09/2010 | 15:54:03 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ALL OTHERS |

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On the afternoon of 11/04/2010 I, assigned to Squad 3762, along with Lieutenant Paul Felician, were present at a court hearing regarding this investigation, Case #10CF002659, before Judge Jeffery Conen in Room 506 of the Safety Building, 821 West State Street. I observed both defendants, Terry Cullen and Jane Flint, in the courtroom gallery on the defendant's side of the courtroom. Most, if not all, of the seating on that side of the courtroom was occupied by apparent supporters of the two and I observed Terry Cullen and Jane Flint shaking hands with, speaking with, and otherwise interacting with people seated on that side of the gallery.

Shortly before 2:37 pm, Lieutenant Felician, who was seated with me behind the state's attorneys on the attorney/judge/jury side of the transparent protective barrier in the courtroom, left the courtroom regarding a phone call. At approximately 2:37 pm, he returned and advised me that, while he had been in the hallway outside of the courtroom, he had been approached by a younger adult black male (whom he also indicated to me and whom I observed seated a few seats away from Terry Cullen and Jane Flint on the defendant's side of the courtroom). The male had asked Lieutenant Felician words to the effect of "Is this for Gary?" while indicating toward the door for the courtroom. Lieutenant Felician indicated to the person that he did not recognize the name "Gary" and asked if he meant "Terry". Lieutenant Felician said that the male then said words to the effect of "Yeah, Terry, Terry Cullen" and, when Lieutenant Felician asked the male how he was involved in the hearing, the male responded that he was from a temporary employment agency (which he had further identified by a series of letters, such as "RTM" or something similar but which Lieutenant Felician was unable to specifically recall) and had just been told to "show up".

I offered to approach and attempt to speak further with the male but it was decided that doing so was not necessary. Both courtroom deputies and both Assistant City Attorney Jay Unora and Assistant District Attorney Sara Lewis were advised.

# Incident Report
# MILWAUKEE POLICE DEPT

101320089

Supplement No
0023

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
12/21/2010
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0023 | 12/21/2010 | 09:55 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 15:09 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Prop Trans Stat | Property? | Approving Officer |
|---|---|---|---|
| Supplement Transfer Complete | Pending | Yes | 005259 |

| Approval Date | Approval Time |
|---|---|
| 12/22/2010 | 17:06:37 |

## Property

| Item | Involvement | Invl Date | In Custody? |
|---|---|---|---|
| 1 | EVIDENCE | 12/21/2010 | Yes |

Description
CD CONTAINING 21 IMAGES REGARDING INVESTIGATION; MPD INVENTORY #542377

| Typ | Cat | Article | UCR Type | # Pieces |
|---|---|---|---|---|
| A | RECORDINGS - AUDIO/VISUAL | CD | RECORDINGS - AUDIO, VISUAL | 1 |

RMS Transfer
Successful

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ALL OTHERS |

## Supplement

This supplemental report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On the morning of 12/21/2010 I, assigned to Squad 3762, received two emails from [redacted] which contained attachments that were photographs that [redacted] had and which were the subject of a request by counsel associated with this case. I received a total of 21 such photographs, and the images contained pictures of (among other things) snakes, [redacted], the victim, and one of the suspects (Terry Cullen) associated with the investigations filed under IR #10 128 0008 and IR #10 132 0089.

I initially attempted to forward the emails directly to Assistant District Attorney Sara Lewis so that she could disseminate them to defense counsel, but repeatedly received error messages that, essentially, the files exceeded size limits for my email and so I copied the images to a compact disc. I inventoried one copy of the images as evidence, Inventory #542377, and also prepared a copy for ADA Lewis and another for defense counsel.

I will deliver these copies, along with copies of the associated inventory and this report, to the District Attorney's Office on 12/21/2010.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0024

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
01/14/2011
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0024 | 01/14/2011 | 08:27 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 13:34 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | 018769 | 01/14/2011 | 16:25:36 |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ALL OTHERS |

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On Thursday, 01/13/2010 at approximately 2:05 pm, I met with Attorney Lew Wasserman in Interview Room 656 of the Police Administration Building, 749 West State Street. Lew Wasserman is one of Terry Cullen's attorneys and the meeting was for the purpose of letting Attorney Wasserman inspect evidence regarding this investigation; specifically, a letter and envelope that were on Milwaukee Police Department Inventory #519859. This meeting and viewing of evidence was done at the direction of Assistant District Attorney Sara Lewis and Lieutenants Paul Felician and Claudia Morris.

Attorney Wasserman, at my request, and I both wore latex gloves while viewing and handling the evidence (which had already been processed by Bureau of Identification personnel for fingerprints). During the inspection, Attorney Wasserman took four photographs of the evidence (after I spoke with Lieutenant Felician regarding his doing so), which Attorney Wasserman subsequently provided to me via email and copies of which I will provide to ADA Lewis when I give her a copy of this report.

After the viewing, which lasted approximately ten to fifteen minutes, I resealed the evidence at the [redacted] Crimes Division and returned it to the Property Control Section.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0025

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date 09/30/2011
Nature of Call CRLTYANIML
Officer WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0025 | 09/30/2011 | 07:57 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53215 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 15:09 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date |
|---|---|---|---|
| Supplement Transfer Complete | None | 009239 | 10/12/2011 |

| Approval Time |
|---|
| 13:51:44 |

## INTERVIEW 1: PIERSON,ROBERT

| Involvement | Invl No | Type | Name | MNI | Race |
|---|---|---|---|---|---|
| INTERVIEW | 1 | INDIVIDUAL | PIERSON,ROBERT | 3142870 | WHITE |

| Sex | DOB | Age | Juvenile? | RMS Transfer |
|---|---|---|---|---|
| MALE | 12/18/1955 | 54 | No | Successful |

| Type | Address | City | State |
|---|---|---|---|
| HOME | [redacted] LN | DIVIDE | COLORADO |

| ZIP Code |
|---|
| 80814 |

| Phone Type | Phone No |
|---|---|
| HOME | [redacted]-2426 |

| Alias Name |
|---|
| PIERSON,BOB |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ALL OTHERS |

## Supplement

This report is written Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On 09/23/2011 at approximately 11:00 am I, assigned to Squad 3762, conducted follow-up regarding this investigation. The follow-up was to attempt to contact and interview a potential witness with information regarding this investigation, Bob Pierson, at [redacted]-2426. The follow-up request had come from Assistant District Attorney Sara Lewis, who is prosecuting this investigation.

I called [redacted]-2426. I did not receive an answer but left a message with my contact information and requesting that Bob Pierson call me back.

At approximately 11:35 am, I received a callback from a male who identified himself as Bob Pierson (White male [redacted]1955), [redacted] Lane, Divide, CO. He later told me that he is known to some of his neighbors as "The Croc Man". Bob Pierson began the conversation by saying words to the effect of "Someone actually caught him" and "He's the scariest individual . . . He's nothing but a pimp, a Jim Jones".

Bob Pierson explained that he had, in about 1997 or 1998, bought six crocodiles (three Nile crocodiles and three Morlett's crocodiles) when they were still babies. He said that he purchased the Nile crocodiles for $650 apiece and the Morlett's crocodiles for $350 apiece, and that he had purchased them from a person named "Gerry Mata" (phonetic spelling). He stated that he nursed them to health and they were about five or six feet long and getting aggressive when his parents died in December, 2002. He said that he loaded the crocodiles into his vehicle and drove to Las Vegas, Nevada, to take care of his parent's house. He indicated that his transporting the crocodiles

had been illegal and that his sister, who works in the legal profession and with whom he does not have a close relationship, had threatened to contact the U.S. Fish and Wildlife Service on him because of this.

Bob Pierson said that, in January, 2003, he had been trying to call Gerry Mata to return the crocodiles to him. He said that he received a call "from out of the blue" from another person he knew, Paul Bodnar, whom he had meet at the Cleveland Rainforest Zoo in 1996. He said that Paul Bodnar had called from Lakewood, Ohio, and Bob Pierson did not know from where Paul Bodnar had gotten his phone number. He said that Paul Bodnar told him that Terry Cullen had a lot of crocodiles, was doing research at a facility in Florida, and would take Bob Pierson's crocodiles. Bob Pierson said that Paul Bodnar was at that time living at [redacted] Madison, Lakewood, Ohio.

The number that Paul Bodnar gave Bob Pierson for Terry Cullen was [redacted]-2436. Bob Pierson said he called that number a couple of times and left a couple of messages. He stated that he continued calling Gerry Mata, as well. Bob Pierson said that Terry Cullen called back, told Bob Pierson that he was a crocodile expert, would take in his crocodiles, and that he had a job for Bob Pierson in Florida at his facility there at which Bob Pierson could do research, write books, and make DVD's about his work. Bob Pierson later described this as the kind of job about which he had been dreaming.

Bob Pierson said that he decided to transport his crocodiles to Florida, which he said was "highly illegal". He said that Terry Cullen told him to soak sponges with honey and place them inside the crocodiles' mouths, then tape their mouths shut during the transport. Bob Pierson said that he had not heard of doing this before but, based on Terry Cullen's representations, did so. He also said that Terry Cullen told him to put the crocodiles in wardrobe boxes packed with damp towels, which he did. Bob Pierson said that he and a friend of his, Brad Mormon (a cameraman and former investigative reporter in Las Vegas), loaded up the crocodiles in Bob Pierson's van. He, along with his Border Collie, "Sparky" (phonetic spelling), and the six crocodiles, then left for Florida. Bob Pierson said that they left around 5:30 am or so sometime around the third week of January, 2003, and that had called Terry Cullen to let him know that he was on his way.

Bob Pierson said that the trip was uneventful until he arrived in Eustis, Florida, about three days later. He said that the address Terry Cullen had given him was incorrect and so he had to call Terry Cullen at [redacted]-2436. He said that Terry Cullen knew exactly where he was and told him to go to a nearby 7/11 store and wait for about half an hour. Bob Pierson said that Terry Cullen pulled up in a truck and, in making small talk when they met, Terry Cullen had said that he had just gotten the truck in an "insurance scam" in Milwaukee.

Bob Pierson said he followed Terry Cullen to his residence. Bob Pierson said that he still has a map secreted away in a book that he will attempt to locate for me that has more details about the location and the layout of Terry Cullen's property at that time. Bob Pierson said that he recalled that they had to drive as though going out of town, and that Terry Cullen's property was located in Eustis, Florida, but on the outskirts of town, twenty to thirty minutes from the aforementioned 7/11 store.

Upon arriving at the property, Terry Cullen exited his vehicle and had to unlock and remove a chain from a gate with "heavy growth" of vegetation on both sides of the gate. He said that the growth was so heavy that the property was concealed from view from the main road. He said that they drove up a sand and dirt road and that, on the left side approximately 90-100 feet up from the gate was a "big pond". He said that Terry Cullen, later that day, had related that there had once been a 14-foot alligator in the pond but that a cashier from a "Wynn Dixie" (phonetic spelling) store had shot and killed the alligator, and so Terry Cullen and a detective had "captured, beat, and killed" the cashier, and that the detective had gotten "the kid" to come out of the store at which he was working and then Terry Cullen and the detective took and killed him. Bob Pierson said that he did not know if Terry Cullen was telling the truth about that.

Bob Pierson said that, farther past the pond, was a "big trailer" in which lived Terry Cullen's neighbor, whose name Bob Pierson could not recall but whom he said looked like the actor Clint Walker. Bob Pierson stated that they continued driving until they come to another "chain fence", with another chained gate that Terry Cullen has to undo before they can proceed. Bob Pierson said that this second gate was "in thick forest" and more heavily overgrown than the area around the neighbor's trailer. He said that, upon passing the gate, they went another hundred feet or so along the sand and dirt road, and then, to the immediate left, was Terry Cullen's residence. Bob Pierson reiterated that Terry Cullen's house is "very secluded" from the woods and growth, even from the

neighbor's trailer.

Bob Pierson said that, in his prior conversations that he had had with Terry Cullen, Terry Cullen had talked about how they would need to build cages for Bob Pierson's crocodiles, and Bob Pierson had brought along ten thousand dollars in cash to pay for that. He said that, when they arrived at Terry Cullen's house, he let Sparky run around the house, which he said was a single-story residence accessed by walked up some "wooden steps". Bob Pierson said he also recalled seeing quite a bit of "boat equipment" outside the residence, but no boat. Bob Pierson said that he wanted to get started building the cages for his crocodiles right away, as they had been confined in the wardrobe boxes for three days, and that Terry Cullen saw the cash he had brought to finance doing so, but that Terry Cullen was not interested in building the cages. Bob Pierson indicated that he was alarmed by the failure of Terry Cullen to even comment on the issue of lactic acid building up in the crocodiles, which Bob Pierson said can build up as a result of a change in environment or climate and can be fatal to the crocodiles, and he was made suspicious of Terry Cullen's credentials based upon that.

Bob Pierson said that, to the right of the sand and dirt road by Terry Cullen's residence, Terry Cullen had about 25 to 30 "big, abused crocodiles" which he was keeping in big "cattle containers", but that the containers were, for the most part, not big enough for the crocodiles to lay straight, which was causing deformities of their spines and snouts, causing them to curve in the same way as they do when kept in a bathtub. He said that Terry Cullen had also remarked that he was only feeding the crocodiles "rats . . . dead, frozen rats" (though he later told me that, over the several days that he was there, he did not observe anyone do any feeding of the crocodiles). He said that some of the crocodiles were also being kept in what appeared to Bob Pierson to be dog pens from a kennel. He said he had never seen anyone keep crocodiles that way and, if he had (for example) seen crocodiles kept that way at a zoo, he would have reported the zoo for maltreatment. Bob Pierson said that he kept asking Terry Cullen "Where's the research? Where's the babies (referring to baby crocodiles)?" but that Terry Cullen would not answer his questions. Bob Pierson said that the crocodiles he saw being kept by Terry Cullen included Black Cayman crocodiles, Siamese Crocodiles, and Graile's crocodiles. Bob Pierson said that another way in which he saw the crocodiles being abused was that, with respect to the Graile crocodiles, they need two or three feet of water in their environment but that Terry Cullen's Graile crocodiles had only "inches . . . a foot at the most". Bob Pierson said that he had also seen an approximately five to six foot long Cuban crocodile in a new cattle trough container in his living room, and that this crocodile was missing the top of its jaw and that Terry Cullen had told him that it had been bitten off by another crocodile. He said Terry Cullen was treating the injury just by misting it with water, which Bob Pierson thought was "BS" because that would only exacerbate the infection and Terry Cullen was not using any antibiotics or other medication to treat the injury. Bob Pierson said that there was also a metal shed, in addition to a couple of tool sheds, in which Terry Cullen was keeping West African Dwarf crocodiles in metal containers, and that a cinder block was used as an island for them to get out of the water and that there was a bright lamp over the container to provide heat. With respect to the dwarf crocodiles, they appeared undernourished and had no fat reserves on their tails, and he was able to make out more skeletal structure than he should be able to in a healthy crocodile.

Bob Pierson said that Terry Cullen walked him around the crocodile pens and then went inside to cook a meal for them. Bob Pierson said that he sprayed his own crocodiles using a mister. He said that he kept asking Terry Cullen questions about his facility, the apparent lack of research and equipment for doing research, and about building the cages. He said that he realized that Terry Cullen was not liking the questioning and he also thought about how easily Terry Cullen could kill him at the facility, so he stopped his questioning.

Bob Pierson said that, instead of building cages, Terry Cullen just wanted to talk about pornography, was bringing out old Playboy magazines that appeared to be from the 1960's, and wanted to talk about how sexually repressed America is and how things such as incest and sex with children are considered taboo. He said that Terry Cullen also put in a videocassette of what appeared to be a family justifying having sexual contact with their children, and Bob Pierson likened it to child pornography, though he said that, from what he saw, the people in the video had been clothed. Bob Pierson said that, when Terry Cullen showed him the video, he [Bob Pierson] "snapped" and told Terry Cullen that he was sick and backwards. Bob Pierson said that he took Sparky and went into his room, where he remained until morning, and that nothing else "weird" happened that night.

Bob Pierson said that, to his knowledge, no one else was at Terry Cullen's residence that first night. However, he said that Terry Cullen was staying in a separate bedroom that was deadbolted and locked whenever Terry Cullen

## Supplement

(or "Angie" [phonetic spelling], who will be discussed further momentarily) entered or exited the room.

Bob Pierson said that he woke up the next morning around 10:30 or 11:00 am, and that he checked to see if his cash was still there, and it was. He said he exited his room and that Terry Cullen and a female, whom he described as being an approximately 21 year old "brown" female and whom he came to know as Angie, were in the kitchen. He said that, in his conversations with Angie, she explained to him that she had been on a sports team in school but had been kicked out of school because of drug use, and that Terry Cullen had "rescued" her. Bob Pierson said that Angie also repeatedly referred to Terry Cullen as a doctor and told him that she does not take drugs anymore "because of Doctor Terry". Bob Pierson said that they all exchanged pleasantries, and that Angie was asking more questions and expressing more interest in Bob Pierson's background than had Terry Cullen. Bob Pierson said he explained to her that he had been a musician and had once been a chemist for the City of Las Vegas, where his responsibilities included checking the pools, spas, fountains, etc. to make sure that they had the appropriate levels of chlorine. Bob Pierson said that he also told Angie that his father, also named Bob Pierson, had been in Frank Sinatra's band and had bee Frank Sinatra's lead woodsman. He said that Terry Cullen started saying that he was one of Frank Sinatra's bodyguards, which Bob Pierson said he knew was a lie because he knew Frank Sinatra's bodyguards through his father, and he knew Terry Cullen was lying and he told him so. He said that Terry Cullen was also claiming to have been one of Ozzy Osbourne's bodyguards.

Bob Pierson stated that it was a sunny day outside and he asked again when they were going to build the cages for his crocodiles, although he was already having misgivings about leaving his crocodiles with Terry Cullen. He said that Terry Cullen told him to go outside with Angie and to measure the temperatures of the crocodiles using a heat gun, which they did while Terry Cullen made lunch. He said that, as they were doing so, he was chewing tobacco and that Angie admonished him for doing so, telling him that Terry Cullen does not allow tobacco use, that Terry Cullen had cured her of drugs, and that Terry Cullen could cure Bob Pierson of his tobacco use. He said that he was now able to see the pens and confinement systems for the crocodiles better than he had been able to the previous day, and he noted that there were no ways for the crocodiles to burrow and that they were exposed to the temperature extremes because they had not other way to shelter themselves. Bob Pierson noted that Terry Cullen's crocodiles seemed "lethargic" and he said that he knew that some of the crocodiles died during the time that he was at the residence (which was for a period of approximately a week).

Bob Pierson said that that day, Terry Cullen said that he needed to fly to Milwaukee to address a "reptile emergency" that no one else was able to handle, which left Bob Pierson alone at the residence with Angie. He noted that, after Terry Cullen left, Angie was smoking cigarettes, and Bob Pierson said he started called people in Las Vegas to tell them about the weird experience he was having in Florida. He said that he started asking Angie what was really going on at the property| but that her replies were basically "He's the expert [referring to Terry Cullen]". He said that Angie, whom he came to realize would very defensive and protective of Terry Cullen when he was around but was more open when he was gone. He said that Angie started telling him he needed to leave, and that he would not be doing research, writing books, or any of the other things Terry Cullen had represented to Bob Pierson that he would be doing; instead, she said, he would be "picking up trash", and "building this boat stuff", adding "that's all he lets me do". Bob Pierson said that, during the time that Terry Cullen was gone, Angie was talking with a woman named "Jane" (phonetic spelling) on the telephone, and would relay events and conversations between herself and Bob Pierson to Jane. He further stated that there were other times when Angie would start acting like Bob Pierson's boss, telling him he could not move out of the residence, could not get his own apartment, and would have to remain at the property and be a security guard. Bob Pierson said that Angie would not answer his questions about what was happening with the crocodiles. He said that Angie was also not letting him go to town to get a newspaper and that he did not know his way around the area. Bob Pierson also told me that, prior to Terry Cullen's leaving, he had armed Angie with a shotgun for protection that Bob Pierson recognized as a Russian-made "Saiga" (phonetic spelling), with a cut barrel and 20-round ammunition drum. Bob Pierson said that, while he recognized the weapon, he had never actually seen someone with a gun like what Terry Cullen had given Angie.

Bob Pierson said that, toward dinnertime, he offered to Buy Angie dinner and that the two took his van to go to Applebee's. He said that, during dinner, he told her that he does not drink, do drugs, or things like that, and that he was onto what Terry Cullen and Angie were doing at their residence. He said that Angie told him that it was a "great opportunity" for Bob Pierson but that he would have to give up his chewing tobacco. He said that he then

## Supplement

pressed her about what she and Terry Cullen were doing, and asked them if they were killing the crocodiles for their skins (which he said sell for $25000 to $30000 each if they get shipped to a country where the animals can be skinner) band if they were "in bed with the Russians", which he explained was a reference not only to the shotgun he had seen but to Russian involvement in the illegal trade of various animals and their body parts (such as crocodile penises being sold to the Japanese). Throughout our conversation, Bob Pierson referred to this selling of the animals and animal parts as "pimping" the animals. Bob Pierson said that Angie did not deny any of the things that he was saying. Bob Pierson said that, at that time, he had not known about Terry Cullen and none of the other people he had talked to had really known him, either, and he was calling other friends of his, telling them about Terry Cullen and how he suspected that he was a "drug trafficker", a "murderer", or something similar. He said that Angie was also kept going to the bathroom and he believed that she was probably making phone calls as she was doing so. He said that, in his continuing conversations with Angie, it did not appear to him that she knew anything about crocodiles and that she was Terry Cullen's "concubine" or something similar. Later in the conversation, he said that Angie "seemed brainwashed or something" but had a "glimmer of not that far gone", because she had given him the aforementioned warning when Terry Cullen had left; however, he reiterated that, when Terry Cullen was around, she would defend him and say things to Bob Pierson when he questioned Terry Cullen by saying things like "How dare you ask him that?", and he believed that Angie would have killed him if Terry Cullen had told her to.

Bob Pierson said that, after dinner, they drove back and Angie unlocked and opened the gates to Terry Cullen's property. On their arrival, he checked on Sparky and his crocodiles, and he laid down to read a new book about alligators that he had purchased in the same shopping center as had been the Applebee's. He said that Angie knocked on the door and said that they had to go outside and check on the crocodiles, so he got up and went outside. He said that, waiting outside, was the neighbor who lived in the trailer next to Terry Cullen's property, another old man and the old man's wife, and Angie. Bob Pierson said that all of them started telling him that he needs to leave the property, that he would not be doing research, writing books, or making DVD's, that Terry Cullen would not be building cages for his crocodiles, and that nothing that Terry Cullen had said to get Bob Pierson to come to Florida would actually happen. He said that he was told that all he would be is a security guard and a janitor, and that he should leave quickly, either that day or that night. He said that he believed that Angie had contacted the others to come to the property and talk to him.

Bob Pierson said that he stayed at the property but stayed awake in his room, and that Angie was "being quiet" after that conversation and was staying in the locked room that she and Terry Cullen used. Bob Pierson said that, the next morning, Terry Cullen showed up at the property again around 9:00 or 10:00 am. Bob Pierson said that, when he exited his room, Terry Cullen and Angie were both there and the first thing that Terry Cullen said, without otherwise greeting him or anything, was "I need to use your van to go get plumbing equipment". Bob Pierson indicated he did not understand why this was so because Terry Cullen had his own truck, but he said he did not feel like he had a choice because he felt "trapped" because he was in a house full of crocodiles, with no weapon and a man who was bigger than him and a woman who had a shotgun, and his cell phone service at the property was spotty, so he gave Terry Cullen his van keys and Terry Cullen left.

Bob Pierson said that he then received a phone call from Jane, whom he said he had not met but whom he said his only contacts with her were speaking to her over the phone. He said that Jane's phone number was [redacted]-1636 and he said that she sounded like an older white female and he guessed that she was over 40 years old at the time they talked. He said that he expressed his concerns to Jane and Jane told him to calm down and that Terry Cullen was nice. He said that Jane told him that she had been on drugs and abused by men, but that Terry Cullen had "rescued" her. He said that, during this conversation, Jane was also referring to Terry Cullen as a doctor. He said that Jane tried to mollify him and said that she would talk to Terry Cullen about the research opportunity and he said that she was saying things as if "this was a test" to see if Bob Pierson was actually, legitimately, "into crocodiles". He said that Jane was being very nice with him and Bob Pierson began pointing out inconsistencies in Terry Cullen's stories, such as his claims to have been a bodyguard for Frank Sinatra. Bob Pierson said that he also talked with Jane about the ponds and general conditions at the Florida facility, and he said that her response was that he would have to talk to Terry Cullen about that.

Bob Pierson said that, during this time, it was also clear that Terry Cullen had been checking up on Bob Pierson and looking into his background, and that these inquiries were made after Bob Pierson had arrived in Florida

## Supplement

because some of the things that were checked (such as his relationship to Frank Sinatra) had not come up until after his arrival in Florida. Bob Pierson said that, about this same time, he received a call from his sister, "Nancy Pierson" (phonetic spelling), whom he had not spoken with since the funeral, and that she had contacted him because she was scared and wanted to know "Who are these people, this detective and this Terry Cullen?" who had been calling her and asking her questions, including about a golden flute that Bob Pierson's father had bought in Japan when he was with Frank Sinatra and asked about money that Bob Pierson had. Bob Pierson did not know how Terry Cullen or others had gotten his sister's phone number.

Bob Pierson said that Terry Cullen returned with the van and plumbing supplies around 3:00 or 4:00 pm. He said that he helped Terry Cullen unload the supplies and that he did not see Angie on the premises at that time, and he thought that she might have been inside the house. He said that, as they were unloading the equipment, Terry Cullen was asking him questions like "Bob, how you going to finance this, Bob", and expressing that he did not want the publicity associated with the books and DVD's that had been the subject of prior conversations. He said that Terry Cullen was talking about how much it cost to take care of the crocodiles and was "being a dick" about the money, and was raising his voice and accusing Bob Pierson of having "a little kid's dream" about setting up his own crocodile zoo to help offset the costs of taking care of the crocodiles. Bob Pierson said that Terry Cullen knew about the amount of money that Bob Pierson had elsewhere, in addition to the cash he had brought with him, and Terry Cullen was talking it seemed like he was trying to get Bob Pierson to take Terry Cullen as a partner.

Bob Pierson stated that, after they got done and went back inside, it appeared that Angie had left because there was a note on the refrigerator that Terry Cullen read, but Bob Pierson did not read it. He said that they continued talking, and Terry was saying that he had a place like what he had in Florida "with a lot of crocodiles" in Missouri, and another in Milwaukee. He said that Terry Cullen had also said that his property in Florida was 250 acres, the one in Missouri was 100 acres, and the one in Milwaukee was "small". Bob Pierson told me that, based on this conversation, he entertained the idea that maybe he and Terry Cullen had gotten off on the wrong foot and that maybe something could work something out, and that Terry Cullen was now being nice.

Bob Pierson indicated that things changed after Terry Cullen asked Bob Pierson how he thought that he [Terry Cullen] paid for his operations. He said that Terry Cullen then said that, in Milwaukee, he gets "destitute people from Milwaukee", specifically those who are addicted to drugs, alcohol, or were homeless or abused women, and he "trains them" and gets them off of drugs or whatever else they are suffering from. He said that Terry Cullen then said that he takes out life insurance policies on them and then said "They're going to die anyways, you might as well get paid". Bob Pierson said that Terry Cullen indicated that that was how he had paid for the truck he was driving, and that the person involved had been getting overly friendly with Jane or Angie (Bob Pierson was not certain) and had been dipping back into alcohol. Bob Pierson said that the phrase "They're going to die anyways . . . . " stuck with him and he was thinking to himself "I'm sitting with the devil, and he's telling me his plans". Bob Pierson indicated that he was now fearful of Terry Cullen again because his earlier suspicions were being validated. He said that Terry Cullen did not go into further details regarding that, but he recalled Terry Cullen remarking "That's how you do it."

Bob Pierson stated that he believed that Terry Cullen was getting the money to run his operations from the insurance policies described above, particularly since, when he would walk around the property with his dog or to simply check out the area, he did not see evidence of drug grows or drug trafficking. Bob Pierson said that he began telling Terry Cullen how sick he thought he was, that he was a "piece of shit" and likened him to Jim Jones, and that voices were raised to the point were Sparky began barking. Bob Pierson said that Angie came into the room and told Bob Pierson to calm down, and then Angie and Terry Cullen were looking at each other wordlessly "like they got some kind of signal". At that, Bob Pierson said that he thought to himself "I'm fucked. I've never been so fucked". I asked him why he had thought that and he reiterated his earlier concerns about the isolation, Terry Cullen's size, the omnipresent crocodiles, the shotgun, and he said he then started wondering about what had been put in the food he had been eating. He also indicated he had thought about how easy it would be to have ended up inside one of the crocodile pens or in the pond.

Bob Pierson said that Terry Cullen exited the room and went into his locked bedroom. Bob Pierson said that Angie stayed in the kitchen and Bob Pierson went into his bedroom with Sparky and started packing his belongings. He said that he wanted to call one of his friends but wanted to do so without alerting Angie or Terry

## Supplement

Cullen that he was doing so, and he did not feel that he was able to safely do so inside his bedroom. Bob Pierson said that he then went back into the common area of the residence and apologized to Angie for it not working out, and said that Terry Cullen had brought him and his crocodiles to Florida under false pretenses, and it was already something like day five at the residence and nothing had yet materialized in terms of Terry Cullen's promises, and Bob Pierson was upset that his crocodiles were still being kept in their wardrobe boxes. He said that he then misted his crocodiles again and put his belongings against his bedroom door and went to bed.

Bob Pierson stated that he woke up the next morning about 5:30 am. He said that, when he awoke, no one was in the house. He said that he was calling out Angie's and Terry Cullen's names, and was banging on the locked door to the bedroom Terry Cullen and Angie used but into which Bob Pierson had not been allowed or able to see into, and he tried to undo the lock without damaging the door because he wanted to get into the room and see if there was a body or a sex slave strapped to a chair or something similar in that room, which he suspected there was.

Bob Pierson said that he then went outside with Sparky and continued yelling for Angie and Terry Cullen, but he did not receive a response. He said that he called his friend Brad Mormon and was able to speak with him about what had been going on, and that Brad Mormon could not believe what Bob Pierson was telling him. Bob Pierson said that he also specifically told Brad Mormon that if he does not get out of his situation alive, then it was Terry Cullen who killed him. Bob Pierson said that the connection on the call then went bad, and the call was terminated.

Bob Pierson said that he also called Gerry Mata, whom he said had two phone numbers he was using at the time. Bob Pierson said that, like Terry Cullen, Gerry Mata was also involved in keeping and trafficking crocodilians illegally, and that Gerry Mata had two phone numbers he used. One was [redacted]-1220, which Bob Pierson said Gerry Mata would use when advertising in publications and for general use. The number that would be used then in the event that someone wanted to engage in illegal animal or other trade and was appropriately vetted was [redacted]-0960. Bob Pierson said that Gerry Mata was not only involved in illegal crocodilian trade but also that involving prohibited types of cacti, parrots, venomous snakes, tortoises, and other things. He said that the address where his animals are kept is [redacted] in Bushnell, Florida, off of I-75 across from a Wal-mart. He described it as the same kind of facility as Terry Cullen's, though he added that Gerry Mata was "legit" in terms of actually taking care of the animals he had.

Bob Pierson said that he talked to Gerry Mata and told him that Terry Cullen is "a nut" and "trying to kill him", and Gerry Mata gave Bob Pierson directions to get out of Eustis and how to get to Gerry Mata's location. Bob Pierson said that he had to use a set of boltcutters that he got out of one of Terry Cullen's tool sheds on the property to cut the chain and lock on the interior gate to get out of Terry Cullen's property, but that the exterior gate was unlocked for some reason. He said that he drove in excess of the speed limit to get to the interstate, and he kept calling Gerry Mata while enroute. He said that his drive to Bushnell was otherwise uneventful.

Bob Pierson stated that, upon his arrival at Gerry Mata's preserve and that Gerry Mata was actually listening to what he was saying about Terry Cullen. He said that the two of them went to a Home Depot in Ocola, Florida, and that people at that time were buying a lot of plastic sheeting for windows because of concern surrounding a terrorism warning about a chemical attack on the country. Bob Pierson said that he and Gerry Mata spent the next week building cages for his crocodiles to live in on Gerry Mata's preserve. However, Bob Pierson said that, the day he actually met with Gerry Mata, Gerry Mata had received a lot of phone calls from other "crocodile experts", whom he said have an elaborate intelligence-type network amongst themselves, telling Gerry Mata to be on the lookout for a guy named "Bob" from Las Vegas who had stolen six crocodiles from Terry Cullen. He said that Gerry Mata knew, from prior dealings with Bob Pierson, that Bob Pierson did not have to steal anyone's crocodiles but Gerry Mata was getting nervous because he did not need "this heat", he did not know Terry Cullen well enough to know what he was capable of, and he could not be 100% certain that Bob Pierson had not stolen someone's crocodiles.

Bob Pierson said that Gerry Mata set up Bob Pierson with a friend who had a "crappy trailer" in the forest that he rented to Bob Pierson for several hundred dollars, and that Bob Pierson could hide out there for two or three weeks. He said that Terry Cullen was continuing to call all kinds of crocodile experts over the next couple of days, and, on about the third day after Bob Pierson had met with Gerry Mata, Gerry Mata came out to the trailer and

## Supplement

told Bob Pierson that Terry Cullen was "the real deal, he's gonna kill you" and said that Terry Cullen was telling people that Bob Pierson had stolen some of his crocodiles and destroyed his house. About that same time, Terry Cullen started calling Bob Pierson on his cell phone, and that, for about the first ten calls, Bob Pierson just hung up on Terry Cullen and that it was "like girlfriend/boyfriend" in that regard. He said that he eventually, after about the tenth call, would answer the phone when Terry Cullen called and would just start saying to him words to the effect of "You're Jim Jones", "You're doing some sick shit", "Are those girls your concubines?" and would then hang up on Terry Cullen. He said that Terry Cullen would call back and they would go through it again. He said that this went on for about a day before he just stopped answering his phone.

Bob Pierson said that, a few days later, he started getting calls from a "detective" from the Eustis Police Department. He said that the detective told him that he needed to "stop bugging" Terry Cullen and that Terry Cullen had filed a "death threat" report against Bob Pierson. He said that he tried to file a report about what he had experienced at Terry Cullen's property but the detective would not let him. Bob Pierson said that he told that detective "This is just like Vegas", referring to police corruption in Las Vegas, and that the detective continued calling for about a week and kept asking Bob Pierson where he was and telling him to leave Terry Cullen alone. Bob Pierson said that the detective was police but repeatedly refused to take a report from Bob Pierson about his concerns about the animal cruelty, the "girls" on his "compound", and Terry Cullen's statements about the life insurance. Bob Pierson said that the detective also called his sister Nancy Pierson, whom he last knew to be living in Ohio and whom he said should be about fifty years old now. He did not know if the detective also called his sister Patty Pierson, whom he said is involved in criminal activity at an attorney's office and works for "corrupt people" and with whom he does not have a close relationship. Bob Pierson acknowledged that, over the course of the week, he had called Terry Cullen repeatedly and was telling him what a sick person he was and likening him to Jim Jones and making similar statements.

Bob Pierson said that he went back out west after about a week of that, to Concord, California, where Brad Mormon was living. He said that he told Brand Mormon and his wife about his experience in Florida, but they did not believe him. He said that he stayed with them for about two months before moving to Colorado.

Bob Pierson said that he also knows someone else, in Missouri, who had met Jane, Angie, and Terry Cullen, and that meeting them had also scared that other person. Bob Pierson said that that person was the same person who had called him about a week ago and told him about Terry Cullen's arrest. He said that he found out about the arrest last Thursday night, when "John", who had been an informant with federal investigators and was associated with a number of the people detailed in a book called "The Lizard King" by "Brian Christie" (phonetic spelling), which was about reptile smuggling. Bob Pierson did not want to further identify John, whom he said had a turtle farm in Missouri, for reasons associated with that book. He said that John had called and they had been talking about "reptile pimping", as described above, and then Bob Pierson started telling John about his experience with Terry Cullen. He said that John told him that Terry Cullen had been arrested on charges related to rape, animal cruelty, and animals stolen from zoos under false pretenses. He said that, based upon his conversation with John, he called a newspaper in Milwaukee, "The Sentinel", at 414-224-4000, and he ultimately spoke with "Bruce Velmeti" (phonetic spelling). He said that it took several days before he actually got to talk with Bruce Velmeti and that they had talked for at least an hour and half, and that, based on that conversation, Bob Pierson had wanted to speak with an officer.

Bob Pierson said that he lives in the mountains "as a monk" with a number of crocodiles, where he has just finished working on a book about reptiles. He said that he does not have Internet service or a television and had not seen news accounts associated with Terry Cullen's arrest prior to speaking with me.

Bob Pierson said he wants to take a lie detector or undergo sodium penthanol to prove he is telling the truth. He said that he would continue trying to locate information that he might still have that could assist with this investigation.

During our conversation, I asked Police Officer Angela Phillips to run Bob Pierson for warrants, as he believed he might have a warrant related to the circumstances he had described. There was a warrant in NCIC, dated 02/07/2003, from the Lake County Sheriff's Office in Florida for Bob Pierson for harassing phone calls, Agency Case # 03MM000393. Bob Pierson expressed that he was happy to know that the warrant was in the system as it corroborated the information he was providing me.

## Supplement

Bob Pierson had nothing further to add at that time, and we agreed to continue our conversation at a later date, after I had been able to follow-up on some of the information he had provided me.

I contacted the Lake County Sheriff's Office at 352-343-9500 and was transferred to the records division, and then transferred to the warrants division, where I was given the Incident #03010845 for the report associated with the warrant. I was then reconnected with the records division, and was advised that a copy of the report was still extant in their computer system but would not be available until Monday, as their computers were locked for the weekend.

After the conversation with Bob Pierson, I contacted ADA Lewis and advised her of the results of the follow-up. Further investigation is pending.

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0026

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date
11/03/2011
Nature of Call
CRLTYANIML
Officer
WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0026 | 11/03/2011 | 08:31 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53204 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 05/12/2010 |

| To Time | Officer |
|---|---|
| 13:34 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Prop Trans Stat | Property? | Approving Officer |
|---|---|---|---|
| Supplement Transfer Complete | Pending | Yes | 019162 |

| Approval Date | Approval Time |
|---|---|
| 11/04/2011 | 13:46:07 |

## Property

| Item | Type | Inv Date | In Custody? |
|---|---|---|---|
| 1 | EVIDENCE | 11/03/2011 | Yes |

Description
BOOK, NOTES, MAP, AND ENVELOPE MAILED TO SCD BY WITNESS; INVENTORY #577359

| DR | Cat | Article | UCR Type | # Pieces | RMS Transfer |
|---|---|---|---|---|---|
| A | OTHER | MISC | OTHER | 4 | Successful |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ALL OTHERS |

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On 10/31/2011 at approximately 3:30 pm I, assigned to Squad 3762, opened a package that had been sent to me at the [redacted] Crimes Division by Bob Pierson, a witness whose statement is detailed in a separate supplemental report.

The envelope contained a book entitled "The Dwarf Crocodilian" by Sobek Templar, inside which was written a note from Bob Pierson (part of which notes that Sobek Templar is a pen name) and three photocopies of a page containing a map and some handwritten notes in an envelope.

I have placed the mailing envelope and all of its contents on inventory as evidence, Inventory #577359. Copies of the inventory, the map and handwritten notes, the front and back cover of the book, and the page with the handwritten notation from inside the book will be provided to Assistant District Attorney Sara Lewis.

Further investigation is pending

# Incident Report
# MILWAUKEE POLICE DEPT

**101320089** Supplement No 0027

2333 N. 49TH ST

Milwaukee,WI 53210

(414)935-7502

Reported Date 06/15/2012
Nature of Call CRLTYANIML
Officer WICK,IVAN T

## Administrative Information

| Agency | Incident No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| MILWAUKEE POLICE DEPT | 101320089 | 0027 | 06/15/2012 | 07:56 | 101321086 |

| Status | Nature of Call | Location |
|---|---|---|
| REPORT TO FOLLOW | CRUELTY ANIMAL | 2323 S 13TH ST |

| City | ZIP Code | Rep Dist | District | Squad | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| MILWAUKEE | 53204 | 5886 | 2 | 250 | 02/27/2010 | 17:00 | 03/12/2012 |

| To Time | Officer |
|---|---|
| 13:34 | 009372/WICK,IVAN T |

| Assignment | Entered by | Assignment |
|---|---|---|
| [redacted] CRIMES DIVISION - DAYS | 009372 | [redacted] CRIMES DIVISION - DAYS |

| RMS Transfer | Property? | Approving Officer | Approval Date |
|---|---|---|---|
| Supplement Transfer Complete | None | 009239 | 07/11/2012 |

| Approval Time |
|---|
| 12:53:57 |

## INTERVIEW 1: COTTREAU,JENNIFER

| Involvement | Invl No. | Type | Name | MNI | Race |
|---|---|---|---|---|---|
| INTERVIEW | 1 | INDIVIDUAL | [redacted] | 3214879 | UNKNOWN |

| Sex | DOB | Age | Juvenile? | RMS Transfer |
|---|---|---|---|---|
| FEMALE | [redacted]/1971 | 40 | No | Successful |

| Type | Address | City | State |
|---|---|---|---|
| HOME | [redacted] LAGOON LN #1705 | OAK CREEK | WISCONSIN |

| ZIP Code |
|---|
| 53154 |

| Phone Type | Phone No |
|---|---|
| CELL | [redacted]-9608 |

| CONVEYED TO | CONVEYED BY |
|---|---|
| NOT APPLICABLE | NOT APPLICABLE |

## Modus Operandi

| Gang Act? | Gang Name | Crime Code(s) |
|---|---|---|
| No | NONE | ALL OTHERS |

## Supplement

This report is written by Police Officer Ivan Wick, [redacted] Crimes Division, Day Shift.

On 06/08/2012 at approximately 8:29 am, I, assigned to Squad 3762, conducted follow-up regarding this investigation. I returned a call to [redacted] (Unknown female [redacted]/1971), [redacted] Lagoon Lane #1705, [redacted]-9608, at [redacted]-9608 and spoke with her regarding information she had regarding this investigation.

[redacted] stated that she had met Terry Cullen on an online dating site either the spring of 2010 or 2011, and she believed that the site was OkCupid. She said that Terry Cullen initiated contact with her on the site and indicated that they had gone to MATC together. She said that he knew personal information about her that she does not just share with people whom she does not know (particularly medical information, such as her suffering from MS and chronic migraines), so she believed that they probably had gone to MATC together, even though she did not independently recognize or remember him. [redacted] said that she had been in her 20's when she had attended MATC. She said that her contact with Terry Cullen took place over the course of several months from start to finish and that the contact included phone, e-mail, and in-person contacts.

In her conversation with Terry Cullen, she said that he told her that he was a "well known veterinarian" and said he had specifically referred to himself using the word "veterinarian". She said he also said he was a conservationist for alligators and had "rehab" places for alligators (in Florida, China, and she thought "somewhere else"), and he showed both her and her 11-year-old daughter the pictures. [redacted] said that Terry Cullen had also shown a picture of him and "a bunch of school-age children in China" which, given the nature of

the allegations against Terry Cullen, concerned her.

[redacted] said that Terry Cullen told her that both she and him were part of a "very small" group of people that consisted "a small evolutionary tribe". She said that he was talking about the differences between the members of that tribe and the general population, particularly as it pertained to bone structure and how, in their tribe, the adults skulls do not completely close like they do in regular adults. She said that Terry Cullen had asked if he could stop by and do a "brief examination" (or something to that effect) of [redacted] and said that he was friends with a "real medical doctor". She said that she agreed to do this, and he came over.

[redacted] said that she did not recognize Terry Cullen when he first came to her apartment door. She said that, normally, she is not good with names but is good with faces. She recalled that he "looked old" and said that she let him in because he knew so much information about her that she thought that he must have known her, even though she did not recognize him. She said that her daughter, [redacted] was out of school at the time and she recalled that Terry Cullen stopped [redacted] and told her that he was "a doctor for alligators". [redacted] said that Terry Cullen showed [redacted] pictures of him holding alligators in what looked like a classroom in China and he went "on and on" about his relations with China.

[redacted] stated that, while he was over, Terry Cullen looked into her eyes, ears, and mouth. She recalled that, before he did this, he told her that he had had enough schooling for an "M.D." She stated that Terry Cullen then, "out of the blue", asked her "Do you mind if I do a [redacted] exam". She stated that she told him "No" and "was appalled that he would even ask". She stated that she kind of laughed his request off and said that Terry Cullen did not further press the issue and left it at that. She stated that they talked a little longer after that, and then Terry Cullen left. She recalled that Terry Cullen was wearing "like four jackets", was sweating, and refused to take off any of his jackets when she suggested he do so.

[redacted] said that, the next time she met with Terry Cullen, he came to her apartment again. She said that he had called her at approximately 10:00 pm and wanted to come over. She told him that it was a bad time because her [redacted] was already in bed, it was 10:00 pm, etc., but he insisted on coming over because he was leaving for Florida for a few weeks and had spent "hundreds" of dollars on vitamins and supplements for her that he needed to get to her "ASAP". She said she agreed to let him come over. She said that Terry Cullen showed her approximately seven to ten items and told her when she should take them, and he told her that he could tell that the nutrients that were going into her body were leaving her body. [redacted] said that she still had all of the items that he brought her and had kept them (and tried them) because she thought that they might make her feel better. She noted that they had not.

[redacted] stated that, around Easter of either 2011 or 2010 (she noted it was prior to the time that Terry Cullen was arrested), Terry Cullen came over and brought [redacted] an Easter basket. [redacted] said that Terry Cullen told her that he has a "very good friend" who was a medical doctor who had a "high tech . . . cellular regeneration thing you lay on". She said that he told her that the doctor was a female but she was unable to remember the woman's name. [redacted] said that Terry Cullen told her that the doctor was "gracious enough" to let him borrow the device but the doctor needs it back right away. [redacted] said that Terry Cullen told her that the device would address the cells causing her MS and migraines and would "jumpstart the process of cellular regeneration".

[redacted] said that Terry Cullen came over with what looked like a three-section "yoga mat" approximately 1 ½ inches in thickness that had a cord that Terry Cullen plugged into the wall. She said that Terry Cullen had her lay on the mat for about 20 minutes. She stated that she was clothed when she did so. After she got off the mat, Terry Cullen told her that she would not feel anything but that "things were happening" in her body and, later, she could meet with the doctor and the doctor would take [redacted] as a patient. [redacted] said that she was thinking that "maybe he was legit", referring to Terry Cullen.

[redacted] said that Terry Cullen had expressed an interest in a romantic relationship with her, and had told her that he wanted "to be with" another person from their "tribe" in a long-term relationship. She also recalled that Terry Cullen wanted to hold her hand. She said that she told Terry Cullen that he was a "nice man" but was clearly very busy, and she wanted someone who would be around. She said that Terry Cullen "cried and cried, I couldn't get him out the house". She said that they may have exchanged an e-mail or two after that but she could

not recall, but that their relationship ended at that time.

[redacted] said that she has not erased any of the emails from Terry Cullen but that she has a lot of emails and it may be hard to find the emails from Terry Cullen. She explained that, while she had not specifically deleted any of his emails, she did not know specifically where those emails were. She described him as "relentless with the phone calls and the emails and all that" during the time she was communicating with Terry Cullen.

She also said that Terry Cullen had give her a yellow T-shirt with an alligator on it and something to the effect of "Terry Cullen Conservatory For Alligators", with several locations listed, and some quote from Terry Cullen.

[redacted] said that she saw the news story about Terry Cullen approximately a year after the period during which she had had contact with Terry Cullen. She said that she thought about calling the police and giving the information described in this statement at that time, but she was not certain if the information she would provide was actually useful, but she also wanted to be anonymous because she was afraid that Terry Cullen might go after her or her daughter. She said that the news story "scared me to such a degree" and she thought that he was in jail. She said that she contacted police now because she saw a news story in the last week that Terry Cullen was out of custody and had not even gone to trial, and she contacted police because of concerns that Terry Cullen might still be doing this kind of thing to other people.

[redacted] also said that Terry Cullen had told her about a woman who he described as the "love of his life" who was blond and beautiful", and with whom he had said he had been with "for years" but that the woman had gotten involved with drugs to the point where he either could not be or did not want to be with her.

[redacted] also stated that her MS nurse, "Erin Gorsky", has been her nurse for a couple of years and that the two had been talking about Terry Cullen and Erin Gorsky had said that Terry Cullen had "[redacted]" [redacted] did not have any details regarding tha[redacted] other than that [redacted] (or a similar statement) to "his warehouse". [redacted] said that [redacted] had said that the person who had been [redacted] Terry Cullen was a very [redacted] and she did not believe that the [redacted] had been reported to police.

[redacted] expressed a willingness to talk further with a district attorney or to testify, if that was necessary, though she expressed she would rather not testify if that could be avoided.

[redacted] had nothing further to add at that time, and I concluded my conversation with her at approximately 9:24 am.

I then called Assistant District Attorney Sara Lewis and advised her regarding my conversation with [redacted] Shortly thereafter, [redacted] called me back and told me that she remembered that, during Terry Cullen's physical exam of her, she recalled that he had been "very, very, very interested" in her health problems. She said that he also checked her spine and asked her to lay down so that he could "palpitate" her abdomen (and she recalled specifically that he had used that word). She said that it had been when he had been palpitating her abdomen that he asked her about doing the [redacted] exam. She also was "pretty sure" that he had checked her leg strength by pushing on her foot, but she was not certain.

Further investigation is pending.