UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

DRAGONWOOD CONSERVANCY, INC.,
PLEGUAR CORPORATION,
TERRY CULLEN,

Plaintiffs,

-vs- Case No. 16-CV-534

PAUL FELICIAN, et al.,

Defendants.

---

Examination of REX RAASCH, taken at the instance of the Defendants, under and pursuant to the Federal Rules of Civil Procedure, before Sarah A. Hart, RPR, RMR, Certified Realtime Reporter, and Notary Public in and for the State of Wisconsin, with all parties appearing remotely via Zoom web conference, on September 1, 2020, commencing at 2:40 p.m. and adjourning at 4:51 p.m.

EXHIBIT
1045
exhibitsticker.com

Page 2

A P P E A R A N C E S

LAW OFFICE OF MARK P. MURPHY, by
MR. MARK P. MURPHY
657 South 72nd Street
Milwaukee, Wisconsin 53214
appeared via Zoom web conference and present with the witness on behalf of Plaintiff.

MILWAUKEE CITY ATTORNEY'S OFFICE, by
MS. HEATHER HOUGH
841 North Broadway, 7th Floor
Milwaukee, Wisconsin 53202
appeared via Zoom web conference on behalf of Defendants.

* * * * *

A L S O P R E S E N T

Mr. Terry Cullen, present with the witness
Ms. Nicole Williams, paralegal, present with the witness

Page 3

* * * * *

I N D E X


| Examination By: | Page |
|---|---|
| By Ms. Hough | 4 |
| By Mr. Murphy | 65 |
| By Ms. Hough | 84 |

| Exhibits Identified: | | Page |
|---|---|---|
| Exhibit 43 - | 6/25/20 Letter to Terry Cullen from Rex Raasch | 59 |
| Exhibit 44 - | Curriculum Vitae for Rex Raasch | 62 |
| Exhibit 45 - | Rebuttal Experts list | 62 |

| Items Requested: | Page |
|---|---|
| Photos of damage taken by Rex Raasch | 55 |


Disposition of Original Exhibits:
Attached to Original Transcript.

Page 4

TRANSCRIPT OF PROCEEDINGS
(Exhibit Nos. 43 through 45 were marked.)
REX RAASCH, called as a witness herein, having been first duly sworn on oath, was examined and testified as follows:
EXAMINATION
BY MS. HOUGH:
Q Good afternoon, Mr. Raasch. Thank you for being here today. I just wanted to know if you've ever given testimony at a deposition before.
**A I have not.**
Q Okay. So we are doing this deposition by Zoom, and you can see there's a court reporter present; she's taking down everything that's said for a transcript, so I'm just going to ask you to allow me to finish my questions before you start answering so that she is able to transcribe the deposition today clearly. Okay?
**A Absolutely. And I apologize in advance if by any reason I slip up on that, but I will do -- I hear that and I want to do that.**
MR. MURPHY: He won't be as interesting as his father was, let's just put it that way.

Page 5

MS. HOUGH: Okay.
MR. MURPHY: You weren't there.
MS. HOUGH: I wasn't there, so...
MR. MURPHY: Okay.
BY MS. HOUGH:
Q So also, I need you to remember that this is a deposition. So if I ask you a question and the answer is yes or no, make sure it's a verbal response and not a head nod or something inaudible.
**A Correct.**
Q So it's a yes or a no. Okay.
And Attorney Murphy is in the room with you. He is permitted to object if he doesn't like the way I ask a question. Unless he instructs you not to answer it, however, even if he objects, you should still provide the answer if you have one. Okay?
**A All right.**
Q Okay. And I don't think this is going to go long, so I just want to ask you a number of questions about your relationship with Mr. Cullen and about some of the documents that have been provided in this case.
MR. MURPHY: That's fine. I don't

Page 6

mean to interrupt. The record should reflect
that Mr. Cullen is here and my assistant as
well. I just had a big dispute in a recent
Zoom because I didn't say my secretary was in
the room. So she's here too.
MS. HOUGH: Okay.
BY MS. HOUGH:
Q All right. You ready?
A **Yep.**
Q Okay. So good afternoon. Can I call you Rex?
A **You may call me Rex.**
Q All right. The first question I'm going to ask
you is, when did you meet Terry Cullen?
A **I met Terry Cullen at the NARBC, North American**
**Reptile Breeders Conference, in October of**
**2006.**
Q Of 2006. And was that in Illinois or
Wisconsin?
A **Tinley Park, Illinois, yeah.**
Q And how old were you in October of 2006?
A **I was a sophomore in high school, so I was 14**
**years old.**
Q Okay.
A **I'm sorry, I was 15 years old.**
Q Okay. And did you approach Mr. Cullen at the

Page 7

conference?
A **We did. He was doing an educational fundraiser**
**for crocodilian conservation, and he had a**
**Chinese alligator with him which I noticed**
**right as we walked in, it was in the front**
**atrium. And my dad actually knew he was, just**
**anecdotally almost. And I knew what animal he**
**was holding; it was actually -- but yes, we did**
**approach him, we waited in line to, you know,**
**see the animals that he had.**
**I was happy meet him, but it wasn't**
**much of an interaction other than we realized**
**he was also up in Wisconsin where we live and**
**thought that eventually, you know, we would see**
**him around more or get involved with him more.**
**But we were very impressed by the**
**care -- or the appearance of the animals, his**
**knowledge for the animals, his dedication to**
**what he was talking about, raising money for**
**protecting both habitat and captive breeding, a**
**multifaceted endeavor to, you know, ensure the**
**survival of endangered species of a number of**
**different animals, primarily crocodilians.**
**But, yeah, I believe we spoke for a**
**fair amount of time. But, again, we spent the**

Page 8

**rest of the day at the show.**
Q Okay. Had you been to prior reptile shows?
A **Yes. Yes. So this was one of the -- we had**
**been to Tinley several times -- Tinley Park,**
**the NARBC, several times previously, and we had**
**also been to Reptile Fest, another educational**
**reptile show in Chicago.**
Q Okay. And did you own any reptiles at this
time?
A **Yes.**
Q What kind of reptiles?
A **I had lizard, a Chinese water dragon, a Tokay**
**gecko, I had a carpet python.**
**The word "python" might be alarming**
**to some people, but it is not a large species.**
**I had ball python, again, a very**
**common pet species. I had a red-eared slider**
**turtle, I had -- let me think. I had other --**
**I might have had an amphibian as well. I also**
**had other -- I had a few other animals but that**
**weren't reptiles.**
Q Okay. So did you have a conversation with
Mr. Cullen at this show in October of 2006?
A **I did, yes. So it was my dad and I, my brother**
**was also -- my younger brother was also there.**

Page 9

**But, again, you know, enjoying the conservation**
**aspect or getting to see a Chinese alligator**
**and how incredible that was, such a rare and**
**beautiful creature.**
**But, yeah, my dad was definitely --**
**I was interested in getting to know Terry just,**
**again, by proximity let's say to the fact that**
**he was working with these incredible animals**
**and he was local to my state if not also my**
**general vicinity around Milwaukee. And we did,**
**in fact, get Terry -- Mr. Cullen's phone number**
**that day.**
Q Okay. Did you get any other phone numbers at
the conference from --
So did you approach any other
individuals at the conference?
A **Yeah. There was a book dealer, David Fogel, I**
**remember speaking with him at length. There**
**was a breeder who doesn't no longer -- I'm not**
**sure what happened to them; I think they were**
**like Leaping Lizards or something like that.**
**They were -- yeah, they were people that we**
**spoke to on numerous occasions every year,**
**would be like people we were familiar with just**
**by going to the show multiple times. I**

Page 10

remember them. And there was also a boa constrictor breeder -- a boa breeder, not specifically boa constrictor. I remember speaking with them at some length. And there was also another Wisconsin reptile breeder I kept in touch with as well.
Q Okay. So you exchanged contact information with other individuals besides Terry Cullen that day?
A I believe so.
Q Okay. After that meeting with Mr. Cullen, when did you see him next?
A I believe a year later at the show again.
Q So that would be 2007?
A Um-hmm.
MR. MURPHY: Yes?
THE WITNESS: Yes. Yes.
BY MS. HOUGH:
Q Did you contact him at any time in between 2006 and 2007?
A Not to my recollection.
Q Okay. And did you have a conversation with Mr. Cullen in 2007?
A Just a brief one. He seemed -- again, the booth was very popular. We didn't want to

Page 11

interfere with the conservation endeavors that he was doing at that moment. And we were also just excited to be at the show, but I do remember just waving or saying hi and also donating -- you know, if I had a few dollars on me, I wanted to give to the cause.
Q Was Mr. Cullen -- do you recall if he was charging for anyone to see his animals?
A No. No, not at all.
Q No. So --
A And he was very careful about the -- the health of both the public and -- and the animals themselves with hand sanitizer available and, you know, again, wanting to have outreach and the ability to meet an animal, an animal ambassador, but also making sure that there was never sort of issue whatsoever with doing such a presentation.
Q So you did not have to pay to interact with Mr. Cullen's animals?
A Not that I'm aware of, no.
Q Okay. After the show or the conference in 2007, when was the next time you contacted Mr. Cullen or you had contact -- strike that.
When was the next time you had

Page 12

contact with Mr. Cullen?
A I believe a year following that in 2008 I saw him again at the same -- same Tinley -- it's colloquially known as the Tinley Park show or the NARBC.
So, yes, three years in a row those three shows. I also -- yeah, that would -- and, again, same -- same deal. I don't remember speaking with him at terrible length that day.
Q And did you make any contact with him either by phone or e-mail, any contact, between 2007 Tinley Park show and the 2008 Tinley Park show?
A Not that I can recollect.
Q And do you recall in 2008 if Mr. Cullen was charging people to interact with the animals?
A Again, no. I just remember it was right in the front entrance of the show. So you didn't even have to -- you could effectively attend the show -- you could attend the lobby of the show without even paying an admission ticket.
So in order to get in the show where the animals are being exchanged or, you know, different breeders have different booths or book sellers or supply sellers, you have to pay

Page 13

to get in the showroom. This was actually outside the showroom in the atrium, and this is where they would put educational people, nonprofit organizations. And this -- Terry -- Terry's booth was the booth right there at the front opening.
So, no, there was no -- there was no money being charged to see the animals or come up and get closer to the animals, no.
Q Okay. And then after the 2008 encounter with Mr. Cullen, when is the next time you interacted with Mr. Cullen?
A I happened to -- I was actually at an art gallery with a high school group. This was my senior year in high school in, again, 2008. And he was doing a fundraiser at an art gallery known as Art Asia in the Third Ward of Milwaukee.
So, again, I was very pleased -- again, I didn't know him very well at the time, but I was familiar with him and how funny to just walk into a random art gallery and see, again, this person and his crocodilian and fundraising endeavors with, again, a critically endangered Chinese alligator.

Page 14

And I spoke with him briefly, just like, look how funny that we're both here. He, again, smiled or was pleased to see me in brief, and I took a few photos of that time as well.
Q So after that encounter at the art gallery in Milwaukee in 2008, when is the next time you saw Mr. Cullen -- or inter- -- excuse me, strike that -- interacted with Mr. Cullen?
A I believe it was at the Wehr Nature Center the following winter. So this would have been 2009. And we were both -- I wasn't aware -- I don't believe I was aware of this until the day of, but I was, again, requested -- this was my second time being requested by the Wehr Nature Center, a place I've been going to since -- my entire life. They knew that I worked with animals and had a deep passion for animals and education, and so they asked if I would be a presenter for their reptile day. And I, of course, said I would be happy to do it. And I brought a number of my animals all in, you know, traveling enclosures but sealed enclosures to put on display so that people could come to the Wehr Nature Center to learn

Page 15

more about reptiles, which I was very excited to do.
And then when I was actually there that day, it was -- the list of animal presenters was the Wehr Nature Center, obviously the location we were holding it at; the Hawthorn Glen Nature Center; the Terry Cullen Vivarium; and Rex Raasch, animal -- high school animal presenter. So I was very pleased to be included in on such a list.
And this, again, was probably the first time -- again, prior to this, Terry and I just had a rapport of like I -- what we've discussed, seeing each other at shows, speaking briefly and knowing that we have a mutual interest or mutual dedication. But it was at this time at the Wehr Nature Center that we -- we had more free time, let's say, and setting to be in the same room together and also seen as really working towards similar goals to protect and promote animals.
Q After the encounter at the Wehr Nature Center in 2009, when do you recall is the next time you interacted with Mr. Cullen?
A I believe there were some phone calls

Page 16

exchanged. And, again, from discussing at the Wehr Nature Center, it was like oh, we could do this together, you know, I could help Terry at his booth after he witnessed me holding my own booth as a high school student at the Wehr Nature Center. So we were coordinating that and also just wanting to get to know Terry better as a -- you know, have a better rapport, so I believe my dad and I took him out to lunch. This is, again, in 2009.
And then after -- so that would be the next time. I believe the next -- those phone calls leading up to a lunch -- a lunch setting.
Q Okay. And did you -- do you recall if you initiated that phone conversation or phone call?
A I had his phone number, so I believe I called him, yes.
Q Okay. Do you recall the location of that lunch?
A I believe it was Melrose, Melrose Restaurant, if I remember correctly.
Q And this was in 2009?
A Correct.

Page 17

Q Okay. So at any time up until the lunch at Melrose Restaurant, have you ever been to any residential property affiliated with Mr. Cullen?
A Not up until that time, no.
Q Okay. After your lunch at Melrose Restaurant in 2009, when did you interact with Mr. Cullen next?
A I believe the next interaction was going to Art Asia and doing a talk with him, which was -- again, I couldn't have felt luckier as a high school student to then be included in such an endeavor to be able to work with -- or present a Chinese alligator and discuss, you know, how critically endangered they are and yet how important they are to having functional ecosystems in China and just what an amazing creature they are to be an ambassador for the zoological world, yeah.
Q And when was the -- when was the Art Asia event?
A This would have been in the spring of 2009. And so then shortly after -- shortly around that time was also when I first went to a property of Mr. Cullen's. I'm assuming that

Page 18

was your next question, the next time I saw him.
Q Yes. Yes.
A Yeah. So it was right around that same -- the same time of -- right around that same time of the Art Asia I also went to 13th Street.
I was concerned about the health of one of my animals. The carpet python I had previously mentioned was an animal that I had been raising for years, and it seemed like it was making a slight noise while it breathed, and I was worried that that might be some kind of infection. And I brought it over to Mr. Cullen's property upon his request; he said he would be happy to take a look at it.
And so we went into the residence, it was a -- we stood in the kitchen. My dad and I went over together. It turns out that the animal was not in any -- did not have a health problem. It was actually a small piece of shed skin that was inside the nostril that was causing the noise to be heard while it breathed. So I was very relieved.
And in that time spent standing in the kitchen at 13th, I was -- we had a

Page 19

wonderful conversation that I'll always remember learning about different -- exchanging ideas or asking questions. Terry had a profound -- seemed to have a profound knowledge about reptile care, seemed to have a profound knowledge. He gave me a number of different tips such as feeding different sizes.
Because I was talking about how having -- he asked me how often do you feed your snake, and I said every Friday. He said, you don't want to feed it every week on the same day at the same exact time because that's not how they would eat in the wild; it's much better to feed at varying times and varying number of amounts of food or size of the prey, so on and so forth.
Also discussing how bleach can actually aid a sick reptile in some cases. Where I had previously heard that that can be a damaging thing to a reptile. But after knowing Terry for as long as I've known him and seeing the -- seeing the application of bleach as an antibacterial or medicinal almost in some ways would, in fact, work and worked much easier than any number of, you know, long and lengthy

Page 20

or expensive medical treatments.
Q Okay.
A Sorry.
Q So you visited the 13th Street property in the spring of 2009?
A Correct.
Q And this was in the City of Milwaukee?
A Um-hmm. It was.
Q Okay.
A Yes. Yes.
Q And are you familiar with this area of town?
A At the time, not -- not particularly.
Q So you live in Wisconsin but not on the south side of Milwaukee?
A Correct. I lived in -- I live in Greendale.
Q Okay. And you stated you entered the 13th Street property. Does 2323 sound correct, 2323 South 13th Street sound correct to you?
A Yes, I believe that sounds correct.
Q Okay. Can you describe what the outside -- do you have a recollection of what the outside of that house or building/structure looked like when you went there?
A It looked like a structure -- you know, a structure. It didn't -- it certainly looked

Page 21

structurally sound. It appeared to be an old firehouse just by the look of it with the large doors out front. But we went in through the alleyway side door.
But, yeah, I don't have any -- other than walking into the -- you know, down the time alley to go to the door, I don't have -- and the fact that it seemed as a building wood, nothing really jumped out at me other than here we are at the place that we were supposed to go.
Q Do you recall if anything was boarded up when you went there in 2009?
A Nothing appeared to be boarded up, nothing appeared to be noticeably damaged, nothing appeared to be in any disrepair in any meaningful way at all.
Q On the exterior, just to clarify?
A This is while I'm walking up to the building, yes. Nothing appeared to be problematic.
Q Okay. And then you stated you went in and you were in the kitchen?
A I was in the kitchen. And then at one point I did use the restroom. So I walked out of the kitchen to the restroom.

Page 22

Q Okay. Can you describe based upon your memory what the kitchen looked like?
A One of the walls was green. There was a sink to my left. There was a stove and a refrigerator directly in front of me with a kitchen countertop in front of that. Terry was there in the kitchen with me and my dad, and that's where we spent the vast majority of the time that we were there.
But there was nothing -- it seemed like -- again, it seemed like it was an odd building shape or it was like previously a firehouse to my understanding, and so it wasn't laid out. The floor plan of the building is not like a house -- a standard suburban home let's say.
But other than that, it was a home. Like it was a residence, people had been living there, there was no -- nothing to think otherwise. Nothing was disheveled or unsightly or -- it seemed like a well-kept residence, and there was no particular odor or anything like that while mentioning -- while entering the premise. I had heard that mentioned later on, that entering the home was a horrible odor or

Page 23

something. And I had been in there not terribly long before that, and I hadn't -- hadn't come across that at all.
Q So the only two rooms you were in on 13th Street during that visit in 2009, then, would it be accurate to say the bathroom and the kitchen?
A And the walkway to the bathroom, but yes. Yes.
Q And was that the bathroom on the same floor as the kitchen?
A Yes.
Q Okay. Do you recall seeing any animal cages -- strike that.
Do you recall seeing any reptiles during your visit in 2009 at that location?
A Yes. So during a conversation Terry also wanted to show me a ball python, which, again, is a very common species that people keep, but I -- and I had seen a number of them up until that point, but I was astounded by the care and -- or the overall appearance of the animal. It was actually a very young animal, and yet it looked -- I couldn't believe how old it was when Terry told me. It looked incredibly healthy and really robust.

Page 24

The majority of the animals that you would see in a pet store of the same species were runts by comparison. They were -- again, nothing particularly wrong with them, but it was like seeing -- you know, the difference between a McDonald's cheeseburger and some kind of, you know, gourmet artisan, you know, well-crafted meal or well-crafted burger, if you will.
Sorry if that's an odd analogy --
MR. MURPHY: That's not bad.
THE WITNESS: -- but it's just trying to distinguish that -- I'm not trying to say there's anything wrong with something you would find in a pet store, but it was clearly -- it was better than any ball python I had seen up until that point and maybe to this day. I was really taken aback. And this, again, has to do with good genetics, sound nutrition, and obviously optimum care that would lead to an animal looking like this.
I also saw -- I also briefly saw Moo-Shu, the Chinese alligator, who I had previously seen at the Wehr Nature Center and at Tinley Park and also held and worked with at

Page 25

Art Asia. But that was only just as I was walking to the restroom.
Q Okay. And was Moo-Shu the alligator freely roaming when you saw him or her?
A As far as I know, she was contained within a room.
Q So you observed her contained in a room?
A Um-hmm.
Q Was she in a cage?
A The room was, the enclosure.
Q Okay. And the boa constrictor, did you observe that in the kitchen?
A Yeah, it was brought out to me. And it was not a boa constrictor. It was a ball python.
Q I'm sorry.
A No worries.
Q I'm sorry. I am not a reptile expert.
Bear with me. I just am running low on juice on my Zoom machine, which is also my telephone. So I just need to plug it in real quick.
(Pause in proceedings.)
BY MS. HOUGH:
Q So remind me of your response just now. The snake was in the kitchen?

Page 26

A **It was brought out to me. It was not residing in the kitchen, no.**
Q Okay. So you did not see where Mr. Cullen was keeping that snake?
A **Correct.**
Q Okay. Did he tell you how long he had had that snake?
A **I believe he had produced it himself from -- from adults that he had, and I believe the animal was -- it was a young -- it was a young animal.**
Q Okay. All right.
So after this visit to the 13th Street property, when is the next opportunity you had to encounter Mr. Cullen?
A **I believe it was later that summer of 2009. My -- my dad was requested -- again, from our interaction at the lunch, it was understood that my dad had carpentry skills, and Terry was looking for someone to come and aid in a project at his house. And so I attended that as well I believe at least twice. That's --**
Q And that -- that was at the 13th Street property?
A **This was at 17th.**

Page 27

Q 17th. So in the summer of 2009 you went to the property at 3343 South 17th Street?
A **No. 34.**
Q Okay.
A **Yeah.**
Q Okay. When you went to the 13th Street property, did you believe that to be where Mr. Cullen lived?
A **I -- it really wasn't specified to me. I wouldn't -- I wouldn't know.**
Q Okay. So in the summer of 2009, you went to the 17th Street property to assist your father in a carpentry project?
A **Um-hmm.**
MR. MURPHY: Yes?
**THE WITNESS: Correct. Yes.**
BY MR. MURPHY:
Q Can you describe what that carpentry project was?
A **We were moving a large piece of furniture, and we were trying -- so in order to get it up a set of stairs, the stairs needed to be altered in order to -- to move what we were moving.**
Q Do you recall what kind of furniture it was?
A **I really -- I'm trying to rack my brains here.**

Page 28

MR. MURPHY: Don't rack them too hard. I object. I don't know how that could be possibly relevant, but if you can answer, go ahead.
**THE WITNESS: I remember it being big.**
BY MS. HOUGH:
Q Okay.
A **I remember it was -- I mean, we wouldn't have been there otherwise. We had to adjust the doorjamb. It wasn't so much as a hard project as Terry was concerned about the integrity of the door and the stairs and wanting to make sure everything wasn't damaged. And he knew that my dad had a similar appreciation for old wood doorways and would be there to, you know, manage. It was more about managing the residence than it was anything to do with what the furniture had -- what -- you know, what that was about, yeah.**
Q And which -- was it the stairs going to the basement that --
A **It was the stairs going -- it was the stairs going up, second level.**
Q To the second level. Okay.

Page 29

A **Um-hmm.**
Q So what rooms do you recall -- what -- do you recall what rooms you were in at the 17th Street property when you visited there in the summer of 2009?
A **I remember sitting in the kitchen and I remember being in the upstairs loft and I remember going into the basement and seeing the condition of the basement as well as the other rooms that mentioned.**
Q And did you observe reptiles at this location?
A **I did. My dad and I were brought down to the basement, and we were shown several large green anacondas, larger than I believe I have ever seen before or since. They were in stock tanks that were immaculately kept. I was very excited to see such animals.**
**Again, typically in zoos they're much smaller, and it's very rare to see something of such -- of such size. We felt -- yeah, we were just very, very pleased to see such beautiful creatures. They were very calm, very placid, just laying in their enclosures in very clean water, and there was -- yeah, we discussed anacondas to some length about, you**


Case 2:16-cv-00534-NJ Filed 05/20/21 Page 8 of 37 Document 194-45

Page 30

know, the majesty of such creatures and their natural history and so forth.
Q And were there any other reptiles besides anacondas?
A Not that I saw at that location.
Q Okay. Were there any horse troughs in the basement?
A That's what the anacondas were in, just like tanks, stock tanks, um-hmm.
Q After the summer of -- and you said there was multiple visits to this property?
A I believe -- I believe around two.
Q And Mr. Cullen was present -- strike that.
Did Mr. Cullen assist in the carpentry work that was conducted?
A Yeah. My dad and he and I -- you know, I was the minor assistant, but I was there, again, protecting the staircase.
Q Would you say by this time you were -- you would consider Mr. Cullen a personal friend?
A It was an acquaintance, someone that, again, I was excited to learn from. He had seemed to have a very large body of knowledge that was -- this is something that we spoke of previously. He was incredibly interested in books, and this

Page 31

was something that we connected with very early on that we were both very avid readers and book collectors.
But in addition to that, as exciting as that was, to find someone that could have the same level of book love that I have, he also seems to have a very -- or seemed to have a very large body of knowledge that wasn't in books, wasn't in textbooks or wasn't in printed written word. It was a hands-on experience, it was a lifetime of working with animals, things that he had learned from other people that may have not published things or may not have written things down, and so much of things like that -- you know, there is a vast body of knowledge that doesn't necessarily get passed on through academic literature, as important as that may be.
Actually, when it comes to keeping animals or caring for animals, as I have a profound interest in doing, actually speaking with and working hands on with someone who has had that experience already hands on, there really is nothing else to it.
So that was -- at the time that was

Page 32

my devotion or my interest of also just assisting my dad with a project or a favor; it was also the -- just the sense of, wow, this person is really dedicated to what they're doing and it's the same interests that I have. And he's been doing it for decades, so someone I would want to be around.
Q After the summer of 2009, when was the next interaction -- or do you recall when you interacted next with Mr. Cullen?
A There were a few phone calls between the two of us, again, likely me calling him, partly because I was just starting to go to college at the University of Wisconsin Stevens Point as a biology major. And as part of that, we also have a campus herpetology society. And very early on in my involvement with the society they had -- wondering about speakers because they have a speaker budget that was otherwise not really used or they hadn't had a speaker come up in however long a period of time.
And I said I do know of someone who's in the state who seems -- again, has this vast body of knowledge and works with an incredible number of species, maybe we should

Page 33

have him come up.
So then between my involvement with the herpetology society on campus and having Terry Cullen's phone number, I called him and requested that we could set that up. He was very excited to do so, again, very dedicated to educating and sharing knowledge.
And so then later -- the next time I saw Terry in person would have been at that time when he came up to Stevens Point.
Q And do you recall what year that might have been?
A Again, that was in 2009.
Q 2009. Okay.
A Yeah, the fall semester.
Q The fall semester.
After the fall semester of 2009, when was the next time that you recall interacting with Mr. Cullen?
A I believe after we had the wonderful time in Stevens Point, I wound up thanking him for coming. It was such an insightful time. It lasted over three hours. We had 30 people plus attend. He brought with him such incredible species, again, a Chinese alligator, but also

Page 34

an African slender snouted crocodile.
Is everything all right with the video?
(Pause in proceedings.)
BY MS. HOUGH:
Q Okay. So getting back to my question, after the fall semester of 2009, when is the next time? Just give me the time of year and the year that you interacted in person with Mr. Cullen.
A It would have been in -- early 2010 I took him out to lunch, again, as a thank you for bringing up the amazing animals. We had such a fantastic response from the herpetology society. They were over the moon. They saw animals that they had never seen before much less in books. So I took him out to lunch.
This would have been -- I was home for winter break, so this would have been early 2010. And we had a very interesting and fun time conversing at that time, again, about animals.
Q And was that in the Milwaukee area?
A Yes. I believe it would have been the general Milwaukee area. I believe Greenfield.

Page 35

Q Okay. So the only visits you had made to his house, then, were the 13th Street property and the 17th Street property in 2009 up until this point?
A Correct.
Q Okay. After you had lunch during your winter break in early 2010, when is the next opportunity? And I'm just looking for time of year and the year that you interacted with Mr. Cullen.
A I remember a few e-mail exchanges while I was, again, back in college for the spring semester. And then the next time I spoke, I remember a phone call from Terry Cullen in late spring. This would have been -- again, this was right -- he called me asking when I would be available to come -- when I was coming back to Milwaukee from Stevens Point, because he needed assistance packaging animals or storing animals to then transport to Florida where he had a conservation breeding program that I was already aware of based on his educational talks or conservation fundraising.
This was also -- had been previously mentioned at the lunch where he was saying, oh,

Page 36

we're getting a heated truck and we're waiting till the warmer weather because right now it's wintertime, but a number of animals that were at an older facility are now all being relocated to the Florida sunshine.
And so then now is the time; it was now May. And I received a phone call asking when I would be around. And it seemed to have worked out really well, we were very excited. He was actually leaving -- or was already in Texas. I'm not entirely sure, but he was working with the project for the conservation of the Chinese alligator with the Chinese government, which was unprecedented. And I was just finishing up my last couple -- my last week of college.
It was right -- we were coming right down to the wire, and I was like, I'm really busy right now with finals, but I'll be back shortly. And he said, I'll be back in town shortly, and we want to get these animals out on May 22nd.
And I thought that was a wonderful date because it was right after -- right when I would get home and my mom's birthday was the

Page 37

21st and then we would start during that time. We thought it was very serendipitous that Terry and my schedules seemed to align very well, so that's why the date of May 22nd comes to mind.
Q And so you recall vividly that May 22nd, 2010, you had plans to assist Mr. Cullen; is that correct?
A Correct.
Q Okay. So the interaction you had with Mr. Cullen between your winter break -- strike that -- between early 2010 and May of -- May 22nd of 2010 was e-mails and phone calls?
A Correct. There actually -- you're jogging my memory. There actually was another -- a meeting in -- at Tinley Park that I did not attend, but Mr. Cullen did, discussing the rights for animal keepers and that we were currently under serious attack by animal rights groups.
Q Strike that. You weren't there?
A This was a phone call that I remember speaking to Mr. Cullen about his attending, and I was wondering what it was like and how it had gone down. Because I wasn't at the meeting, but Mr. Cullen did speak in Tinley Park at that

Page 38

**spring of 2010, again, organizing the zoological animal community to stand up to the legislation.**

Q I can interrupt you right there. I'm not interested in that information. I'm only interested in anything you -- any interactions you had with Mr. Cullen between you and him. So if he did things that he relayed to you, that is not part of my line of questioning and we can really reduce the amount of time here if we just stick with the questions that I'm asking.

A **Oh, I'm only trying to answer your questions to the fullest extent and that --**

Q Okay.

A **And aside from an e-mail, I also remember speaking with him on the phone and the context of the phone call was the animal rights legislation ongoing.**

Q Okay. Very good.

So what then do you recall being your next interaction with Mr. Cullen?

A **Well, right -- right after that phone call discussing moving animals and, again, needing me to help care for them, package them, and**

Page 39

**keep them safe, which I was very excited to do, it would be then -- this wasn't my interaction with Terry Cullen; it was just hearing about the raid through my father, which I was astounded by thinking -- at first I thought Terry must be helping getting these animals -- because he rescues animals -- and then realizing, oh, this happened to Terry.**

**And then to answer your question -- I didn't want to not have that inserted in there.**

**I then spoke with him shortly after that, that raid, in May.**

Q And was that an in-person interaction?

A **No. I was again -- I was still in Stevens Point, I was just finishing the spring semester. But it was an incredibly distressing time. We were so concerned about what was happening, how it was happening, why it was happening. It just seemed absolutely unbelievable, unthinkable.**

Q And this was a phone call?

A **Correct.**

Q And you called Mr. Cullen?

A **I did.**

Page 40

Q Okay. And this would be late May of 2010?

A **Mid-May.**

Q Mid-May.

A **Yeah, that would have been right around -- right around the raid.**

MS. HOUGH: Can we just take a brief break and go off the record here for a little bit?

MR. MURPHY: Sure.

(Recess taken, 3:26 p.m. to 3:33 p.m.)

BY MS. HOUGH:

Q All right. So in the interest of time, Mr. Raasch, if I ask you a question about your interactions with Mr. Cullen, I'm just going to ask you to keep it very specific to the question I'm asking. So if I'm asking you when it was, just tell me when it was. And if I need to ask a follow-up question, I will ask that, okay?

A **Okay.**

Q Okay. So after May of 2010, did you revisit the 13th Street property affiliated with Mr. Cullen?

A **I did.**

Q And when was that?

Page 41

A **That would have been in the summer of 2010.**

Q Okay. And what was the purpose of that visit?

A **So Mr. Cullen was allowed back into his old properties, and I was able to attend viewing said properties with a camera to document, you know, the aftermath of what had taken place.**

Q Did Mr. Cullen ask you to do this?

A **Yes. Well, he was wondering if I was available and if I would be willing to. And I wanted -- from what I understood, I wanted to know more and I certainly wanted to help Terry regain what was lost.**

Q And you went there with a camera?

A **I did.**

Q And you took photographs?

A **Correct.**

Q Okay. And do you still have those photographs?

A **I do.**

Q Okay. Of the 13th Street property?

A **Um-hmm. Correct. Correct.**

Q Correct. And this is from the summer of 2010?

A **The summer of 2010. I know it was very recently from when they were allowed back -- back into the buildings. I was not the first person to go back into the buildings, but it**


Case 2:16-cv-00534-NJ Filed 05/20/21 Page 11 of 37 Document 194-45

Page 42

was around that time.

Q Okay. Did you -- when you went to the 13th Street property to take photographs, was anyone else present besides you and Mr. Cullen?

A No.

Q It was just the two of you walking through?

A Correct.

Q And did he ask you to take photographs?

A Yeah. That was -- that was part of the reason for being there. And this was a -- this was not just a -- we went to several locations. And Ms. Jane Flint might have also been around at the time as well.

Q Okay. And did he tell you why he wanted you to take photographs?

A Documenting. Just to have a record of what had happened. It seemed seeing -- seeing what had happened on the news or seeing what had happened in the media, it seemed unbelievable, like just absolutely unbelievable what had happened. So I wanted to witness what had happened myself and say I had been in these locations before, what happened, what was going on. And yes, just a sense of -- I'm a photographer by nature, I appreciate

Page 43

documenting things, so I was happy to -- to help in that endeavor.

MS. HOUGH: Okay. I just hear some whispering and snapping in the background. Does somebody need to take a break or is something going on?

MR. MURPHY: That's me. Sorry. I was talking to Nicole. Sorry.

MS. HOUGH: All right. Okay. We can get back on with this.

BY MS. HOUGH:

Q So on that day in the summer of 2010, you went to the 13th Street property. Did you visit any other of -- did you visit the 17th Street property as well?

A I did.

Q That same day?

A That same day.

Q Okay. And you took photographs of that property?

A Correct. Yeah, the destruction was unimaginable. I mean, I --

Q At the 17th Street property?

A At all the properties that I went to, but there were particular things that still stand out in

Page 44

my mind about the wall being ripped apart, the toilet being shoved with chairs, other things that were on the floor that could be a fire hazard.

Q Timeout.

MR. MURPHY: Wait. Wait. Hold on.

BY MS. HOUGH:

Q Stop. Stop. I just want to take this property by property.

A Sure. Sure.

Q So the 13th Street property you stated you went through the property in the summer of 2010 and took photographs, correct?

A Correct.

Q And you went at that time through all of the rooms of that property?

A Correct.

Q Okay. But prior to that, you had only been in the kitchen and the bathroom of that property?

A Correct.

Q Okay. And so what observations did you make at the 13th Street property in 2010 -- in the summer of 2010?

A The doors -- the -- it seemed like the doors were boarded up. Obviously, from after the

Page 45

break-in they then had to be reboarded. So there was -- I don't remember exactly how we got in. We went in through the same side door, but it seemed like the doorjamb or whatever was there was problematic. The gate that was by the door may have had less integrity than it should have. The kitchen was a horrible mess, significant -- you know, just a terrible, terrible mess.

Q Could you describe what you mean by mess?

A Brown residue or -- you know, on the walls, on the counter, things strewn around the room leading into things broken, like not just fallen over, but things actually like -- kitchen utensils or, you know, things found in a kitchen strewn about and broken.

There was also -- leading into the side room that was viewable from the kitchen from where I stood previously was the visible remnants of -- liquid remnants let's say of the dogs that were horribly slaughtered, sadly. So you could actually see blood or brain material or something -- biological residue let's say from the two dead dogs, which was horrific to say the least.

Page 46

Going into the bathroom it seemed as though there was damage to that toilet. Again, things were just strewn. There was blood all over the place from the dogs.
Q What damage did you see in the toilet that you had used in 2009?
A It seemed like it had been ajar or it seemed as if it had been in some -- in some case that there was -- it wasn't a standard toilet that it had been.
Q What do you mean by ajar?
A Askew.
Q Can you describe how a toilet is askew?
A Not -- not perfectly level to the floor.
Q So the damage that you recall observing is that the toilet was not perfectly level to the floor?
A Correct. It seemed -- it seemed like there had been other -- it seemed like a vast number of things had taken place in that residence of people moving, of people tipping things over, breaking things, of people having little care for the existing property. The toilet isn't -- it was just one of the many things therein.
Q Okay. And you took photographs of the toilet?

Page 47

A I believe I took photographs of the space the toilet was in.
Q Okay. And you took photographs of everything you felt was damaged somehow?
A I took a number of photos. I'm not sure if I took a photo of every single thing that was damaged partly because the damage was so severe and so all encompassing. It would also have to depend on the lighting of the situation.
Yes, so a number of photos were taken, but I wouldn't say I took a photo of every single solitary thing. Because, again, we were working little by little by little trying to cover as much ground as we could while it was still daylight.
Q And did Mr. Cullen tell you -- for the rooms you had never been in before, did he tell you what the damage was in those rooms to photograph?
A Not particularly. It was pretty self-evident. Again, I could see the dining room and part of the living room from where I stood previously when I was there talking with Mr. Cullen. By just seeing that -- as I stated before, it was a residence. So just the fact that I didn't

Page 48

see the couch or see the back courtyard, there's no reason to think that the courtyard would have been strewn with building materials and particle board and shelving or a dresser or other, you know, possessions. It was a residence. And so suddenly to be put in the -- to see the courtyard, that back garden area, I mean, it was horrific. Terry didn't have to point anything out whatsoever. I just took a picture of what was there. I mean, it was -- it looked apocalyptic. It looked like someone took everything out of a portion of the house and threw it in the yard outdoors. And I have no reason to believe or think that someone would do that to their own property.
Q And you took photographs of the courtyard?
A Yes. Yes, I did.
Q Okay. And I'm just going to back up here in time just a little bit.
In 2009 when you visited the 13th Street property, did you observe any dogs at the property?
A Briefly. I knew there were dogs there. They seemed very --
Q Did you observe them? Yes or no.

Page 49

A Yes.
MR. MURPHY: There you go. If you can say yes or no, that's fine. If she wants to know what you saw, she'll ask you. You're doing fine. No worries.
BY MS. HOUGH:
Q Okay. So now we're going back to 2013 [sic] in the summer. So after the 13th Street property, you went to the 17th Street property?
A I believe it was the other way around, but yes, we went to both properties that day.
Q Okay. And you also took photographs of damage at the 17th Street property?
A Correct.
Q And can you describe part of the damage that you saw at the 17th Street property?
A Yes. So the first thing -- well, outside of the -- outside of the residence there was the front -- the main entryway door, which would be the side doorway that I had always used; that was smashed and leaning up against the house outdoors. It seemed like a very strong wooden door that was now, you know, beyond repair or could no longer be used as a door.
Moving into the -- into the


Case 2:16-cv-00534-NJ Filed 05/20/21 Page 13 of 37 Document 194-45

Page 50

**residence, the entire first floor, which Terry was actually in the process of moving things around and was suddenly disheveled. You know, again, things were toppled upon one another. There was a terrible sticky residue, which we weren't sure what it was, but we couldn't remove it with anything on the floor.**

Q In the 17th Street property?

**A This was in the 17th Street kitchen, yes.**

Q Okay, great.

**A And then moving to --**

MR. MURPHY: Hold on a second. Let's just hold on a second. Just so the record is clear, I thought we were still on 13. So when did we move to 17?

MS. HOUGH: We moved to 17th when I said we will now talk about the 17th Street property. I don't know if we want to read that back.

MR. MURPHY: Well, I'm not sure he was done describing all the -- I mean, I'm going to follow up and I'm going to go through my list, but I'm not sure he finished with 13th.

**THE WITNESS: No. There was more to**

Page 51

**say about 13th.**

MR. MURPHY: I think you moved to 17th, which you can do, and I can double back and fill in some holes. I just wanted you to be aware of that.

MS. HOUGH: Can we read back the transcript?

MR. MURPHY: Well, he knew you were on 17th, I think.

MS. HOUGH: Right. Right.

MR. MURPHY: So I missed that.

MS. HOUGH: Yes.

MR. MURPHY: All I'm saying is he wasn't done with what he saw on 13th. And I can ask him those questions later if that's --

MS. HOUGH: Yeah. That's fine. That's fine.

MR. MURPHY: Okay.

BY MS. HOUGH:

Q So getting back to 17th, you were talking about the sticky residue on the floor. Anything else that you observed that was damaged at that property?

**A A profound amount. Obviously most jarringly in my mind was the gaping hole in the basement**

Page 52

**where I had previously witnessed his snakes residing. It seemed un- -- just unbelievable why that would take place and why it wasn't just -- I mean, it was a gaping hole in the house including the entire window frame, you know, just completely removed. It seemed completely pointless or useless to just start -- I mean destroying property in such a way.**

**Then the tanks that we had spoken of that the snakes lived in, the water had been dumped on the floor and then left to reside throughout that entire, you know, span of weeks and months in the Milwaukee summer. So there was significant water damage to the floor and to the room in general.**

**And then also mold, which I believe still exists in the room, a black mold problem -- or a mold problem.**

**There was a significant heap of property, tools and paint, solvents, and animal enclosures or animal boxes, you know, shipping containers that were just strewn in a bizarre heap in the basement. That had already been started to be cleaned up by the time I was**

Page 53

**there because it was a danger to the property.**

**There actually were, you know, turpentine or very highly flammable solvents dumped over this pile. And luckily the furnace or water heater doesn't have a pilot light in the basement, otherwise the whole building could have gone up.**

**So then that had already been started to have been cleaned by the time I was there, but I also witnessed, you know, the bottom of the pile let's say that was still on the ground or a portion of the pile.**

Q Let me just follow up with your statements right now.

In 2009 when you went to the basement of the 17th Street property, did you observe any solvents in that basement?

**A I knew it was a basement that had tools and other basement -- you know, things that you would keep in a basement. I didn't notice any solvents specifically, but there certainly wasn't any dump -- you know, any, you know, chaos that was there when I was there, again, taking photos. It was a -- again, the difference of being in a residence and being in**

Page 54

A a trash heap. That's the difference.
Q Okay. Go on. So there was additional -- was there additional damage you saw at 17th Street?
A Yes. Another thing that comes to mind -- again, there are a number of photos that I took from this residence. Another one that comes to mind right now is the fact that there was a toilet -- a toilet in the basement that had a chair jammed into it. So someone had taken a chair and forcibly like shoved it into the toilet bowl. That seemed -- again, it was so bizarre. It was beyond what I would have ever imagined or expected.
Q Had you used that toilet in 2009 when you visited that property?
A I had not.
Q Okay. Any other damage you witnessed at the 17th Street property?
A I believe there was compromised windows in the basement that could have allowed animals to have come in through the basement. And, again, the -- just a general damage -- a general disregard for the sake of the property, things that had banged into the walls or banged into the doorjambs.

Page 55

Again, it's -- the whole memory of it is remembering just the destruction of a property. So I feel like what I've just -- I've hit that -- some of the major points of, oh, my God, the hole in the wall, oh, my God, the leaking solvents or the solvents that were dumped over the trash heap. But the -- to -- I want to answer it as -- in full clarity, and at this point it just seems like extensive damage all around. And there are a number of photos --
Q Well, it's okay. You have pictures, right?
A There are pictures, yes.
MS. HOUGH: Attorney Murphy, we are going to want those.
MR. MURPHY: I've given you several hundred pictures including damage pictures. I was going to walk him through some of the electronic files I have so I can identify them, but many of the pictures we've produced were from Rex.
MS. HOUGH: From Rex.
MR. MURPHY: Yep.
MS. HOUGH: Okay. Okay.

Page 56

BY MS. HOUGH:
Q So besides the 13th Street and 17th Street properties, were there any other properties you visited on that day?
A We also went to the property on KK.
Q And is that a property you had ever been to before?
A I don't believe so.
Q Okay. And what did you observe when you arrived there?
A There was a garage door that was -- had been un- -- it wasn't locked, but it had been ripped off the -- or, you know, horribly askewed and off the track. A horrible mess in the garage.
Moving into the -- into the residence, on the first floor there was -- the kitchen, again, was just a wreck. It just seemed like things had been thrown in and toppled on and smashed and broken.
There was damage to the water line in the bathroom. So it wasn't -- the bathroom looked disheveled, it looked messy, it looked unkempt. But beyond a residence unkempt, it looked -- you know, it was like a slop bucket was spilled or something terrible, something --

Page 57

a very -- again, a lot of people moving through. It didn't look like any sort of residence that I had ever seen much less one that I had already seen from Mr. Cullen's previously.
But then around that -- on the other side of the wall that the bathroom was a part of, in that wall was access to the water line for that bathroom, and it had been dented or like pushed in. And it seemed, again, very strange that that doorway was open or that hatchway to the water line was open. There was a bucket leading against -- into it, and that had been -- that had damaged the water line.
Then there were a considerable number of books, which is where Mr. Cullen's library was kept. Books were strewn about both the dining room and the living room.
The front office space, again, where there were file cabinets it was just as if papers and files were just strewn around. It was almost as if a little kid had gotten into somewhere where you shouldn't have, just a mess, an absolute mess, no regard for the safety of the property, no regard for the care

of -- you know, expensive volumes, expensive books on natural history among other things.
And, again, as a book lover, that was -- so many things throughout the day were hard to see. I mean, the dogs and the basement damage. But then just to add insult to injury, seeing books damaged or strewn about a room carelessly, it was -- didn't add to the day one bit.
In the basement of that residence there was also a significant amount of just senseless damage. There was actually a door -- a door that did not have a lock on it that was smashed into or broken -- like someone had to like take a crowbar to like pry open the door. And it's like, well, the door didn't have a lock on it, it was just a doorknob. To my understanding. To my understanding and experience it seemed completely unnecessary as to what had transpired.
Q But this was the first time you were in that property, correct?
A That is correct.
Q Okay. Had you seen pictures of the property prior to that?



A I had not. I had not.
Q Okay.
A And to my --
Q Did you --
A And, again, thinking about being in that basement, it smelled, again, like solvents had been dumped or spilled. There was an odor in the air of that.
Q Okay. And did you go to any other property that day?
A I believe those were the three places that we went that day.
Q Okay. We're almost done here with my questions, and then we will take Attorney Murphy's questions.
I am going to direct your attention to the exhibit marked 43, which is a letter signed by Mr. Raasch and dated June 24th.
A June 25th.
Q June 25th. Excuse me.
Does this letter look familiar to you?
A It does.
Q Okay. And this is a letter that you wrote?
A It is.



Q Were you asked to write this letter?
A I wanted to -- to aid -- to give my expertise on the -- on the issues.
Q To give your expertise on what issues?
A On the appraisals of the animals -- or the values of the animals.
Q And were you asked to provide this letter?
A It was generally -- you know, I was already involved in the case. And as soon as I heard that there was a necessary -- a need for backing anything up, I was happy to do so.
Q So you weren't asked to provide this letter?
A Not particularly, no.
Q Okay. And how were you involved in this case? So --
A I was involved by what I've stated previously, between knowing Mr. Cullen, working with him with endangered animals, and then witnessing what had transpired with the damages in the animals being removed from his property and not given back. That would be -- that would be my involvement is just my history of being a witness to it all.
Q Okay. And then you voluntarily submitted a letter about the value of the animals?



A Upon reviewing the -- what was compiled, yes.
Q Okay. And when did you -- could you describe what you mean by reviewing what was compiled?
A The Kalmanson report. I looked over that. Yeah.
Q When did you look that over?
A Right around the time that I wrote this letter. So middle of June.
Q Were you asked to review that report?
A I was a part of -- I knew it was around, and I was interested in seeing what was said. So, again, I was already like in the -- I was basically in the room or in the conversation, and I was curious to know what -- what was what.
Q So just yes or no were you asked to review the Kalmanson report?
MR. MURPHY: If you remember, say yes or no. If you don't remember, say you don't remember.
THE WITNESS: I don't particularly remember.
BY MS. HOUGH:
Q Okay. Who provided you with a copy of the Kalmanson report?

Page 62

A **Mr. Cullen.**
Q Mr. Cullen. And that was in June of this year?
A **Correct. If not -- again, I don't particularly remember. It was before I wrote this letter.**
Q Okay. And you wrote -- did you send this letter to Mr. Cullen?
A **I did.**
Q Okay. If you now refer to Exhibit 44, which is a copy of your CV.
A **Um-hmm.**
Q Were you asked for a copy of your CV in June of 2020 by Mr. Cullen?
A **I believe it was more a request from Mr. Murphy. And it could have been in June. It was around that time.**
Q Okay. And were you asked for this before you wrote your letter to Mr. Cullen or after?
A **It was around that time. I don't know if it was before or after specifically.**
Q Okay. When you sent your letter to Mr. Cullen, did you provide a copy of your CV with that letter?
A **I don't know specifically.**
Q And then if you refer to Exhibit 45, it is an eight-page document entitled "Rebuttal

Page 63

Experts." Does this document look familiar to you?
MR. MURPHY: Let's see here. Where does it say Rebuttal Expert?
MS. HOUGH: That's the name of the file. I'm sorry, you're not looking at it electronically. If you just take a look at Exhibit 45, it is an expert witness report and assessment, and it's eight pages long.
BY MS. HOUGH:
Q Does this document look familiar to you?
MR. MURPHY: Well -- okay, yeah, go ahead and answer it.
**THE WITNESS: Yes, it looks familiar.**
BY MS. HOUGH:
Q Okay. Did you provide edits to this document that are listed in red?
A **I thought that while this was ongoing, I would help highlight things for -- you know, a visual representation of things that we wanted to draw attention to.**
Q Okay. Were you asked to provide this feedback by Mr. Cullen?
A **No. This was just something that, again, I**

Page 64

**wanted to have it easily represented. It was -- it was meant to be -- so it was something that was done quickly. And I do realize that there were spelling errors that were unintended. But no, it was not -- it was not asked for specifically by Mr. Cullen.**
Q Were you asked to review the original expert witness report document that these edits are contained upon?
A **I was interested myself in looking at them.**
Q Okay. And so you voluntarily asked to review this expert report?
A **Yes.**
Q And who did you ask?
A **Mr. Cullen or Nicole or Mark Murphy.**
Q Okay. And who did you provide the edited document to?
A **Mark Murphy.**
Q Okay. And were you provided payment for these edits?
A **No.**
Q Okay. I have no further questions.
MR. MURPHY: Let's go off the record for a second so I can discuss something, please.

Page 65

MS. HOUGH: Okay, sure.
(Discussion off the record.)
EXAMINATION
BY MR. MURPHY:
Q So Alexander Studios Supply LLC zoological supply company, owner/operator, what is that? What do you do for a living?
A **I'm primarily an insect supplier. So I raise insects, sell them to zoological institutions.**
Q And your CV indicates you've been affiliated with the Dragonwood Wildlife Conservancy since 2012?
A **Correct. Well, I was associated with Mr. Cullen, but the first time that I went to Florida would have been in the winter of 2012.**
Q And how many times have you been to the Florida facility?
A **I believe 15 times.**
Q Over what stretch of time?
A **Between 2012 and 2018.**
Q And how long did you stay when you would go down there? Can you give us a general rule? A couple days? A couple weeks?
A **Anywhere from several days to several weeks at a time. And sometimes I would leave and come**

Page 66

right back for another extended stay.
Q And you've given me some -- sorry.
You gave me photos and I was just talking about them off the record. I call them the second supplemental production, August of 2020, that appears to show animals in a natural or outdoor environment. And we went over those earlier today. Are you with me so far?
A Um-hmm.
Q Yes?
A Yes.
Q And many of those pictures you took while at the Florida facility?
A Correct.
Q And we're going to identify for counsel those pictures specifically, particularly of the Florida facility and so forth, but also of the pictures you took of the destruction post-raids, correct?
A Correct. I also have photos of the Stevens Point and working with Terry at Art Asia.
Q Okay. And those are I think in the educational subfile?
A Correct.
Q We'll let counsel know which pictures are

Page 67

yours.
What do you know about Terry Cullen as we sit here in terms of his expertise or reputation in the reptile world?
A He's incredibly well respected in the international community zoologically speaking and specifically for crocodilians among other animals. He's a part of the CSG, Crocodile Specialists Group. He's been integral in working with a number of species-specific programs and heading a number of those programs for, you know, species-specific endeavors. He is very well connected amongst the animal community, the zoological community, on and on and on. And he has spent his life dedicated towards caring for animals, helping animals, helping people with their own individual animals, and a profound amount of research on a varying number of topics all, again, related to zoology.
Q Earlier you mentioned that Mr. Cullen discussed with you the transportation of animals to Florida.
A Um-hmm.
Q And what do you specifically recall about your

Page 68

discussions?
A I remember discussing it, as I've said, that winter of early 2010. It was more or less in passing, just something to plan for the future.
And then again, I was very excited to receive that phone call in May of 2010 asking me when I would be around. I was very pleased to be included on that.
Q In terms of specifics, did he mention any specifics, or was it just a general, hey, we're going to need your help?
A It was we're going to need help packing, moving, loading up vehicles. They were going to have multiple vehicles with qualified people, they were going to have climate control, you know, abilities. And obviously, they needed people who were aware of animals and reptiles who could safely pack them for the journey.
Q And you mentioned something about the Chinese government. Could you tell me what you know about that again?
A I remember that it was the first time any monumental work was going to be done with the Chinese government to protect the Chinese

Page 69

alligator. Terry had connections therein to get the meeting underway and to, you know, progress such an endeavor for crocodilian conservation for the Chinese alligator.
And that -- it was just a momentous occasion to actually have this happen between such a government to the point where they were actually friendly and working together and seeing -- you know, having a broad scope, having a broad vision towards, again, preserving such a fascinating creature that is critically endangered.
Q I know you mentioned the UW Stevens Point -- what do we call it? -- outreach education program?
A Educational, yes.
Q Besides that, are you aware of any other educational programs that Dragonwood has done up until 2020?
A Numerous. Beyond -- like we could be here all afternoon. A number of occasions at different animal events or reptile shows, also a number of occasions at pop culture fests like sort of like a MegaCon or a public outreach also in places such as Humane Society in Florida

Page 70

outreach, a number of local areas around the state of Florida and then branching out from there.
Q Were you involved in any of those educational outreach programs?
A Numerous. I would -- a number of times I've flown to Florida to be involved in such things, one of them being at Daytona Reptile Expo in Florida. But without -- but I was only -- anything that I was part of, numerous more took place without my assistance.
Q Right. How many times would you estimate you actually were involved with Dragonwood and the educational outreach?
A Dozens?
Q Dozens? I was going to say ballpark it. A couple? Couple dozen?
A Several to many. I mean, I would really have to think about that. But, yeah, the NARBC shows. Yeah, yeah. And then going to Florida.
Q Okay. What, if any, knowledge do you have about Mr. Cullen and/or Dragonwood being involved in accepting sick or injured animals and rehabilitating them for release to the wild?

Page 71

A One more thing to add to the previous question. That even without my presence, part of what is adding to my personal involvement in the number of educational presentations was that even without my presence I would also -- I would still help coordinate, I would still help do things remotely.
Q Okay. What do you know about the rehabilitation of injured or sick animals that was provided by Dragonwood and/or Terry Cullen?
A Again, unbelievably extensive. There are numerous anecdotes or numerous offshoots of horribly, horribly injured or, you know, near-death animals arriving in Terry's care, which he was able to turn around.
A really great one -- or a really great story rather, unfortunately, was a yacare caiman that came into Terry's possession from a zoo that they did not want on the records to have died. So they sent Terry it with a broken back among a number of other injuries, which Terry was able to recover, and it's now actually a breedable animal to preserve that lineage and those genetics.
I also know of numerous stories

Page 72

around the community in Milwaukee of people needing assistance with their pet and Terry was always -- again, I was one of those people. Terry was always welcome to offer his expertise, offer his knowledge, administer care in a number of ways, and not charge anything or request -- you know, it was all done just for the love of the animals.
And that is something that has been imparted upon me with knowing Terry is a sense of community and a sense of working together and a sense of caring for animals. You know, if you care for animals, I care for animals, we have common ground and we can all work together to -- to do good things.
Q Are you aware of the humane society using the services of Dragonwood or Terry Cullen?
A Yes, quite extensively. I know that the -- he logged numerous, numerous hours with the Humane Society of Wisconsin.
Q Where would most of the rescue -- I call them rescue animals -- where would they come from?
A From all over. People that were -- animals that were found, animals that -- they could be wild animals that were injured or, you know,

Page 73

found injured that needed rehabilitation, they could be pets that were no longer wanted or otherwise surrendered to any number of bodies or people that would then give them to Mr. Cullen.
I recall a time that a number of crocodilians had been fed buck- -- roadkill or -- hunters were killing animals and then feeding their crocodiles or crocodilians animals that had buckshot in them and then obviously had lead poisoning from that and then were given to Terry to recuperate saying I don't know what's wrong with these animals. Well, they have been eating -- they have literally been eating lead. And Terry was able to recuperate them to the best of his ability.
Q Your CV mentioned you have successful breeding experiences with reptiles, arachnids, and insects; is that fair?
A That is correct.
Q And you observed the breeding in Dragonwood Florida?
A Yes. Yes. Extensively.
Q What is your impression from being there as to the breeding operations of Dragonwood Florida?


Case 2:16-cv-00534-NJ Filed 05/20/21 Page 19 of 37 Document 194-45

Page 74

A It's actually one of the -- the top organizations in existence certainly in the country, if not in the world, for crocodilian conservation, crocodilian breeding, especially with endangered species and animals that are incredibly rare and hard to find.

And along with that, it's not just breeding animals. It's also breeding animals with clean genetics; they're not being inbred, they're not being hybridized. We keep very good records with -- you know, we're very aware and very concerned about lineages and bloodlines, making sure animals have pure -- pure genetics and are outbred as opposed to being inbred.

Q What, if any, information have you gleaned over the years from the Dragonwood Florida and/or Mr. Cullen in terms of research, animal -- research relating to the animals?

A Again, extensively. There are a number of things that come to mind. Ongoing plans and projects to understand the musculature of large constrictors, primarily anacondas. It's a fascinating topic in the sense that they can lie torpid or, you know, not moving, where --

Page 75

if a mammal or a human did such a thing, our muscles would atrophy, whereas within a reptile it's not the case. So that is an ongoing plan that we're set -- that was being set up by Mr. Cullen.

Things that were ongoing while I was present at Dragonwood would be a study with osteolaemus, the taxonomy therein of African dwarf crocs that would otherwise distinguish one, if not two, new species of crocodilians that were previously all thought to be one species.

(Discussion off the record.)

BY MR. MURPHY:

Q Okay. Continue.

A So, yes, the African dwarf croc taxonomy study and then working with endothermy within crocodilians, primarily Tomistomas. And then also extensive, extensive research involving reptile nutrition and just a varying number of degrees how that could be applied for breeding and propagating or overall general animal health or in terms of medical care, any sort of how nutrition plays into the life of a reptile. There could be numerous studies therein.

Page 76

Q Were you involved in any of the animal care in Milwaukee?

A No.

Q You had one reptile that was seized from Cullen's -- from one of the premises and was not returned to you, correct?

A That is correct.

Q And did you attempt -- did you try to get your reptile back?

A I did.

Q Could you briefly describe your efforts?

A I -- my father and I went to MADACC in the summer of 2010 trying to receive back a lizard that was mine, and I was -- I spoke with several people there and was ultimately denied ever receiving my -- my animal back.

Q In the basement -- strike that.

In any of the buildings, what, if any, standing water did you observe?

A In the basement of 13th it seemed as though there were puddles. It was very dark, but I definitely noticed a water line as well as like receding water that was still present in the basement of 13th while I was there as we previously discussed. I also -- in conjunction

Page 77

with that basement, we could no -- we had to go back up around the way we came, and we had to be very careful to remember not to try to access the basement again through the courtyard, because the staircase was no longer there; it had been ripped out and thrown into the courtyard. So there was effectively a doorway to nowhere, which was quite dangerous.

Q Given your knowledge of this case and your preexisting knowledge of Terry Cullen and Dragonwood, did you observe or have any opinions about how this case has impacted the Florida facility?

A Just in a matter of, you know, emotional and financial stress. Terry was not able to devote as -- you know, all of his time and energy the way he was supposed to or would have liked to.

Again, just so much of this has been tied up in being around Milwaukee where he doesn't want to be tied up in all of these legal dealings. And that has put obvious, you know, understandable strain, you know, with his hands tied behind his back being unable to -- he's trying to operate in two different worlds, operating in this legal world and figuring all

Page 78

this out and then obviously his dedication to his calling being conservation and education.
Q Have you noticed any change in Mr. Cullen's personality?
A It -- again, I'm happy to say that I knew him back when I did. But yes, I mean, he's been under a decade -- a decade worth of stress. I can document emotional traumas. At one point he was very, very reluctant to mention -- or it seemed like something was off or that one of his eyes was bloodshot, and he didn't want to mention what had happened. And it actually occurred that it was a night terror after I had, you know, slowly kept inquiring but in a careful manner. Again, it's just been one instance after another.
I can recall a number of phone calls, again, later in my college career just calling to check up on him just to wonder how he's doing. Again, someone that I would think of as a mentor, someone that I would want to learn from someday for his body of knowledge, but in that current moment it wasn't about me trying to learn; it was about trying to maintain that he could stay alive, stay around,

Page 79

stay functional. Because his life had absolutely been ruined, had been ripped apart both physically and financially and, you know, on and on and on and on and on.
Just so many of the animals that he had had so much potential, so much of his life goals and -- again, just a complete apocalyptic event that would obviously cause horrible damage to Mr. Cullen.
Q Have you received any repercussions because of your affiliation with Mr. Cullen?
A Yes. So in general, after the raid people were incredibly wary of Mr. Cullen who didn't otherwise know him previously.
Again, within the international community he was in very high regard always, but the -- it's two things. There's a general sense of, oh, that person knew Terry Cullen. Or like walking around Stevens Point, my friends who had previously been overjoyed to have met him and to have seen the animals that he brought and commenting on their fantastic care suddenly wouldn't mention his name, suddenly would just -- it was very taboo all of a sudden.

Page 80

There was a general sense of that all the way around at trade shows or the educational events that we would otherwise attend. The people that knew Terry the best were all saying, oh, my God, what happened to you, so happy to see you. But anyone else who wasn't aware or hadn't previously been involved with Terry were suddenly completely shut out or completely unwilling to -- it was very hard to get through to people after they had seen what was reported by the news.
But then more specifically, myself from the University of Stevens Point I was involved in the animal lab there as a volunteer, and I was -- again, part of what I was looking to do was -- was be involved in taking care of those animals. And Dr. Eric Wilde who was partly overseeing that facility wound up threatening to take me away because of my association with Mr. Cullen.
Q I forgot to ask you. We talked about your observations of water in the basement at 13th. Did you observe water in the basement at any other of the buildings?
A I observed water damage. I believe the water

Page 81

damage from -- at 17th the water had already evaporated into the floorboards or into the building itself, because it had been, again, weeks if not months -- yeah, months since the tanks with the snakes in them had been dumped on the floor.
So I observed water damage, but there was -- and along with that, there's been significant damage to the drain system at 17th, which has caused significant flooding, and there are water lines that can be seen. And that has been ongoing ever since the raid. So the drain system at 17th is horribly -- there's massive problems. And that's also leading to the foundation. So water actually leaks through the foundation as well as up through the drain, which should otherwise -- obviously, it's a drain -- should have water flowing down it.
Q Have you seen dermestid beetle colonies?
A I have. I have.
Q And, in fact, have you seen any in Milwaukee or in Dragonwood Florida?
A I have not seen any dermestid colonies under Mr. Cullen's care, although I'm aware that he

had one. And that -- other than in Milwaukee, I was actually aware of the dermestid colony a part of the Milwaukee Public Museum. So I had witnessed -- I had been in that -- they actually had a dermestid room.

Q And where was the dermestid room for the museum?

A It was on a rooftop, like a rooftop terrace because of, again, wanting it to be ventilated. But, again, it was much more of a shanty or a space just to keep the bugs, nothing -- no frills about it. And it was basically a room of -- of tanks with insects in it and, obviously, specimens that they were trying to preserve for, you know, museum and scientific purposes for education and anatomy.

Q Okay.

A There was not -- yeah, it seemed like it wasn't -- it was very utilitarian. It was very straightforward. No frills, nothing particularly -- sanitary, but also just a utilitarian space.

Q With the dermestid beetles that you've seen being used, was it part of a clinically clean operation?



A I would say no. It was a utilitarian space at best. But, again, it served -- it perfectly served its purposes of what they were intending to do, which was create biological, zoological specimens.

Q And you actually have seen a picture of a skeletonized reptilian of some sort, a crocodilian in this case, right?

A Correct.

MR. MURPHY: And we'll point that one out to you, Counsel, that in his opinion it appears to be consistent with a dermestid beetle operation.

MS. HOUGH: I'm going to object. I don't have a copy of this photograph, it's not listed as an exhibit in any way, so there's no reference point.

MR. MURPHY: All right. Slow her down. I'll get it out for you then. I was going to have him make a list of it. You gave me the picture for crying out loud.

MS. HOUGH: Right. But you're referring to it in a deposition that I -- you know, I --

MR. MURPHY: Right, well --



MS. HOUGH: I can't do any follow-up, so --

MR. MURPHY: I'm assuming you're going to do some follow-up questioning.

MS. HOUGH: Um-hmm.

MR. MURPHY: And then I'll include that picture in reference to this line of questions. Do you want it right now?

MS. HOUGH: Yes, please. And can we mark it as an exhibit?

MR. MURPHY: Sure.

If we're agreed you're going to ask more questions of him at a later date, why don't I just --

MS. HOUGH: Well, I have a couple follow-ups, too, based on the questions you just asked, so --

MR. MURPHY: Right. But I'm saying if that's what we're going to do, I'll get it all together and get it to you.

MS. HOUGH: Okay.

MR. MURPHY: All right.

EXAMINATION

BY MS. HOUGH:

Q So I just have a couple of follow-up questions



for you. Mark had asked you questions about a lizard and trying to retrieve that at MADACC. And I just want to clarify. So this was a lizard that Mr. Cullen had that was yours?

A That is correct.

Q Okay. As we went through your visits with him between the years of 2000 and 2010, which one of those visits did you give him a lizard?

A That wasn't at any one of those visits. It was actually after I went to college, the lizard came into Mr. Cullen's care.

Q And how did you get that lizard to Mr. Cullen?

A It was -- it was actually at the Mitchell Park Domes. And then the Mitchell Park Domes originally wanted it for their education, and then were unable to care for it, and so then it went to Mr. Cullen and he watched over it for me.

Q So you had arranged for the Mitchell Park Domes to get a lizard to Mr. Cullen?

A It wound up happening that way, yes.

Q Okay. So this was --

A I believe Mr. Cullen may have been at the Domes, which was a place that he had already been helping out or, you know, contributing



Case 2:16-cv-00534-NJ Filed 05/20/21 Page 22 of 37 Document 194-45

Page 86

**expertise to and doing educational shows potentially. And then after already being there and seeing that he knew that that -- that the lizard that was mine was there at the Domes, it worked out between him discussing there that then he would take the lizard.**
Q So you had conversations with Mr. Cullen about your lizard and taking it from the Domes sometime between 2009 and 2010 outside of the interactions you testified to?
A **Correct. Yeah, it would have been while I was in school, so over the phone.**
Q Okay. And then just a couple of follow-up questions.
Mr. Murphy asked you about your work with the Dragonwood Wildlife Conservancy. You've been the assistant director since 2012, correct?
A **I was -- I was the assistant director within that time. That should be said that the 2012 through 2020 is for as long as I've been assisting there.**
Q So you have not been the assistant director that entire time?
A **That would be correct. That should be --**

Page 87

Q How long have you been the assistant director?
A **I should -- it should be stated that I was the assistant director -- let's see. I would have to say 2014. 2014/2015.**
Q Until present?
A **After having -- again, I apologize. I realize that now.**
Q That's okay.
A **Yeah. So the 2012 to 2020 is the extent of my involvement specifically at the place. It should be two separate. It should be two separate points.**
Q Okay. So you then -- so your CV should reflect that you've been assistant director since 2014/'15?
A **Again, I would want to --**
MR. MURPHY: Well --
**THE WITNESS: Again, I would want to review that further, but yes.**
BY MS. HOUGH:
Q Okay.
A **Let's say -- let's say upon my graduation with my biology degree and then spending more time in Florida, which would have been post- -- about midway through 2014, that is when I --**

Page 88

**that's when I was with --**
Q So you'll have to take a look at that CV and make some corrections?
A **This one correction.**
Q Okay. And then how much does Mr. Cullen pay you as assistant director?
A **Nothing.**
Q Nothing.
A **Correct.**
Q So your annual salary as assistant director of the Dragonwood Wildlife Conservancy is nothing?
A **It is nothing. It's a nonprofit organization.**
Q Okay. Who is the director of the Dragonwood Wildlife Conservancy?
A **Mr. Cullen.**
Q Okay. And are you aware of any other employees of the Dragonwood Wildlife Conservancy?
A **I'm aware of Brad Valle.**
Q And what does he do?
A **Day-to-day management.**
Q Okay. And where does he work?
A **On site at the Dragonwood Conservancy.**
Q In Florida?
A **Correct.**
Q And as assistant director, what are some of

Page 89

your daily duties?
A **General oversight.**
**Again, I'm not there, so it's remotely, but it's just a general understanding of the facilities, maintaining any sort of records or photos. At one point I compiled an inventory; this would have been a few years ago. And then also managing communications for the Dragonwood Conservancy and then relaying that information to Terry.**
Q Do you maintain any documents for the conservancy as an assistant director?
A **I'm not entirely sure. What do you mean by documents?**
Q So do you do any accounting for the Dragonwood Wildlife Conservancy?
A **No. Not that I'm aware of.**
Q Okay. Okay. Do you know who the president of the Dragonwood Wildlife Conservancy is?
A **I believe that would be Mr. Terry Cullen.**
Q And do you know if he has been the president of the Dragonwood Conservancy since 2014, since you became assistant director?
A **Yes. Yes.**
Q Okay.

Page 90

A **So I've been an assistant to Terry Cullen in his endeavors for the Dragonwood Wildlife Conservancy.**
Q And Jane Flint, has she been the president during the time you've been the assistant director at all?
A **Not that I'm aware of, no.**
Q Okay. What about Forrest Fanning? Has he been an officer of the Dragonwood Wildlife Conservancy since 2014 when you became assistant director?
A **He was a board member. He was vice president as far as I know.**
Q Okay. So the structure then would be Forrest Fanning and Terry Cullen and no others?
A **I'm not entirely sure at the time.**
Q Okay. Okay. I have no other questions at this time.
A **All right.**
MR. MURPHY: All right. Do you want to pick out an adjourned date for this?
MS. HOUGH: Well, I want to review the photographs first because I want to see what is in his inventory.
(Discussion off the record.)

Page 91

MS. HOUGH: So we're back on the record. We just had a conversation that Mr. Murphy is going to go over photographs that Mr. Raasch has taken that relate to this case in 2010, he will be providing me with those photographs. And we are adjourning out some additional deposition to be taken after I've had an opportunity to review those, and that will occur on September 9th at 2:30 in the afternoon.
MR. MURPHY: That's agreed. Thank you.
(Proceedings adjourned at 4:51 p.m.)
(Exhibit No. 46 was marked.)

Page 92

STATE OF WISCONSIN )
) SS:
COUNTY OF MILWAUKEE )

I, Sarah A. Hart, RPR, RMR, CRR, and Notary Public in and for the State of Wisconsin, do hereby certify that the preceding deposition was recorded by me and reduced to writing under my personal direction.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof, I have hereunder set my hand and affixed my seal of office on this 9th day of September, 2020.

SARAH A. HART, RPR/RMR/CRR
Notary Public
In and for the State of Wisconsin
My commission expires October 9, 2023.


Case 2:16-cv-00534-NJ Filed 05/20/21 Page 24 of 37 Document 194-45

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

DRAGONWOOD CONSERVANCY, INC.,
PLEGUAR CORPORATION,
TERRY CULLEN,

Plaintiffs,

-vs- Case No. 16-CV-534

PAUL FELICIAN, et al.,

Defendants.

---

Examination of REX RAASCH, VOL. II, taken at the instance of the Defendants, under and pursuant to the Federal Rules of Civil Procedure, before Sarah A. Hart, RPR, RMR, Certified Realtime Reporter, and Notary Public in and for the State of Wisconsin, with all parties appearing remotely via Zoom web conference, on September 9, 2020, commencing at 2:40 p.m. and concluding at 3:46 p.m.

A P P E A R A N C E S

LAW OFFICE OF MARK P. MURPHY, by
MR. MARK P. MURPHY
657 South 72nd Street
Milwaukee, Wisconsin 53214
appeared via Zoom web conference and present with the witness on behalf of Plaintiff.

MILWAUKEE CITY ATTORNEY'S OFFICE, by
MS. HEATHER HOUGH
841 North Broadway, 7th Floor
Milwaukee, Wisconsin 53202
appeared via Zoom web conference on behalf of Defendants.

* * * * *

A L S O P R E S E N T

Ms. Nichole Williams, paralegal, present with the witness



* * * * *

I N D E X


| Examination By: | Page |
|---|---|
| By Ms. Hough | 96 |
| By Mr. Murphy | 134 |
| By Ms. Hough | 138 |

| Exhibits Identified: | | Page |
|---|---|---|
| Exhibit 46 - | Photographs | 96 |


Disposition of Original Exhibit:
Attached to Original Transcript.



TRANSCRIPT OF PROCEEDINGS

REX RAASCH, called as a witness herein, having been first duly sworn on oath, was examined and testified as follows:

MS. HOUGH: Mark, who is in the room with you just so we can get that on the record?

MR. MURPHY: Nichole is in and out, on the phone, that's who you -- no, she's out. And just Rex and I.

MS. HOUGH: Okay. And Mr. Cullen is not with you today?

MR. MURPHY: If he was, I would have said it.

MS. HOUGH: Okay. Just checking. All right.

EXAMINATION

BY MS. HOUGH:

Q So hello, again, Rex. Thanks for continuing this.

I am going to be referring to Exhibit 46. Exhibit 46 is a file with photographs in it.

There is one file with 172 photographs. And there is another file, and that file folder is called "Terry Destruction,"



and within that folder there are another 68 photographs.

**A Um-hmm.**

Q I am asking if you've had an opportunity to review the photographs that were contained within this exhibit. So this would be the 172 photographs and then the separate folder entitled "Terry Destruction" with 68 photographs.

**A Yes.**

Q Okay. And on the record I'm asking you under oath if all of these photographs are photographs that you have taken?

**A As far as I know, that's correct.**

Q Okay. So I'm not going to go through every single one, but I am going to recite a file name and ask you questions about those photographs contained within this exhibit. Okay?

**A Okay.**

Q Okay? And if you need time --

**A Yes.**

Q -- to review the photograph to refresh your memory, feel free to take that time.

And if you need a break at any

Page 98

time -- this shouldn't take that long, it shouldn't be as long as the last deposition, but if you need a break at any time, please let us know and we can take that break, okay?
A **Okay. All right.**
Q So the first photograph I want to bring your attention to in my Dropbox is picture No. 1 of 172, but the file name is PIC 1-R BOTH.PDF.
A **Okay.**
Q All right. Do you have that one up?
A **Yes.**
Q Okay. So it looks like there are two photographs side by side -- and I'm just going to describe it a little bit for the record -- of plastic containers?
A **Um-hmm, yes.**
Q Do you recall when you took these photographs?
A **I would have to go back and review my -- my files.**
Q Okay. Do you recall where you took these photographs?
A **I believe the photo on the left would be in the basement of 13th Street. Strike that. I'm wrong. The basement of 17th Street. Left, 17th Street. I just said the wrong number.**

Page 99

Q Okay.
A **And the photo on the right being in the basement of KK.**
Q Of KK?
A **Yeah.**
Q And these were taken -- now, I know you don't know the exact date, but you believe they were taken sometime in the year 2010?
A **I believe the photo on the right was taken in 2010. And the photo on the left, again, I would have to check.**
Q Okay. So the photos depicted here in this one image are from two separate locations?
A **Correct.**
Q Okay. And do you recall why you took photographs of plastic bins?
A **I was just stating what was in the space and also documenting the amount of new enclosures that Mr. Cullen had or new storage units Mr. Cullen had. So the bins on the -- on the left in particular are made for -- for animals, among other things.**
Q Okay. And the bins on the right are for animals?
A **Not particularly, but they could have that**

Page 100

**purpose.**
Q Okay. And did Mr. Cullen ask you to take these pictures?
A **I don't exactly remember, but I know that I was just there documenting what was there and creating a record for -- to have a record.**
Q Do you recall why you needed a record of plastic bins used to contain animals?
A **I don't -- I don't think there was a reason not to. It was just a matter of documenting what was in the res- -- what was in the space.**
Q Okay. All right. All right. Now --
A **And I guess you could also say to establish just, yeah, again, the care, the amount of money invested and the level of dedication to caring for the animals.**
Q Okay. And this is something you wanted to document or --
Was this something you wanted to document?
A **Yes.**
Q Was this something you were asked to document?
A **Not any specific way. Just a matter of I was there, I had a camera, and I was documenting things.**

Page 101

Q Okay. Now I ask you to refer to another image. This one is entitled PIC 1-R TOP ANACONDA.PDF. And within the Dropbox it is image No. 3 of 172. Let me know when you're there.
MR. MURPHY: I might have messed it up for you. There, does that help?
**THE WITNESS: So it seems like this has multiple pages.**
BY MS. HOUGH:
Q Correct.
A **So it's the second page.**
Q So I will describe to you what I'm seeing, and then you tell me if it's the same thing that you're seeing.
There are -- so it is one PDF, but within this one PDF there are a number of images; the top appears to be of a brick and cement structure with a statue on top?
A **Correct.**
Q And then there's a chair. And then there is a wooden or it could be a metal locker-like-looking storage container with other items. And then there is a snake and then there is another snake and then there is another snake.

Page 102

Is that what you're seeing?
A **Yes.**
Q Okay. And you took all of the images captured in this?
A **That is not correct. So these are compilations, and I was trying to document amongst the compilation which photo I took within the compilation.**
**So of these six photos here, I took the top photo on the second page. So there's a photo of a green anaconda in a travel -- you know, a travel crate let's say.**
Q Okay.
A **A plastic bin with newspaper underneath it --**
Q Okay.
A **-- in that photo.**
Q And that is the only photo of these that you took?
A **As far as I can recollect, yes.**
Q Okay. And do you --
MS. HOUGH: Can we go off the record for a second so I can chat with Mark?
MR. MURPHY: Yeah, sure.
(Discussion off the record.)

Page 103

BY MS. HOUGH:
Q So just for the purpose of the record, we were off the record and I got clarification from Attorney Murphy that in some of these images there are multiple photographs included, but the file name describes which of those images Rex Raasch took himself.
So, for instance, right now we are on picture -- or file 3 of 172, and the file name is PIC 1-R TOP ANACONDA. R meaning Rex Raasch. Top anaconda is the image that Rex took.
MR. MURPHY: Correct.
MS. HOUGH: Hopefully that is clear for the transcript.
BY MS. HOUGH:
Q Okay. So getting back to that image, then, Rex, do you recall when you took this picture of the snake -- the anaconda?
A **Yes. So that would have been my second semester in Stevens Point. This was during the educational presentation that Terry came to give at the University of Stevens Point.**
Q Okay. So this was not in 2010?
A **This was in later 2009.**

Page 104

Q Okay. Okay. If you go now to in the Dropbox it is image 14 of 172, and that image is entitled R DRAGONWOOD - AFRICAN ROC.
MR. MURPHY: R -- let's see. Dragonwood African Croc, C-R-O-C?
BY MS. HOUGH:
Q Yep. Yep.
A **Dwarf croc?**
Q Yep. So are you viewing an image where there is a crocodile head peeking out of some water?
A **Um-hmm.**
Q When did you take this image?
A **Again, I would have to check my records specifically, but this would have been post-2010 in Florida.**
Q In Florida?
A **Um-hmm.**
Q So this was not at any of Mr. Cullen's -- any of the properties affiliated with Mr. Cullen in Milwaukee, Wisconsin?
A **Not that I'm aware of, no.**
Q Do you recall if this photo was taken because of your role as a director of the Dragonwood Conservancy?
A **I wouldn't necessarily say it had anything specifically to do with my role. It was just a matter of, again, being a -- someone who's documenting things, someone who is taking record of things.**

Page 105

Q Okay. And why did you want to take a record of this particular crocodile?
A **I took many photos of all my trips being there. And in this case particularly I thought it was just a nice, casual photo of this dwarf crocodile relaxing in her enclosure. I was happy to see the animal, I was excited to be there. It's not something you can see very often. So, yeah, I was happy to be there with my camera.**
Q Okay. So is it fair to say you were only recording this for purposes of being somebody to enjoy reptiles?
A **That, and also just to document what it's like at the facility that Terry runs. Obviously, I enjoy reptiles, I was happy to see the animal, but it was also -- it's not just any animal anywhere. It's specifically under the care of Terry Cullen.**
Q Okay. And were you asked to document animals under the care of Terry Cullen?

Page 106

A Not particularly in any specific manner. Again, I was there with the camera.
Q Okay.
MR. MURPHY: Asked and answered.
BY MS. HOUGH:
Q So now let's go to image No. 58 of 172 in the Dropbox. And I will tell you the image file, R P1050365.
A Could you repeat that again?
Q Sure.
A P10 --
Q P1050 -- hand on real quick. P1050365.
A All right.
Q Okay?
A Um-hmm.
Q So are you looking at a photograph of what appears to be a red lid of some kind?
A I am.
Q Okay. And this image, do you recall when you took this photograph?
A Not particularly. I would have to check.
Q Okay. Can you approximate what year you might have taken this photograph?
A Generally speaking, I would say it would have been between 2011 and -- I don't -- a broad

Page 107

spectrum between 2011 and 2014.
Q Okay. And do you recall where you took this photograph?
A Again, I can't see anything else around it, so I would have to -- I'm not sure.
Q Okay. And does this -- in viewing this image, do you recall why you took this photograph?
A I believe it was documenting damage that had been done to Mr. Cullen's property, you know, him having this lid.
Q So just to summarize, sometime between 2011 and 2014 you may have taken this picture to document some kind of damage?
A As far as I know.
Q Okay. And do you recall if anyone asked you to take this photograph?
A I don't recall, no.
Q Okay. All right. Let us now -- moving on down the line, if you want to go to -- there's an image, and the file name is R P6170337. And in the Dropbox it is photograph 75 of 172.
A That was 337, the final numbers?
Q Yes.
A Okay.
Q Okay?

Page 108

A Um-hmm.
Q Are you viewing an image of what looks like some cords and perhaps tools?
A On a black and white stack of what looks to be shelving, something like that?
Q Yes.
A Yes.
Q Do you recall when you took this image?
A I believe I took that image in the summer of 2010.
Q And do you recall where you took this image?
A This would be in the basement of 17th.
Q And do you recall why you took this image?
A Same reason for the other images. I was there with the camera and documenting what was in the space at the time.
Q Okay. And do you recall what in particular you're trying to document with this image?
A Basically what was in front of my camera while -- while snapping the shutter. And particularly what's underneath the number of tools that Terry had was also -- the shelving units are actually components for creating snake enclosures. They were highly expensive articles for reptile care.

Page 109

So, again, just documenting that he did have those, putting in the effort to -- you know, he was planning on installing these snake enclosures before the raid happened.
Q Did he tell you he was planning on installing these snake enclosures?
A Yes. Yes. That was something that we had previously discussed before the raid.
Q Okay. And did he ask you to take this picture to document the materials he was planning on installing?
A I don't remember if he specifically asked me to do that, but I was there with my camera.
Q Now moving on down the line, bear with me. If you would please turn your attention to photograph R P7140 -- oh, my eyes are so bad, 0032. Let me get my readers. Yes, RP7140032. And in the Dropbox that is image 110 of 172.
Does this image -- so it's the brick structure with the statue on it?
A Um-hmm.
Q Is this an image that you took?
A I believe so.
Q Okay. And do you recall when you took this?
A Again, this would have been in the summer of

Page 110

**2010.**
Q Okay. And do you recall why you took this?
A **To be honest, I don't, other than being there and I -- either wondering what the rubble was on the porch or around the edge or just, again, a document of the property itself.**
Q Okay. And what property do you recall this was at?
A **I believe this is the front porch of 17th Street.**
Q So it is your recollection that you took this photograph sometime in 2010 --
A **Correct.**
Q -- of this -- okay.
Now go back to the image PIC 1-R TOP ANACONDA.PDF.
A **Right, yes.**
Q So we were already there. It was one of the first images we discussed. And you had stated that the only image from here that you took was of the snake -- the anaconda in the container.
There is an image on the top of that same structure with the gargoyle. You did not take that photograph?
A **Not to my recollection, no.**

Page 111

Q Okay. I am going to go to -- the image is R P7140037. And this in the Dropbox is 113 of 172.
A **Um-hmm.**
Q Okay. It looks like a bathroom?
A **Correct.**
Q Correct. Okay.
Do you recall where you took this photograph?
A **I believe I took this photograph at KK.**
Q At KK. And do you recall when you took this photograph?
A **This would have been the summer of 2010.**
Q Okay. And do you recall why you took this photograph?
A **I was there with my camera, I was documenting what was -- what the state of the property was.**
Q Okay. And just going back to your previous deposition, just to clarify, before 2010 you had never been to the KK property?
A **That is correct.**
Q Okay. So were you told to take a picture of this damage?
A **I don't remember being specifically told to take this picture, but I did take the picture.**

Page 112

Q Okay. Did you assume it was some kind of damage from the warrant that was executed at the property?
A **I assumed that it was worth taking because I took it; it seemed --**
Q Okay. Were you told that this was damage done during the warrant?
A **I don't remember specifically, but I do remember that the house was in a state of shambles or quite messy because of the raid, and this is indicative of being quite messy.**
Q Okay. I am going to ask you to look at the image -- and the full name is R P7140050. In the Dropbox it is image 121 of 172. And it is -- what I'm looking at, it looks like some DVDs and a VHS?
A **Um-hmm, correct.**
Q Is that what you're looking at?
A **That is what I'm looking at.**
Q And you took this photograph?
A **I did take this photograph.**
Q Okay. Do you recall when you took this photograph?
A **I believe it would have been in the summer of 2010.**

Page 113

Q Do you recall where you took this photograph?
A **I believe it would have been at KK.**
Q And do you recall why you took this photograph?
A **I honestly don't. I don't remember why I took this photograph other than I do think that I took it.**
Q Okay. And, again, I'm not going through all of those; I'm just trying to locate the images that I had questions about.
A **Understood.**
Q Image R P7140084. And that would be image 142 of 172 in the Dropbox. Let me know when you have the picture up. It looks like a Sponge Bob bathroom.
A **Yep, I'm still looking at it.**
Q Do you recall when you took this photograph?
A **I believe it would have been in the summer of 2010.**
Q And do you recall where you took this photograph?
A **I believe it would have been in the -- at 13th Street.**
Q And do you recall why you took this photograph?
A **I was there with my camera.**
Q Were you told to take a picture of the

Page 114

bathroom?
**A Not particularly. I was -- I was there with my camera.**
Q And you just took a picture of the bathroom?
**A I had my camera out, I had been taking other photos. We had just actually --**
MR. MURPHY: We've kind of asked and answered this.
MS. HOUGH: Okay.
MR. MURPHY: If you could just say "yes," that will save a whole page of transcript costs. So yes or no, that's fine. If you have to explain, she'll ask you.
BY MS. HOUGH:
Q Okay. So in this image you'll see in the mirror the image of Terry Cullen. Is that Terry Cullen in that photograph?
**A I couldn't fully say.**
Q Okay. Do you recall if he was walking around with you while you were taking photographs of his property?
**A We were at -- we were at the property.**
Q Okay. So was he walking around with you as you were taking these photographs?
**A He was there at the property. I'm not -- I**

Page 115

**can't entirely remember where he was.**
Q Okay. Now I am going to go to the folder in the Dropbox that is called "Terry Destruction."
So I don't know if this is in a separate spot for you, Mark, but there are 68 photographs in this folder.
Okay. So the first photograph I am going to go to is photograph 2 of 68. And this is called -- the file is R KK TERRY BEDROOM. And let me know when you have the image up. It looks like a laundry basket, some cardboard boxes.
MR. MURPHY: We got it.
**THE WITNESS: Um-hmm.**
BY MS. HOUGH:
Q Okay. And this is an image you took, Rex?
**A As far as I can recall, yes.**
Q Okay. Do you recall where you took it?
**A I believe this would be at KK.**
Q Okay. Do you recall why you took it?
**A Again, stating what the -- the state of the property was at the time.**
Q Okay. Did you -- when you took this photograph, did Mr. Cullen tell you where he stored these things prior to the date you took

Page 116

the photograph?
**A Not specifically other than the room was clean. He was apologizing for the state of the -- the condition of everything post- -- post-raid.**
Q Was he embarrassed by the condition?
**A That's -- it's hard to put a word to it. I mean, it was devastating.**
Q Okay. But he allowed you to take photographs of the condition, correct?
**A Correct.**
Q And did he describe to you where things were prior?
And maybe that's too broad. So I'll just go through some images and ask you that specific to the image. So disregard -- strike that question.
I am going to go to image R P7140045. This is in the Dropbox in the Destruction folder image 37 of 68.
MR. MURPHY: Ending in 45?
MS. HOUGH: Yep, ended in 45. It's some books.
MR. MURPHY: Yep. Got it.
BY MS. HOUGH:
Q Do you recall when you took this photograph?

Page 117

**A I believe that would have been in the summer of 2010.**
Q And do you recall where you took this photograph?
**A I believe I took this at KK.**
Q And do you recall why you took the photograph?
**A To document what was at the property and particularly what books were on the shelf.**
Q Okay. So when you went to the property, you were documenting damage and items -- and random items?
**A Documenting the damage and documenting the general property that was there on the premise.**
Q And these books?
**A I did take a picture of the books, yes.**
Q Was it a picture you were asked to take?
**A Not that I can recall.**
Q Okay. If you want to go to image R P7140051, this is in that Destruction folder, Item 40 of 68. Looks like an image of a lamp on the floor, a box on the floor, some random household items.
**A RP7 --**
Q 140051.
MR. MURPHY: Probably can just do

Page 118

the last two numbers, but that's all right.
BY MS. HOUGH:
Q Okay. Do you recall when you took this image?
**A I believe I took this in the summer of 2010.**
Q Do you recall where you took this image?
**A I believe this was at KK.**
Q Okay. And do you recall why you took this image?
**A Again, just -- just documenting the state of the property and the property -- on the property -- on the premise.**
Q And did Mr. Cullen ask you to take this image?
**A I don't recall.**
Q Okay. And did Mr. Cullen indicate to you where these items were stored prior to taking this image?
**A Again, I couldn't fully recall other than I know that things were out of place when I was there due to the raid.**
Q But you were never there before?
**A I was told that things were disheveled, out of place.**
Q Okay.
**A Correct, I had never been there before.**
Q Okay.

Page 119

**A To KK.**
Q Okay. Now if you want to go to image R P7140009. That is 11 of 68 in the Destruction folder.
**A Last two numbers were 99 you said?**
Q 09.
MR. MURPHY: Okay.
BY MS. HOUGH:
Q So this looks like Mr. Cullen and then some items in perhaps a basement?
**A Correct.**
Q All right. Do you recall when you took this photograph?
**A I believe that would have been in the summer of 2010.**
Q Okay. And do you recall where you took this photograph?
**A I believe this was the basement of 17th.**
Q Okay. And do you recall if Mr. Cullen asked you to take this photograph?
**A I don't believe so. I don't recall.**
Q Do you recall the purpose of taking this photograph?
**A I was there with my camera, I was documenting the state of the property and the property on**

Page 120

**the premise.**
Q Did Mr. Cullen indicate to you where he stored these items normally?
**A Not that I can recall.**
Q Okay. And what exactly in this photograph, if you have a recollection, were you trying to capture?
**A The scope of the basement from this angle.**
Q Okay. And had you ever been in that basement prior to this?
**A Yes.**
Q Okay. And how long before this had you been in the basement?
**A It was -- it was at the same time that I had been there previously that I discussed in the deposition, the previous deposition.**
Q Okay. So maybe 2009?
**A Correct. Yeah, 2009.**
Q Okay. All right. If you want to go to image R P7140016. And this is 18 of 68 in the Dropbox in the folder titled "Terry Destruction." Let me know when you get there.
**A I'm here.**
Q So this looks like two boxes of -- it looks like some kind of supplies?

Page 121

**A Correct.**
Q Do you recall when you took this?
**A I believe this would be in the summer of 2010.**
Q And do you recall where you took this?
**A I believe this would be in the basement of 17th.**
Q And do you recall why you took this?
**A I was there documenting in this case the state of the property on the premises, including also -- again, what I previously stated about these are -- these are parts to then create enclosures for animals, which we had previously discussed. And, again, just stating that Terry had such property and had the intention of creating more animal enclosures for future animal caretaking.**
Q Did you think it unusual if things were in disarray that these items were still nicely packed?
**A Not particularly.**
Q Okay.
**A I thought it was lucky.**
Q Do you recall where Mr. Cullen had stored these?
**A I don't. I don't know where he stored them. I**

Page 122

**just know where they were in the photo that I took.**
Q All right. If you want to take a look at image R P7140015, this is 17 of 68 in that Destruction folder. Let me know when you're there.
A **I'm there.**
Q Okay. It looks like a black rack of some kind?
A **Correct.**
Q Okay. Do you recall taking this photograph?
A **I do.**
Q When?
A **This would have been in the summer of 2010.**
Q Where?
A **In the basement of 17th.**
Q Okay. And do you recall why?
A **The reasons I've stated already, just documenting the property on the premise. And, again, they're parts for creating snake enclosures or animal enclosures, detailing the level of care that was intended for the animals that were taken.**
Q Okay. And Mr. Cullen, did he ask you to take this photograph?
A **Not that I recall.**

Page 123

Q Okay. And did it seem unusual to you that these racks were left intact?
A **It seemed lucky. I don't know exactly where they were other than where they were when I was there taking the photo, but I thought it was incredibly lucky based on all the other property damage that had transpired.**
Q Okay.
A **And they -- there also are -- or just because they appear to be fully intact in the photos, I'm not trying to make it sound like they are. I don't know.**
Q Okay. Now I am going to go to image 47 of 68, R P7140063. Looks like these are some more plastic bins. It looks like these are some more plastic bins. It might be the same image.
A **I believe it is.**
Q Does it seem unusual to you that these bins for the care of animals were left intact?
A **Again, I thought it was lucky.**
Q Lucky. Okay.
A **Yeah. For all the other damage that existed on the property.**
Q Okay. So if you want to go to image R P7140033, image 29 of 68.

Page 124

MR. MURPHY: There.
BY MS. HOUGH:
Q Okay. Do you recall taking this photograph?
A **I do.**
Q Where?
A **I believe this would have been at 17th.**
Q Okay. Do you recall when?
A **I believe this would have been in the summer of 2010.**
Q Okay. And do you recall why?
A **Again, documenting the state of -- of the property therein.**
Q So in the photograph there are neatly stacked plastic bins.
Was this to document supplies?
A **I was documenting what was there.**
Q Okay. Did you find it unusual that these were nicely stacked when the property was allegedly in disarray?
A **I don't recall, and I'm not -- I'm not sure if this area was -- had any disarray. The disarray was primarily on other areas.**
Q Okay. This is 17th Street?
A **I believe so.**
Q Did Mr. Cullen indicate to you any roof damage

Page 125

at this property?
A **I don't recall.**
Q Okay. Any water damage?
A **There was -- there was water damage in the basement that we discussed in the previous deposition.**
Q Okay. Of your images did you capture any images of the water in the basement?
A **I -- while I was there -- at which location are we talking about?**
Q 17th Street.
A **17th Street the water had been dumped and then left in the space. So it had already been -- this was, you know -- we're talking about the summer of 2010. That obviously happened in the spring of 2010. So I didn't see the actual liquid water; I just saw the damage from the water.**
Q Okay. Did you document the damage from the water in any of your images?
A **I believe I documented part of the basement of 17th that would show the wall destruction. And I'm not sure if -- I --**
Q What about the water damage?
A **I believe -- I would -- I thought there would**

Page 126

be an indication of that there, but I don't recall.
Q Okay. So you don't -- so when you were at 17th Street, did you attempt to document any and all damage that you saw at that property?
A I was -- I was going through taking pictures, not necessarily -- I don't think I documented every single thing. There was so much. It was quite overwhelming and quite tragic, to be honest.
Q Okay. But you recall from your deposition last time you asserted you saw water damage in the basement of 17th, correct?
A Correct.
Q Do you recall opting not to take images of that?
A I don't recall opting not to, no.
Q Okay. Did you take any images of any water damage at 13th Street?
A I'm not -- not that I'm aware of.
Q Okay. But you recall seeing water damage at 13th Street?
A Correct.
Q Okay. Can you recollect why you didn't take pictures of that damage?

Page 127

A We were only in the area for a very short amount of time, and it was also incredibly dark.
Q Okay. Let me direct your attention to photograph -- I've just got a couple more -- R PC290072. And this is image 66 of 68 in the folder.
A What was --
MR. MURPHY: What was the last --
MS. HOUGH: Last two are 72, Mark. So PC290072.
BY MS. HOUGH:
Q Do you recall taking this photograph?
A I do.
Q When?
A The summer of 2010, I believe.
Q Okay. And where, do you recall?
A I don't fully recall. It could have been -- it's at one of the three properties. I don't really recall.
Q And do you recall why?
A Just documenting the recordkeeping that Mr. Cullen had done for an animal.
Q And did he ask you to document his recordkeeping?

Page 128

A Not that I recall.
Q Okay. If you could go to image R PC290073, this is image 67 of 68. Containers with newspaper. Do you recall when you took this image?
A This would have been the summer of 2010.
Q Do you recall where you took this image?
A I believe this is in the basement of 13th. And so I can therefore amend what I previously just said about not being aware. I believe this is the same -- same image, this -- I believe -- I'm not 100 percent certain, but I believe that the note card that's depicted in this image is the note card that we just saw.
Q Okay. This is the basement of 13th?
A I believe so.
Q Okay. Just a little while ago you said it was dark. And so you didn't --
A I'm sorry. You caught me. You are correct. I did this at the beginning of the deposition too. This is 17th. This is 17th.
Q 17th.
A My mistake. I -- the number's just inverted. My mistake. So scratch that. We are in the basement of 17th.

Page 129

Q Okay. And it looks like the basement floor is on the right-hand corner there; is that correct?
A Incorrect. The right-hand corner would be another lid or plastic something. The basement floor would be on the bottom left.
Q Okay. Your image -- okay. All right. I think you're looking at it in a different way.
A Oh, yeah. So you're right, yeah.
Q Okay. Do you recall why you took this photograph?
A I was there with my camera. I was documenting what was at the property at the time.
Q Okay. And this would have been -- do you recall if this was a container for animals?
A It could have been.
Q Okay. Were you asked to take this picture?
A Not that I remember.
Q Okay. R P7140086. One more just out of curiosity. 59 of 68.
A Sorry, say that again. What were the numbers that you said?
Q R P7140086. Are you there?
A Um-hmm.
Q Do you recall where you took this photograph?

Page 130

A **I believe this would have been at 13th.**
Q Okay. Do you recall when you took this photograph?
A **I believe it would have been in the summer of 2010.**
Q And do you recall why you took this photograph?
A **Documenting the state of the property therein.**
Q And what in this photograph do you recall documenting about the state?
A **Or just -- what was at the property at the time. I like elephants, and I noticed there was an elephant statue and I took a photograph of it while I was there with my camera.**
Q Was it broken at all?
A **I don't know.**
Q Oh, okay.
A **It was high on -- it was above on a shelf.**
Q Okay. But intact?
A **I don't know.**
Q Okay. R P7140044. It is 36 of 68 in that folder. Looks like an office.
A **You said 14?**
Q 44. Last two are 44.
A **44. Correct.**
Q Do you recall when you took this photograph?

Page 131

A **I believe it would have been in the summer of 2010.**
Q Do you recall where you took this photograph?
A **I believe this was at KK.**
Q Okay. And do you recall why you took this photograph?
A **I was there with my camera documenting the state of the property at the time.**
Q Had you ever seen this office before?
A **I don't believe so.**
Q Okay. Did Mr. Cullen indicate to you this was damage -- indicate to you that this was in some kind of disorder?
A **The general property and -- yes. Yes, it was not supposed to look that way.**
Q And he did not ask you to take a photograph?
A **I don't recall particularly, but I was there with my camera.**
Q Okay. All right. So are you able to look at all of the photographs that are presented within Exhibit 46 today kind of just all on one screen or by scrolling? Because I'm not going to go through any additional individual photographs, but I do want to ask just a couple of quick questions about the photographs in

Page 132

their aggregate.
A **Okay.**
Q Let me know if you can do that.
A **I mean, I can see them, I can scroll through and see previews.**
Q Okay. So is it fair to say that the images of supplies for the keeping of animals were taken in the year 2010?
A **I believe so.**
Q Okay. And is it fair to say you took those to document how well Mr. Cullen cared for his animals?
A **As partial evidence to that --**
Q Evidence --
A **Yeah, as partial evidence to show the -- yeah, the amount of materials, the amount of infrastructure that had been invested in, correct.**
Q Okay. And for what purpose were you gathering that evidence?
A **From knowing him in the past, from knowing the care that he had given his animals and just, again, seeing in the news or everything that had happened -- had already transpired, that had -- trying to speak to -- that spoke to what**

Page 133

**otherwise I knew.**
Q And did you think it unusual that all of these supplies for this purpose were not in disarray?
MR. MURPHY: I'm going to object to the question as asked and answered. I have no idea what this has to do with anything. Do you really need to ask him again?
BY MS. HOUGH:
Q Okay. I'm just saying in the aggregate. So I'm not doing each individual photograph.
I'm just saying did you find it unusual that all of these supplies were not in disarray?
MR. MURPHY: You asked him specifically as to each photograph --
MS. HOUGH: Okay.
MR. MURPHY: -- and he answered. So I'm going to assume that his answer to the aggregate's going to be the same.
MS. HOUGH: Okay.
MR. MURPHY: I guess I can't stop you from asking it, but now we're getting off the trail, I think.
MS. HOUGH: Then I have no further questions.

Page 134

MR. MURPHY: I have two questions for Mr. Raasch.

EXAMINATION

BY MR. MURPHY:

Q I don't remember if we went over this in the last part of the deposition, but you've been noticed up for one area, including a conversation you had with the DNR with Analise Lindborg I think her name is, L-I-N-D-B-O-R-G?

A **As best I can recall.**

Q What was your conversation with Ms. Lindborg?

A **I was discussing whether or not a state permit was needed for federally listed endangered animals nonnative to the state.**

Q So what do you know about Ms. Lindborg?

A **I know that she worked for the correct department to discuss the matter with in the DNR.**

Q Do you remember the name of the department?

A **I would have to look that up.**

Q And do you remember when you had this conversation with her?

A **In 2019.**

Q How long was the conversation?

A **Several minutes.**

Page 135

Q Did she have to go check anything, or did she -- you know, how did she handle the call?

A **She handled it professionally, but she was very adamant that no statute or permit was required or there was nothing to suggest that anything was needed for a nonnative animal.**

Q Have you had the opportunity to look at the inventories in this case at MADACC and vis-a-vis Mitchel Kalmanson and perhaps others?

A **Yes.**

Q Were you familiar with the plaintiff's inventory of animals as of the time of the raid?

A **Yes.**

Q Do you have any comment as to the inventories as to -- the listed inventories that you reviewed as to the inventory that you knew --

MS. HOUGH: Timeout. Can we go off the record for a second here, Mark?

MR. MURPHY: Sure. Off the record.

(Discussion off the record.)

MR. MURPHY: Let's go back on the record.

BY MR. MURPHY:

Q And Ms. Lindborg, did she hesitate? Did she

Page 136

check anything? Was she able -- or in your opinion did she just answer this off the top of her head? What was her response?

A **It seemed -- it seemed more like she knew what she was talking about and was very ad- -- like straightforward saying, nope, don't worry about it, not a problem. And I was more adamant saying I want to cross all my T's and dot all my I's making sure that everything was aboveboard. And so for every question that I had, she answered almost exactly the same.**

Q Okay. And then we were talking about the inventories. I guess my point is, between the police inventory, the MADACC inventory, and now there's an inventory by Mitchel, what is your comment, if any, as to the inventory of the animals seized from plaintiffs?

A **So there are numerous inventories, as you mentioned. They vary in degree and numbers, and some are better at identifying the animals than others. There seem to be mistakes in virtually every inventory that I've seen that came from the City or from MADACC or the police. But there are some that have more complete numbers, there are some that have**

Page 137

**better identifications or specifications as to the condition and specific type of the animals. There definitely are better lists than others.**

Q In terms of the police and MADACC inventories, do you believe that they tend to be accurate, inaccurate, other? What is your comment on them in terms of them covering all the animals?

A **I would say --**

MS. HOUGH: And I'm just going to object real quick to this whole line of questioning, because the questions you're asking him do not relate to what we have been noticed up as the purpose of this witness.

MR. MURPHY: Well, you're being noticed up right now of whatever information he may have --

MS. HOUGH: Okay.

MR. MURPHY: -- and we can fight about it. I'm just asking him to comment, because he's familiar with the inventory, as to the inventories that the police and MADACC did.

BY MR. MURPHY:

Q Do you know if the police and MADACC inventories identified all the animals that were taken out of the house or at least all the

animals that were taken from plaintiffs?

A **I don't believe they do.**

MR. MURPHY: Okay. That's all I have.

EXAMINATION

BY MS. HOUGH:

Q Okay. Just a couple of follow-up questions for you.

So you just stated that you spoke to somebody from the DNR in 2019 about federal permitting; is that correct?

A **That's correct.**

Q Were you asked to call them?

A **No.**

Q Why did you call them?

A **I was curious about the Statute 29.604.**

Q Why were you curious about that statute?

A **There was a question as to whether or not it pertains to keeping -- keeping animals with an endangered -- endangered animals with or without a state permit.**

Q Okay. And that was your question?

A **Correct.**

Q For your own personal purposes?

A **Correct.**



Q Okay. And then you were asked a couple of questions about some inventories, MPD inventories, an expert witness inventory.

Were these documents given to you by someone?

A **They were available to me. I was able to look at them, yes.**

Q Where were they available?

A **With Mr. Terry Cullen.**

Q Did he ask you to look at these?

A **I was interested in looking in them -- at them.**

Q Okay. So you asked him to look at them?

A **While they were being reviewed, I also reviewed them.**

Q So while Mr. Cullen was reviewing the inventories?

A **Correct.**

Q And how recent was that?

A **I can't recall. It's -- I've looked at a number of different inventories over the span of everything that's transpired here with this -- with this legal case.**

Q And would you say it was in the last year?

A **To a degree. I may have seen something prior to that, but yes, within the last year.**



Q Okay. And then were you familiar with Mr. Cullen's entire inventory in 2010?

A **I was familiar with portions of it.**

Q Okay. Were you ever provided a list in 2010 of the animals Mr. Cullen possessed?

A **Not that I recall.**

MS. HOUGH: Okay. I have no further questions.

MR. MURPHY: Okay. Fine with me. Is that it?

MS. HOUGH: That's it.

(Proceedings concluded at 3:46 p.m.)



STATE OF WISCONSIN )
) SS:
COUNTY OF MILWAUKEE )

I, Sarah A. Hart, RPR, RMR, CRR, and Notary Public in and for the State of Wisconsin, do hereby certify that the preceding deposition was recorded by me and reduced to writing under my personal direction.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof, I have hereunder set my hand and affixed my seal of office on this 14th day of September, 2020.

SARAH A. HART, RPR/RMR/CRR

Notary Public

In and for the State of Wisconsin

My commission expires October 9, 2023.